IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DONALD MIDDLEBROOKS, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **CAPITAL CASE** |
| V. | ) | No.    3:19-cv-01139 |
| | ) | |
| | ) | |
| TONY PARKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS COMPLAINT FOR INJUNCTIVE RELIEF**

The defendants' arguments in their motion to dismiss are unavailing.

Middlebrooks' claims are not barred by the statute of limitations or by res judicata.

Accordingly, the Court should deny the motion to dismiss.

**I.      Middlebrooks' action is timely.**

The defendants contend that the plaintiff's complaint is untimely. This

argument misapprehends the governing law. The defendants point the Court to

*Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007) and *Irick v. Ray*, 628 F.3d 787 (6th

Cir. 2010), as providing sufficient guidance to resolve this case. Those cases stand

for the proposition that in lethal injection protocol challenges, the statute of

limitations "begins to run either 1) upon the conclusion of direct review in the state

court or the expiration of time for seeking such review, or 2) when the particular

method of execution is adopted by the state." *Irick*, 628 F.3d at 788.

1

This approach fails to consider the most basic variable in this litigation: that "prisoners must identify an alternative that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'" *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 52 (2008)). Necessarily, feasibility and ease of implementation shift in relation to a number of factors that affect the availability of items such as lethal injection chemicals and the relative hardship upon the state in implementing a proposed alternative. This is particularly true because the Sixth Circuit has tied feasibility to market conditions and the regulatory environment. Under the governing standard, a plaintiff must demonstrate that the state can obtain the proposed alternative by "ordinary transactional effort." *In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017). The level of transactional effort required will obviously be tied market forces such as supply and demand, which are dynamic and changing. This particular market, moreover, is subject to a regulatory regime, such that changes in that regulatory scheme affect the availability and feasibility of acquiring items like lethal injection chemicals.

Central to this dispute is the availability of pentobarbital to penal institutions. In recent history, it has been difficult for penal institutions to obtain pentobarbital for the purpose of carrying out executions. *See, e.g.*, Susie Nelson, *Lethal Injection Drugs' Efficacy and Availability for Federal Executions*, NPR News, https://www.npr.org/2019/07/26/745722219/lethal-injection-drugs-efficacy-and-availability-for-federal-executions. Due to a number of factors, discussed in greater

2

length in this response, this is no longer seems the case. For example, Attorney General Barr has stated that pentobarbital is "widely available," rendering federal executions utilizing the drug as feasible. Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. Times, July 25, 2019, A1, https://www.nytimes.com/2019/07/25/us/politics/federal-executions-death-penalty.html. Numerous states have been able to successfully acquire and utilize pentobarbital to execute individuals. Because pentobarbital is now readily available, conditions have shifted, making the plaintiff's action timely.

The Sixth Circuit has held that the mere fact the federal government and other states have obtained pentobarbital did not mean Ohio could readily obtain pentobarbital. *In re Ohio Execution Protocol*, 860 F.3d at 891. That may have been true with respect to Ohio in 2017 but that was more than two and a half years ago. *Id.* at 884. More fundamentally, however, the ability for an increasing number of states to obtain pentobarbital cannot be ignored either. Challenges to lethal injection protocols are "fact-dependent inquir[ies]." *Arthur v. Thomas*, 674 F.3d 1257, 1260 (11th Cir. 2012). The fact that some states have been able to obtain the drugs successfully suggests a market swing, such that suppliers of the drug are available. Under the governing law, the State "need not already have the drugs on hand." *In re Ohio Execution Protocol*, 860 F.3d at 891. And "[e]quity, as a rule, will not reward those who sit on their hands." *Interactive Media Corp. v. Imation Corp.*, No. CIV.A. 12-11364-RGS, 2012 WL 4058064, at *1 (D. Mass. Sept. 13, 2012).

In other words, the State may not feign frustration when it has not undertaken meaningful efforts to pursue an alternate means of execution. "An inmate seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019). In fact, the Supreme Court envisions that "a prisoner may point to a well-established protocol in another State as a potentially viable option." *Id.* By selecting an alternative method that is widely utilized, the plaintiffs here have done just that.

In this type of litigation, the availability of a feasible alternative is a condition precedent to any actionable claim. Without such an alternative, a § 1983 challenge to a lethal injection protocol is simply not a colorable claim. *Glossip*, 135 S. Ct. at 2737. This reality is all the more certain in light of *Bucklew*, where the Supreme Court emphasized that "distinguishing between constitutionally permissible and impermissible degrees of pain is a necessarily comparative exercise." *Bucklew*, 139 S. Ct. at 1116. In light of that new standard, plaintiffs must make a threshold assessment prior to even filing an action to assess the relative degree of suffering that will be inflicted by comparing the State's current method of execution with a proposed alternative. Under the State's theory, a plaintiff would have to bring a lawsuit at a time when he knew that an alternative method was unavailable or infeasible. Such an action would be destined to fail, as the plaintiff would initiate an action knowing that he was unable to carry his ultimate burden. This is nonsensical and makes any remedy available to a prisoner illusive. Indeed,

4

where there is a right, there is a remedy. *Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("The very essence of civil liberty certainly consists in the right of every indicial to claim the protection of the laws whenever he receives an injury."); *Ashby v. White* (1703) 92 Eng. Rep. 126 ("If the plaintiff has a right, he must, of necessity, have a means to vindicate and maintain it, and a remedy, if he is injured in the exercise or enjoyment of it; and, indeed, it is a vain thing to imagine a right without a remedy."); William Blackstone, Commentaries on the Laws of England, Vol. II 23 (1916) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever a legal right is invaded.").

A simple hypothetical demonstrates the infeasibility of the State's approach. Imagine an individual whose death sentence became final on January 1, 2020. 366 days later, a new medication is invented that substantially lowers the risk of suffering an inmate might experience during execution. Under the State's theory, a condemned individual could never challenge the state's execution protocol because more than a year had passed since the individual's conviction had become final and there was no intervening change in state protocol. The requirement initiated in *Baze*, that an individual must propose a feasible alternative, creates an arduous challenge to this type of litigation. The state's approach seeks to transform this difficult challenge into an impossibility. Taken to its logical extreme, Plaintiffs could show up at Respondents' doorstep with sufficient quantities of pentobarbital

5

in hand only to have Respondents refuse the drugs and Plaintiffs would have no recourse. Such a result is perverse.

