IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DONALD MIDDLEBROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:19-cv-01139 |
| | ) | Judge Crenshaw |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| FRANK STRADA, in his official capacity | ) | |
| as the Commissioner of the Tennessee | ) | |
| Department of Correction, and | ) | |
| KENNETH NELSEN, in his official | ) | |
| capacity as Warden of Riverbend | ) | |
| Maximum Security Institute, | ) | |
| | ) | |
| Defendants. | ) | |

---

## [PROPOSED] SUPPLEMENTAL AND AMENDED COMPLAINT

---

Donald Middlebrooks hereby brings this civil action pursuant to 42 U.S.C. §1983, 28 U.S.C. § 2201, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), seeking declaration and enforcement of certain rights in connection with the State of Tennessee's plan for carrying out his execution.

## I.    INTRODUCTION

1.        Felony sentences imposed by Tennessee courts are, for the most part, entrusted to the Tennessee Department of Correction ("TDOC") to carry out. In furtherance of that responsibility, TDOC receives over a billion dollars of taxpayer money each year. *See* Governor of the State of Tennessee, The Budget: FY2024–25 at A-19, (Ex. 1).

2.      The sentences that TDOC administers broadly fall into three categories: sentences of incarceration; sentences involving supervision of a non-incarcerated person, such as sentences of probation or community correction; and, for a very small number of individuals, sentences of death.

3.      Each type of sentence requires some expertise to administer competently and lawfully. Sentences of incarceration, for example, require expertise in prison administration, whereas sentences involving supervision require expertise in law enforcement and information systems, among other things.

4.      Sentences of death have historically required some specific expertise, as well. The nature and extent of the expertise necessary, however, depend in significant part on the State's chosen mechanism of killing.

5.      Around the start of the present century, Tennessee changed its death penalty statutes to make the default method of execution "lethal injection," a term that the relevant statute does not define, but which is broadly understood to mean the intravenous injection of some chemical killing agent—that is, a poison—into the bloodstream. *See* Tenn. Code Ann. § 40-23-114 ("Method of Execution Statute").

6.      Lethal injection, as a form of state execution, is a wholly modern invention. The prospect of performing an execution by inserting poison into the bloodstream of an individual would have been horrifying to Americans of the eighteenth and early nineteenth centuries, who (1) condemned poisoning as a cruel, disgraceful, and dishonorable form of killing and (2) had not yet experienced the mid-

2

nineteenth century revolution in the professionalization of medicine that lends lethal injection a superficial patina of respectability in modern eyes.

7.      Tennessee's adoption of lethal injection as its default execution method, therefore, put TDOC in the position of administering sentences of death in a manner that lacked historical foundations and required expertise of a wholly different sort than Tennessee executions had previously required.

8.      TDOC has consistently struggled, and often failed, to fulfill that responsibility in a consistent, reliable, and lawful way. Despite the relative recency of the State's move to lethal injection, TDOC has burned through at least *five* now-discarded "protocols" for carrying such executions out—significantly more, if one counts revisions. Each of those past protocols collapsed under the weight of its own flaws and/or TDOC's mismanagement after no more than, at most, a few executions.

9.      In January of 2025, TDOC partially unveiled—and partially kept secret—its latest attempt at a policy for execution by lethal injection, the January 8, 2025 Lethal Injection Execution Protocol ("2025 Protocol") (Ex. 2), which, among other things, calls for individuals to be executed by the intravenous injection of a toxic dose of pentobarbital, in a small chamber with few witnesses.

10.     Mr. Middlebrooks faces the prospect of being among the first individuals killed under the 2025 Protocol before it, like its predecessors, becomes too obviously untenable to stand. He brings this lawsuit not to dispute his conviction or sentence, but to vindicate his right not to be punished in a manner inconsistent with the laws and Constitution of the United States and State of Tennessee.

3

11.     TDOC's mismanagement of its responsibilities has put Mr. Middlebrooks' rights in peril in at least five ways:

    a.  First, TDOC has selected a poison that has been shown through recent evidence to pose a high risk of a torturous death, particularly if obtained, stored, handled, and/or administered incorrectly.

    b.  Second, TDOC has developed an internal culture of recklessness and noncompliance, such that no person could reasonably expect TDOC to comply with even the bare-bones protections against maladministration that it is willing to adopt. This culture of noncompliance, when combined with the risk-prone nature of pentobarbital poisoning as a method of execution, creates a high risk that a person receiving a lethal injection administered by TDOC will be tortured to death.

    c.  Third, TDOC has failed to consider whether its process of performing executions comports with the most fundamental moral and legal commitments made by the Framers of the U.S. Constitution and Tennessee Constitution, as those commitments must be honored under current caselaw. Instead, TDOC has adopted a killing protocol designed for modern eyes and modern sensibilities, but which would have appalled the Framers of the Constitution.

    d.  Fourth, TDOC has imposed draconian restrictions on the ability of an individual facing death to communicate with his family, friends, fellow worshippers, and spiritual advisors during the final twelve hours of his

life. These restrictions serve little, if any, purpose, and reflect a profound disrespect for the personal and spiritual needs of a person facing death.

e. Finally, TDOC has failed to take necessary steps to ensure that counsel for an individual facing execution will be able to monitor the process effectively and vindicate the individual's right to access the courts in the event of an error or complication.

12. Because TDOC has failed in its responsibilities, Mr. Middlebrooks files this Complaint pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and RLUIPA to ask the Court to hold the agency to its commitments by enjoining the Defendants from continuing any of their policies that violate federal or state law.

## II.   JURISDICTION, VENUE, AND EXHAUSTION

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Mr. Middlebrooks is incarcerated at Riverbend Maximum Security Institution ("RMSI"), in Davidson County, and Defendants intend to execute him in Davidson County. Accordingly, the events giving rise to this Complaint have occurred and will occur in this county.

14. This Court has subject matter jurisdiction over Mr. Middlebrooks' claims arising out of 42 U.S.C. § 1983 and RLUIPA pursuant to 28 U.S.C. § 1331 (federal question), §1343 (civil rights violations and equitable relief under an act of Congress), §2201 (declaratory relief), and §2202 (preliminary and permanent injunctive relief).

5

15.     This court has supplemental subject matter jurisdiction over Mr. Middlebrooks' claims seeking declaratory judgment with regard to issues arising out of Tennessee law pursuant to 28 U.S.C. § 1367 and § 2201.

16.     Mr. Middlebrooks is not required to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because Tennessee has not held out any administrative process that reaches complaints of the type that he asserts. Nevertheless, out of an abundance of caution, Mr. Middlebrooks filed and fully appealed a grievance to TDOC encompassing the concerns set out in this Complaint.

## III.   STATEMENT OF INCORPORATION

17.     All allegations in this Complaint are incorporated in all sections as if fully set forth therein.

## IV.   PARTIES

18.     Plaintiff Donald Middlebrooks is incarcerated at RMSI in Nashville, Tennessee, under a sentence of death. He has completed his direct appeal, initial state postconviction proceedings, and initial federal habeas proceedings.

19.     Defendant Frank Strada is the Commissioner of the Tennessee Department of Correction, a state agency located in Nashville, Tennessee. As head of TDOC, Commissioner Strada adopted and implemented the 2025 Protocol. Commissioner Strada will oversee Mr. Middlebrooks' execution at RMSI. Mr. Middlebrooks sues Commissioner Strada in his official capacity.

20.     Defendant Kenneth Nelsen is the Warden of RMSI, where Mr. Middlebrooks is in custody and where the State of Tennessee intends to execute him. Warden Nelsen is directly in charge of carrying out the lethal injection protocol that violates Mr. Middlebrooks' rights as described below. Mr. Middlebrooks sues Warden Nelsen in his official capacity.

## V.     FACTUAL ALLEGATIONS

### A.     The Framers of the U.S. Constitution adopted the Eighth Amendment to forbid governments from imposing punishments that the Framers would have considered inconsistent with fundamental norms of civilization.

21.     In 1688, King James II of England was deposed. In his wake, Parliament enacted what has come to be known as the English Bill of Rights of 1689.

22.     Section 10 of the English Bill of Rights of 1689 stated that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266 (1989).

23.     Parliament's use of the phrase "cruel and unusual punishments" in Section 10 directly mirrored language previously set out in two 1642 protests of the British Crown's treatment of the inhabitants of Northern Ireland ("Ulster Remonstrances"). The Ulster Remonstrances complained of the use of "heavy fines, mulcts, and censures of pillory, stigmatizings, and other like cruel and unusual punishments." *See* John D. Bessler, *The Forgotten Origins of the "Cruel and Unusual Punishments" Prohibition*, Br. J. Am. Leg. Stud. (forthcoming) (manuscript at 150, 154).

7

24.     Parliament's specific motivation in adopting Section 10 is often traced to two sets of preceding events: the mass trials for treason known as "the Bloody Assizes"; and the prosecution of Titus Oates for perjury. *See Ingraham v. Wright*, 430 U.S. 651, 664 (1977).

25.     "[T]he Bloody Assizes were the culmination of a policy of torture and terror employed by the" Stuart monarchy against its perceived enemies. *Carmona v. Ward*, 576 F.2d 405, 426 (2d Cir. 1978).

26.     Oates was a "Protestant cleric whose false accusations had caused the execution of 15 prominent Catholics for" an alleged treasonous plot. *Harmelin v. Michigan*, 501 U.S. 957, 969 (1991). Oates was sentenced to be scourged to death, despite the fact that he was, under the prevailing law at the time, not eligible for that punishment, leading to concerns about the lawlessness of his sentence. *Id.*

27.     Section 10 has been understood to reflect both Parliament's desire to avoid torturous punishments, such as those imposed in the Bloody Assizes, and punishments based solely on the discretion of officials, as were imposed on Oates.

28.     A century after the English Bill of Rights of 1689, as Americans debated their proposed Constitution, many voiced concern that the newly formed federal government might impose torturous punishments from outside of the common law tradition embraced by the Framers.

29.     For example, Patrick Henry worried that, if the new Constitution "loose[d] the restriction of not imposing excessive fines, demanding excessive bail, and inflicting cruel and unusual punishments," then "Congress [might] introduce the

8

practice of the civil law, in preference to that of the common law" and "introduce the practice of France, Spain, and Germany of torturing, to extort a confession of the crime." *See* John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment As A Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1807 (2008).

30.     The Framers of the Eighth Amendment "feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured." *Ingraham*, 430 U.S. at 665 (citing *Weems v. United States*, 217 U.S. 349, 371–73 (1910)).

31.     In light of these concerns, the Framers drafted and ratified the Eighth Amendment, which, following the language of Section 10, reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

32.     At the time of the framing, the term "cruel" was understood to refer to punishments that were "inhuman and barbarous,—torture and the like." *Weems*, 217 U.S. at 368.

33.     The word "unusual" had two relevant definitions. One definition—similar to that associated with the word today—was "out of the ordinary." *Stinneford*, *supra*, 102 Nw. U. L. Rev. at 1767. "Unusual," however, was also a legal "term of art that referred to government practices that are contrary to 'long usage' or 'immemorial usage.'" *Id.*

9

34.　　At the time of the adoption of the Eighth Amendment, sentences of death were common in America, as they were in England.

35.　　There were, at that time, a number of poisons known and readily available, including arsenic, belladonna alkaloids (e.g., deadly nightshade), and aconites (e.g., wolfsbane). *See, e.g., Arsenic: A Murderous History*, Dartmouth Toxic Metals (April 2022), https://sites.dartmouth.edu/toxmetal/arsenic/arsenic-a-murderous-history/; *The Powerful Solanaceae: Belladonna*, U.S. Forest Service, https://www.fs.usda.gov/wildflowers/ethnobotany/Mind_and_Spirit/belladonna.shtml; Joe Schwarcz, PhD, *Wolfsbane Has a Long, Dark History*, McGill University (Nov. 22, 2024), https://www.mcgill.ca/oss/article/medical-history/wolfsbane-has-long-dark-history.

36.　　Poisoning was also a relatively common practice among individuals. In English physician Samuel Farr's 1788 textbook, *Elements of Medical Jurisprudence*, he described poisoning as one of the two most common "kinds of murder" in the era and devoted twelve pages to the topic, with a special focus on arsenic. *See* Katherine D. Watson, *Poisoning Crimes and Forensic Toxicology Since the 18th Century*, 10 Acad. Forensic Pathol. 35 (2022).

37.　　Nevertheless, no American government engaged in the regular practice of poisoning individuals to death as a form of criminal punishment.

38.　　There is some evidence that execution by poisoning was, on occasion, contemplated in the case of individuals convicted of murders that were themselves committed by the use of poison, as part of a broader practice of intentionally cruel

"eye for an eye" punishments. *See* Rob Warden & Daniel Lennard, *Death in America Under Color of Law: Our Long, Inglorious Experience with Capital Punishment*, 13 Nw. J. L. & Soc. Pol'y 194, 206–07 (2018). Poisoning was not, however, the default method of killing for other murders, even especially grievous ones.

39.     The refusal to adopt poisoning as an ordinary method of execution was consistent with contemporaneous norms that considered poisoning to be a particularly barbaric practice.

40.     For example, sixteenth- and seventeenth-century statesman and prosecutor Sir Francis Bacon described murder by "impoisonment" as "grievous beyond other Murders."[1]

41.     For a period of time during the reign of Henry VIII, this special aversion to killing with poison resulted in murder by poisoning being classified as full treason, punishable by boiling, rather than simply a felony punishable by hanging. *See* Note, *A Draft of the 1531 'Acte for Poysoning'*, 116 Engl. Hist. Rev. 894 (2001) (Ex. 3); *see also United States v. Roof*, 252 F. Supp. 3d 469, 484 (D.S.C. 2017).

42.     In 1616, Justice Edward Coke lamented the "baseness and cowardice of poisoners" and exclaimed, "How rare it was [in the past] to hear of poisoning in England, how detestable it was to our nation; But the devil has [now] taught [many]

---

[1] The Charge 1.1 by way of Evidence, by Sir Francis Bacon, his Majesties Attourney General, before the Lord High Steward and the Peers, against Frances Countess of Somerset, concerning the poysoning of Sir Thomas Overbury, available at https://quod.lib.umich.edu/e/eebo/A28024.0001.001/1:8?rgn=div1;view=fulltext.

11

to be cunning in it." *See* Charles Mackay, *Memoirs of Extraordinary Popular Delusions and the Madness of Crowds, Vol. II.* at 198 (1852) (Ex. 4).

43.     That same Justice Edward Coke who remarked about the novelty and impropriety of poisoning was "the most important common law jurist in English history" and was specifically known for his advocacy of the concept of "immemorial usage" that would come to be included in the term of art "unusual." *See Stinneford*, *supra*, 102 Nw. U. L. Rev. at 1772.

44.     The limited instances in which governments did use poison as an instrument of policy in early American history (1) typically did not involve criminal punishment and (2) were widely frowned upon as inhumane.

45.     Most notably, in 1623, Captain William Tucker fed poisoned wine to more than 200 Native Americans as part of a prisoner exchange—possibly as an attempt to assassinate an indigenous leader. That incident was, according to historians, the first time that the English had ever "intentionally used poison in war," because the practice was already so frowned-upon in Europe. *See* Peter C. Mancall, *Was the 1623 Poisoning of 200 Native Americans One of the Continent's First War Crimes?*, Smithsonian Magazine (May 22, 2023).

46.     If the federal government had attempted to impose fatal poisoning as a criminal punishment following the adoption of the Eighth Amendment, the Framers would have considered that punishment to be both unusual, in that it had no legitimacy from immemorial usage, and cruel, because poisoning a person to death would have been considered a barbarous act that, among other things, subjected the

recipient to disgrace and injury to his human dignity over and above that which is inherent to death by execution.

**B. For two centuries, the State of Tennessee abided by the Framers' expectation that U.S. governments would not use poisoning as a form of criminal punishment.**

47. The State of Tennessee was admitted to the Union by Act of Congress in 1796. 4 Cong. Ch. 47, June 1, 1796, 1 Stat. 491; *see also* U.S. Const. art. IV, § 3, cl. 1 ("New States may be admitted by the Congress into this Union . . . .").

48. Several decades later, the then-government of the State of Tennessee, along with the governments of a few other states, took part in a bloody, but ultimately failed, insurrection against the legitimate government of the United States. After the failure of that attempt, the State of Tennessee sought, and was granted, renewed recognition as a state government in good standing under the U.S. Constitution. *See* 39 Res. No. 73, July 24, 1866, 14 Stat. 364.

49. In connection with both the 1796 admission as a State and the 1866 recognition of Tennessee's acceptance of the Union, the government of the State of Tennessee affirmatively agreed to abide by the Constitution and laws of the United States.

50. In 1868, the United States adopted the 14th Amendment to the United States Constitution, which, among other things, has been construed to make the Eighth Amendment applicable to state governments, including the government of the State of Tennessee.

13

51.     In 1870, the State of Tennessee adopted the constitution that continues, in amended form, to be the Constitution of the state.

52.     Article I, § 16 of that Constitution directly mirrors the Ulster Remonstrances, Section 10 of the English Bill of Rights of 1689, and the Eighth Amendment of the U.S. Constitution: "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Tenn. Const. art. I, § 16.

53.     The Framers of the Tennessee Constitution included an additional provision, Article I, § 32, which states "[t]hat the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for." Tenn. Const. art. I, § 32. They also adopted a third provision, Tenn. Const. art. I, § 13, specifically applicable to mistreatment of arrestees.

54.     Throughout the State of Tennessee's existence, there have been periods in which state executions were relatively commonplace and other periods in which no state executions occurred at all. *See* Tenn. Dept. of Correction, Death Penalty in Tennessee, available at https://www.tn.gov/correction/statistics/executions/death-penalty-in-tennessee.html (acknowledging that the State has used capital punishment "intermittently") (Ex. 5).

55.     Until 1913, Tennessee performed executions by hanging.

56.     In 1916, following a two-year cessation of all executions, the State began practicing execution by electrocution.

57.     At no time in the eighteenth century did the State of Tennessee poison a person to death as a form of criminal punishment.

58.     At no time in the nineteenth century did the State of Tennessee poison a person to death as a form of criminal punishment.

59.     At no time in the first ninety-nine years of the twentieth century did the State of Tennessee poison a person to death as a form of criminal punishment.

**C.    In the closing years of the twentieth century, the State of Tennessee, relying on a body of constitutional caselaw that had downplayed the importance of historical traditions in constitutional interpretation, began using intravenous poisoning, or "lethal injection," as its default mechanism for performing executions.**

60.     Intravenous injection of the sort performed in our era did not exist at the time of the Founding.

61.     The development of the first effective hypodermic needle has been credited to Alexander Wood in 1853. *See* M. Richard Schorr, M.D., *Needles: Some Points To Think About*, 45(4) Anesthesia & Analgesia 509–13 (1966). Insofar as there is uncertainty regarding which physician or scientist is entitled to credit as the technology's inventor, it is nevertheless agreed by historians that the development of the technology itself occurred around the middle of the nineteenth century.

62.     As one professor of the history of pharmacy has explained, the invention of the hypodermic needle "dramatically changed the medical landscape *from the 1850s onwards*." Toine Peters, *Poisons in the Historic Medicine Cabinet*, "It All Depends on the Dose": Poisons and Medicines in European History 14 (Ole Peter Gell et al. eds. 2018) (emphasis added).

15

63.     The development and adoption of hypodermic needles were part of a much broader social and technological process by which the practice of medicine was professionalized over the course of the 19th century. Although physicians existed prior to this transformation, their social roles were more marginal, and they enjoyed significantly less institutional support.