While the *Cooey II* standard provides a baseline for determining the applicable statute of limitations, that decision is prior to *Bucklew*. As detailed below, *Bucklew* transformed the legal landscape and sheds a new light upon the comparative harm analysis in these types of cases. As such Plaintiffs colorable claim only arose recently due to the transformed legal landscape and changes in the availability of lethal injection chemicals.

The requirement that individuals propose an alternative means of execution requires the consideration of when a plaintiff exercising reasonable diligence could become aware of a change in the availability of an alternative means of execution. The relevant inquiry in this instance is when could these plaintiffs become aware that pentobarbital was a feasible and available alternative to Tennessee's three drug midazolam cocktail. Here, the issuance of OLC opinion on May 3, 2019, represents a material change in circumstances. As such, the plaintiff's action was timely, as the instant litigation commenced within one year of that date.

Not only is this approach sensible, it is grounded in the law. As the Fifth Circuit has held in similar circumstances, "the limitations period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Walker v. Epps*, 550 F.3d 407, 414 (5th Cir. 2008) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)). Here, Plaintiffs injury is excruciating pain and suffering which is avoidable

due to recent changes in the law and market which makes a substantially less painful execution method available. The pivotal moment in this case, therefore, is when a plaintiff exercising diligence could have discovered an available alternate means of execution. Several factors contributed to this awareness, specifically the utilization of pentobarbital in other states, the federal government's adoption of a pentobarbital protocol, and the OLC opinion paving the way for importation of pentobarbital. This last factor is critical because it opened a commercial avenue for Tennessee to acquire pentobarbital through "ordinary transactional effort." *In re Ohio Execution Protocol*, 860 F.3d at 891. Before the OLC opinion, the State of Tennessee consistently maintained that pentobarbital was an unavailable and infeasible option. *See, e.g., Abdur'Rahman v. Parker*, 558 S.W.3d 606, 624 (Tenn. 2018), *cert. denied sub nom. Zagorski v. Parker*, 139 S. Ct. 11 (2018), and *cert. denied sub nom. Miller v. Parker*, 139 S. Ct. 626 (2018), and *cert. denied*, 139 S. Ct. 1533 (2019) (describing the testimony during the 2018 lethal injection trial in Tennessee chancery court of TDOC's Commissioner and Deputy Commissioner "regarding TDOC's unsuccessful efforts to obtain pentobarbital for use in the lethal injection protocol"). With the effective de-regulation of the market for importation of lethal injection chemicals, Tennessee may no longer legitimately claim that such an option is infeasible under the governing law.

As such, the statute of limitations runs from the point at which a plaintiff exercising diligence could have been aware of an available and feasible alternate

means. In this case, the plaintiffs commenced action within one year of that date and their action is timely.

Furthermore, when, as here, factual disputes do not permit an adjudication of the statute of limitations issues, dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is inappropriate. "[A] motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir.2001)). Dismissal pursuant to 12(b)(6) is only appropriate if it "clearly and unequivocally appears on the face of the complaint" that the statute of limitations has run. *Reid v. Baker*, 499 F. App'x 520, 524 (6th Cir. 2012). Moreover, "statute of limitations defenses are non-jurisdictional and may be waived." *Mcintyre v. Ogemaw Cty. Bd. of Commissioners*, No. 15-CV-12214, 2016 WL 4917537, at *6 (E.D. Mich. Sept. 15, 2016); *Miller v. Volkswagen of Am., Inc.*, 889 F. Supp. 2d 980, 986 (N.D. Ohio 2012) ("the statute of limitations is not jurisdictional"); *accord Arbaugh v. Y&H Corp.*, 546 U.S. 500, 502, (2006) ("[W]hen Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character.").

8

## II.    The action is not barred by the doctrine of res judicata.

Plaintiffs allege that Tennessee's three-drug protocol, adopted as the sole lethal injection protocol on July 5, 2018, violates the Eighth Amendment's prohibition against cruel and unusual punishment. Complaint, D.E. 1, PageID# 4-5. Defendants have moved to dismiss, arguing that the state court's adjudication of *Abdur'Rahman v. Parker*[1] resolved the issues raised by the plaintiff's current complaint. Defendants ask this Court to bar relitigation of the plaintiff's claim under the doctrine of res judicata. D.E. 8 (Motion); D.E. 9 (Memorandum).

The plaintiff's challenge to Tennessee's lethal injection protocol is a new claim, distinct from any previously adjudicated in state or federal court. Since the state court's 2018 decision in *Abdur'Rahman*, the legal and factual landscape has changed. The Supreme Court has held that such intervening changes give rise to a new constitutional claim. *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) ("In our view, such changed circumstances will give rise to a new constitutional claim. This approach is sensible, and it is consistent with our precedent.").

In *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019), released after the state court's 2018 *Abdur'Rahman* decision, the Supreme Court merged the first and second prong of a method-of-execution challenge, such that such a challenge now requires a comparison of the pain caused by the challenged protocol and the alternative proposed by an inmate. This change in the legal analysis changes the nature of the

---

[1] 558 S.W.3d 606 (Tenn.), *cert. denied sub nom. Zagorski v. Parker*, 139 S. Ct. 11 (2018), *and cert. denied sub nom. Miller v. Parker*, 139 S. Ct. 626 (2018), and *cert. denied*, 139 S. Ct. 1533 (2019).

9

claim and the applicable legal standard. In addition, the plaintiffs have presented an alternative method not adjudicated by the state court—a two-drug protocol omitting the paralytic second drug—and have alleged that pentobarbital is now available. Last, res judicata is unavailable as a matter of Tennessee res judicata law because (1) the applicability of the defense does not appear "clearly and unequivocally" on the "face of the complaint;" and (2) defendants have failed to introduce portions of the record necessary to establish the application of the doctrine.

For these reasons, res judicata cannot bar the plaintiffs from litigating their constitutional challenge. The plaintiffs have alleged sufficient facts to entitle them to relief, and defendants' motion to dismiss should be denied.