64.     In 1800, for example, there were only four medical colleges in the United States; by 1877, there were well over seventy. *See* S.E.D. Shortt, *Physicians, Science, and Status: Issues in the Professionalization of Anglo-American Medicine in the Nineteenth Century*, 27 Med. Hist. 51, 53 (1983).

65.     The American Medical Association did not exist until 1847. *See id.*

66.     Modern, regularized regimes of licensure did not begin to take hold until the 1870s. *See id.*

67.     As one historian put it, "[b]y the 1880s, . . . a physician in the Anglo-American medical world could point to educational facilities, licensing standards, medical societies, and periodicals—the hallmarks, it is said, of professionalization—most of which had been unavailable to practitioners in the early decades of the century." *Id.* at 54.

68.     The trappings of professionalization were "a mode of cultural expression" focused on the "social legitimation" of the practitioners. Arnold Thackray, *Natural knowledge in cultural context: the Manchester model*, 79 Am. Hist. Rev. 675, 681–82 (1974).

16

69. The trust afforded to the modern medical profession, in other words, was neither inherent nor a simple byproduct of technological advances. Rather, it was created, through identifiable social processes, in the century *after* the Founding.

70. In the mid-20th century, a series of disastrous executions with the electric chair prompted state lawmakers to search for a method of execution that they could present to the public as comparatively humane and affordable.

71. Matters were particularly dire in Oklahoma, where botched executions caused thousands of dollars' worth of damage to the State's electric chair. *See* Jonathan Groner, *Lethal Injection and the Medicalization of Capital Punishment in the United States*, 6 Health & Human Rights 64, 66 (2002).

72. In 1976, Oklahoma Assemblyman Bill Wiseman asked Dr. Jay Chapman, Oklahoma's medical examiner, to devise a new execution method. *See* Human Rights Watch, *So Long As They Die: Lethal Injections in the United States*, 18 HRW 1, 14 (Apr. 2006) (Ex. 6).

73. By his own admission, Dr. Chapman had "no experience" with executions. While he was "an expert in dead bodies," he was "not an expert in getting them that way." *See* Deborah W. Denno, *The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty*, 76 Fordham L. Rev. 49, 66 (2007).

74. Nevertheless, Dr. Chapman agreed to assist Wiseman in devising an alternative to the electric chair. Sitting in the Assemblyman's office, Chapman dictated the following lines, which Wiseman transcribed on a notepad: "An intravenous saline drip shall be started in the prisoner's arm, into which shall be

introduced a lethal injection consisting of an ultra-short-acting barbiturate in combination with a chemical paralytic." *Id.* at 66–67.

75.     Approximately one year later, the Oklahoma legislature adopted Dr. Chapman's proposal, copying Wiseman's notes nearly word for word. *See, e.g.*, Okla. Stat. Ann. Tit. 22, § 1014(A) (1977) ("[T]he punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbiturate . . . [in] combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice."); Human Rights Watch, *supra*, at 14.

76.     In an interview with Human Rights Watch, Dr. Chapman later explained that he "didn't do any research" before recommending an ultra short-acting barbiturate and paralytic agent. There is no evidence to suggest that Oklahoma consulted any other medical experts before adopting its statute. *Id.* at 14–15.

77.     Although Oklahoma's lethal injection law clearly specified two drugs, Dr. Chapman later included a third drug when formulating Oklahoma's protocol. When asked why he added potassium chloride (a heart-stopping agent), Dr. Chapman replied, "Why not?" He explained that even though large doses of the short-acting barbiturate and paralytic would suffice to kill the condemned person, he "wanted to make sure the prisoner was dead at the end, so why not just add a third lethal drug?" *Id.* a 14.

78.     Dr. Chapman noted that he did not have a specific reason for choosing potassium chloride, aside from his general knowledge of its lethality. *Id.*

18

79.     Dr. Chapman's three-drug combination of sodium thiopental (the short-acting barbiturate), pancuronium bromide (the paralytic), and potassium chloride (the heart-stopping agent) became, at the time, the standard protocol throughout the United States.

80.     There is, to Mr. Middlebrooks' knowledge, no evidence that Dr. Chapman, Assemblyman Wiseman, or any other person involved in the development of Oklahoma's lethal injection protocol engaged in any effort to reconcile the state's new method with historical norms of punishment at the time of the Framing.

81.     Rather, it appears that a modern legislator, facing the backlash of a modern public, directed a modern medical professional to devise a quintessentially modern approach to killing human beings.

82.     There was no historical precedent for Dr. Chapman's quasi-medical method.

83.     However, the potential cost savings of using injected poison to kill prisoners, combined with the fact that the practice's veneer of medical professionalism made it superficially more palatable than other forms of execution to many laypeople, resulted in Dr. Chapman's method becoming popular among departments of correction.

84.     Dr. Chapman came to express deep misgivings about what his work had wrought. He told a reporter, "I had no idea, I was so naive. I was young—I had no idea that it would spread so quickly across the states. All of a sudden it was all over the place." Ed Pilkington, *It's problematic": inventor of US lethal injection reveals*

19

*death penalty doubts*, Guardian (UK), (Apr. 25, 2015), available at https://www.theguardian.com/world/2015/apr/29/supreme-court-lethal-injection-inventor-death-penalty-doubts.

85.     Dr. Chapman lamented that "[u]nconscionable things have occurred," in the implementation of lethal injection, "like the needle being applied in the wrong direction or drugs being injected not into the vein but into tissue." *Id.*

86.     Dr. Chapman stated that, in his view, such problems arose because "the people administering [lethal injection] . . . lack the skills they need." *Id.*

87.     In 1982, Texas became the first U.S. state to execute a person by lethal injection, and the popularity of the practice only boomed thereafter.

88.     By 2000, about 95% of executions were performed by lethal injection. *See Groner*, *supra*, at 66.

89.     Tennessee joined the herd, as a relative latecomer, in the final years of the twentieth century. In 1998, the General Assembly enacted the Method of Execution Statute, which, as since amended, creates the structure for the selection of a method of execution in Tennessee. Tenn. Code Ann. § 40-23-114(a); *see* 1998 Tenn. Laws Pub. Ch. 982.

90.     In its current form, the Method of Execution Statute creates a three-step structure for selecting the method of execution to be used.

91.     The first step ("Step One" or the "Feasibility Determination") calls on TDOC to make "reasonable efforts" to develop a system for carrying out execution by

"lethal injection" of some killing agent, the nature of which is left undefined. Tenn. Code Ann. § 40-23-114(e)(2).

92.      Step One was added to the Method of Execution Statute as part of the Capital Punishment Enforcement Act of 2014, 2014 Tenn. Laws Pub. Ch. 1014 (S.B. 2580), which was adopted by the Tennessee General Assembly as a response to difficulties that TDOC had experienced in effectively and lawfully carrying out executions by lethal injection.

93.      The version of Step One originally adopted permitted the Commissioner to move on to a non-injection method only if "one (1) or more of the ingredients essential to carrying out a sentence of death by lethal injection is unavailable through no fault of the department." 2014 Tenn. Laws Pub. Ch. 1014 (S.B. 2580) § 1. However, the Method of Execution Statute was later amended again to expand those grounds to include any reason for which TDOC was "unable to carry out a sentence of death by lethal injection despite making reasonable efforts to do so." 2023 Tennessee Laws Pub. Ch. 375 (H.B. 289) § 3.

94.      For lethal injection to be feasible, it is typically necessary to (1) adopt an adequate protocol for performing the executions, (2) develop a team of personnel capable of effectively carrying out the protocol, and (3) obtain a sufficient, reliable supply of the chosen poison, which, in the United States, has typically been a chemical medication or combination of chemical medications, administered in a fatal overdose.

95.      Under the Method of Execution Statute, if TDOC concludes that its reasonable efforts have resulted in a lawful and adequate apparatus for performing

21

executions by lethal injection, then lethal injection pursuant to that apparatus is selected as the default mechanism of execution.

96.     If, however, TDOC's efforts are not successful—for example, because it cannot obtain a medication that it concludes is necessary in order perform the execution lawfully—then the Commissioner may "certif[y] to the governor that the department is unable to carry out a sentence of death by lethal injection despite making reasonable efforts to do so." Tenn. Code Ann. § 40-23-114(e)(2). Upon such certification, the default "method of carrying out the sentence shall be by electrocution." Tenn. Code Ann. § 40-23-114(e).

97.     The second step required by the Method of Execution Statute ("Step Two" or "Review for Constitutionality") requires TDOC to assess whether its default method of execution has been held to be unconstitutional at the appellate level—either by the U.S. Supreme Court, by the Tennessee Supreme Court, or by a relevant intermediate appellate court whose decision those courts of last resort declined to review. *See* Tenn. Code Ann. § 40-23-114(d).

98.     If TDOC's default method of execution is lethal injection, but the Review for Constitutionality reveals that lethal injection has been held to be unconstitutional in a qualifying case, then the default method of execution becomes electrocution, and Step Two begins again. *See* Tenn. Code Ann. § 40-23-114(e)(2).

99.     If the default method of execution is electrocution, but the Review for Constitutionality reveals that electrocution has been held to be unconstitutional by a

qualifying court, then TDOC may rely on "any constitutional method of execution." Tenn. Code Ann. § 40-23-114(d).

100.     The third step contemplated by the Method of Execution Statute ("Step Three" or "Individual Selection") is only statutorily required if (1) the default method of execution is lethal injection and (2) the underlying offense for which the sentence was imposed occurred before January 1, 1999.

101.     In Step Three, the individual facing execution may select the method that TDOC will employ to carry out his execution from the options that are available. *See* Tenn. Code Ann. § 40-23-114(b).

102.     The Tennessee General Assembly "generally lacks the authority to delegate its law-making powers to other entities" and may only "do so under two circumstances: when the Constitution itself authorizes the delegation and when the delegation is 'sanctioned by immemorial usage originating anterior to the Constitution and continuing unquestioned thereunder.'" *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 712 n.3 (Tenn. 2001) (quoting *Kee v. Parks*, 283 S.W. 751, 753 (Tenn. 1926)).

103.     Nevertheless, the Method of Execution Statute does not designate the poison to be used in lethal injections, how that poison should be obtained, or who should administer it.

104.     The Method of Execution Statute grants TDOC the power to "promulgate necessary rules and regulations to facilitate the implementation of this section." Tenn. Code Ann. § 40-23-114(c).

105.     TDOC, however, has never relied on the rule promulgation structure created by the Uniform Administrative Procedure Act ("UAPA") to select a poison or to issue its lethal injection protocol. Rather, the agency has relied on its general authority to make "statements concerning inmates of a correctional or detention facility," which are exempted from Tennessee's UAPA. Tenn. Code Ann. § 4-5-102(12)(B)(vi); *see Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 312 (Tenn. 2005) (upholding reliance on "statements concerning inmates" exception in connection with lethal injection protocol).

106.     The UAPA rulemaking process constrains executive branch policymaking in multiple ways:

    a.  It requires notice and publication. Tenn. Code Ann. § 4-5-202(a), (c).

    b.  It ordinarily requires a hearing. Tenn. Code Ann. §§ 4-5-202(a), 4-5-204.

    c.  It requires consideration of public comments. Tenn. Code Ann. § 4-5-205(a).

    d.  It requires a written statement of the agency's rationale, if requested. Tenn. Code Ann. § 4-5-205(a).

    e.  It declares any rule made in violation of its provisions to be void. Tenn. Code Ann. § 4-5-216.

107.     The UAPA also ensures that executive branch policymaking is subject to review for constitutionality by the Tennessee Attorney General and Reporter, who is appointed by the Tennessee Supreme Court. Tenn. Code Ann. § 4-5-211; *see* Tenn. Const. art. VI, § 5.

24

108.     Because TDOC does not rely on the UAPA structure in connection with the promulgation of its execution protocols, its authority to dictate the details of how an individual will be punished by "lethal injection" is an essentially unbounded delegation of authority, with no accompanying intelligible legislative principle.

109.     Pursuant to that authority, Tennessee performed its first execution by intravenous poisoning/lethal injection on April 19, 2000.

**D.  Tennessee's performance of executions behind closed doors represents a further break from historical precedent that works alongside the medicalization of executions to obscure the violent nature of killing the condemned persons.**

110.     In a further nod to modern sensibilities, Tennessee's executions by lethal injection are performed behind closed doors—that is, in a small indoor room with only a few government-approved witnesses.

111.     This level of seclusion is a clear break from practices that prevailed at the time of the Founding. In the 18th and early 19th centuries, executions were quintessentially public affairs. Hangings were commonly conducted in town squares and attended by members of the local community. *See* Stuart Banner, The Death Penalty: An American History 24, 31–32 (2002) ("Until the nineteenth century, hangings were conducted outdoors, often before thousands of spectators, as part of a larger ritual including a procession to the gallows, a sermon, and a speech by the condemned prisoner. Hangings were not macabre spectacles staged for a bloodthirsty crowd. A hanging was normally a somber event, like a church service. Hanging day was a dramatic portrayal, in which everyone could participate,

of the community's desire to suppress wrongdoing. It was a powerful symbolic statement of the gravity of crime and its consequences." (emphasis omitted)).

112.     Such events could draw thousands of spectators. For example, the last public execution in Philadelphia in 1837 drew an audience of approximately 20,000 people. *See* John D. Bessler, *Televised Executions and the Constitution: Recognizing a First Amendment Right of Access to State Executions*, 45 Fed. Comm. L.J. 355, 359 (1993).

113.     Executions moved behind closed doors in the late 19th century in response to a burgeoning anti-death penalty movement. Abolitionists across the country decried capital punishment as a grisly and barbaric practice. But rather than respond to this growing distaste by abolishing the death penalty altogether, most states reacted by removing executions from the public eye.

114.     In 1833, Rhode Island became the first state to authorize closed-door executions, and, by 1849, fourteen other states had followed suit. Nevertheless, a dearth of private execution facilities meant that public executions continued in the United States at the discretion of local officials for decades to come. *See* Bessler, *supra*, at 363. Public executions only disappeared entirely after state governments took control of capital punishment in the early 20th century.

115.     The seclusion of modern executions removes the element of collective moral reckoning that characterized earlier executions and insulates the public from the reality of the killing act in a way largely, if not entirely, unprecedented in American history.

26

116.     Tennessee is a state of over 7 million people. Because of the secrecy and seclusion of the State's executions, only an infinitesimal fraction of those 7 million Tennesseans have any direct knowledge of what it looks like when the government kills a person in their name.

### E.     TDOC's performance of executions by lethal injection has been consistently marked by failures and scrapped protocols since its inception.

117.     Tennessee's decision to rely on a complicated, quasi-medical execution process introduced additional complexity and a need for biomedical expertise into the performance of executions.

118.     As the agency charged with carrying out those executions, TDOC bore the responsibility of navigating that complexity and drawing on the necessary expertise.

119.     Its fulfillment of that responsibility has been consistently marked by errors and setbacks.

#### 1.     Tennessee's first lethal injection protocol was a slapdash, incoherent document that had to be rescinded.

120.     TDOC's first lethal injection protocol ("Pre-2007 Protocol") (Ex. 7) was drafted in secret, with minimal oversight.

121.     In 1998, after the enactment of the Method of Execution Statute, the TDOC Commissioner set up an "ad hoc" committee to devise the protocol. The committee—which was comprised only of TDOC personnel, none of whom had any

medical or scientific background[2]—met only four times over the course of five months. *So Long As They Die: Lethal Injections in the United States*, 18 HRW 17–18 (Apr. 2006) (Ex. 6) (citing Testimony of Ricky Bell, Transcript of Proceedings, *Abu-Ali Abdur'Rahman v. Sundquist*, No. 02-2236-III, at 204 (Davidson County Chancery Court, May 29, 2003)).

122. The committee did not consult with any medical, pharmacological, or scientific experts. *Id.* at 18 (citing Testimony of Ricky Bell at 200-209; Deposition of Debra K. Inglis, general counsel for the Tennessee Department of Corrections, *Rahman v. Sundquist, et al.*, No. 02-2236-III, at 15–16, 38 (Davidson County Chancery Court, Mar. 25, 2003)).

123. Its meetings were held in secret, and the committee did not seek input from the public. *Id.* at 18.

124. Ultimately, the committee gave Warden Ricky Bell—an individual with no college degree, let alone a medical degree—the task of writing the new protocol. *Id.* at 18 (citing Testimony of Ricky Bell, Transcript of Proceedings, *Abu-Ali Abdur'Rahman v. Sundquist*, No. 02-2236-III, at 200 (Davidson County Chancery Court, May 29, 2003)).

125. The Tennessee Supreme Court later found that Bell did so "simply by copying the state method currently in use by some thirty other states"—specifically

---

[2] For a description of the committee members' qualifications (or lack thereof), *see* Deposition of Debra K. Inglis, general counsel for the Tennessee Department of Corrections, *Rahman v. Sundquist, et al.*, No. 02-2236-III, at 15-16, 38 (Davidson County Chancery Court, Mar. 25, 2003).

28

relying on information he received from the Indiana and Texas departments of correction. *Abdur'Rahman v. Bredesen, et al.*, No. M2003-01767-COA-R3-CV, at 77a (Tenn. Oct. 17, 2005).

126. An internal memorandum, written by a TDOC committee member, warned the committee about the problems experienced by other states with execution by lethal injection. Ex. 6 at 18 (citing Memorandum from Virginia Lewis to the Committee Members). However, there is no evidence that the committee made any effort to respond to these concerns when drafting Tennessee's protocol.

127. Indeed, when asked how the committee put together Tennessee's lethal injection procedures, a committee member responded: "There wasn't a lot of discussion on it once the team had access to the information that was provided from other states . . . which all used the same chemicals." *Id.* (citing Testimony of Warden Richard Peabody, Special Hearing, *Abdur'Rahman v Sundquist* et al., No. 02-2236-III,, Vol. II, at 63 (Davidson County Chancery Court, Sep. 16, 2003)).

128. According to committee member William Henry Lloyd, "[the committee] didn't discuss pain and suffering" when devising the protocol. *Id.* at 1 (citing Deposition of William Henry Lloyd, *Abdur'Rahman v. Sundquist,* et al., No. 02-2236-III, at 28 (Davidson County Chancery Court Apr. 4, 2003)).

129. The Pre-2007 Protocol document that Warden Bell drafted was, by any reasonable account, not merely incomplete but amateurish and, in places, incoherent.

130. Then-Governor Phil Bredesen, who generally supported the death penalty, admitted that, "[w]hen the attorney general went and got the procedures,

29

they were awful." *Harbison v. Little*, No. 3:06-CV-01206, 2007 WL 6887553, at *6 (M.D. Tenn. July 12, 2007) (quoting Dwight Lewis, *Alas, We Take a Serious Look at How We Kill the Condemned*, The Tennessean, Feb. 8, 2007).

131.    Perhaps most shockingly, despite the fact that the relevant manual was designated as the State's "Execution Guidelines for Lethal Injection," the document's "Execution Day" procedures did not even describe an execution by lethal injection. Rather, they appeared to have been cut-and-pasted procedures for performing an execution by electric chair. *See* Pre-2007 Protocol at i, 34–35 ("The electrician will ready the equipment and the physician will stand by in the designated waiting area . . . . The Deputy Warden will supervise the shaving of the condemned inmate's head and legs. . . . The Deputy Warden will supervise the application of conducting gel to both ankles, lower legs and head of condemned inmate. . . . The Deputy Warden and Extraction Team will place the condemned inmate in the chair. . . . The Extraction Team will secure the head set. . . . The Facility Manager will check the electrodes to insure that they are properly attached. . . . The Assistant Facility Manager will proceed to electrical control panel and activate for execution. . . . The Warden will give the signal to proceed and the Executioner will engage the automatic rheostat. The Administrative Assistant or designate will record the time the process began. When current has been on for required time, the rheostat will automatically disengage. . . . Once the cycle runs its course, the Facility Manager indicates the current is off. The Administrative Assistant or designate will record the time the

30

current is disengaged. . . . The Facility Manager will disconnect electrical cables in rear of chair.").