## A. Tennessee res judicata jurisprudence

As this Court has held, "Congress has dictated that state court judicial proceedings 'shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." *Sutton v. Parker*, No. 3:19-cv-00005, at *6, 2019 WL 4220896 (M.D. Tenn. Sept. 5, 2019), *appeal docketed*, No. 19-6135 (6th Cir. Oct. 7, 2019) (quoting 28 U.S.C. § 1738)). "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so[.]" *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Thus, the parties agree that Tennessee law governs any potential res

Case 3:19-cv-01139   Document 23   Filed 03/02/20   Page 10 of 35 PageID #: 280

judicata effect of the state court's judgment in *Abdur'Rahman. See* D.E. 9, PageID# 106 ("Tennessee law governs the res judicata effect of the state court's judgment.").

In Tennessee, a party asserting a defense predicated on res judicata must demonstrate that (1) the underlying judgment was rendered by a court of competent jurisdiction; (2) the same parties or their privies were involved in both suits; (3) the same claim or cause of action was asserted in both suits; and (4) the underlying judgment was final and on the merits. *Jackson v. Smith*, 387 S.W.3d 486, 491 (Tenn. 2012).

Tennessee follows the "transactional" approach to res judicata used by the federal courts and multiple other states:

> The doctrine of res judicata "extends only to the facts in issue as they existed at the time the judgment was rendered, and *does not prevent a re-examination of the same question between the same parties where in the interval the facts have changed or new facts have occurred* which may alter the legal rights or relations of the litigants."

*Creech v. Addingon*, 281 S.W.3d 363, 380 (Tenn. 2009) (quoting *Banks v. Banks*, 77 S.W.2d 74, 76 (1934) (emphasis added)). Tennessee courts apply the transactional standard of res judicata "on a case-by-case basis, with *sensitivity to the facts of each proceeding*." *Id.* at 381 (emphasis added).

Here, the plaintiff's claim is not the same claim raised in previous litigation. In Tennessee, "even where two claims arise out of the same transaction, the second suit is not barred by res judicata unless the plaintiffs had the opportunity in the first suit to fully and fairly litigate the particular issue giving rise to the second suit." *Creech*, 281 S.W.3d at 382 (Tenn. 2009). The plaintiffs did not fully and fairly litigate their current constitutional challenge to the State's lethal injection protocol,

as the legal and factual circumstances of their current claim are different from the claim that was adjudicated in state court. Nor has any court considered the plaintiff's proposed two-drug alternative method of execution.

**B. Changes in the law and facts since the state court's ruling in *Abdur'Rahman* make the application of res judicata inappropriate here.**

Several changes since the state court's 2018 adjudication of *Abdur'Rahman* make the application of res judicata inappropriate here. First, *Bucklew* changed the legal framework for analyzing a method-of-execution challenge, now requiring that courts consider the pain and suffering of the challenged method only in comparison to the plaintiff's proposed alternative. Second, one of the plaintiff's alternatives—a two-drug protocol that omits the paralytic—was never considered by the state court. Third, pentobarbital is now widely available domestically and internationally.

**1. *Bucklew* changed the applicable legal standard for a method of execution claim, as it requires a comparative analysis between the challenged execution method and the proposed alternative method.**

The defendants claim res judicata applies because, "the single claim in this Complaint was one of the claims adjudicated in *Abdur'Rahman*." D.E. 9 at PageID# 107. [2] According to the defendants, "the causes of action are identical." *Id.* at

---

[2] The defendants also maintain that the complaint fails on the merits because of the preclusive effect of *In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019) (*Henness v. DeWine*) D.E. 9, PageID# 110. Because *Henness* was pled and litigated pre-*Bucklew*, the *Henness* complaint is distinct from the complaint here. *Compare Bucklew v. Precythe*, 139 S. Ct. 1112, (2019) (decided April 1, 2019) *with In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2019 WL 275646, at *1 (S.D. Ohio Jan. 22, 2019) (denying motion for reconsideration of order denying motion for stay of execution and preliminary injection on Jan. 22, 2019). Just as res judicata does not apply in light of (1) the intervening change in the legal landscape created by *Bucklew's* requirement of comparative analysis, and (2) the importance of the fundamental federal constitutional rights involved, collateral estoppel likewise does not apply to the petitioners' claims. *Baloco v. Drummond Co.*, 767 F.3d 1229, 1251

PageID# 108. The defendants are wrong that the claim presented here was adjudicated in state court. Further, even if that were the case, an exception to res judicata exists for cases involving developing constitutional principles and issues of broad public importance.

### 2.  Plaintiff's claim under *Bucklew* was not—and could not have been—previously adjudicated.

In *Bucklew*, the Supreme Court changed the legal analysis for method-of-execution challenges. The Tennessee Supreme Court's adjudication of *Abdur'Rahman* in 2018 applied the *Baze/Glossip* analysis. In *Baze* and *Glossip*, the Supreme Court articulated a two-prong analysis. Prong one required consideration of the risk of harm: "[P]risoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50). Prong two requires that "prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 52).

In *Bucklew*, the Supreme Court changed the analysis, holding that these two prongs are inextricably linked—that is, that no analysis of the suffering question posed by prong one is possible without comparing the suffering caused by challenged method of execution with the suffering caused by the proposed

(11th Cir. 2014) (holding that collateral estoppel is only applicable when "the issue at stake is identical to the one involved in the prior litigation").

13

alternative. The relevant inquiry as to the permissible degree of pain that an individual must endure is "necessarily a comparative exercise." *Bucklew*, 135 S. Ct. at 1126. "To decide whether the State has cruelly superadded pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by compar[ing] that method with a viable alternative." *Id.* (internal citations and quotation marks omitted).

Broadly characterizing the petitioners' claim as a "challeng[e to] the constitutionality of the current three drug protocol" (D.E. 9, PageID#104), the defendants' res judicata argument fails to engage with the legal framework applicable to plaintiff's post-*Bucklew* claim, which is decidedly different than the claim presented and adjudicated in state court. No court has adjudicated whether Tennessee's three-drug protocol is unconstitutional because it causes comparatively more pain than pentobarbital or the newly-proposed two-drug protocol that omits the torturous paralytic vecuronium bromide.  The Tennessee Supreme Court rendered its decision in 2018 solely on prong two—availability. *Abdur'Rahman*, 558 S.W.3d at 625. Where the plaintiff's *Bucklew* claim requires comparative analysis of the harm under the challenged protocol *viz* either alternative presented by plaintiffs (and where one of the two alternatives—pentobarbital—cannot be reasonably said to be "unavailable"), the state court litigation did not resolve the same cause of action under Tennessee law on res judicata.