132.     The sections of the Pre-2007 Protocol that did acknowledge the actual method of execution at issue were woefully inadequate. The document did not even include dosage guidelines, which the Governor conceded was a "huge failing." *See* Sheila Burke, *Executions in State Halted to Fix Process*, (Nashville) Tennessean, Feb. 2, 2007.

133.     On February 1, 2007, Governor Bredesen issued an executive order acknowledging that "a recent review ha[d] highlighted deficiencies in the written procedures intended to ensure that all executions will continue to be carried out appropriately." The order immediately revoked the Pre-2007 Protocol and granted a temporary reprieve to individuals with upcoming expected executions. *See* Gov. Phil Bredesen, Exec. Order No. 43 (Ex. 8).

> **2.     Tennessee's second lethal injection protocol was little more than a proofread version of its original, deficient one, and its third lethal injection protocol was never successfully used at all.**

134.     "In late April [of 2007], the Governor announced the new lethal-injection procedure for the State ['2007 Protocol'], which left the prior procedure unchanged in the main, though it formalized some components of the procedure and improved others." *Workman v. Bredesen*, 486 F.3d 896, 900–01 (6th Cir. 2007).

135.     TDOC admitted that there was "no material difference between the 2007 revised protocol and the one in place in 2000." *Harbison*, 2007 WL 6887553, at *5 (quoting briefing).

31

136.     The 2007 Protocol lasted only a few years before its flaws forced it to be rewritten, and TDOC adopted its successor in September of 2013 ("2013 Protocol"), which called for execution using pentobarbital. *See West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017).

137.     TDOC was unable to successfully execute a single person under the 2013 Protocol.

138.     Nevertheless, the State had to revise the protocol at least twice in order to preserve even the possibility of doing so. *See id.* at 553.

### 3.     Tennessee's fourth and fifth lethal injection protocols were inadequate and never adhered to, leading to the 2022 execution moratorium.

139.     In January 2018, TDOC once again drafted a new protocol, which provided two alternative lethal injection methods—Protocol A and Protocol B. Protocol A detailed a death by pentobarbital as the sole lethal injection chemical, and Protocol B detailed a death by a three-drug combination of midazolam, vecuronium bromide, and potassium chloride (collectively, "First 2018 Protocol") (Ex. 9).

140.     The First 2018 Protocol provided no guidance as to when Protocol A was to be used as opposed to Protocol B, thus giving the TDOC Commissioner and RMSI Warden unfettered and arbitrary discretion to choose one protocol over the other.

141.     Nor did the First 2018 Protocol provide for the manner or timing of notice to any Plaintiff about the method, manner, or reason for the choice of a particular protocol.

32

142.     On May 4, 2018, in the context of a declaratory judgment action challenging the First 2018 Protocol, the Chancery Court denied the Commissioner's and Warden's motion to dismiss the plaintiffs' federal and state procedural due process claims based on the lack of standards for choosing between Protocol A and Protocol B, as well as the lack of notice to plaintiffs regarding which protocol would be used in their executions. The court noted: "One of the aspects of Tennessee adopting a protocol which consists of alternative means of execution is that it appears at this preliminary stage of the case that there is no precedent for these specific facts. . . ." Chancery Court Order (May 4, 2018) (Ex. 10).

143.     On Thursday July 5, 2018—four days before trial began in Chancery Court on the First 2018 Protocol—the defendants, which included the TDOC Commissioner and RMSI Warden, filed notice that TDOC had adopted a new lethal injection protocol ("Second 2018 Protocol"), signed by the Commissioner that very day. Defendant's Notice of Filing (July 5, 2018) (Ex. 11).

144.     The Second 2018 Protocol detailed a death by a three-drug combination of midazolam, vecuronium bromide, and potassium chloride. *See* Ex. 12. It required that, if any of those drugs were obtained in compounded form, "[t]he Pharmacist shall arrange for independent testing of the compound for potency, sterility, and endotoxins." *Id.* at 35.

145.     As with Tennessee's previous lethal injection protocols, the Second 2018 Protocol provided no meaningful guidance as to how the required lethal injection chemicals would be obtained, and it entrusted that responsibility, not to a trained,

dedicated professional, but simply to a preexisting TDOC employee—known in later documents as the "Drug Procurer"—who took on the additional responsibility "off the books" and who received "no direction." *See* Tennessee Lethal Injection Protocol Investigation, Report and Findings 5 (Dec. 13, 2022) ("Stanton Report") (Ex. 13); 2018 Protocol at 37 (Ex. 12).

146.    That individual's research consisted primarily of Googling pharmaceutical suppliers and making cold calls. Stanton Report at 5–6 (Ex. 13).

147.    The result of those efforts was a deal with a compounding pharmacy that proved incapable of providing drugs that reliably complied with the Second 2018 Protocol's requirements.

148.    TDOC was fully aware that its pharmacy could not be trusted to perform its obligations effectively, because TDOC knew that the pharmacy, upon being hired by TDOC, openly misrepresented its ability to compound drugs with a consistent potency.

149.    Specifically, in text messages between TDOC's Drug Procurer and the compounding pharmacy's owner in August 2018, the pharmacy owner informed the Drug Procurer that his "methodology is good for any batch of midazolam," such that potency testing "isn't required for every lot" and would merely confirm that "how we process the compound yields the intended dosing within an acceptable range." Stanton Report at 24–25 (Ex. 13); Text Messages of Aug. 7, 2018 (Ex. 14). The pharmacy nevertheless consented to such testing "given the sensitive nature of [the chemical's] intended use." Text Messages of Aug. 7, 2018 (Ex. 14).

150.    Only months later, on November 7, 2018, midazolam provided for potential use in the execution of Edmund Zagorski badly failed potency testing, with a potency of merely 54.2%. *See* Stanton Report at 26 (Ex. 13). That failure directly contradicted the representation that the pharmacy's "methodology is good for any batch of midazolam."

151.    As of that date, TDOC was on notice that the pharmacy owner had affirmatively misrepresented the reliability of his processes and product, while arguing that mandatory quality testing was unnecessary.

152.    Insofar as TDOC had any reason to believe that the November 7, 2018 failed potency testing was an isolated occurrence, that possibility was contradicted when compounded midazolam obtained for potential use on the next individual slated to be executed, David Earl Miller, also failed potency testing. *See id.* at 26–27.

153.    However, TDOC continued to rely on the pharmacy, including for the drugs used in the execution of Donnie Johnson. *See id.* at 27–28.

154.    Indeed, every single execution by lethal injection performed or planned under the Second 2018 Protocol was characterized by failures to adhere to the Second 2018 Protocol.

155.    Most of the individuals executed by Tennessee during the relevant time chose to be executed by electrocution—reflecting the degree of well-founded mistrust that had grown to surround the State's lethal injection process. Even for electrocution-based executions, however, TDOC obtained lethal injection chemicals pursuant to the Second 2018 Protocol in the event of a change in preference.

35

156.    Time and again, the chemicals that TDOC obtained for potential use were inadequate by the State's own standards. Specifically:

a.  Billy Ray Irick was executed on August 9, 2018, with midazolam that was not tested for either potency or endotoxins. *See* Stanton Report at 25.

b.  The midazolam obtained for potential use in the execution of Edmund Zagorski on November 1, 2018, was not tested for endotoxins and failed potency testing, which was known only after his execution by electrocution, because the testing results did not arrive on time. *See id.* at 26.

c.  The midazolam obtained for potential use in the execution of David Earl Miller on December 6, 2018, was not tested for endotoxins and failed potency testing. *See id.* at 26–27.

d.  Donnie Edward Johnson was executed on May 16, 2019, with midazolam that was not tested for endotoxins and was shipped to TDOC prior to receiving results for sterility testing. *See id.* at 27.

e.  Lethal injection chemicals obtained for potential use in the August 15, 2018 execution of Stephen West were shown repeatedly to have been inadequate. TDOC's preexisting batch of potassium chloride had expired, requiring it to turn to the compounding pharmacy from which it was receiving midazolam to receive compounded potassium chloride, as well. Its first batch of potassium chloride failed to fall within the required range for potency testing. *See id.* at 29. Then, the pharmacy informed TDOC that it was struggling to compound potassium chloride at all—with the drug "falling out

36

of solution." When the pharmacy did finally send the potassium chloride, the pharmacy owner told TDOC that sterility testing was unnecessary, only to retract that representation shortly thereafter. The pharmacy ultimately used an "in-house sterility report," rather than the outside testing called for by the Second 2018 Protocol. The lethal injection chemicals were not tested for endotoxins, and West was ultimately executed by electrocution. *See id.* at 30–31.

      f.   Both the midazolam and the potassium chloride prepared for potential use in the December 5, 2019 execution of Lee Hall failed potency testing and had to be scrapped. Replacements were provided, but the testing confirming the sterility of the potassium chloride was not returned until two weeks after the execution, which was performed by electrocution. None of the chemicals were tested for endotoxins. *See id.* at 32.

      g.  Lethal injection chemicals obtained for potential use in the February 20, 2020 execution of Nicholas Sutton were not tested for endotoxins, and it does not appear that the results of testing for potency or sterility were provided to TDOC prior to Mr. Sutton's execution by electrocution. *See id.* at 32–33.

**F.    Mr. Middlebrooks challenged the 2018 Protocol, but, before his claims could go to trial, the case was derailed when TDOC's aborted effort to execute another man, Oscar Smith, uncovered substantial agency wrongdoing**

157.    On December 18, 2019, Mr. Middlebrooks filed a Complaint against the then-Commissioner and then-Warden stating four grounds for liability under § 1983. The first claim alleged that the then-operative Second 2018 Protocol violated the

37

Eighth and Fourteenth Amendments of the U.S. Constitution. The latter three claims involved the possibility of execution by electrocution. R. 1. The electrocution-based claims were dismissed *sua sponte* on initial review as unripe. R. 6. The case was assigned to Judge Todd Campbell.

158.    On January 13, 2020, Mr. Middlebrooks filed a First Amended Complaint, in which he stated two claims challenging the 2018 Lethal Injection Protocol as inconsistent with the Eighth and Fourteenth Amendments. R. 13.

  a.  The first claim, designated as Count 1, asserted that application of the 2018 Protocol would be unconstitutional if applied to any individual. This claim was ultimately referred to by the Court as "the facial challenge." *See Middlebrooks*, 2020 WL 1876055, at *1.

  b.  The second claim, designated as Count 2, asserted that application of the 2018 Protocol to Mr. Middlebrooks, in particular, would be unconstitutional, in light of his specific circumstances, particularly his seizure disorder.

159.    Supreme Court caselaw requires an individual challenging a method of execution to plead an alternative method.

160.    To that end, Mr. Middlebrooks proposed two alternative methods: nitrogen gas and pentobarbital.

161.    Mr. Middlebrooks did not assert that pentobarbital was inherently humane or free of risks. Rather, he asserted that use of pentobarbital, if the drug was "properly compounded and properly administered, would constitute a significant

38

reduction of the substantial risk of severe pain, needless suffering, and terror" posed by the three-drug combination. R. 13 ¶ 274.

162.     The defendants moved to dismiss the claims, and the Court granted that motion. *See Middlebrooks v. Parker*, No. 3:19-CV-01139, 2020 WL 1876055, at *11 (M.D. Tenn. Apr. 15, 2020). Specifically, the Court held that both counts were precluded by the judgment of the Tennessee state courts in separate litigation in which Mr. Middlebrooks was a plaintiff. *Id.* at *10–11.

163.     Mr. Middlebrooks appealed that ruling to the Sixth Circuit, which affirmed in part, reversed in part, and remanded the case for further proceedings. *See Middlebrooks v. Parker*, 15 F.4th 784, 797 (6th Cir. 2021).

> a. Specifically, the court found that Mr. Middlebrooks had plausibly alleged new facts that prevented *res judicata* from applying to Count 1. *See Middlebrooks v. Parker*, 15 F.4th 784, 793 (6th Cir. 2021)
>
> b.  The court, however, held that *res judicata* still barred Count 2, because the relevant new facts did not sufficiently bear on the specific medical issues that Mr. Middlebrooks had identified.

164.     While Mr. Middlebrooks pursued his claims, another individual sentenced to death in Tennessee, Terry King, was challenging the 2018 Protocol in a separate case and with different counsel. On April 4, 2022, Mr. Middlebrooks and Mr. King moved to have the cases consolidated for the purposes of trial. R. 45. On April 20, 2022, the Court granted that motion and set a joint bench trial for October 4, 2022. R. 52, PageID#476.

39

165.     Before that bench trial could commence, the cases were derailed by events surrounding the planned execution of a third individual, Oscar Franklin Smith, on April 21, 2022.

166.     Oscar Smith was scheduled to be executed on April 21, 2022.

167.     On April 20, 2022, Mr. Smith's attorney, Kelley Henry, sent an email to TDOC Deputy Commissioner/General Counsel Debra Inglis inquiring whether the chemicals intended for Mr. Smith's execution had been subjected to the full testing for sterility, potency, and endotoxins required by the Second 2018 Protocol.

168.     The chemicals had not, in fact, been tested for endotoxins, as required by the Second 2018 Protocol, a fact of which Inglis was aware no later than shortly after Ms. Henry's email.

169.     Despite the fact that TDOC knew that it had failed to comply with the Second 2018 Protocol and would be unable to do so in time for the planned execution, it initially prepared to go forward with the killing.

170.     On the day of the planned execution, TDOC officials went as far as preparing the syringes for the use of the noncompliant drugs in Mr. Smith's execution.

171.     Mr. Smith reached the point of beginning to receive communion in anticipation of his imminent death.

172.      The execution of Mr. Smith was halted because the Governor intervened and granted Mr. Smith a reprieve.

40

173. It quickly became clear to the Governor that TDOC's wrongdoing was not limited to the planned execution of Mr. Smith.

174. TDOC had, in fact, never fully complied with the Second 2018 Protocol in any execution by lethal injection.

175. TDOC's failures to comply with the Second 2018 Protocol were not limited to failures to perform endotoxin testing.

176. TDOC executed at least one person, Billy Ray Irick, with midazolam that were not tested for potency.

177. The Stanton Report confirms that TDOC's employee in charge of procuring drugs was fully aware of that omission and did nothing to rectify it or stop the execution. Stanton Report at 24–25.

178. Two of the next three times that midazolam from that provider was tested for potency in connection with Tennessee's process, the midazolam failed.

179. In addition to the errors that TDOC made in connection with the executions themselves, TDOC officials also misrepresented its compliance with its procedures in both this case and Mr. King's.

180. Counsel for TDOC has now admitted to several such misstatements— including ones that involved their counsel's overt scoffing at opposing counsel's now-vindicated concerns as "speculative" and "baseless." *See* R. 81 at 3–5.

181. Because those misrepresentations took place in ongoing litigation, they were disclosed. The sheer number of times that TDOC misrepresented the truth to the public, attorneys, its prisoners, and others will likely never be known.

41

182.     On May 2, 2022, the Governor directed former U.S. Attorney Edward Stanton III to conduct an independent investigation of (1) the "[c]ircumstances that led to testing the lethal injection chemicals for only potency and sterility but not endotoxins preparing for the April 21 execution"; (2) the "[c]larity of the lethal injection process manual that was last updated in 2018, and adherence to testing policies since the update"; and (3) TDOC staffing considerations. *See* Ex. 15 at 2.

183.     In acknowledgment of the State's loss of confidence in the Second 2018 Protocol, as implemented by TDOC, Governor Lee "paus[ed] scheduled executions through the end of 2022 in order to allow for the review and corrective action to be put in place."

184.     Mr. Middlebrooks, Mr. King, and the defendants agreed that it was not practicable to proceed with the scheduled bench trial for several reasons, including that the challenged protocol was likely to be rescinded or substantially revised.

185.     The parties agreed that the defendants would seek a stay of proceedings and an administrative closure of the case until greater clarity could be reached. To that end, Mr. Middlebrooks, Mr. King, and the defendants entered into a written agreement drafted to go into effect if and when the court granted the defendants' expected motion. *See* R. 59-3 at 1 ("2022 Stay Agreement").

186.     Consistent with the agreement, the defendants filed an Unopposed Motion to Stay Proceedings on May 6, 2022. R. 59.

187.     On the same day, the defendants filed a notice to the Court acknowledging that "there may be factual inaccuracies or misstatements in some of

42

Defendants' filings" and assuring the court that they would "correct any inaccuracies and misstatements once the truth has been ascertained." R. 58 at 1.

188.    On May 10, 2022, the court granted Defendants' motion, administratively closed the case, and stayed proceedings "pending the outcome of the independent investigation." R. 61 at 2.

### G.    The aftermath of the aborted execution of Mr. Smith revealed more TDOC wrongdoing and deficiencies, and TDOC was forced to take ostensible remedial steps.

189.    On December 13, 2022, Mr. Stanton issued the Report and Findings of his investigation, also known as the "Stanton Report." *See* Ex. 13.

190.    Mr. Stanton publicly confirmed, for the first time, that TDOC had been routinely failing to follow its procedures related to lethal injection chemicals.

191.    Mr. Stanton publicly revealed, for the first time, that TDOC had never fully complied with the Second 2018 Protocol in connection with any execution by lethal injection.

192.    Mr. Stanton expressly concluded, as part of his published report, that the agency's failures were a direct result of the fact that "TDOC leadership viewed the lethal injection process through a tunnel-vision, result-oriented lens." Stanton Report at 40.

193.    Mr. Stanton also set out a number of "concrete recommendations":

- Consider hiring a full-time employee or retaining a consultant with a pharmaceutical background to provide guidance in connection with the lethal injection process.
    - Conduct an exhaustive review of the current Protocol.
    - Review the current Protocol's testing requirements.

43

- o Establish testing guidelines for any compounded [lethal injection chemicals ("LIC")] with procedures for confirming that the appropriate tests are being performed.

- o Establish a procedure for storing and maintaining test results.

- o Establish a procedure for storing and maintaining LIC, including recommendations regarding suitable equipment for storage.

- o Assist with locating LIC sources and communicating pertinent information to same.

- Ensure that a copy of any current or future version of the TDOC Protocol is provided to the LIC provider.

- Evaluate the roles and outline the duties of all TDOC employees, as well as any third parties, tasked with participating in the lethal injection process.

- Consider hiring a full-time employee or retaining a consultant with a healthcare background to provide scheduled guidance and training to the Execution Team.

  - o Determine whether any Execution Team members should be required to obtain any certifications and/or licenses.

- Establish a team/committee to review all relevant testing data prior to each scheduled execution to ensure that there are no deviations from the Protocol.

  - o Consider incorporating deadlines to obtain testing results in sufficient time to ensure that failing LIC are not made available or used during a scheduled execution.

  - o Consider annual audits to ensure compliance and to evaluate Protocol efficiencies and best practices.

*Id*. at 41–42.

194.    On December 28, 2022, Governor Lee issued a formal statement in response to the Stanton Report, stating that he was "proactively sharing . . . [his] administration's next steps to ensure continued transparency for the people of Tennessee." *See* Ex. 16 at 1–2.