A recent Tennessee Supreme Court opinion rejecting application of res judicata, illustrates the fallacy of the defendants' argument. In *Napolitano v. Bd. of*

*Prof'l Responsibility*, 535 S.W.3d 481 (2017), the court resolved the claims of a disgruntled client against his attorney. The attorney moved to dismiss the case, citing the Tennessee Board of Professional Responsibility's previous dismissal of a complaint by the client against the attorney. *Id*. at 495. The Tennessee Supreme Court held that res judicata did not apply; despite all claims stemming from the same transaction (the attorney's representation of the client), the two issues were deemed distinct. "The first dispute was based on the fee dispute between Client and Attorney," as contrasted with the later dispute, which involved ethical issues of the attorney's handling of client's money in his trust account. *Id*. at 497. Just as the *Napolitano* attorney attempted to define the dispute at a high level of generality (a fee dispute) to avoid litigating his ethical violation, defendants here attempt to define the legal issue at a high level of generality (the constitutionality of the lethal injection protocol) to avoid litigating the plaintiff's claim which is distinct from that which was presented in state court, given the changes in the legal and factual context. Plaintiffs could not previously litigate the constitutionality Tennessee's three-drug protocol, as compared to the two-drug protocol, because *Bucklew*'s comparative harm analysis was not yet the law of the land. Where the claim before this Court is wholly distinct from that before the state court, res judicata cannot apply.

### 3. *Bucklew* is an "intervening change in the applicable legal context."

In 2019 the Supreme Court reaffirmed that "an intervening change in the applicable legal context" creates an exception to issue preclusion. *Herrera v.*

*Wyoming*, 139 S. Ct. 1686, 1697 (2019) (cleaned up) (quoting *Bobby v. Bies*, 556 U.S. 825 (2009)) (citing Restatement (Second) of Judgments § 28, Comment *c*). Like the United States Supreme Court, federal courts, and several other states, Tennessee has also recognized the "intervening change in the applicable legal context" exception. *Anderson v. Washburn*, No. M201800661CCAR3HC, 2019 WL 453957 (Tenn. Crim. App. Feb. 5, 2019), *appeal granted, decision rev'd on other grounds*, No. M201800661SCR11HC, 2019 WL 3071311 (Tenn. June 27, 2019), *appeal granted, cause remanded* (June 27, 2019).

In *Herrera*, a member of the Crow Tribe was convicted for off-season hunting, notwithstanding his argument that he had a protected right to do so under an 1868 Treaty between the Crow Nation and the United States. The state trial court refused to allow him to advance a treaty-based defense because of a federal appellate court ruling years before that the Crow Tribe's off-reservation hunting rights had expired upon Wisconsin's statehood, and he was convicted. *Id.* at 1693. Despite Herrera's argument that a later Supreme Court case had repudiated the appellate court ruling about his tribe's hunting rights, the state appellate court affirmed his conviction, concluding that the federal court ruling was still good law (such that his hunting rights under the treaty had, in fact, expired) or, alternatively, that the federal court ruling "merited issue-preclusive effect against Herrera because he is a member of the Crow Tribe, and the Tribe had litigated the [federal] suit on behalf of itself and its members." *Id.* at 1694. The Supreme Court reversed, holding that where intervening decisions "undercut" the *reasoning* of the

16

prior adjudication, the prior adjudication did not preclude Mr. Herrera from relitigating the issue. *Id.* at 1697 (citing *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 363 (1984) (refusing to find a party bound by "an early decision based upon a now repudiated legal doctrine")); *Montana v. United States*, 440 U.S. 147, 158–59 (1979) (asking "whether controlling facts or legal principles ha[d] changed significantly" since a judgment before giving it preclusive effect); *id.* at 157–58 (explaining that a prior judgment was conclusive "[a]bsent significant changes in controlling facts or legal principles" since the judgment); *Comm'r v. Sunnen*, 333 U.S. 591, 599 (1948) (issue preclusion "is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally").

Similarly, in *Bobby v. Bies*, 556 U.S. 825 (2009), a capital defendant sought issue preclusion for his claim that he was intellectually disabled and therefore exempt from execution under *Atkins*-exemption, based on an earlier, pre-*Atkins* state court opinion noting his intellectual disability. The Supreme Court found that the intervening issuance of *Atkins* required an exception to the doctrine of issue preclusion. *Id.* at 836. The court reasoned that, "even where the core requirements of issue preclusion are met, an exception to the general rule may apply when a 'change in [the] applicable legal context' intervenes." *Id.* 834 (quoting Restatement (Second) Judgments § 27, comment h).

The Sixth Circuit and district courts within the Sixth Circuit have also recognized the intervening change of law exception to res judicata. In *FCA US, LLC*

*v. Spitzer Autoworld Akron, LLC*, 887 F.3d 278 (6th Cir. 2018), the Sixth Circuit held: "[I]n some circumstances a significant change in the legal climate can warrant an exception to issue preclusion." *Id.* at 285. In *Hill v. Snyder*, the Eastern District of Michigan found that *Graham v. Florida,* 560 U.S. 48 (2010), represented "an evolution in Eighth Amendment jurisprudence that creates the possibility of relief for Plaintiffs on a claim that was previously unlikely to be viable," and allowed relitigation of an otherwise precluded claim. *Hill v. Snyder*, No. 10-14568, 2011 WL 2788205, at *3 (E.D. Mich. July 15, 2011).

This challenge involves an intervening change in the legal context surrounding the adjudication of Eighth Amendment challenges to lethal injection. Even if the court were to accept the defendants' broad characterization of the issues and find those similar to those litigated in *Abdur'Rahman,* the intervening change announced in *Bucklew* would require application of a *Herrera* exception to this case.

> **4. Tennessee courts have declined to apply the res judicata doctrine when a dispute involves "matters of special sensitivity;" or involves fundamental constitutional rights. Petitioners' claim is both.**

In Tennessee, an exception to the res judicata doctrine exists "when a dispute involve[s] matters of special sensitivity." *Jackson v. Smith*, 387 S.W.3d 486, 494 (Tenn. 2012). That exception generally arises "in cases of developing constitutional principles and issue of broad public importance." *Id.* (citing *Parnell v. Rapiodes Parish Sch. Bd.,* 563 F.2d 180, 185 (5th Cir. 1977)). As an example of this principle, the Tennessee Supreme Court cited with approval *Christian v. Jemison*, 303 F.2d 52, 54–55 (5th Cir. 1962), where the Fifth Circuit declined to apply res judicata to a

18

segregation issue in light of the intervening issuance of *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). *Jackson*, 387 S.W.3d at 494.