195.     The Governor identified four "proactive steps to ensure TDOC adheres to established protocol," which, he stated, "will occur in the following sequence": (1) make staffing changes at the department's leadership level; (2) hire and onboard a permanent TDOC commissioner in January 2023; (3) revise the State's lethal injection protocol; and (4) review all training associated with the revised protocol and make appropriate operational updates. *See id.*

196.     Mr. Middlebrooks and Defendants agreed that, because the protocol was going to be revised or superseded, this case should remain stayed until the completion of the corrective actions recommended by the Governor and Mr. Stanton.

197.     Defendants, therefore, asked the court to "extend the stay of the proceedings until the completion of corrective actions called for by the report and the Governor's directives based on the report." R. 72. On January 27, 2023, the Court granted the defendants' motion. R. 78.

198.     Around the time of the release of the Stanton Report, TDOC fired Inglis.

199.     On information and belief, Inglis was fired for wrongdoing related to executions, including making misrepresentations.

200.     Around the same time, TDOC fired Inspector General Kelly Young.

201.     On information and belief, Young was fired for issues related to executions.

202.     On May 1, 2023, Defendants filed a Notice of Corrections of Inaccuracies and/or Misstatements admitting to several false statements made in the course of litigating the *King* case and this case. *See* R. 81.

45

**H.** **After over two years, TDOC finalized a new protocol and immediately misrepresented the contents or circumstances of that protocol more than once.**

203.    TDOC's process of developing a new protocol for performing executions following the Stanton Report was performed behind closed doors, with no public participation.

204.    TDOC's limited public comments during that period confirmed that the agency was attempting to formulate a lethal injection protocol, but did not indicate that any particular approach had been finalized. *See,* e.g., R. 88.

205.    Step One of the Method of Execution Statute requires TDOC to attempt to formulate a method for performing executions by lethal injection, before it can certify to the Governor that no feasible option was available. Accordingly, the fact that TDOC acknowledged that it was working on a lethal injection protocol could not be taken as confirmation that TDOC would ultimately conclude that such a protocol was feasible or possible.

206.    TDOC has an acknowledged history of struggling to obtain chemicals to perform lethal injection executions.

207.    TDOC has specifically claimed, in past litigation, that it could not obtain pentobarbital. *See Abdur'Rahman v. Parker*, 558 S.W.3d 606, 616 (Tenn. 2018)

208.    At no point in the period during which TDOC was formulating and assessing a potential new protocol did it make any public indication that it had located a reliable supplier for any lethal injection chemical.

209.    In the years preceding the Governor's intervention, electrocution had become the State's de facto primary method of execution, because so few individuals were willing to subject themselves to TDOC's lethal injection efforts.

210.    TDOC's difficulties in obtaining lethal injection chemicals, combined with the agency's history of struggles in formulating an adequate lethal injection protocol, created a significant apparent possibility that TDOC would be unable to finalize a feasible protocol and would, therefore, select electrocution as its default method of execution under Step One of the Method of Execution Statute.

211.    In October 2024, however, TDOC informed this Court, in one of its periodic status updates, that it was "finalizing revisions to Tennessee's execution procedures for lethal injection." R.89.

212.    On December 27, 2024, TDOC issued a bare-bones press release informing the public that it had "completed its revision of the lethal injection protocol, which will utilize the single drug pentobarbital." *See* Ex. 17.

213.    The press release's assertion that the revision was "completed" was false, or at least misleading, as the revised protocol had, in fact, not yet been signed by the Commissioner and would not be until January 8, 2024. *See* 2025 Protocol (Ex. 2) at 2.

214.    TDOC's premature declaration that its process had been completed ensured that the "completion" of the protocol was reported within days of the State of Tennessee's filing of a Response opposing the Rule 11 application to the Tennessee Supreme Court in *McKay v. Tennessee*—a case involving an attempt, by the

47

Tennessee General Assembly, to divest local prosecutors of certain powers related to capital cases. *See McKay v. State*, No. W2023-01207-CCA-R9-CO, 2024 WL 4404318, at *1 (Tenn. Crim. App. Oct. 4, 2024).

215.    In the State's opposition to review in *McKay*, it complained that the State's pursuit of carrying out capital sentences would be delayed by a Rule 11 grant.

216.    That professed concern about delays would have been less credible if all executions in Tennessee were being delayed by TDOC's revision of the protocol—which, in fact, they were.

217.    Although the Tennessee Supreme Court ultimately did not resolve the *McKay* Rule 11 application until after the 2025 Protocol's actual finalization date, there was no way to know, at the time, whether that would be the case. Based on the then-available information, the premature declaration that that protocol revision process had been completed ensured that that supposed "completion" was publicly reported before the Tennessee Supreme Court could fully consider whether to grant review in *McKay*.

218.    The State's opposition to the Rule 11 application in *McKay* was ultimately successful.

219.    The December 27, 2024 press release did not include, and provided no link to, the protocol itself—revealing essentially nothing of the protocol's details, other than the drug/poison to be used.

48

220.     The press release made no assertions regarding whether TDOC had taken any of the specific corrective actions set out in the Stanton Report or the Governor's directive, other than the revision of the protocol.

221.     The press release made no mention of the fact that the Governor had directed TDOC to review and overhaul its training after the completion of the new protocol.

222.     The Associated Press ("AP") requested a copy of the written protocol pursuant to the Tennessee Public Records Act ("TPRA") and was, at that juncture, refused.

223.     According to the AP, TDOC "sa[id] it need[ed] to keep the entire document secret to protect the identities of the executioner and other people involved." Travis Loller and Kimberly Kruesi, *Tennessee is refusing to release its new execution manual. Here is why it matters*, Associated Press, Jan. 2, 2025.

224.     The TPRA exception on which TDOC was relying can be found in Tenn. Code § 10-7-504(h).

225.     That exception reaches only "those parts of the record identifying an individual or entity as a person or entity who or that has been or may in the future be directly involved in the process of executing a sentence of death . . . ." Moreover, the statute expressly provides that "[i]nformation made confidential by this subsection (h) shall be redacted wherever possible and nothing in this subsection (h) shall be used to limit or deny access to otherwise public information because a file, a

49

document, or data file contains confidential information." Tenn. Code Ann. § 10-7-504(h)(1)–(2).

226.     Accordingly, for TDOC's assertion of the exception to have been meritorious—or even colorable—it would need to have been plausibly the case that the written protocol was composed in such a manner that no amount of redaction could have made disclosure possible without revealing protected identities.

227.     Based on the actual text of the 2025 Protocol, no reasonable person could believe in good faith that it was impossible to release a redacted copy without revealing a protected identity.

228.     On January 9, 2025, TDOC released a redacted copy of the 2025 Protocol to the AP, which, among other things, reflected the actual January 8, 2025 date of finalization.

229.     According to the AP, TDOC's "only explanation for the change" in the agency's position regarding the confidentiality of the protocol "was that the state was revising its decision." Travis Loller and Kimberly Kruesi, *Tennessee reverses course, releases redacted execution manual with vague details*, Associated Press, Jan. 9, 2025.

I.     **The 2025 Protocol relies on pentobarbital, a drug that has been shown by recent evidence to pose a significant risk of a torturous death.**

230.     The 2025 Protocol calls for the individual to be executed by the intravenous administration of 5 grams of pentobarbital or, if the initial administration fails, a cumulative 10 grams of pentobarbital.

50

231.     Pentobarbital is a barbiturate that is sometimes used, in nonlethal doses, as a sedative or preanesthetic.

232.     In order for an execution to be performed by pentobarbital, the individual to be executed must receive a dose far in excess of the dose recommended for a therapeutic purpose.

233.     The acidity or alkalinity of a chemical is measured on the 14-point pH scale. On that scale, a 7 is neutral, a 0 is maximally acidic, and 14 is maximally alkaline. Pentobarbital is a "highly alkaline" substance, often with a pH of around 11 to 12. *See* Colin A. Laferriere, Daniel SJ Pang, *Review of Intraperitoneal Injection of Sodium Pentobarbital as a Method of Euthanasia in Laboratory Rodents*, 59 J. Am. Assoc. Lab Animal Sci. 254, 258 (2020) (Ex. 18).

234.     By way of comparison, commercial solutions of the pest control/cleaning chemical borax "typically have a pH of about 9.24." *See* National Pesticide Information Center, Technical Fact Sheet: Boric Acid, available at https://npic.orst.edu/factsheets/archive/borictech.html (Ex. 19).

235.     In the past, it was generally known that execution by intravenous pentobarbital poisoning poses some risk of unintended side effects.

236.     The extent of these risks, however, was largely unknown, because, prior to the adoption of pentobarbital as a popular method of execution, human deaths by pentobarbital poisoning were very rare.

237.     The evidence regarding the risks of a torturous death from pentobarbital poisoning has substantially increased in recent years.

238.     For example, in September 2020, NPR published the results of its review of over 200 autopsies of individuals executed by lethal injection/intravenous poisoning, including 58 individuals executed with pentobarbital. *See* Ex. 20.

239.     The review showed that at least 49 of those 58 individuals executed with pentobarbital experienced pulmonary edema, a condition in which fluid accumulates in the air spaces of the lungs.

240.     A pulmonary edema is not simply painful or uncomfortable; it can create a sense of suffocating or drowning that has been likened by experts to the sensation intentionally induced by the practice of waterboarding—an unambiguous form of outright torture.

241.     NPR is a journalistic organization, not a medical research entity.

242.     However, the risks that NPR described were further confirmed in 2022, when physicians Joel Zivot, Mark Edgar, and David Lubarsky released a study ("Zivot/Edgar/Lubarsky Study") finding evidence of lung edema in at least two-thirds of the reviewed autopsy findings of individuals executed by a protocol involving pentobarbital. *See* Ex. 21.

243.     The Zivot/Edgar/Lubarsky Study noted, in particular, the shockingly increased weights of the lungs of individuals executed with pentobarbital. Pulmonary edema causes the weight of lungs to increase as they become saturated with liquid.

244.     Every single autopsy of a person executed with pentobarbital that the physicians reviewed showed lungs well above the expected weight of the lungs of a

man who experienced a sudden death, with the average weight for right lungs being 723 grams and for left lungs being 631 grams.

245.    On January 15, 2025, the U.S. Department of Justice ("DOJ") announced that it was withdrawing its pentobarbital-based execution protocol, a decision that it supported with a report by the Department's Office of Legal Policy ("OLP"). *See* DOJ OLP, Review of the Federal Execution Protocol Addendum and Manner of Execution Regulations (Jan. 15, 2025) ("DOJ Report") (Ex. 22).

246.    The OLP concluded that "there remains significant uncertainty about whether the use of pentobarbital as a single-drug lethal injection causes unnecessary pain and suffering." *Id.* at 1–2.

247.    That uncertainty, the OLP concluded, justified the cessation of all pentobarbital-based executions "until [it] is resolved." *Id.* at 2.

248.    The DOJ Report identified three primary areas of concern regarding the use of pentobarbital: (1) the "risk of flash pulmonary edema" caused by the drug; (2) the "pain associated with the injection of a highly alkaline solution into the bloodstream"; and (3) the "lack of clarity as to whether pentobarbital causes individuals to become unconscious, and therefore incapable of feeling pain, or simply unresponsive." *Id.* at 11.

249.    The OLP emphasized that its concerns were not based simply on the historical information cited in earlier discussions or litigation regarding pentobarbital, but on, among other things, "recent medical research evaluating autopsy data from executions that used pentobarbital, information collected from

53

autopsies conducted on two individuals recently executed by the federal government, [and] recent witness accounts from federal and state executions." *Id.*

250.     The OLP noted that the injection of a highly alkaline solution like pentobarbital can, even if performed correctly, lead to vascular damage including the rupturing of veins and the spreading of the solution into other tissues. *See id.* at 14.

251.     That risk of extreme pain is significantly worsened if an error is made during the insertion of the IV catheter. A catheter may be inserted improperly into the vein, causing the solution to leak into surrounding tissues, or it may be inserted, incorrectly, into an artery instead—in what is known as an "intra-arterial" injection, as opposed to "intravenous" injection. *Id.*

252.     In light of the aforementioned risks, it is highly likely that, if a person executed by pentobarbital remains sensate until after the physical damage to his body has begun, then he will experience extreme suffering.

253.     Accordingly, the only way for execution by pentobarbital poisoning to reliably avoid extreme suffering would be for the pentobarbital to render the recipient insensate *before* pulmonary edema, vascular damage, or leakage could occur.

254.     Pentobarbital, a barbiturate, is believed, in theory, to be capable of compromising an individual's consciousness, if administered properly and in a high enough dosage.

255.     The timing, consistency, and effectiveness with which that process occurs, however, is unknown and/or uncertain as a general matter and can vary significantly depending on the individual and context at issue.

256.    There is evidence that the relative timing of pentobarbital's anesthetic effects, on one hand, and the physical effects of overdose, on the other, can vary based on the details of administration—with the physical effects of overdose potentially preceding the anesthetic effects. *See* Companion Animal Euthanasia Training Academy, *Euthanasia Drugs; Administration rates matter*, available at https://caetainternational.com/euthanasia-drugs-administration-rates-matter/ (Ex. 23).

257.    The timing of the anesthetic and physical effects of pentobarbital overdose are likely to depend, in part, on the rate at which the drug is administered. The 2025 Protocol says nothing about the rate at which the pentobarbital is supposed to be administered, stating only that "The Special Operations Team Leader administers all syringes in Primary Set A." 2025 Protocol (Ex. 2) at 43. The 2025 Protocol makes no mention of an IV infusion pump, meaning that the pentobarbital and saline solutions are likely being pushed manually—such that the LIC might be administered at an inconsistent rate.

258.    The ability of pentobarbital to superficially compromise a person's consciousness does not preclude the possibility that an individual who has been given the drug will remain in a semi-conscious or partially conscious state.

259.    An individual experiencing reduced or impaired consciousness may remain sensate and capable of experiencing suffering. For example, individuals recovering from surgery requiring anesthesia routinely experience extreme pain and

55

suffering, requiring treatment with pain-reducing medication, before they regain full, ordinary consciousness.

260.	The DOJ Report concluded that the evidence did not sufficiently demonstrate that intravenous pentobarbital would reliably have the effect of shielding the individual from extreme suffering.

261.	Specifically, the OLP wrote that "experts have debated whether 5 grams of pentobarbital leaves a person in a state of disconnected consciousness," but that eyewitness accounts of pentobarbital executions have frequently noted actions—such as grimacing, furrowing of eyebrows, wincing, yawning, and quivering—that are highly suggestive of the experience of suffering. *Id.* at 15.

262.	An underdose of pentobarbital that is sufficient to cause death but insufficient to render the recipient unconscious and insensate before experiencing the symptoms of poisoning is almost certain to result in a torturous death.

263.	A dose of 5 g of pentobarbital would be an underdose for a substantial portion of adult men, including Mr. Middlebrooks, according to the weight-based dosing recommended for use of pentobarbital in animal euthanasia.

J. **The risks of a torturous death by a person intravenously poisoned with pentobarbital are increased if the individuals tasked with obtaining, preparing, and/or administering the drug are not competent and dedicated to compliance.**

1. **The risk of torturous death in an execution by pentobarbital is increased if the drug is not procured properly by an individual with adequate knowledge of drug procurement practices.**

264. The effects of the injection of a lethal dose of pentobarbital depend, in part, on both the physical integrity of the pentobarbital itself and whether it is administered properly.

265. For example, in the case of compounded pentobarbital, improper compounding and/or improper handling of the compounded drug can result in the drug falling out of solution, causing the recipient to receive a lower dose of the drug that is less likely to render him fully or promptly unconscious or insensate.

266. In the case of manufactured pentobarbital, the reliability of the drug is dependent on whether it has been obtained through licit, reliable channels, as well as whether the drug has been handled, transported, and stored properly.

267. It is common, in the United States, for individuals or entities to pass off expired drugs, adulterated drugs, mishandled drugs, and/or drugs not approved for sale in the United States as licit drugs.

268. For example, a vendor may obtain foreign, expired drugs at a price significantly lower than the licit American equivalent would cost and then pass those drugs off as legitimate.

269.     Such drugs are often referred to as "gray market" drugs, because they were permissible for sale in some jurisdiction at some time but have since been removed from those legitimate channels.

270.     Gray market drugs cannot be assumed to be as potent or reliable as licit American drugs that have been properly handled and stored.

271.     Tennessee Attorney General and Reporter Jonathan Skrmetti recently said, of gray market drugs: "These counterfeit or copycat drugs can be contaminated through shady supply chains running from China, Turkey, and other overseas suppliers, or they can contain entirely different drugs manufactured and packaged to look like" licit versions. *See* Tenn. Att'y Gen. & Rptr., *TN Attorney General Leads Bipartisan Call for Action Against Sellers of Counterfeit, Unapproved, and Contaminated Weight Loss Drugs* (Feb. 20, 2025) (Ex. 24).

272.     When a drug has been diverted from legitimate channels, one cannot safely assume that it was stored in appropriately temperature-controlled environments.

273.     Pentobarbital is a drug that must be stored in temperature-controlled conditions.

274.      When a drug has been diverted from legitimate channels, it is impossible to know whether the expiration date on the packaging is accurate, because the label could have been forged or altered, or expired drugs could have been placed in newer packaging.

275.     Pentobarbital is a drug that expires.

58

276. When a drug has been diverted from legitimate channels, it is impossible to know whether a seemingly normal drug has been diluted, altered, adulterated, or swapped out without performing independent testing.

277. Pentobarbital is a drug capable of being diluted or adulterated.

278. There is a strong economic incentive to dilute drugs made available for commercial sale. A seller can turn a certain number of actual doses into a much higher number of diluted doses but sell those diluted doses at full price.

279. It is notoriously difficult to obtain pentobarbital for execution purposes, because most entities capable of lawfully providing the drug refuse to take part in the execution process.

280. The difficulty of obtaining pentobarbital increases the risk of using pentobarbital as a killing agent in executions in at least two ways.

281. First, the scarcity of pentobarbital, combined with the eagerness of some governments to use it, has made the drug very expensive. Its high price increases the potential profit to be made by diluting the drug, as well as the potential loss from discarding batches that have expired or been improperly handled. The incentives for diluting the drug and/or passing off expired doses as unexpired are, accordingly, unusually high.

282. Second, the difficulty of obtaining pentobarbital has led many buyers to turn to disreputable vendors.

59

283.     For example, a number of states have obtained execution drugs from a small British wholesaler, Dream Pharma, that operated out of the back of a driving school in London.

284.     It was recently reported that the State of Texas obtained injectable pentobarbital from a strip mall-based compounding pharmacy that has been cited for violating basic standards of practice more than a dozen times. *See* Ex.25.

285.     When one obtains drugs from an obscure, disreputable supplier, there is a significantly higher chance that the drugs will have come from the gray market and/or will have had their physical integrity compromised in some way.

286.     The State of Tennessee has consistently asserted a right to absolute secrecy with regard to the supplier of its lethal injection chemicals.

287.     The 2025 Protocol contains no minimum competency requirements for the pentobarbital supplier.

288.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of safety violations.

289.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of fraud.

290.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of selling gray market drugs.

291.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of selling diluted drugs.

292.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of selling drugs that have been tampered with.

293.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of selling drugs with altered labeling.

294.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of storing drugs in improper conditions.

295.     The 2025 Protocol contains no prohibition against TDOC obtaining pentobarbital from an entity or individual with a history of selling drugs after their expiration date.

296.     In the past, TDOC has taken advantage of the secrecy afforded to its selection of suppliers of lethal injection chemicals to contract with pharmacists whose licensure and disciplinary histories included multiple red flags suggesting unreliability.