Federal courts, similarly, exempt fundamental constitutional questions from the res judicata doctrine. The Sixth Circuit has developed a two-step test for determining whether a federal claim is barred by a prior state court judgment, including whether application of the state res judicata principles are "inconsistent with a federal right that is fundamental in character." *Hemelberg v. City of Fraser*, No. 18-CV-12196, 2019 WL 247228, at *4 (E.D. Mich. Jan. 17, 2019) (quoting *Ludwig v. Twp. of Van Buren*, 682 F.3d 457, 460 (6th Cir. 2012)); *see also Richards v. Jefferson Cnty.*, 517 U.S. 793, 797, (1996)). As the Fifth Circuit held: "Faced with changing law, courts hearing questions of constitutional rights cannot be limited by res judicata. *Parnell v. Rapides Parish Sch. Bd.,* 563 F.2d 180, 185 (5th Cir. 1977); *Hill*, 2011 WL 2788205, at *3. The Fourth Circuit held: "Relitigation of an issue of public importance should not be precluded when there has been an intervening change in the applicable legal context." *Kania v. Fordham,* 702 F.2d 475, 476 n.2 (4th Cir. 1983).

Clearly, the plaintiff's allegation that the State's method of executing them violates the Eighth Amendment right to be free of cruel and unusual punishment implicates a "federal right that is fundamental in character." *Hemelberg*, 2019 WL 247228, at *4. Further, where *Bucklew* changed the legal landscape, determination of the constitutionality of Tennessee's lethal injection protocol post-*Bucklew* is an issue of broad public importance. Further, the plaintiff's claim that the State

19

intends to execute them in a cruel and unusual manner implicates a fundamental right and is an issue of "broad public importance," involving a "matter of special sensitivity." Tennessee law—as well as that of the Sixth Circuit— provides an exception to the general principles of res judicata in such a circumstance.

5. **Plaintiffs have material, new facts: The federal government has removed legal roadblocks to the importation of pentobarbital from foreign suppliers, and, as the U.S. Attorney has acknowledge, pentobarbital is now "widely available."**

a. **Legal obstacles to the importation of pentobarbital that existed at the time of the state court adjudication in *Abdur'Rahman* have been removed.**

Since the state court's ruling in *Abdur'Rahman*, there has been a sea change in the availability of pentobarbital. In 2012, a federal court ordered the Food and Drug Administration ("FDA") to block illegal imports of sodium thiopental. *Beaty v. Food & Drug Admin.*, 853 F. Supp. 2d 30, 41 (D.D.C. 2012), *aff'd in part, vacated in part sub nom. Cook v. Food & Drug Admin.*, 733 F.3d 1 (D.C. Cir. 2013). After that order, states and the federal government were unable to import sodium thiopental.

On May 3, 2019, federal government removed the legal roadblock to importation of pentobarbital. On that date, the U.S. Department of Justice Office of Legal Counsel ("OLC") issued an opinion concluding that the Food and Drug Administration (FDA) lacked jurisdiction to regulate lethal injection chemicals. D.E. 1-1, PageID# 29–30, "Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions," 43 Op. O.L.C. — (2019) ("OLC Opinion").

The OLC Opinion is binding on the FDA. *Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 922 F.3d 480, 484 (D.C. Cir. 2019) (noting that the OLC considers its opinions to be "authoritative" and "binding by custom and practice in the executive branch"); *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (explaining that the reasons supporting an agency's actions or inaction "constitute the 'working law' of the agency); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 925 F.3d 576, 594 (2d Cir. 2019) (noting that OLC memoranda have an "operative effect" that has a "binding rather than persuasive power"); Trevor W. Morrison, *Stare Decisis in the Office of Legal Counsel*, 110 Colum. L. Rev. 1448, 1464 (2010) ("OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled.").

Acknowledging that the FDA is bound by the OLC Opinion, an FDA spokesperson quickly issued the following statement indicating that the FDA would follow the OLC Opinion and not interfere with the importation of lethal injection chemicals except the sodium thiopental at issue in *Beaty*:

> DOJ's Office of Legal Counsel issued an opinion concluding FDA does not have jurisdiction over drugs or devices intended for use in the death penalty. FDA will follow the conclusion of the opinion to the extent permissible by the *Beaty v. FDA* order, which relates to sodium thiopental. Drug products that are not intended for use in lethal injection remain subject to FDA regulation.

Brennan, Zachary, *FDA to Follow DOJ Memo on Limiting its Regulation of Execution Drugs*, Regulatory Affairs Professionals Society (May 15, 2019) https://www.raps.org/news-and-articles/news-articles/2019/5/fda-to-follow-doj-memo-on-limiting-its-regulation.

The defendants speculate that the OLC Opinion is immaterial because OLC opinions do not have the force of law. Although the defendants are correct that OLC opinions are subject to judicial review, it does not follow that the executive branch's decision to cease FDA oversight of lethal injection drugs does not represent a change in circumstances. The judgment that the defendants posit has preclusive effect—*Abdur'Rahman*—was premised upon the unavailability of pentobarbital to Tennessee. *Abdur'Rahman*, 558 S.W.3d at 623. The OLC Opinion throws open the door to the international marketplace for states looking for pentobarbital.

The defendants seek to preclude the plaintiffs from litigating this case because of the Tennessee Supreme Court's prior determination that pentobarbital was unavailable to the State. Necessarily, the availability of lethal injection chemicals is an issue that is subject to changing circumstances. The OLC issued its opinion at a time when numerous states had not only obtained pentobarbital, but had also carried out executions utilizing protocols that included pentobarbital. *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse*, United States Department of Justice, https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse (last visited Jan 22, 2020) (noting that since 2010, 14 states have carried out over 200 executions utilizing pentobarbital). The OLC's opinion further reduced barriers to accessing pentobarbital by effectively ceasing FDA regulation of the importation of pentobarbital. OLC Opinion, D.E. 1-1, PageID# 29–30. This decision eliminated what has previously been understood as a barrier to states obtaining lethal injection

22

chemicals. *Charlie Savage, Justice Dept. Stop F.D.A. From Regulating Death-Penalty Drugs*, N.Y. Times, May 14, 2019, https://www.nytimes.com/ 2019/05/14/us/politics/justice-dept-fda-death-penalty-drugs.html (noting that the FDA has historically interfered with states' ability to obtain lethal injection chemicals). In the short time since *Abdur'Rahman* was decided, the FDA has been stripped of its regulatory authority to oversee lethal injection chemicals, numerous states have not only obtained but also utilized pentobarbital in executions, and the federal government has moved to resume executions utilizing pentobarbital, which Attorney General Barr has announced is now "widely available." Katie Benner, *U.S. to Resume Capital Punishment for Federal Inmates on Death Row*, N.Y. Times, July 25, 2019, available at https://www.nytimes.com/2019 /07/25/us/politics/federal-executions-death-penalty.html.