297.     For example, in Chancery Court litigation over the First and Second 2018 Protocols, the TDOC Commissioner, RMSI Warden, and "John/Jane Doe Pharmacists," who were to supply Tennessee with lethal injection chemicals, admitted the following facts:

         a.  "The Pharmacy under contract with the Defendants to provide drugs for purposes of lethal injection relinquished its license to conduct high-risk

61

sterile compounding for a short time to make facility upgrades in accordance with the findings and recommendations derived from a private review of the facility. . . ." Defendant's Response to Order at 5 (July 3, 2018) (Ex. 26).

b. The State's Pharmacy entered into an agreed settlement with the state Board of Pharmacy, as a result of the Pharmacy's omission of required information from a 2013 Application for Pharmacy License. *See id*.

c. The State's Chief Pharmacist had been disciplined for failure to supervise pharmacy personnel. *See id*. at 6.

298.    The combination of TDOC's practice of extreme secrecy, the agency's culture of results-oriented tunnelvision, and the 2025 Protocol's lack of controls creates a high likelihood that TDOC will, again, rely on a supplier that is unable or unwilling to comply with the requirements necessary to ensure a high-quality, reliable product.

299.    An individual who is executed pursuant to the 2025 Protocol, but who receives a lower-than-intended or otherwise insufficient dosage of pentobarbital, is likely to remain conscious and sensate as he experiences the physical effects of the drug, including, in most cases, pulmonary edema.

300.    Based on the foregoing issues, pentobarbital that has been improperly procured, manufactured, transported, handled, and/or stored poses a greater risk of severe suffering than licit, properly processed pentobarbital.

301.    That risk is intolerable.

**2. The risk of torturous death in an execution by pentobarbital is increased if the individuals preparing the syringes, setting the IV line, and administering the drug are not competent, sufficiently trained, and qualified.**

302.     The risk of a torturous death by pentobarbital poisoning is increased if the individuals charged with preparing the pentobarbital, setting the intravenous ("IV") line, and administering the pentobarbital are incompetent, insufficiently trained, insufficiently dedicated to doing their jobs properly, and/or insufficiently attentive.

303.     An error in the preparation or administration of the syringes of pentobarbital increases the likelihood that the individual to be executed will receive a dosage that causes extreme suffering but is insufficient to render him unconscious or insensate.

304.     The 2025 Protocol entrusts the preparation of the syringes to be used in the execution to an individual identified as the "Special Operations Team Leader." 2025 Protocol (Ex. 2) at 18.

305.     The 2025 Protocol entrusts the administration of the syringes through the affixed IV line—that is, the killing act—to the Special Operations Team Leader, as well. *See id.* at 21.

306.     The 2025 Protocol does not require that the Special Operations Team Leader have any form of healthcare licensure whatsoever. *See id.* at 9.

307.     The 2025 Protocol does not require that the Special Operations Team Leader have any form of healthcare certification whatsoever. *See id.*

63

308.     The 2025 Protocol does not require that the Special Operations Team Leader have any form of healthcare experience whatsoever. *See id.*

309.     As a result, the 2025 Protocol calls for the person to be executed to be killed by a pharmaceutical agent that has been prepared and administered by a layperson, giving rise to an increased risk of errors resulting in severe suffering.

310.     In addition to the risks associated with the preparation and administration of the syringes, an improperly set IV line can cause less than the intended dosage of pentobarbital to enter the executed person's bloodstream, increasing the likelihood that he will remain conscious and sensate as he experiences the poisonous effects of the drug, including pulmonary edema.

311.     An IV line that is not fully and squarely inserted into the vein at a proper angle, without piercing through to the other side of the vein, is likely to leak some of the drug into the surrounding tissue.

312.     If pentobarbital leaks into the surrounding tissue, that leakage is likely to cause excruciating pain.

313.     If pentobarbital leaks into the surrounding tissue, the leaked portion will not contribute to the immediate sedation of the individual, causing the equivalent of an underdose.

314.     An IV line that is set in a manner that does too much damage to the targeted vein can cause the vein to rupture, leading to some of the drug escaping from the circulatory system.

64

315. Medications that are administered via syringe too forcefully can cause the vein to rupture, leading to some of the drug escaping from the circulatory system.

316. The rupturing of the vein and the consequent dumping of pentobarbital into the surrounding tissue is likely to cause excruciating pain.

317. If the vein ruptures and pentobarbital escapes from the circulatory system, the escaped portion will not contribute to the immediate sedation of the individual, causing the equivalent of an underdose.

318. An IV line that is not sufficiently firmly affixed can come loose during the administration of the drug, leading to an underdose. This is especially likely if the IV solutions are pushed too forcefully—as is possible if the LIC is being manually administered by the Special Operations Team leader.

319. If the IV line comes loose before the full dose is administered, a lower dose of pentobarbital will enter the bloodstream.

320. An individual who is executed pursuant to the 2025 Protocol but receives a lower-than-intended dosage of pentobarbital, is more likely to remain conscious and sensate as he experiences the physical effects of the drug, including, in most cases, pulmonary edema.

321. The 2025 Protocol calls for an IV line to be set by a TDOC-selected "IV Team," defined as follows:

> IV Team: consists of at least two members who are either
> physicians, physician assistants, nurses, emergency medical
> technicians ("EMTs"), paramedics, military corpsman with
> relevant medical training, or other certified or licensed personnel
> including those trained in the United States Military. All team
> members are currently certified, licensed and/or qualified within

65

the United States to place IV lines. IV Team members are selected
by the Commissioner.

2025 Protocol (Ex. 2) at 11.

322.     The 2025 Protocol does not require that members of the IV team have any kind of professional licensure, as long as at least two are "certified." The remaining team members need only be "qualified."

323.     The 2025 Protocol does not identify any particular entity from which a certification must be obtained.

324.     The 2025 Protocol does not define "qualified."

325.     The State of Tennessee has recently asserted authority, by its executive branch, to declare a person "qualified" for a position based on a unilateral assessment of the person's general fitness—in direct contravention of the usual requirements for that type of "qualification." *See* Tenn. Att'y Gen. Op. No. 24-007 (Apr. 23, 2024) (asserting that the statutory requirement that the Commissioner of Education be "qualified to teach in the school of the highest standing over which the commissioner has authority," Tenn. Code Ann. § 4-3-802(b)–(c), is merely a "general standard to be administered principally by the Governor through the appointment and removal process" and permits the Governor to select a Commissioner who is not, as a matter of law, qualified to teach in any Tennessee public school).

326.     That understanding of the term "qualified," as applied to the IV Team, would result in the equivalent of absolute, unreviewable discretion by TDOC to select team members, untethered to any actual, formal licensing regime or industry-accepted certification system.

66

327.     Not all physician assistants are capable of effectively setting an IV line.

328.     Not all physicians are capable of effectively setting an IV line.

329.     Not all military corpsmen with medical training are capable of effectively setting an IV line.

330.     Not all nurses are capable of effectively setting an IV line.

331.     The 2025 Protocol does not bar the participation of individuals with a history of reported medical errors.

332.     The 2025 Protocol does not bar the participation of individuals with a history of malpractice claims.

333.     The 2025 Protocol does not prescribe a particular training regimen for members of the IV team.

334.     The 2025 Protocol does not set a minimum number of times in which a member of the IV Team must have previously set an IV line in a professional setting.

335.     The 2025 Protocol does not require that a member of the IV Team ever have set an IV line in a professional setting.

336.     The 2025 Protocol calls for "Monthly Practice Sessions," but it specifically provides that "[n]o IV is inserted into the person playing the role of the inmate" during those sessions, meaning that the individuals on the IV Team do not receive monthly practice in actually setting an IV line in a human being. 2025 Protocol (Ex. 2) at 12.

337.     The Second 2018 Protocol also called for monthly practice sessions, but did not exempt the setting of the IV from those sessions. *See* Second 2018 Protocol at

67

32. The 2025 Protocol, accordingly, reflects an affirmative change to require less practice in setting an IV.

338.    The Second 2018 Protocol also included lengthy instructions for assessing both the adequacy of the IV line and whether drugs were being administered properly. For example, it specifically required the individual pushing the drugs through a syringe to pull back if he experienced pressure. *See* Second 2018 Protocol at 46. This instruction is important because continuing to push medication despite experiencing pressure could cause the prisoner's vein to rupture or the IV line to become dislodged.

339.    The 2025 Protocol, however, has removed essentially all of those detailed instructions.

340.    The difficulty of properly setting IVs has led to errors and complications in numerous American executions.

341.    For example, officials of the respective relevant governments had significant difficulties in setting the IV line in the executions or failed executions of the following individuals:

    1.  Stephen Peter Morin

    2.  Randy Woolls

    3.  Ricky Ray Rector

    4.  Billy Wayne White

    5.  Richard Townes, Jr.

    6.  Tommie J. Smith

68

7.  Michael Eugene Elkins

8.  Genaro Ruiz Camacho

9.  Roderick Abeyta

10. Christina Marie Riggs

11. Bennie Demps

12. Claude Jones

13. Jose High

14. Christopher Newton

15. John Hightower

16. Curtis Osborne

17. Romell Broom [failed]

18. Brandon Joseph Rhode

19. Brian Keith Terrell

20. Brandon Jones

21. Alva Campbell [failed]

22. Doyle Lee Hamm [failed]

23. Clarence Dixon

24. Frank Atwood

25. Joe Nathan James, Jr.

26. Alan Eugene Miller [failed]

27. Stephen Barbee

28. Murray Hooper

69

29. Kenneth Eugene Smith [failed]

30. Thomas Creech [failed]

342.      The details of the failed Doyle Lee Hamm execution—the twenty-second incident listed above—are emblematic of the types of problems that states have encountered. The Alabama Department of Corrections (ADOC)'s execution team spent over an hour inserting needles into Doyle Lee Hamm's lower extremities—even turning him onto his stomach and slapping the back of his legs in order to find a usable vein. *See* Liliana Segura, *Another Failed Execution: the Torture of Doyle Lee Hamm*, The Intercept (Mar. 3, 2018), https://theintercept.com/2018/03/03/doyle-hamm-alabama-execution-lethal-injection/. The execution team then moved on to Hamm's right groin, where they stabbed him numerous times in an effort to obtain central venous access. *See id.* In the process, they punctured Hamm's bladder and femoral artery—causing Hamm to bleed profusely on the gurney. The execution team placed a pad on Hamm's groin to staunch the bleeding but were forced to change it when the fabric became completely soaked with blood. *See* Tracy Connor, *Doyle Lee Hamm wished for death during botched execution, report says*, NBC News (Mar. 5, 2018), https://www.nbcnews.com/storyline/lethal-injection/doyle-lee-hamm-wished-death-during-botched-execution-report-says-n853706. After two-and-a-half hours, ADOC finally called off Hamm's execution, just before midnight, as they worried Hamm's death warrant would expire. *See id.*

343.      Hamm was left with dozens of puncture wounds across his lower body, as well as heavy bruising, swelling, and pain in his legs and groin area. For much of

the following day, Hamm urinated blood as a result of his punctured bladder. *See id.* Nevertheless, when speaking to reporters following the aborted lethal injection, ADOC officials denied that there were any problems with the procedure: "I wouldn't necessarily characterize what we had tonight as a problem," ADOC Commission Jeff Dunn stated. *See* Tracy Connor, *Lawyer describes aborted execution attempt for Doyle Lee Hamm as 'torture'*, NBC NEWS (Feb. 25, 2018), https://www.nbcnews.com/storyline/lethal-injection/lawyer-calls-aborted-execution-attempt-doyle-lee-hamm-torture-n851006.

344.    In addition to issues that arose during the setting of the IV, other executions saw more complex problems associated with the adequacy of the IV administration.

345.    For example, when the State of Ohio executed Joseph Clark by lethal injection, it took 22 minutes for the individuals charged with inserting the IV to find a vein that they believed to be suitable. That vein, however, collapsed within three or four minutes of being accessed. Mr. Clark's arm began to swell, he raised his head off the gurney, and he said, five times, "It don't work. It don't work." The curtains surrounding the gurney were then closed while execution personnel worked for 30 minutes to find another vein. Media witnesses later reported that they heard "moaning, crying out and guttural noises." Death was pronounced almost 90 minutes after the execution began. *See DPIC Botched Executions,* February 28, 2024 (Ex. 27).

346.    When the State of Texas executed Raymond Landry by lethal injection, the needle came out of Landry's vein shortly after the administration of the chemicals

71

began. The curtain separating the witnesses from Mr. Landry was then drawn for fourteen minutes, while the execution team apparently reinserted the catheter into a vein. Witnesses reported "at least one groan." A spokesman for the Texas Department of Correction said, "There was something of a delay in the execution because of what officials called a 'blowout.' The syringe came out of the vein . . . ." *Id.*

347.　　When the State of Missouri executed Charles Walker, a kink in the plastic tubing going into Mr. Walker's arm first stopped the deadly chemicals from reaching Mr. Walker effectively. When the chemicals did reach his body and bloodstream, however, they did so moving in the wrong direction. As a result, Mr. Walker experienced a prolonged and likely excruciating death. *See id.*

348.　　When the State of Missouri executed Emmitt Foster, the execution was temporarily halted when the chemicals stopped circulating. Mr. Foster was gasping and convulsing while officials drew the blinds to attempt to address the issue. According to the county coroner who eventually pronounced death, the problem was caused by the tightness of the leather straps that bound Mr. Foster to the execution gurney, which restricted the flow of chemicals into Mr. Foster's veins. The coroner entered the death chamber twenty minutes after the execution began, diagnosed the problem, and told the officials to loosen the strap so the execution could proceed. Mr. Foster did not die until several minutes after a prison worker finally loosened the straps. *See id.*

349.　　When the State of Florida executed Angel Diaz, Mr. Diaz continued to move after the first dose of poison was administered and was squinting and grimacing

72

as he apparently tried to mouth words. A second dose was then administered, and 34 minutes passed before Mr. Diaz was declared dead. At first, a spokesperson for the Florida Department of Corrections claimed that this was because Mr. Diaz had some sort of liver disease. *See id.*

350.    Mr. Diaz's autopsy, however, showed that his liver was undamaged. What had happened, rather, was that the IV catheters, which had been inserted in both arms, had gone fully through Mr. Diaz's veins and out the other side, so the deadly chemicals were injected into soft tissue. Two days after the execution, Governor Jeb Bush temporarily suspended all executions in the state and appointed a commission "to consider the humanity and constitutionality of lethal injections." *See id.*

351.    Later-published photographs of Mr. Diaz's execution revealed large chemical burns, including a blister-covered area 12 inches by 5 inches in size, in which his skin appeared to be coming loose from his body. Terry Aguayo, Ben Crair, *Photos from a Botched Lethal Injection*, The New Republic, May 29, 2014, available in incomplete form at http://www.newrepublic.com/article/117898/lethal-injection-photos-angel-diazs-botched-execution-florida (Ex. 28) (photos no longer available in archived article but available upon request).

352.    When the State of Oklahoma executed Clayton D. Lockett, the State's governor was informed, an hour before the execution began, that the executioner was having problems finding a usable vein, but the governor did not intervene. After an hour, a vein was finally found in Mr. Lockett's "groin area," and the execution went

73

forward. Ten minutes after the administration of the first drug, a sedative, the physician supervising the process announced that the inmate was unconscious, and therefore ready to receive the other two drugs that would actually kill him and which, if administered to a conscious and sensate person, would likely cause extreme suffering. However, Mr. Lockett was not unconscious. Three minutes after the latter two drugs were injected, "he began breathing heavily, writhing on the gurney, clenching his teeth and straining to lift his head off the pillow." Officials then lowered the blinds to prohibit witnesses from seeing what was going on, and 15 minutes later the witnesses were ordered to leave the room. Mr. Lockett died 43 minutes after the execution began, of a heart attack, while still in the execution chamber. *See* Bailey Elise McBride & Sean Murphy, *Oklahoma Inmate Dies after Execution is Botched*, Associated Press, Apr. 29, 2014, available at https://apnews.com/article/ executions-oklahoma-00a761ac0ea241a4b89f386bfa841d38 (Ex. 29); Eric Eckholm, *One Execution Botched, Oklahoma Delays the Next*, N.Y. Times, Apr. 29, 2014 (Ex. 30); Cary Aspinwall & Ziva Branstetter, *Secrets Still Shroud Clayton Lockett's Execution*, Tulsa World, May 11, 2014 (Ex. 31).

353.    The 2025 Protocol acknowledges that the work of the IV Team must be assessed for sufficiency before the execution can proceed and requires that an individual check to "ensure[] that the catheters are properly secured, properly connected to the IV lines, and out of reach of the inmate's hands." 2025 Protocol (Ex. 2) at 20.

354.     The individual charged with performing that assessment, however, is the Special Operations Team Leader—an individual who is not required to have any medical licensure or certification. *See id.* at 20.

355.     The lax, vague requirements for the IV Team, the improper reliance on the Special Operations Team Leader, and the lack of adequate mandatory training create a significant, unnecessary, and avoidable risk that errors will occur in an execution performed pursuant to the 2025 Protocol. As a result, pentobarbital that is administered pursuant to the 2025 Protocol presents a higher risk of a torturous death than pentobarbital administered by a competent, appropriately trained and licensed team of capable professionals.

356.     That risk is intolerable.

**K.    TDOC has come to suffer from a culture of noncompliance and disregard for professional standards that is incompatible with execution by intravenous pentobarbital poisoning.**

357.     Every failed Tennessee lethal injection protocol is tied together by a single thread: TDOC, in its form as an actually existing entity with an established culture and workforce.

358.     The adequacy of a set of instructions depends on the qualities of the person or entity to whom the instructions are directed.

359.     For example, instructions minimally sufficient to tell a seasoned pilot how to land a particular aircraft would be woefully insufficient to tell a layperson how to do the same, and instructions minimally sufficient to tell a skilled carpenter how to make an ornate table would be insufficient for a beginner.

75

360.     A version of the same principle holds true at the organizational level: the adequacy of a set of instructions depends on the organization to whom the instructions are directed.

361.     For example, instructions minimally sufficient to tell a construction crew how to erect a structure would be insufficient for a law firm charged with the same task.

362.     For the same reasons, instructions minimally sufficient for a well-trained government agency with a dedication to compliance will often be insufficient for an agency with an organizational culture of noncompliance and/or insufficiently trained personnel.

363.     The 2025 Protocol does not—and cannot—eliminate the need for a competent, appropriately skilled and trained agency to carry it out in good faith.

364.     The effectiveness of any written protocol will depend on the individuals carrying it out, because no protocol can eliminate either (1) the need for good faith, competent execution of its steps or (2) the inevitable need to make interstitial, implementing decisions in the face of events that were not contemplated by the protocol.

365.     For example, the 2025 Protocol calls for an IV catheter to be inserted by the IV Team. The effectiveness of that step is inherently inseparable from the ability of the IV Team to carry it out. The Protocol requires competent, good faith execution.

366.     The importance of interstitial decision making, in turn, is demonstrated by the numerous errors made in handling the relationship between TDOC and its

76

pharmacy under the Second 2018 Protocol. The Second 2018 Protocol gave TDOC no guidance regarding how to communicate with or assess the performance of its supplier, which led to both breakdowns of communication regarding testing and a decision to stay with a questionable pharmacy after numerous red flags had arisen.

367.     Implementation of the 2025 Protocol has already presented, and will undoubtedly continue to present, its own set of unforeseen situations and factors that the Protocol's written instructions do not address.

368.     The 2025 Protocol, on its face, entrusts its execution and implementation to TDOC. Accordingly, the adequacy of the 2025 Protocol depends, in no small part, on the ability of the actually existing TDOC to carry it out.

369.     TDOC has developed an internal culture of noncompliance with the law.

370.     TDOC has developed an internal culture of noncompliance with its own policies.

371.     TDOC has developed an internal culture of secrecy, opacity and, in some instances, outright dishonesty regarding its failures of compliance.