Defendants further argue that even if the OLC Opinion facilitates the importation of lethal injection chemicals, it does not follow that Tennessee will be able to obtain lethal injection chemicals due to the efforts of anti-death penalty advocates to restrict the importation of these items. These arguments are unavailing.

The defendants point to the D.C. Circuit's decision in *Cook v. Food & Drug Admin.*, 733 F.3d 1 (D.C. Cir. 2013), as evidence that the OLC Opinion does not change the legal landscape, by arguing that the OLC's conclusion conflicts with the court's holding in that case. D.E. 9, PageID# 108. This conclusion rests on an undiscerning reading of the court's decision in *Cook. Cook* pertained to the

importation of sodium thiopental. *Cook*, 733 F.3d at 4. There, the court determined that sodium thiopental was a "misbranded and unapproved new drug," which the FDA must regulate. *Id.* at 12.

At issue in the instant litigation is the availability of and potential use of pentobarbital. Unlike sodium thiopental, the FDA has approved pentobarbital. *Gissendaner v. Comm'r, Georgia Dep't of Corr.*, 779 F.3d 1275, 1279 n.5 (11th Cir. 2015) (noting that manufactured pentobarbital is subject to "FDA monitoring and standards"). The defendants' reliance on *Cook* is unfounded, as that case concerns a different drug, subject to a different monitoring regime. Accordingly, the defendants' contention that the importation of pentobarbital would conflict with the court's injunction in *Cook* is dubious. Nothing in that case pertains to pentobarbital, a compound the FDA has approved for use and importation. *Pentobarbital Sodium*, Food & Drug Admin., https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=206404 (last visited Jan. 21, 2020) (noting that injectable pentobarbital is FDA approved). Given this regulatory posture and the FDA's newly limited authority to regulate lethal injection chemicals, the defendants' arguments with respect to *Cook* are without merit.

Moreover, the defendants go on to speculate that Tennessee will not be able to obtain pentobarbital because anti-death penalty activists will impede the state's efforts to obtain pentobarbital. D.E. 9, PageID# 109. Such speculation in a motion pursuant to 12(b)(6) is not permitted. 12(b)(6) motions are subject to the familiar admonition that the "district court must accept as true the plaintiff's well-pleaded

facts and draw all reasonable inferences in favor of the complaint." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006). Here, the defendants are asking the court to do the exact opposite and infer that Tennessee cannot obtain pentobarbital based upon the hypothetical actions of "anti-death penalty advocates." D.E. 9, PageID# 109. The governing law does not permit such an inference. In fact, the court must make all reasonable inferences in favor of the plaintiffs in this instance. Having alleged and substantiated that the importation of pentobarbital is permitted, dismissal pursuit to 12(b)(6) is not appropriate.

The governing law is clear that an alternative execution method must not only be "'feasible'" but also "'readily implemented.'" *Bucklew*, 139 S. Ct. at 1129 (quoting *Glossip*, 135 S. Ct. at 2737–38). The plaintiffs have extensively documented that numerous states and the federal government can and have obtained pentobarbital. They have further shown that a historical barrier to obtaining lethal injection chemicals—FDA regulation—has been eliminated by the binding effect of the OLC Opinion. Although the plaintiffs must demonstrate that such an alternative is feasible and available, they need not acquire the means of their own death for the state. *See Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir.), *cert. denied sub nom. Price v. Dunn*, 139 S. Ct. 1542 (2019) (noting that it would be an "absurd result" to allow state inaction to defeat a claim of a viable alternative). Having demonstrated a change in the legal circumstances due to the widespread availability of pentobarbital and declining barriers to Tennessee's

acquisition of the drug, the plaintiffs have carried their burden to demonstrate that dismissal pursuant to 12(b)(6) is impermissible at this juncture.

>    **b.**    **The U.S. Attorney General has publicly stated that pentobarbital is "widely available."**

As the plaintiffs have alleged, United States Attorney General William Barr, has publicly represented that pentobarbital is "widely available." D.E. 1, PageID# 17. Indeed, in pending litigation in the district court in the District of Columbia, the federal government represented in October of 2019 that it had found a domestic bulk manufacturer properly registered with the Drug Enforcement Administration to provide the active pharmaceutical ingredient ("API") needed to compound pentobarbital and had selected a compounding pharmacy to produce an injectable solution. *Id.* General Barr's representations and the federal government's ability to find a domestic source of pentobarbital points to the reality of the changed circumstance as to the availability of pentobarbital. It is now an available and readily implemented alternative method of execution.

>    **c.**    **The changed circumstances as to availability of pentobarbital make the application of res judicata inappropriate here.**

The doctrine of res judicata in Tennessee "does not prevent a re-examination of the same question between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of the litigants." *Creech*, 281 S.W.3d at 380; *see also* Restatement (Second) of Judgments § 28 (1982) ("Even when claims in two actions are closely related, an intervening change in the relevant legal climate may warrant reexamination of the

26

rule of law applicable as between the parties."); *Herrera*, 139 S. Ct. at 1697; *FCA US*, 887 F.3d at 285. Further, for purposes of a motion to dismiss, a court must take all the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 758 (6th Cir. 2019); *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Here, there are "changed circumstances" and "new facts" as to the availability of pentobarbital that have changed since the state court proceedings. *West v. Parker*, 783 Fed. App'x 506, 517 (6th Cir. 2019) (Moore, J., concurring). In short, the plaintiff's case has reached a tipping point, wherein the Tennessee Supreme Court's conclusion that pentobarbital was unavailable is no longer tenable. Because the plaintiffs have demonstrated a material change in legal circumstances due to the OLC Opinion and the widespread use of pentobarbital, the *Abdur'Rahman* decision can longer have a preclusive effect. *FCA US*, 887 F.3d at 285. This type of litigation requires the plaintiffs to conduct the gruesome task of electing a method to effectuate their own deaths. In this case, the plaintiffs have done so and selected a method widely employed in the United States that, because of the OLC Opinion, has become all the more feasible. The law does not require more.