372.     TDOC has developed a culture of active recklessness—that is, conscious disregard of known, unacceptable risk—regarding its performance of executions.

373.     TDOC's ineffective leadership and broken internal culture create an intolerable risk that errors or wrongdoing in the procurement, transportation, handling, storage, and/or administration of pentobarbital will result in a torturous death by Mr. Middlebrooks.

### 1. TDOC's procurement processes have been plagued by legal noncompliance, shortcuts, and corruption.

374. TDOC has a well-established history of untrained, sloppy, and/or legally noncompliant behavior in its procurement decisions and oversight of vendors.

375. TDOC's failure to impose sufficient oversight or accountability on the compounding pharmacy it used in connection with the Second 2018 Protocol is one example of those problems.

376. However, TDOC's procurement-related failures were not limited to the Drug Procurer or to the purchase of drugs for executions.

377. From 2012 through 2020—that is, for most of the years leading up to the current protocol—TDOC's finances were overseen by Deputy Commissioner and Chief Financial Officer Wesley Olan Landers.

378. Deputy Commissioner Landers was responsible for, among other things, ensuring that the State paid for the services necessary for its prisons to be humane places in which prisoners could be constitutionally housed.

379. According to the U.S. Department of Justice, Deputy Commissioner Landers used his personal email account to leak confidential information to the ultimately successful corporate bidder for a $123 million TDOC behavioral health contract, after which he left for an executive position created for him at that very company to which he helped steer those millions of dollars. Ex-Deputy Commissioner Landers was federally indicted for his alleged attempts to cover up those actions late last year. *See* Former Tennessee State Public Official and a Corporate Executive Charged with Conspiracy to Obstruct Justice and Commit Perjury in Connection with

a $123 Million State Contract, available at https://www.justice.gov/usao-mdtn/pr/former-tennessee-state-public-official-and-corporate-executive-charged-conspiracy.

380.     There is no publicly available evidence that TDOC has taken meaningful steps to rectify the culture of noncompliance and self-interestedness that Deputy Commissioner Landers represented.

> ### 2. TDOC has a demonstrated history of misrepresenting its compliance with the law and concealing issues with the state's lethal injection processes.

381.     Government employees, like all people, make errors.

382.     One of the most essential bulwarks against maladministration in government is a norm of forthrightness and transparency, by which employees are expected to disclose, and not conceal, errors.

383.     TDOC has demonstrated a lack of a culture of forthrightness and transparency on multiple occasions.

384.     For example, attorneys for the State were required to retract multiple statements made before the Middle District of Tennessee in the *King* discovery that was eventually annexed to this case.

385.     At the same time, Defendants had to retract an assertion in the Defendants' Answer in this case.

386.     TDOC's outright misrepresentations function alongside its culture of extreme secrecy and concealment to prevent meaningful scrutiny of its executions.

79

387. For example, in 2018, when TDOC executed Billy Ray Irick with midazolam that was not tested for potency, it prevented observers from assessing whether Mr. Irick retained consciousness by unnecessarily wrapping his hands in tape, so as to prevent him from moving his fingers. *See* Steven Hale, *The Execution of Billy Ray Irick*, Nashville Scene, August 10, 2018 (Ex. 32).

388. TDOC's decision to tape Mr. Irick's hands came shortly after an expert testified in the 2018 Chancery Court lethal injection litigation that moving of fingers could indicate that the person being executed was either awake or was likely to reawaken shortly. *See* Lubarsky Tr. at 1725, 1850 (July 17, 2018) (Ex. 33).

389. There is no indication that the firing of Inglis and Young or the appointment of a new Commissioner fully remedied TDOC's culture of secrecy, misrepresentation, and concealment.

390. Since the 2025 Protocol was ostensibly completed, TDOC has misrepresented facts about that protocol at least twice: (1) TDOC falsely suggested that the protocol was completed in December of 2024, rather than January of 2025; and (2) TDOC falsely claimed that it was impossible to redact the protocol in such a way that it protected the identity of its pentobarbital supplier.

391. The fact that TDOC reflexively misled the public on those issues confirms that the agency's tunnelvision and result-oriented approach to performing executions has persisted.

80

**L. Tennessee officials currently face incentives to disregard the law that, insofar as they have any precedent, reflect a drive to return to the very approaches to government administration of justice that the Eighth and Fourteenth Amendments were intended to forbid.**

392.     In the final years of the twentieth century and the early decades of the twenty-first century, nearly every sector of the American economy was transformed by advancements in computing and information technology.

393.     During this transformation, many firms—including both legacy companies and startups—engaged in intense competition for market position.

394.     One popular strategy for new companies, particularly in the technology sector, was embodied by the popular phrase "move fast and break things." The philosophy behind this approach was that market entrants often fail to obtain a dominant position because their concerns about legal compliance and avoiding missteps cause them to act too slowly and timidly. However, as many investors and executives came to realize, if one acted aggressively to obtain a dominant market position, one could then use the spoils of that success to address any harms or violations that one committed along the way—for example, by paying damages or fines from the enormous revenues enabled by the superior market position that was obtained through the very actions that incurred those liabilities in the first place.

395.     The most prominent such case may be the rideshare company Uber, which faced significant potential regulatory barriers in entering certain local markets. While it arguably made efforts to navigate those barriers where possible, it

81

also at times simply disregarded them in favor of establishing its market position, even if that meant facing enforcement at a later date.

396.    For example, Uber operated in the State of Pennsylvania without necessary authorization by that state's public utility commission, resulting in an ultimate $11.4 million fine. *See* Jonathan Stempel, *Uber hit with record $11.4 million fine in Pennsylvania*, Reuters, Apr. 21, 2016.

397.    Uber's conscious decision to use noncompliance as a tool of competitive advantage was so pronounced that the company developed and used a sophisticated data analysis tool, known as "Greyball," for the specific purpose of evading authorities. *See* Mike Isaac, *How Uber Deceives the Authorities Worldwide*, N.Y. Times, Mar. 3, 2017.

398.    Uber's strategy of intentionally violating the law was extraordinarily effective, and Uber is now the dominant rideshare service in the United States.

399.    Similarly, audio and video streaming companies "faced powerful incentives to play fast and loose with copyright law in the name of building the most comprehensive—and, therefore, enticing—[media] libraries possible." *Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-CV-0736, 2024 WL 3836075, at *1 (M.D. Tenn. Aug. 15, 2024).

400.    Some market participants responded to those pressures by taking a lax approach toward securing the rights that they needed. *See id.*

401.    The strategy of being sloppy about copyrights was, like Uber's strategy of being willing to violate state and local laws, effective for at least some of its

practitioners, who can now pay any damages for copyright infringement from the revenues that their market positions afford them.

402.     For much of the present century, this anti-compliance approach was primarily isolated to the business sector, rather than the public sector.

403.     Historically, public officials have been considered to have an obligation to follow the law and have, in many instances, specifically sworn to do so. This obligation was not considered to be subject to a caveat that the law could be disregarded simply because following it was inconvenient.

404.     This baseline commitment to complying with the law, even if the law is constraining, is incompatible with a "move fast and break things" approach to legal obligations.

405.     In 2025, however, there has been an aggressive, open effort to replace the norms of professionalism and legal compliance that have typically characterized America's governing institutions with something more like the "move fast and break things" attitude of the technology sector.

406.     This newly ascendant political ethos is built around the belief that government officials should be willing either to consciously disregard the law or to make intentionally weak efforts to comply with the law in order to secure certain desired outcomes as fully and quickly as possible.

407.     Another way to describe that type of thinking is to say that it is an overt endorsement of the premise that officials should be "result-oriented" and approach

their duties with a "tunnelvision" that excludes considerations, like legal compliance, that might slow or hinder the officials' goals.

408.     The expediency-first, anti-compliance approach of "move fast and break things" is relatively novel in modern American government. However, it has historical precedents.

409.     For example, the vision of unfettered authority to pursue policy aims mirrors the attitudes that provoked the Ulster Remonstrances and led to the English Bill of Rights of 1689.

410.     The assertion of a government's right to disregard legal constraints in pursuit of its policy goals also mirrors the attitudes that led the State of Tennessee to attempt to withdraw from the compact underlying the U.S. Constitution in 1861.

411.     In context, then, the 2025 movement against recognizing governments' obligations to comply with the law represents a reassertion of a governing philosophy that has been repudiated by the Framers of the Constitution twice—first, when the Bill of Rights was adopted, and, second, when that document's restrictions were extended to the States.

412.     Although the "move fast and break things" approach to government is far from universally shared, it has some high-profile and powerful adherents. The popularity of this new hostility to compliance means that Tennessee officials who wish to advance professionally now face new incentives to disregard legal constraints and norms of professionalism.

413.     The existence of these incentives is an objective fact, independent of any person's opinions about the wisdom or desirability of the underlying approach: A governing philosophy that emphasizes a willingness to violate the law in order to achieve specific outcomes will, by definition, encourage poor compliance with the law.

414.     These incentives have the potential to bear directly on many of the individuals who would ordinarily have the responsibility for ensuring that Tennessee executions are carried out lawfully and appropriately.

415.     The result is that one of the ordinary baseline constraints that would ensure the competent performance of the government's tasks—the desire of ambitious or otherwise reputation-sensitive officials to avoid the embarrassment of having broken the law—has been substantially weakened by a countervailing force.

**M.     The 2025 Protocol and TDOC's post-2022 actions do nothing to protect against the agency's culture of noncompliance.**

416.     One of the key tasks that TDOC faced, in formulating the 2025 Protocol, was to attempt to prevent instances, like those that occurred in connection with the Second 2018 Protocol, in which TDOC personnel failed to follow the protocol's requirements.

417.     The primary approach to this issue in the 2025 Protocol is not to take steps to increase accountability or transparency, but rather simply to reduce the number of requirements that TDOC can fail to meet.

418.     The 2018 Protocol was over 100 pages in length; the 2025 Protocol is only 44 pages—having eliminated entire sections' worth of specifications and requirements.

419.     Most notably, the 2018 Protocol included extensive instructions regarding the preparation, handling, storage, and testing of the chemicals to be used in the lethal injection process. *See* Second 2018 Protocol at 35–40.

420.     In reviewing TDOC's pre-2022 procedures, the Stanton Report recommended that TDOC "review the current Protocol's testing requirements" and "[e]stablish testing guidelines for any compounded [lethal injection chemicals ("LIC")] with procedures for confirming that the appropriate tests are being performed." Stanton Report at 41. The Report recommended that TDOC establish a procedure for storing and maintaining those test results. *See id.*

421.     The Stanton Report also recommended that TDOC "[e]stablish a procedure for storing and maintaining LIC, including recommendations regarding suitable equipment for storage." *Id.*

422.     Instead, the 2025 Protocol appears to have eliminated nearly all of those requirements, replacing them with only a few scant, boilerplate passages stating that adequate steps will be taken. *See* 2025 Protocol at 13.

423.     The Second 2018 Protocol also included detailed instructions regarding the administration of lethal injection chemicals via IV line. *See* Second 2018 Protocol at 40–46. The 2025 Protocol mostly eliminates those detailed instructions. *See* 2025 Protocol at 16, 18–20.

424.     The result is a protocol that poses a potentially lower risk of superficially obvious "violations," because it imposes significantly fewer concrete obligations that TDOC could violate.

86

425. The Eighth Amendment, however, is not simply, or even primarily, a bar on technical administrative errors. It bars cruel and unusual punishment, and the elimination of requirements intended to prevent cruel and unusual punishment likely will, if anything, increase the risk of an Eighth Amendment violation, even if it decreases the risk of a violation of the protocol itself.

426. The Eighth Amendment forbids the State of Tennessee from executing any person in a manner posing an "'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)).

427. One of the most important indications of whether a particular risk is "intolerable" by contemporary standards is whether it "is in fact" tolerated by democratically accountable governments—that is, whether individual states and/or the federal government have found a particular approach to executions to be acceptable. *See id.*

428. The State of Tennessee is the only government that relies on TDOC to perform executions.

429. The Governor is the chief executive of the government of the State of Tennessee.

430. In 2022, the Governor concluded that he could not tolerate the risk associated with TDOC's continuing to perform executions unless substantial remedial measures were taken.

87

431.     The Governor selected Mr. Stanton to assess the nature of TDOC's problems related to executions.

432.     Mr. Stanton concluded that TDOC's errors were not solely the result of inadvertence but reflected cultural problems within the agency.

433.     In response to the Stanton Report, the Governor directed TDOC to take certain remedial actions.

434.     The Governor expressly called for those actions to be taken sequentially.

435.     The first two of the Governor's proposed actions were to "[m]ake staffing changes at the department's leadership level" and "[h]ire and onboard a permanent TDOC commissioner."

436.     TDOC now has a new Commissioner.

437.     TDOC also replaced Ms. Inglis, Mr. Young, and the warden of RMSI.

438.     TDOC has announced no other changes to its leadership team that appear to be related to the need to address issues surrounding the performance of executions.

439.     It is a common public relations tactic, when an entity's wrongdoing has been publicly exposed, to terminate one person or a small number of individuals to create an appearance of responsiveness.

440.     This strategy is so common that there are multiple widely recognized terms to describe the person offered up for termination: "fall guy," "scapegoat," and "sacrificial lamb," for example.

441.     In reality, while individual leadership is often important to an entity's success, superficial changes in leadership frequently fail to solve problems in companies, agencies, and other large organizations.

442.     A change in leadership is especially unlikely to be effective if the change was made to satisfy public relations objectives and was not accompanied by an actual change in the organization's culture.

443.     It would, therefore, be improper to assume that the appointment of a new Commissioner, the hiring of a new warden of RMSI, or the replacement of Inglis and Young necessarily changed TDOC's culture in any significant way.

444.     The Governor's third directive was to adopt a new lethal injection protocol.

445.     TDOC has adopted a new lethal injection protocol, but it has not publicly released the full protocol, choosing instead to redact several of its key portions.

446.     The Governor's fourth directive was for TDOC to review and overhaul its execution training practices after the completion of the new protocol.

447.     Such an approach would ensure that the new training regimen was appropriately tailored to the protocol itself.

448.     TDOC represented to this Court that it would complete all of the Governor's directed remedial steps. *See* R. 72 at 2 (asking the court to "extend the stay of the proceedings until the completion of corrective actions called for by the report and the Governor's directives based on the report").

449.     TDOC has made no public indication that it intends to complete the post-drafting review and overhaul of training that the Governor directed.

450.     Mr. Stanton also made a number of recommendations in the Stanton Report.

451.     TDOC represented to this Court that it would complete all of Mr. Stanton's proposed remedial steps. *See id.*

452.     Mr. Stanton recommended that TDOC consider "hiring a full-time employee or retaining a consultant with a pharmaceutical background to provide guidance in connection with the lethal injection process." Stanton Report at 41.

453.     TDOC has made no public indication that it complied with that recommendation.

454.     Nor is there any evidence that TDOC has taken steps to ensure that anyone, let alone a qualified person, performs several of the tasks for which Stanton suggested TDOC consider hiring a full-time, specialized employee: (1) "[e]stablish[ing] testing guidelines for any compounded LIC with procedures for confirming that the appropriate tests are being performed"; (2) "[e]stablish[ing] a procedure for storing and maintaining test results"; and (3) "[e]stablish[ing] a procedure for storing and maintaining LIC, including recommendations regarding suitable equipment for storage." Stanton Report at 41.

455.     TDOC has taken no other publicly revealed steps to rectify its culture of noncompliance, despite the fact that many potential remedial steps are available to the agency.

90

456.     For example, there is a substantial body of evidence that the most effective deterrent to wrongdoing is certainty of detection. *See United States v. Corchado-Aguirre*, No. CR 15-0393 JB, 2015 WL 10383207, at \*16 (D.N.M. Aug. 31, 2015) (collecting literature).

457.     Consistently with that principle, courts have long recognized that one of the principal evils of government secrecy is its use as a tool for "obscuring incompetence." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983).

458.     TDOC could have provided a safeguard against maladministration by making its processes more transparent.

459.     Instead, TDOC has increased the secrecy surrounding the execution process by including fewer details about its practices in its newer, shorter written protocol.

460.     TDOC also could revise its disciplinary policies to impose higher expectations of professionalism and compliance from its employees involved in the execution process.

461.     TDOC has given no indication that it has done so.

462.     Although TDOC revealed its new protocol only months ago, it has already demonstrated its continuing culture of noncompliance by departing from the Protocol's requirements several times.

463.     The 2025 Protocol instructs the Warden to "[c]ollect[] the Affidavit For Method of Execution from the inmate (if applicable)" thirty days prior to the scheduled date of execution. 2025 Protocol at 14.

464.     Forcing an individual to complete his Affidavit For Method of Execution at an earlier date would deprive the individual of the benefit of the most up-to-date information about the respective options.

465.     That issue is particularly acute with regard to the 2025 Protocol, which is new and has only been made publicly available in redacted form. Individuals facing execution under the 2025 Protocol are diligently trying to assess it, but that process has only just begun.

466.     Mr. Middlebrooks formally has a scheduled execution date of September 24, 2025, although that execution is currently subject to a stay of this Court.

467.     Accordingly, TDOC should seek his Affidavit of Method of Execution no earlier than August 25, 2025.

468.     Oscar Smith, who is not a plaintiff in this case, had a scheduled date of execution of May 22, 2025.

469.     Accordingly, TDOC should have sought his Affidavit of Method of Execution no earlier than April 22, 2025.

470.     Byron Black, who also is not a plaintiff in this case, currently has a scheduled date of execution of August 5, 2025.

471.     Accordingly, TDOC should seek his Affidavit of Method of Execution no earlier than July 6, 2025.

92

472.     On or around March 7, 2025, employees of TDOC—including an attorney—approached Mr. Middlebrooks, Mr. Smith, and Mr. Black, outside the presence of, and with no prior notice to, their counsel and attempted to have each man complete an Affidavit For Method of Execution.

473.     Not only were TDOC's actions a departure from the 2025 Protocol, but they were also contrary to repeated insistences by counsel for Mr. Smith, Mr. Black, and Mr. Middlebrooks that they, and others in their position, should not be approached with an Affidavit for Method of Execution without counsel present.

474.     Moreover, the attempt to obtain a completed Affidavit of Method of Execution from Mr. Middlebrooks was an attempt to obtain a waiver/statement from him on issues directly relevant to this very case, which was, and continues to be, ongoing, and in which Mr. Middlebrooks is unambiguously represented by counsel.

475.     TDOC's casual, open violation of its own processes confirms that it is, at heart, still the agency that it was in 2022—one that is simply focused on bringing executions about, with little, if any, attention being paid to whether applicable rules are being followed or appropriate caution is being exercised.

476.     The 2025 Protocol depends on the competency, good faith, professionalism, and dedication to compliance of TDOC personnel.

477.     Insofar as the 2025 Protocol could be sufficient, on its face, for some theoretical agency to carry out without an intolerable risk of severe pain and suffering, it is not sufficient for TDOC to do so.

## N. The ostensible option of execution by electrocution does not resolve Mr. Middlebrooks' concerns.

478.     The 2025 Protocol calls on the individual who is eligible for execution by lethal injection or electrocution to fill out and return an "Affidavit for Method of Execution" memorializing his "choice" and waiving certain underlying rights. *See* 2025 Protocol at 25.

479.     Mr. Middlebrooks does not intend to fill out that form. Among the reasons is his well-founded concern that, if he "chooses" to be executed by electrocution, the State of Tennessee will treat him as having waived his right to raise any issues related to Tennessee's particular policies, practices, or equipment for that purpose. *See Miller v. Parker*, 910 F.3d 259, 262 (6th Cir. 2018) ("[B]ecause Miller has elected to be executed by electrocution, he has waived any challenge to his execution by that method.").