**III. Under Tennessee res judicata jurisprudence, the defendants are not entitled to dismissal: They have not shown support for their affirmative defense "clearly and unequivocally appears on the face**

**of the complaint," nor have they introduced portions of the record
necessary to establish the application of the doctrine of res judicata.**

Under Tennessee law, the defendants are not entitled to res judicata because

the applicability of the defense does not appear "clearly and unequivocally" on the

"face of the complaint":

> For a Tenn. R. Civ. P. 12.02(6) motion to be used as a vehicle to assert
> an affirmative defense, the applicability of the defense must "clearly and
> unequivocally appear[ ] on the face of the complaint." In other words,
> the plaintiff's own allegations in the complaint must show that an
> affirmative defense exists and that this defense legally defeats the claim
> for relief.

*Jackson v. Smith*, 387 S.W.3d 486, 491–92 (Tenn. 2012) (citing 5B Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 713–14 (3d

ed. 2004) (other citations omitted).

The Tennessee law of res judicata limits the determination of whether an

affirmative defense exists to the documents in the record:

> A party asserting a res judicata defense may generally prove its defense
> with a copy of the judgment in the former proceeding. However, if the
> judgment leaves any of the elements of the defense uncertain, the party
> asserting the defense must provide additional evidence. In other
> circumstances, the Court of appeals has stated that parties asserting a
> res judicata defense "must generally put in evidence the record or a copy
> of the record of the former case." While parties asserting a res judicata
> defense may introduce a copy of the entire record of the prior
> proceedings to support their motion to dismiss, *they are required to
> introduce only those portions of the record that are necessary to establish
> the application of the doctrine of res judicata.*

*Jackson*, 387 S.W.3d at 492 n.10 (internal citations omitted) (emphasis added).

In *Jackson*, the Tennessee Supreme Court considered Tennessee's res

judicata doctrine in the context of litigation involving a grandmother's attempt to

obtain court-ordered visitation with her granddaughter. After a court held that Ms.

28

Jackson was not entitled to visitation based on a petition she filed in 2009, the Tennessee General Assembly changed the legal standard for grandparents' visitation rights cases, and Ms. Jackson again sued the child's father (her daughter's widower), seeking visitation under the new law that was friendlier to grandparents' rights (that she helped get passed). *Id.* at 489–90. The child's father, Mr. Smith, moved to dismiss under Tenn. R. Civ. P. 12.02(6). *Id.* at 490.

The Tennessee Supreme Court held that "the trial court could have denied Mr. Smith's motion to dismiss, had Ms. Jackson requested the court to do so," because Mr. Smith did not support his motion with the record of their prior litigation. *Id.* at 492. Ms. Jackson's petition contained "no allegations that would give rise to a res judicata defense. It does not mention or even allude to Ms. Jackson's 2009 petition." *Id.* The Court found that "[w]hile Mr. Smith's motion to dismiss includes the details of the litigation relating to Ms. Jackson's 2009 petition, Mr. Smith did not file copies of the October 2, 2009 order or any other portions of the record of the 2009 proceedings along with his motion." *Id.* But instead of asking for the trial court to deny Mr. Smith's motion to dismiss, Ms. Jackson provided the materials he had failed to introduce. *Id.* at 492–93. She essentially cured Mr. Smith's legal error.

Here, the plaintiff's complaint clearly alleges a new cause of action based upon *Bucklew*'s comparative-harm analysis, a new proposed two-drug alternative, and new facts about the availability of the other alternative—pentobarbital. Plaintiff's complaint is facially sufficient to survive the defendants' affirmative

29

defense of res judicata. Nothing in the plaintiff's complaint "show[s] an affirmative defense exists" much less "that this defense legally defeats the claim," as required by Tennessee law. *Id.* at 492. Nor have Defendants attached the "portions of the record that are necessary to establish the application of the doctrine of res judicata." *Id.* at 486, n.10. Unlike Ms. Jackson, plaintiffs here have not cured defendants' legal error. Thus, this Court should deny the motion to dismiss, because the defendants failed to comply with Tennessee process for asserting a res judicata defense.

## IV. The Sixth Circuit's decision in *Henness v. DeWine* does not warrant dismissal of the plaintiff's complaint.

The defendants also maintain that the complaint fails on the merits because of the preclusive effect of *In re Ohio Execution Protocol Litig.*, 946 F.3d 287 (6th Cir. 2019) (hereinafter *Henness*).D.E. 9, PageID# 110. As an initial matter, *Henness* has no preclusive effect, because it was decided in the context of litigation for a preliminary injunction. *Abbott Labs. v. Andrx Pharm, Inc.,* 473 F.3d 1196 (Fed. Cir. 2007); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 859 F.2d 36, 38 (7th Cir. 1988) ("In general, rulings in connection with grants or denials of preliminary relief will not be given preclusive effect."); *Cabot Corp. v. King*, 790 F. Supp. 153, 156 (N.D. Ohio 1992) (citation omitted); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that findings of fact and conclusions of law from preliminary injunction ruling is not binding at even trial); *In re Ohio Execution Protocol Litig.*, 235 F. Supp. 3d 892, 894 (S.D. Ohio) (continuing litigation without issue preclusion). Finally, *Henness* was pled and litigated pre-*Bucklew*, and the allegations in the *Henness* plaintiff's motion for a preliminary injection are distinct

30

from those in the plaintiff's complaint here. *See In re Ohio Exeuction Protocol Litig.*

*(Henness v. Dewine),* 946 F.3d at 288; D.E. 1929, PageID# 74867 (filed September

28, 2018). As discussed above, res judicata does not apply, because of *Bucklew*'s

intervening change in the legal landscape. Additionally, collateral estoppel based on

the limited litigation in a preliminary injection context would be inappropriate,

given the importance of the fundamental federal constitutional rights involved.