480.     However, even aside from that fact, the availability of electrocution as a method for execution does not resolve Mr. Middlebrooks' concerns regarding lethal injection. Indeed, Mr. Middlebrooks challenged his potential execution by electrocution in this case, and that challenge was dismissed only because the Court considered it unripe—not because Mr. Middlebrooks abandoned his position or his claim was rejected on the merits.

481.     Electrocution, like poisoning, was not an accepted form of execution at the time of the adoption of the Eighth Amendment.

482.     Electrocution, like poisoning, is not closely analogous to any accepted form of execution at the time of the adoption of the Eighth Amendment.

94

483. Nor is electrocution consistent with modern, evolving standards of decency. If anything, the rush by many states toward lethal injection was a direct response to the public's unease with execution by electrocution.

484. There is, moreover, a substantial amount of evidence that execution by electric chair poses an intolerable risk of severe suffering, terror, and disgrace. See *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008); *Dawson v. Georgia*, 554 S.E.2d 137, 144 (Ga. 2001).

485. "Electrocution as a method of executing condemned prisoners is an extremely violent method of accomplishing death. It includes some burning, smoke, and involves extreme contortion of muscles and tissue of almost every part of a person's body. It includes no effort at all to anesthetize the person into unconsciousness before the mechanisms of death are employed." *Mata*, 745 N.W.2d at 272 (quoting trial court's findings).

486. Moreover, Tennessee's unique facts establish that the risk of a torturous death from execution in Tennessee's electric chair is exceptionally high.

487. Tennessee's first execution by electric chair was on July 13, 1916. *See* Steven Hale, *The Chair: 100 years after its first use, Tennessee's electric chair remains the State's most prolific killer*, Nashville Scene, July 7, 2016.

488. In 1989, Fred A. Leuchter built Tennessee's second electric chair, which the State nicknamed "Old Sparky," by incorporating wood from the original chair, which was taken from the old gallows used by the State before it abolished hangings in 1913. *See* Travis Loller, *Electric chair builder worried Tennessee execution will fail,*

95

Associated Press, October 31, 2018; Natalie Neysa Alund, *5 things to know about Tennessee's electric chair, scheduled to be used for the third time in two years*, The Tennessean, July 3, 2014. On information and belief, a version of Leuchter's chair continues to be TDOC's electric chair for executions.

489. Mr. Leuchter's self-appointed role as a supplier of execution devices is inseparable from his longstanding obsession with—and promotion of repellant conspiracy theories about—the Holocaust. The year before furnishing Tennessee's chair, for example, in April 1988, Leuchter offered purportedly expert testimony that the number of deaths in the Holocaust had been exaggerated. During that testimony, it was established that Leuchter had no engineering credentials and only held a Bachelor of Arts degree in history from 1964. *See* Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551, 656–56 (1994).

490. In early 1989, Leuchter spoke at the Ninth International Revisionist Conference. *See id.* at 656.

491. In November 1989, Leuchter installed Tennessee's new electric chair. *See* Natalie Neysa Alund, *5 things to know about Tennessee's electric chair, scheduled to be used for the third time in two years*, The Tennessean, July 3, 2014.

492. In August 1990, Alabama's Attorney General sent a letter to all states that used capital punishment questioning Leuchter's credentials and expertise.

493. In June 1991, facing charges of practicing engineering without a license in violation of Massachusetts law, Leuchter entered into a settlement agreement in

96

which he admitted that he was not and never had been registered as a professional engineer, and that he had represented himself as an engineer to various state governments when he provided equipment and advice for executions. He received a sentence of two years' probation, which required him to stop practicing engineering without a license. *See* Denno, *supra*, at 660.

494. Leuchter's so-called expertise in scientific matters has been rejected by trained scientists in the fields in which Leuchter held himself out as an expert. For example, Leuchter claimed that the absence of trace elements of lethal gas on bricks he stole from the WWII Auschwitz concentration camp constituted evidence that the Nazis did not operate a gas chamber at the death camp. The scientific community has universally rejected his theory.

495. Indeed, Massachusetts required that he stop distributing his Holocaust denial report, entitled "An Engineering Report on the Alleged Execution Gas Chambers at Auschwitz, Birkenau, and Majdanek."

496. On or around April 16, 1994, Michael S. Morse tested the electrocution equipment Leuchter created. Morse opined that Leuchter's equipment did not deliver an adequate current to carry out an execution and did not have the capacity to do so. Morse made fourteen specific recommendations for modifications to Leuchter's electrocution equipment.

497. On or around April 25, 1994, Jay Weichert tested the electrocution equipment Leuchter created. Weichert opined that Leuchter's equipment did not

function properly. Weichert made seven specific recommendations for modifications to Leuchter's electrocution equipment.

498.     Tennessee made some, but not all, of the modifications Morse and Weichert suggested.

499.     Defendants maintain the electrocution equipment in an Execution Chamber and Executioner's Room located within the RMSI.

500.     The Execution Chamber contains the Electric Chair.

501.     The component parts of the Electric Chair include: (a) a head piece (a leather cranial cap lined with copper mesh inside—sometimes referred to as the "head electrode"); (b) two leg electrodes; (c) a junction box located behind a back leg of the Electric Chair; (d) a cable that runs from the junction box to the head electrode; (e) two cables that run from the junction box to the leg electrodes; and, (f) a removable drip pan underneath a perforated seat.

502.     In preparing to activate the Electric Chair, Defendants connect a low voltage cable from the electrical console to the transformer and a high voltage cable from the transformer to the Electric Chair's junction box.

503.     When activated, the transformer and the Electric Chair create an open alternating current electrical circuit. Any object that creates a connection between the head electrode and the leg electrodes closes, and becomes part of, the electrical circuit.

504. The 2017 Tennessee Protocol for Execution Procedures For Electrocution ("Electrocution Protocol") (Ex. 34) that preexisted the 2025 Protocol has not been superseded.

505. The Electrocution Protocol provides that Defendants' electrocution equipment is designed to deliver to a prisoner for twenty seconds an alternating current of 1,750 volts at 7 amps, followed by a pause of fifteen seconds, followed by a fifteen second alternating current of 1,750 volts at 7 amps. *See id.* at 42.

506. Defendants use a Test Load Box when they test the electrocution equipment. *See id.* at 8.

507. The purpose of the Test Load Box is to simulate a prisoner's body. *See id.*

508. Defendants place the Test Load Box in the Electric Chair's perforated seat and connect it to the power cable for the head electrode and the leg electrodes. *See id.* at 34.

509. After connecting the Test Load Box to the power cable for the head electrode and the leg electrodes, Defendants activate the Electric Chair and check to see if the transformer meter reads 1,750 volts and the amperage meter reads 7 amps. *See id.* at 34–35.

510. Ohm's Law establishes that for the electrocution equipment to maintain a circuit that delivers a current of 1,750 volts at 7 amps, the circuit must provide 250 ohms of resistance. (1,750 (volts)/7 (amps) = 250 (ohms)).

99

511.     Defendants' testing procedure establishes only that when the Test Load Box is used to complete the circuit containing the Electric Chair, the Test Load Box provides resistance that creates a total circuit resistance of 250 ohms.

512.     Defendants' testing procedure fails to establish that the electrocution equipment will maintain a circuit that delivers a current of 1,750 volts at 7 amps to an individual being executed, because:

a.   For testing purposes, Defendants attach a tester lead from the Test Load Box directly to the power cable for the head electrode. During an execution, however, Defendants: (a) attach the power cable for the head electrode to the head piece; (b) put a sponge saturated with salt water on the prisoner's head; and, (c) attach the head piece to the prisoner's sponge-covered head. The interface between the head electrode/sponge and scalp of the prisoner's head presents a region of high electrical resistance unaccounted for in Defendants' testing procedure.

b.  While the Test Load Box contains constant material and thereby reliably provides a constant resistance that creates a total circuit resistance of 250 ohms, the electrical resistance of human bodies varies widely. Factors affecting an individual's resistance to an electrical current include, but are not limited to: (a) the presence or absence of fatty tissue beneath his skin; (b) the distribution and activity of sweat glands; (c) the amount of oil in and on his skin; (d) the thickness of his skin; (e) the amount of hair on his body; (f) the

thickness of his skull; (g) the location and size of any cranial skull fissures; and, (h) regional blood flow at the time of electrocution.

    c.   As a consequence of these factors, a prisoner's body may create a circuit resistance significantly higher or lower than the 250-ohm circuit resistance the Test Load Box creates, and thereby significantly alter the voltage and/or current that Defendants apply to him.

    d.   Defendants make no effort to investigate the resistance individual prisoners present to electrical current.

513.    When the Electric Chair is activated, the transformer sends electrical current through the head electrode/sponge and onto the prisoner's head. The current exits the prisoner's body at the leg electrodes and travels back to the transformer, completing a circuit. The current alternates between traveling this direction and the opposite direction sixty times per second.

514.    While conditions remain constant within the Test Load Box throughout the testing procedure, during an electrocution execution the resistance of the prisoner's body changes dramatically as his skin heats, perforates, vaporizes, burns, and chars, and as the saline solution in the sponges between the prisoner's body and the electrodes heats and vaporizes.

515.    Defendants' testing procedure fails to ensure that the electrocution equipment will minimize the pain it inflicts on a prisoner because:

    a.   Individual prisoners have different thresholds for the sensation of electrical current.

b. Individual prisoners experience different physiological effects to electrical current.

c. Individual prisoners will experience significant differences in the amount of electrical current required, and the amount of time for application of that current, to cause unconsciousness.

516. In 2017, Dr. John P. Wikswo, Jr.—who holds a Ph.D. in Physics from Stanford University, is the Founding Director of the Vanderbilt Institute for Integrative Biosystems Research and Education, and who has been researching judicial electrocution protocols and electrocution equipment since 1992—prepared an analysis of issues related to the Tennessee electric chair ("Wikswo Declaration") (Ex. 35) and found several reasons to expect an execution with Tennessee's electric chair to pose an unacceptable risk of torturous death:

a. An individual can remain alive for some period of time during the electrocution.

b. An individual may remain conscious and sensate for some period of time during the electrocution, because the skull somewhat protects the brain by providing greater resistance than the skin, so that the current will primarily travel down the perimeter of the head, down the torso and legs, until it leaves through the leg electrodes.

c. If an individual being executed by electrocution remains conscious and sensate, he is likely to experience extreme pain and/or suffering from a number of potential effects of the electrocution process: the high-voltage electrical

102

current produces severe burns; the current thermally heats (i.e., cooks) the body and internal organs; the current directly excites most, if not all, nerves along its path; the current excites some brain neurons causing extreme pain as well as sensations of sound, light, dread, and fear; the current tetanizes all muscles simultaneously; the tetanized breathing muscles cause the sensation of suffocating; time perception may be altered such that the prisoner experiences each cycle of current and/or perceives the electrical trauma as lasting dramatically longer than it would appear to a bystander.

d.  Because contact with high voltage electrical current causes muscles to malfunction and because individuals executed in Tennessee are harnessed tightly onto the electrocution equipment, the individual is unable to signal that he is experiencing pain and suffering during an electrocution execution.

e.  Because of the unpredictability and variability of each individual's electrical resistance and that of the connections to his body during an electrocution execution, the current delivered to each prisoner will vary significantly from the currents delivered to others in the same chair, such that the time an individual being executed will remain alive, conscious, and sensate are unknown and will vary substantially from prisoner to prisoner.

f.  Because an individual can remain alive at the end of an electrocution execution and the medical doctor waits five minutes before examining the body for signs of life, an inmate who survives the electrocution process will die from

thermal heating (cooking of their vital organs) and asphyxiation during this time.

517.     Regarding Tennessee's use of Leuchter's electric chair, Dr. Wikswo reviewed various records and documents, including an autopsy of Daryl Holton, who Tennessee executed by electrocution in 2007, color photographs of Mr. Holton's body and other items associated with his execution, and newspaper accounts of Mr. Holton's execution.

518.     Dr. Wikswo's expert opinion was that Leuchter's chair will cause excruciating pain, the likelihood of lingering death, and disfigurement of the body attendant to death by electrocution. In particular, the initial 20 second application of electrical current will not provide a long enough time for a prisoner to die because (1) it will not necessarily stop the heart, and (2) when the current stops and the skeletal muscles needed for respiration relax, air will flow into the prisoner's lungs. During the 15 second "disengage period," a prisoner's heart can circulate the newly oxygenated blood to the brain and the rest of the prisoner's body, keeping him alive, possibly conscious, and possibly sensate for the second application of electrical current.

519.     Tennessee's maintenance of and training for its electric chair have failed in the past. For example, despite training on September 27, 2018, and testing on October 10, 2018, the Tennessee electric chair, designed and installed by Fred Leuchter, was not capable of use on October 11, 2018.

520.     If an electric chair exists that can bring about quick unconsciousness and then death, such a chair is not possessed by Tennessee. Tennessee's electric chair, which was designed and installed over thirty years ago by an unlicensed, since-disgraced charlatan whose personal obsession with state killing was inseparable from his Holocaust denial, will inevitably inflict severe pain, mental anguish, and needless suffering on any person executed with that chair.

521.     Moreover, the 2025 Protocol does not permit Mr. Middlebrooks to be executed by electrocution unless he affirmatively elects that method of execution through a form that explicitly calls on him to waive certain rights in connection with his execution and would likely be asserted, by the Defendants, to implicitly entail a waiver of additional rights. *See* 2025 Protocol at 25.

522.     "[A] state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights . . . ." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005).

523.     Mr. Middlebrooks has a right, under the Petition Clause of the First Amendment, to seek redress for injuries, including injuries related to a method of execution that he selected, under duress, as the better of two bad options.

524.     Any effort by TDOC to force a Plaintiff to surrender his right to seek redress in order to select a method of execution is, therefore, unlawful.

525.     Moreover, Mr. Middlebrooks is Catholic and has a religious objection to suicide that extends to participating in his own death. Filling out the form to select electrocution would force him to violate that belief.

526.     Accordingly, the ostensible option of signing a waiver that would permit Mr. Middlebrooks to "choose" execution by electrocution does not reduce or negate the injuries asserted in this litigation.

**O.     The 2025 Protocol restricts Mr. Middlebrooks' right to communicate in a manner that is inconsistent with his right to freedom of speech and free exercise of religion under the First Amendment and Article I, §§ 3 and 19 of the Tennessee Constitution.**

527.     In addition to the issues posed by the provisions of the 2025 Protocol directly bearing on the execution of the prisoner, the Protocol imposes restrictions on the right of an individual to communicate with the outside world during the final 12 hours prior to his scheduled execution ("12-Hour Blackout Policy"). *See* 2025 Protocol at 17.

528.     The 12-Hour Blackout Policy directs the warden to "[e]nsure[] non-contact visits and phone calls—excluding visits and calls from the inmate's attorney of record—are concluded" before the commencement of the blackout period "unless expressly approved by the [REDACTED]." *Id.* at 17.

529.     The 2025 Protocol sets out no principle pursuant to which the unidentified official must exercise his or her discretion to allow or forbid communications.

530.     TDOC routinely monitors the non-legal telephone conversations of individuals in its custody.

531.     Moreover, the 2025 Protocol calls for an individual facing execution to be continuously surveilled for the final days of his life.

106

532.     As a result of this omnipresent surveillance, there is no meaningful risk that an individual facing execution would use his telephone access to coordinate any action that would disrupt the State's performance of its legitimate functions.

533.     Insofar as there are particular individuals whom TDOC has a legitimate reason to prevent the person facing execution from contacting, there is nothing about the final 12 hours prior to execution that creates a unique challenge justifying a blackout.

534.     Because the 12-hour blackout concludes with the execution of the restricted person, the 12-Hour Blackout Policy is a restriction on the individual's ability to communicate for most of the remainder of his life. This is particularly true with regard to Mr. Middlebrooks, whose stress-sensitive seizure disorder is very likely to interfere in his ability to give a final statement in the execution chamber.

535.     Because the 12-hour blackout concludes with the execution of the restricted person, the 12-Hour Blackout Policy is a restriction on the individual's ability to communicate his thoughts and feelings as he faces death.

536.     The imposition of this absolute bar on outside communications, subject only to exceptions made pursuant to the unbounded discretion of a government official, is inconsistent with the right of an individual facing execution to engage in speech protected by the First Amendment.

537.     Moreover, the fact that the 12-Hour Blackout Policy contains no exception for religious communication, including prayer and other sacramental communications with religious advisors or fellow worshippers, causes the policy to

violate the Free Exercise Clause of the First Amendment, Article I, § 3 of the Tennessee Constitution, and RLUIPA, 42 U.S.C. §2000cc *et seq.*

**P.    The 2025 Protocol unduly burdens Mr. Middlebrooks' right of access to the courts under the First, Eighth, and Fourteenth Amendments and Article I, §§ 17 and 23 of the Tennessee Constitution.**

538.    It is well established that "prisoners have a constitutional right to have meaningful access to the courts . . . ." *Lewis v. Casey*, 518 U.S. 343, 347 (1996). The "right to file for legal redress" is more valuable to a prisoner than to any other citizen: "Inasmuch as one convicted of a serious crime and imprisoned usually is divested of the franchise, the right to file a court action stands . . . as his most 'fundamental political right, because [it is] preservative of all rights.'" *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 15 (1992)) (Blackmun, J., concurring in the judgment). Thus, "inmate access [must be] adequate, effective and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977).

539.    The Fourteenth Amendment incorporates the First and Eighth Amendment's guarantees against the states and requires that they take certain affirmative steps to protect the Mr. Middlebrooks' right of access to the courts. *See, e.g., Bounds*, 430 U.S. at 828 (holding that states must take affirmative steps to protect prisoners' right of access to the courts by making available "adequate law libraries or adequate assistance from persons trained in the law"); *see also Johnson v. Avery*, 393 U.S. 483, 489 (1969) (holding that a state must take steps to provide prisoners access to fellow prisoners who are able to assist them in preparing "with reasonable adequacy" habeas corpus petitions and other filings); *Long* v. *District*

108

*Court*, 385 U.S. 192, 194 (1966) (holding that a state is obligated to furnish prisoners with a transcript or equivalent record of prior habeas proceedings for use in subsequent litigation if they are not otherwise able to obtain them); *Burns v. Ohio*, 360 U.S. 252, 258 (1959) (requiring state courts to waive filing fees for indigent prisoners); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (requiring state courts to waive transcript fees for indigent prisoners).

540.    As a matter of state law, Mr. Middlebrooks' right to access the courts flows from Article I § 17 of the Tennessee Constitution, which provides"[t]hat all courts shall be open[,] and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay," and Article 1, § 23 of the Tennessee Constitution, which provides "[t]hat the citizens have a right . . . to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by address or remonstrance.

541.    In evaluating a claim of denial of meaningful access to the courts brought by an incarcerated person, the courts must "weigh[] the interest of the prison as an institution (in such matters as security and effective operation) with the constitutional rights retained by the inmates." *Thaddeus-X,* 175 F.3d at 390; *see also Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

542.    It is well-settled that an individual facing execution has a right to seek redress with regard to aspects of the planned execution process that he believes violate the Eighth Amendment. While such a claim may, like any other claim, fail on

109

the merits or be subject to some specifically applicable procedural bar, Mr. Middlebrooks' right to ask a court to consider the claim is beyond dispute.

543.     Mr. Middlebrooks' First Amendment right of meaningful access to the courts allows him to assert his right against cruel and unusual punishment up until the point of his execution.