**V.      Mr. Middlebrooks as applied claim (Claim 2) is not subject to dismissal.**

Under Tennessee law, Mr. Middlebrooks' as applied claim would have been

non-justiciable at the time of the earlier litigation and is therefore not subject to

dismissal as alleged by Respondents. In July, 2018, Mr. Middlebrooks was not

subject to imminent execution. The State had not yet requested an execution date in

his case. The State did not request an execution date for Mr. Middlebrooks until

September 20, 2019. Exhibit A, Motion to Set Execution, *State v. Middlebrooks*, No.

M2001-01865-SC-R11-PD (Tenn. 2019). As Mr. Middlebrooks' claim is based in his

mental illness and medical disease, both of which are subject to treatment, his claim

was not ripe until execution was imminent. *See Stewart v. Martinez-Villareal*, 523

U.S. 637 (1998).

Had Mr. Middlebrooks brought his claim in 2018, it would have been subject

to dismissal under state law. *West v. Schofield*, 468 S.W.3d 482, 494 (Tenn. 2015)

("Causes of Action [that] depend entirely on future and contingent events that have

not occurred and may never occur, … are unripe and nonjusticiable.") In the July

2015 *West* opinion, the Tennessee Supreme court explained the ripeness doctrine as to method of execution claims.

> Ripeness … requires a court to answer the question of whether the dispute has matured to the point that it warrants a judicial decision. Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, though avoidance of premature adjudication, from entangling themselves in abstract disagreements. The central concern of the ripeness doctrine is whether the case involves uncertain or future events that may or may not occur as anticipated or, indeed, may not occur at all.

*West*, 468 S.W.3d at 490-91 (cleaned up).  The ripeness analysis in Tennessee asks (1) if the case is fit for judicial determination and (2) whether the parties will suffer hardship because of non-adjudication. *Id.* at 491.

To answer the fitness for adjudication question, the court asks whether the "claims are based on an existing legal controversy or on hypothetical and contingent future events that may never occur." *Id.* In 2018, the possibility existed that Mr. Middlebrooks epilepsy would respond to a medical management. Further, his mental state at the point of execution was not capable of determination since mental states can fluctuate. *Van Tran v. State*, 6 S.W.3d 257, 263 (1999) ("The issue of competency to be executed … is generally not considered ripe until execution is imminent.")

"The second part of the ripeness analysis requires consideration of whether withholding adjudication [of the method of execution challenge] at this time will impose any meaningful hardship on the parties." *West*, 468 S.W.3d 492. The court described "[t]he prototypical case of hardship comes from the claimant who faces a choice between immediately complying with a burdensome law or risking serious

32

criminal and civil penalties." *Id.* (cleaned up). In the July 2015 *West* case, the Tennessee Supreme Court held that the inmates were not harmed by the non-adjudication of their electrocution claims because, the court held, should they become ripe, they would be given the opportunity to litigate them – even if the claims did not ripen until 14 days before execution.

Mr. Middlebrooks' as applied claim was not fit for adjudication in 2018, nor will Respondents suffer hardship from litigating the claims now, instead of then. Respondents do not dispute Mr. Middlebrooks' illness or its effect on his behavior. At this stage, it is taken as a given, that Mr. Middlebrooks will become psychotic and endure tonic-colonic (grand mal) seizures when the execution team attempts to gain venous access preventing a successful IV insertion. The party harmed by non-adjudication now that the claim has ripened is Mr. Middlebrooks.

The fact is that Mr. Middlebrooks seizures have increased in the past year and he suffered a full psychotic break during the summer of 2019. His physical and mental health have worsened.

Nitrogen gas was not a readily available alternative in 2018. It is now. Respondents do not dispute this in their motion to dismiss. So even had Mr. Middlebrooks raised his as applied claim, there was no readily available non-lethal injection method to propose. As states have moved away from midazolam-based protocols, they have developed the nitrogen gas protocol. His claim has only recently ripened.

Nicholas Sutton's case, cited by Respondents, is distinguishable. At the time of the *Abdur'Rahman* litigation, Sutton's execution was imminent. Sutton's execution had been stayed in 2015. Exhibit B, Stay of Execution, *State v. Sutton*, E2000-00712-SC-DDT-DD (Tenn. 2015). Before filing the state court complaint, the State of Tennessee requested Sutton's execution date be reset. Exhibit C, Motion to Reset Execution Date, *State v. Sutton*, E2000-00712-SC-DDT-DD (Tenn. 2018). Sutton's alternative method of execution was firing squad, which was available as a method of execution in 2018. Amended Complaint, *Sutton v. Parker, et al.*, No. 3:19-cv-00005 (M.D. Tenn. 2019), ECF No. 11, PageID 1420.

Mr. Middlebrooks newly ripened as applied challenge should not be dismissed.

## VI.  Conclusion

The legal and factual landscape have changed since the state court's 2018 *Abdur'Rahman* ruling. The defendants failed to distinguish the claim presented and adjudicated in state court under *Glossip* from the comparative analysis required by *Bucklew*. Instead, the defendants engage in a superficial analysis of the doctrine of res judicata, fail to fulfill Tennessee requirements for application of res judicata, and fail to engage with either the plaintiff's complaint or the new facts plaintiffs seek to present. Accordingly, the plaintiffs respectfully request that this Court deny the defendants' motion and allow the plaintiffs to proceed to trial with their claims.

Respectfully Submitted,

34

FEDERAL PUBLIC DEFENDER FOR
THE MIDDLE DISTRICT OF
TENNESSEE

KELLEY J. HENRY, BPR#21113
Supervisory Asst. Federal Public
Defender
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265

*/s/ Kelley J. Henry*
Kelley J. Henry
Supervisory Asst. Federal Public Defender

## CERTIFICATE OF SERVICE

I certify that on March 2, 2020, I filed this motion by means of the Official Court Electronic Document Filing System, CM/ECF, for the Middle District of Tennessee, which will email a copy to opposing counsel:

Scott Sutherland, Deputy Attorney General
Rob Mitchell, Asst. Attorney General
Charlotte M. Davis, Asst. Attorney General
Miranda Jones, Asst. Attorney General
Office of the Attorney General and Reporter
Law Enforcement and Special Prosecutions Division
P.O. Box 20207
Nashville, Tennessee 37202-0207.

*/s/ Kelley J .Henry*
Counsel for Plaintiffs