544.     As a practical matter, some issues related to the Mr. Middlebrooks' right against cruel and unusual punishment cannot be raised until the actual day, or even hour, of execution.

545.     Most notably, if something goes wrong during the execution process—such as a clearly botched IV catheterization or a failed first attempt at killing him that draws the reliability of an immediate second attempt into question—Mr. Middlebrooks may have a right, under the Eighth Amendment, to petition for an order requiring TDOC to delay the performance or continuation of the execution until a future date when the issue has been genuinely resolved.

546.     The 2025 Protocol prevents Mr. Middlebrooks' counsel from witnessing key details of the execution process—specifically, the preparation of syringes, the closed-circuit feed of the IV catheterization site, and the death check.

547.     Per the 2025 Protocol, TDOC uses an "overhead camera that monitors the IV catheter during the lethal injection process." *See* 2025 Protocol at 35. The Protocol does not explicitly state that the witnesses will or will not be able to observe the closed-circuit TV, but TDOC's May 22, 2025 execution of Oscar Smith confirmed that the feed is not available to the attorney-witness.

548.     Given the intolerably high risk of Mr. Middlebrooks being subjected to cruel and unusual punishment as a result of the administration of pentobarbital through an improperly placed IV, it is critical that Mr. Middlebrooks' attorney-witness be able to personally view the IV catheterization site continuously throughout the execution process and to monitor for both visible uncoupling of the IV and signs of extravasation, such as swelling and discoloration. Otherwise, it is possible that the attorney-witness will not know to access the courts on their client's behalf to vindicate the client's right against cruel and unusual punishment.

549.     This issue is particularly pronounced with regard to Mr. Middlebrooks, who suffers from a seizure disorder and presents an unusually high likelihood of dislodging or otherwise impeding his IV catheterization. Accordingly, for Mr. Middlebrooks to have effective access to the courts, his attorney-witness must be granted continuous access to the video feed of the IV site that the 2025 Protocol calls for. *See* 2025 Protocol at 18, 20, 34–35.

550.     The 2025 Protocol also prevents an attorney-witness from observing the Physician's death check. Five minutes after the pentobarbital has been administered, "all witness blinds are closed, the camera [monitoring the IV catheter] is disengaged, and the privacy curtains are closed. The Warden asks the Physician to enter the room to examine the inmate and determine if he/she is deceased." 2025 Protocol at 21. During this time, counsel will be unable to observe whether their client is still alive— which would indicate that the lethal injection was botched and that their client is likely suffering.

551. While the 2025 Protocol calls for the blinds to be reopened if the Physician determines that the prisoner is not deceased, the Protocol does not specify how long the execution team may wait before re-opening the blinds. *See id.* It is possible that the execution team would wait to see if the prisoner eventually died from the first round of drugs before reopening the blinds and administering the second set of syringes. With the blinds closed and cameras disengaged, the prisoner's attorney-witness would have little way of knowing whether their client is still alive and suffering. As such, they would be unable to vindicate their client's right against cruel and unusual punishment by accessing the courts on their client's behalf.

552. The attorney-witness must likewise be able to observe a closed-circuit feed of the IV line during and after the Physician's death check—particularly if it is determined that the prisoner is not deceased. More likely than not, the prisoner's survival would be due to an improperly placed IV line; as such, it is critical that the attorney-witness be permitted to observe the closed-circuit feed at all stages of the execution process. Otherwise, the attorney-witness might not know to access the courts on their client's behalf, in the event of a botched execution.

553. TDOC will be unable to assert any penological interests that would outweigh Mr. Middlebrooks' paramount interest in protecting his right against cruel and unusual punishment through meaningful access to the courts.

112

## VI.   CAUSES OF ACTION

## COUNT 1

### The 2025 Protocol calls on Defendants to execute Mr. Middlebrooks in a manner inconsistent with state and federal law.
### (42 U.S.C. § 1983, 28 U.S.C. § 2201, RLUIPA)

**COUNT 1.A**:   **Execution by pentobarbital, as called for by the 2025 Protocol, violates the Eighth Amendment to the U.S. Constitution and Article I, §§ 16 and 32 of the Tennessee Constitution due to the intolerable risk of superadded pain, terror, and disgrace.**

554.     Execution by pentobarbital poses a high risk that the executed person will experience a pulmonary edema prior to death.

555.     Execution by pentobarbital poses a high risk that the drug will escape the circulatory system and enter other tissues, where it will both cause severe pain and fail to contribute to the drug's sedative effects.

556.     There is a high likelihood that, when a person is executed with pentobarbital, he will remain conscious or semiconscious and sensate until a point after which he has begun to experience pain from pulmonary edema and/or the poison escaping the circulatory system. Insofar as there exists any way to mitigate that risk by altering the circumstances or details of how the pentobarbital is administered, the 2025 Protocol fails to do so.

557.     In such an instance, the person will experience severe, avoidable pain and suffering.

558.     Individuals of the Founding generation, and of the preceding generations from which the terminology of the Eighth Amendment was taken,

113

considered poisoning to be an intolerable invasion of the human body, which they understood to be a sacred vessel for the soul. Using a chemical agent to invisibly turn an individual's body against him was seen as degrading and horrific.

559.     The palatability of lethal injection/intravenous poisoning to modern eyes depends entirely on cultural changes that took place in the nineteenth century, at the earliest. At the time of the adoption of the Eighth Amendment, an ordinary American would have considered execution by poisoning to impose extreme, unnecessary disgrace on the person being executed.

560.     As a result, an individual facing execution pursuant to the 2025 Protocol faces a high likelihood of superadded severe suffering and a certainty of what the Framers would have considered to be superadded disgrace, in violation of "basic concept underlying the Eighth Amendment": "the dignity of man." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

561.     That risk is intolerable.

562.     There is a feasible and readily available alternative method of execution that would eliminate these risks: competently designed and administered execution by firearm.

563.     "Other than hanging, the firing squad is this country's oldest method of execution." Deborah W. Denno, *Back to the Future with Execution Methods,* The Eighth Amendment and Its Future in a New Age of Punishment (Meghan J. Ryan & William W. Berry III, eds. 2020).

114

564. An individual killed by a competent, appropriately designed firing squad is almost certain to experience a significantly quicker loss of total consciousness than an individual killed with pentobarbital.

565. An individual killed by a competent, appropriately designed firing squad is almost certain to experience a significantly quicker death than an individual killed with pentobarbital.

566. An individual killed by a competent, appropriately designed firing squad faces a significantly lesser risk of severe pain and suffering than an individual killed with pentobarbital.

567. On information and belief, TDOC employs numerous skilled, trained marksmen, and even operates a firing range at RMSI.

568. The state of South Carolina executed Brad Sigmon by firing squad on March 7, 2025. *See* Jeffrey Collins*, Violent and sudden. What a firing squad execution looked like through my eyes*, Associated Press, Mar. 7, 2025 (Ex. 36).

569. The state of Utah has executed over forty people by firing squad since the 1850s, including multiple individuals since 1977. Utah's most recent use of the firing squad was in the execution of Ronnie Lee Gardner in 2010.

570. Gardner was executed by a firing squad consisting of trained police officers.

571. Thousands, if not millions, of public servants nationwide, particularly members of law enforcement and the military, are trained and expected to be willing

to use a firearm on another person in settings far less controlled than an execution chamber.

572.     On information and belief, TDOC likely employs significantly more individuals who are proficient with firearms than individuals who are capable of competently and reliably setting an IV line or perceiving when drugs pushed through an IV line are not moving properly.

573.     The State of Tennessee already licenses individuals in the professional use of firearms and, therefore, already possesses expertise in assessing competency for that purpose. *See, e.g.*, Tenn. Code Ann. § 62-35-125 ("An armed security guard/officer may carry only the types of firearms that the commissioner prescribes, by rules and regulations, in the performance of the person's duties. A security guard/officer may carry a firearm only if certified to carry the firearm.").

574.     It is, moreover, easier to create a structure for execution by firearm, rather than lethal injection, because firearms are actually designed and intended to be used as instruments of killing, including killing human beings. Execution by firearm involves wielding tools for their intended purpose, rather than refashioning tools—like medical equipment and pharmaceuticals—to a purpose for which they were not intended.

575.     It is possible and feasible to select and/or prepare a room in such a manner that a firearm can be discharged in that room without posing any meaningful risk to individuals in adjoining rooms or to individuals at whom the firearm is not directed, particularly if appropriate protective gear (e.g., hearing protection) is used.

116

576.     Insofar as there exist obstacles to preparing a room for execution by firearm at RMSI, there is a long tradition of performing executions outdoors. RMSI includes significant swaths of flat, open land in which an execution could be performed.

577.     Dr. James Williams, a physician who has trained police and members of the military in shooting effectively and who has consulted with individuals facing execution, has explained that, when a person is shot in the heart, as individuals executed by firing squad typically are, "[t]here is a lot of evidence that the near-instant loss of blood pressure means no blood gets to the brainstem, and there is a rapid loss of consciousness. . . . I interviewed several U.S. military field medics who witnessed men shot in the heart at very close quarters, and they said, in every case, the victim stopped moving purposefully within a few seconds and did not vocalize or express that they were experiencing pain. In 1938, during a firing squad execution in Utah, a doctor monitored the man's heart activity, and it stopped entirely 15 seconds after the shots were fired." *See* Ex. 37.

578.     Dr. Williams has further explained that, insofar as there are concerns regarding the potential for pain in a conventional firing squad setup intended to shoot the individual in the heart, "[a]n even more effective way to guarantee there is no pain would be to aim for the brain or brainstem." *Id.*

579.     Dr. Williams, who was himself the victim of an accidental shooting when he was 18, has stated that the immediate pain he felt was minimal, with greater pain not setting in until hours later. Many other gunshot survivors have reported

117

relatively limited immediate discomfort, comparable to a hard blow, like a football tackle. *See id.*

580.     Feeling the equivalent of a firm blow for a few seconds before immediately losing consciousness is a far less torturous experience than drowning to death on one's own fluids, over a period of several minutes, while intoxicated by a barbiturate but retaining enough consciousness and sensation to suffer.

581.     Mr. Middlebrooks does not wish to be executed by any mechanism.

582.     However, he recognizes that, under current Supreme Court caselaw, he is required to plead the existence of a feasible and readily available alternative method of execution.

583.     A competently designed and performed execution by firearm would be readily available and feasible.[3]

584.     Because execution by pentobarbital poses an intolerable risk of severe pain and suffering that could be avoided by adopting a feasible and constitutionally permissible method of execution, the 2025 Protocol is inconsistent with the prohibition on cruel and unusual punishment under the Eighth Amendment.

585.     Mr. Middlebrooks is, therefore, entitled to a judgment under 42 U.S.C. § 1983 based on Defendants' deprivation of his federal rights under color of law.

---

[3] Mr. Middlebrooks asserts merely the availability and feasibility of executions by firearm. He does not hereby elect firearms as his preferred method of execution, as an administrative matter.

586. For the same reasons, Mr. Middlebrooks has a right to declaratory judgment that the defendants' plans for his execution violate Article I, §§ 16 and 32 of the Tennessee Constitution.

**COUNT 1.B:** **Execution pursuant to the 2025 Protocol, as carried out by the Defendants, will violate the Eighth Amendment to the U.S. Constitution and Article I, §§ 16 and 32 of the Tennessee Constitution due to the intolerable risk of superadded pain and disgrace created by TDOC's internal culture of recklessness and noncompliance.**

587. Execution by pentobarbital poses a high risk that the executed person will experience severe pain and suffering due to pulmonary edema and/or the drug escaping the circulatory system.

588. Insofar as the risk of a torturous death is not already a near certainty based on the issues related to pentobarbital itself, that risk is substantially increased if the pentobarbital was obtained from an unreliable source.

589. Insofar as the risk of a torturous death is not already a near certainty based on the issues related to pentobarbital itself, that risk is substantially increased if the pentobarbital was stored, transported, and/or handled incorrectly.

590. Insofar as the risk of a torturous death is not already a near certainty based on the issues related to pentobarbital itself, that risk is substantially increased if the individuals involved in obtaining the ostensible pentobarbital, setting the IV line, preparing the syringes, or administering the chemicals are not sufficiently trained.

591.    Insofar as the risk of a torturous death is not already a near certainty based on the issues related to pentobarbital itself, that risk is substantially increased if the individuals involved in the execution process do not have a consistent, universally shared commitment to complying with all applicable laws and policies.

592.    TDOC has developed a culture of noncompliance, recklessness, and secrecy that is particularly pronounced with regard to (1) issues of procurement and (2) issues related to executions.

593.    That culture of noncompliance, recklessness, and secrecy has resulted in an intolerable risk that an individual executed by TDOC with pentobarbital will experience severe pain and suffering.

594.    Because that pain and suffering will be inflicted by way of poisoning, moreover, it will also be a form of superadded disgrace.

595.    Insofar as the Court concludes that execution by pentobarbital is not *per se* unconstitutional, a readily available, feasible alternative method of execution for the purposes of this theory of liability would be execution by pentobarbital, but only as performed by TDOC *after* having taken adequate remedial steps to ensure competence, compliance with the law, and adherence to appropriate procedures.

596.    Insofar as the Court concludes that execution by pentobarbital is *per se* unconstitutional, execution by firearm would be a feasible, readily available alternative.

597.    Because execution by the currently existing version of TDOC with pentobarbital poses an intolerable risk of severe pain and suffering that could be

avoided by adopting a feasible and constitutionally permissible method of execution, the 2025 Protocol is inconsistent with the prohibition on cruel and unusual punishment under the Eighth Amendment and the Tennessee Constitution.

598.     Mr. Middlebrooks is, therefore, entitled to a judgment under 42 U.S.C. § 1983 based on Defendants' deprivation of his federal rights under color of law.

599.     For the same reasons, Mr. Middlebrooks has a right to declaratory judgment that the defendants' plans for his execution violate Article I, §§ 16 and 32 of the Tennessee Constitution.

**COUNT 1.C:**     **The 2025 Protocol calls on the Defendants to violate Mr. Middlebrooks' rights under the First Amendment, RLUIPA, and Article I §§ 3, 17, 19 and 23 of the Tennessee Constitution.**

600.     An individual in the custody of RMSI has a First Amendment right to freedom of speech.

601.     The 12-Hour Blackout Policy substantially burdens that right at a time of extraordinary importance—the final hours of his life.

602.     There is little, if any, plausible legitimate policy rationale for the 12-Hour Blackout Policy.

603.     Insofar as there is a legitimate basis for some restrictions during the 12-hour blackout period, there is no legitimate basis for placing exceptions to that policy within the wholly unbounded discretion of a TDOC official.

604.     An individual in the custody of RMSI has a First Amendment right to free exercise of religion.

605.     An individual in the custody at RMSI also has a right under RLUIPA not to have his free exercise of religion unduly burdened.

606.     The 12-Hour Blackout Policy substantially and unjustifiably burdens the ability of an individual facing execution to communicate about spiritual matters with clergy and/or other worshippers or adherents, without a sufficient legitimate government purpose.

607.     As such, the 12-Hour Blackout Policy violates the Free Speech Clause, the Free Exercise Clause, and RLUIPA.

608.     Mr. Middlebrooks is therefore entitled to a judgment that the 12-Hour Blackout Policy would deprive him of his First Amendment rights under color of law, violate Article I, §§ 3 and 19 of the Tennessee Constitution, and improperly burden his exercise of religion under RLUIPA.

609.     Mr. Middlebrooks has a right to access to the courts under the First Amendment to the U.S. Constitution.

610.     That right to access to the courts includes the right to seek judicial relief in connection with execution-related issues that do not arise, or are not discovered, until the day of execution.

611.     In order for Mr. Middlebrooks to have meaningful execution-day access to the courts, his attorney-witness must be able to perceive, visually and aurally, each step of the execution process at which a legally cognizable injury is likely to arise or be caused.

612.     Although the 2025 Protocol calls for the use of a closed-circuit video relay to allow TDOC to monitor the IV catheterization of the individual being executed, it does not permit the attorney-witness to monitor that feed, unjustifiably preventing Mr. Middlebrooks' counsel from serving as effective guardians of his rights during the execution process.

613.     The preparation of vials for use in the execution is a crucial stage in the execution process at which errors may occur or become apparent—for example, by discovering that the solution in the vials has precipitated or by improperly filling the syringe—but counsel is not permitted to view that step.

614.     The physician death check is also a stage at which potential injuries are likely to occur or be discovered, because it is at that stage when the effects of a botched attempted execution may first be observed up close.

615.     The 2025 Protocol does not permit the attorney-witness to observe the death check.

616.     Accordingly, the 2025 Protocol violates Mr. Middlebrooks' right to meaningful access to the courts in violation of the First Amendment of the U.S. Constitution and Article I, § 3 of the Tennessee Constitution.

617.     Mr. Middlebrooks is therefore entitled to a judgment that the 2025 Protocol violates his First Amendment rights under color of law and that the 2025 Protocol is inconsistent with Article I, § 3 of the Tennessee Constitution.

## VII.  PRAYER FOR RELIEF

1.  Based on the foregoing, Mr. Middlebrooks respectfully requests the following relief, as applicable:

    a.  A declaratory judgment that execution by injected pentobarbital, as administered pursuant to the 2025 Protocol, is unlawful under the Eighth Amendment of the U.S. Constitution and sections 16 and 32 of Article I of the Tennessee Constitution.

    b.  A declaratory judgment that execution by injected pentobarbital is unlawful under the Eighth Amendment of the U.S. Constitution and sections 16 and 32 of Article I of the Tennessee Constitution, unless TDOC takes appropriate steps to remedy its culture of noncompliance, to ensure sufficient training, accountability, and transparency in the performance of executions, and to correct inadequacies in the 2025 Protocol.

    c.  A declaratory judgment that the 12-Hour Blackout Policy violates the Free Speech Clause of the First Amendment of the U.S. Constitution and Article I, § 19 of the Tennessee Constitution.

    d.  A declaratory judgment that the 12-Hour Blackout Policy violates the Free Exercise Clause of the First Amendment of the U.S. Constitution, Article I, § 3 of the Tennessee Constitution, and RLUIPA as applied to communication with religious leaders, spiritual advisors, and co-worshippers/co-adherents.

e. A declaratory judgment that the curtain, camera, and vial preparation policies of the 2025 Protocol violate the Mr. Middlebrooks' rights to access to the courts under the First Amendment of the U.S. Constitution and Article I, §§ 17 and 23 of the Tennessee Constitution.

f. Injunctive relief preventing the defendants from violating Mr. Middlebrooks' rights in any of the above-described manners.

g. Such other relief as the court deems just, necessary, and proper.

Respectfully submitted this the 20th day of June, 2025.

Kelley J. Henry, BPR # TN 21113
Chief, Capital Habeas Unit

Amy D. Harwell, BPR # TN 18691
First Assistant Federal Public Defender

Eli Swiney, BPR # TN 026626
Research and Writing Specialist
Katherine Dix, BPR # TN 022778
Kit Thomas, BPR # WV 13477
Drew Brazer, BPR # TN 042363
Asst. Federal Public Defender
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF
TENNESSEE
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265
Email: Kelley_Henry@fd.org

/s/ Kelley J. Henry
Kelley J. Henry, BPR # TN 21113
Counsel for Mr. Middlebrooks

125

## CERTIFICATE OF SERVICE

I, Kelley J. Henry, certify that on June 20, 2025, a true and correct copy of the foregoing was served via the Court's electronic filing system to opposing counsel, Cody Brandon, Asst. Attorney General.


<u>/s/ Kelley J. Henry</u>
Kelley J. Henry