IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DONALD MIDDLEBROOKS,<br><br>Plantiff,<br><br>v.<br><br>FRANK STRADA, in his official capacity as the Commissioner of the Tennessee Department of Correction, and KENNETH NELSEN, in his official capacity as Warden of Riverbend Maximum Security Institute,<br><br>Defendants. | ) | No. 3:19-cv-01139<br>Judge Crenshaw<br>**CAPITAL CASE** |

**MEMORANDUM IN SUPPORT OF MOTION
FOR LEAVE TO AMEND AND SUPPLEMENT COMPLAINT**

Plaintiff Donald Middlebrooks has moved for leave to file a Supplemental and Amended Complaint[1] to state claims reflecting changes in the underlying facts and/or law that occurred during the lengthy period in which this case was administratively

[1] Because some of the facts that Mr. Middlebrooks seeks to assert occurred after the date of the filing of his initial Complaint, the Rules of Civil Procedure consider the pleading of those facts to be supplementary and therefore governed by Rule 15(d), rather than Rule 15(a), which governs ordinary pretrial amendments to pleadings. *See* Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). For ease of reading, however, Mr. Middlebrooks will largely refer to this motion as seeking leave to amend.

closed. For the reasons set out herein, leave should be granted in the interests of justice and the efficient litigation of the underlying claims.

## I. Background

### A. Mr. Middlebrooks filed a timely claim challenging Tennessee's then-expected method of carrying out his execution and litigated that claim diligently until wrongdoing by the Defendants brought this case to a standstill.

Mr. Middlebrooks is an individual in Tennessee Department of Correction ("TDOC") custody who has been sentenced to death by the courts of the State of Tennessee. R. 1.[2] On December 18, 2019, Mr. Middlebrooks filed a § 1983 Complaint asserting claims under 42 U.S.C. § 1983 related to Defendants' then-planned method for performing executions by lethal injection. R. 1. The lethal injection protocol that Mr. Middlebrooks challenged ("Second 2018 Lethal Injection Protocol"), *see* Proposed Supplemental and Amended Complaint ("PSAC") Ex.12, called for the individual to be executed with a three-drug combination consisting of midazolam, vecuronium bromide, and potassium chloride, to be administered by TDOC. *Id.* at 35.

Following an initial amendment of his Complaint, Mr. Middlebrooks asserted two claims: first, that lethal injection by Tennessee's then-preferred method violated the Eighth Amendment due to the risk that the executed person "will experience severe pain and unnecessary suffering due to pulmonary edema resulting from the dose of 500 mg midazolam, from suffocation and terror of paralysis from the

[2] Mr. Middlebrooks also challenged the Defendants' secondary method of execution, electrocution, but that challenge was dismissed on initial screening as unripe. R. 6 at 6.

vecuronium bromide, and from the searing pain of the potassium chloride"; and, second, that, insofar as that method of execution was generally permissible, it violated the Eighth Amendment with regard to Mr. Middlebrooks because his seizure disorder created an increased risk of severe pain. R. 13 ¶¶ 281, 282–89.

Judge Campbell dismissed both claims on April 15, 2020. *See* R. 26–28. Mr. Middlebrooks, however, appealed, and the Sixth Circuit reversed as to the first claim, while affirming as to the second. *See Middlebrooks v. Parker*, 15 F.4th 784, 797 (6th Cir. 2021). Specifically, the Sixth Circuit held that Mr. Middlebrooks could and should have raised certain seizure disorder-related claims in earlier litigation of which Mr. Middlebrooks was a part, but that this Court's dismissal of his more general challenge to the Second 2018 Protocol had been error. *See id.* at 793, 797. The Sixth Circuit remanded the case, and litigation resumed. *See* R. at 39.

Meanwhile, another individual facing a sentence of death in Tennessee, Terry King,[3] had filed his own complaint asserting similar claims in 2018. *See King v. Helton*, No. 3:18-cv-01234, R. 51, at PageID#2142. Mr. Middlebrooks' case and Mr. King's case were litigated separately for several years. Mr. Middlebrooks' case, however, fell far behind Mr. King's in terms of development, because the Court's erroneous dismissal of Mr. Middlebrooks' claim and the resultant appeal had rendered the case dormant until remand. That delay left Mr. Middlebrooks with insufficient time to engage in discovery for his claims before his then-impending

[3] Mr. King was originally joined by three other plaintiffs.Only Mr. King's case bears directly on the background of the present motion. *See* King, R. 47.

execution date. Facing that impossible situation, Mr. Middlebrooks moved to have his case and Mr. King's consolidated for the purposes of shared discovery and a trial. R. 45. On April 20, 2022, the Court granted that motion and set a joint bench trial for October 4, 2022. R. 52, PageID#476.

While the cases were advancing toward trial, the State continued in its efforts to execute other prisoners with the very same deficient protocols that Mr. Middlebrooks and Mr. King were challenging. It was entirely foreseeable that this approach could lead to disruption of litigation, because, as demonstrated by Tennessee's own history, executions by lethal injection often involve unforeseen complications and missteps that force the State to alter its protocols on an *ad hoc*, ongoing basis. Such changes, in turn, create a moving target for litigation that can create burden and inconvenience not only for a plaintiff challenging the underlying execution protocol, but for the Court and the State as well. Nevertheless, Defendants proceeded undeterred.

That choice proved fatal to the expected trial. The day before Defendants' planned execution of Oscar Smith on April 21, 2022, Mr. Smith's attorney Kelley Henry (who also represents Mr. Middlebrooks in this case) sent an email to TDOC Deputy Commissioner/General Counsel Debra Inglis inquiring whether the chemicals intended for Mr. Smith's execution had been subjected to the full testing for sterility, potency, and endotoxins required by the Second 2018 Protocol. *See* Second 2018 Protocol at 86. The chemicals had not, in fact, been fully tested as required, and TDOC's planned execution of Mr. Smith was halted at the last second.

Governor Lee issued what he described as a "temporary reprieve" to allow review of TDOC's execution protocol. R. 59-1, PageID#566.

TDOC's actions surrounding and in response to the aborted Smith execution immediately disrupted Mr. Middlebrooks' ability to pursue his claims in an expeditious manner, for several reasons.

First, the revelation that Tennessee had not been performing the required testing also meant that Defendants had misrepresented the agency's history of compliance with the 2018 Protocol in both this litigation and Mr. King's, which raised issues of necessary corrections and potential sanctions. *See, e.g.*, R. 81 (admitting to and correcting "inaccuracies").

Second, the discovery of Tennessee's noncompliance with its own protocol raised serious questions about whether Mr. Middlebrooks had, through no fault of his own, failed to plead significant, viable claims for liability under § 1983 based on that persistent noncompliance. Mr. Middlebrooks had challenged the 2018 protocol as inadequate—which, he still steadfastly asserts, it was. His rights under the Eighth Amendment, however, do not simply entitle him to having a constitutionally sufficient execution protocol *on the books*; they entitle him to a constitutionally sufficient execution protocol that is *actually in effect*. The fact that TDOC's actual practices fell short of its stated protocol, therefore, gave rise to additional grounds for relief. Mr. Middlebrooks, who had been on a path to litigating his case to trial before the end of that year, found himself with viable claims unpleaded and undeveloped, with no meaningful discovery having been performed on the most fact-intensive

issues that he would need to raise—that is, issues about TDOC's actual practices, not its written manual.

Third, litigation was unavoidably affected by the Governor's (entirely appropriate) announcement that the state would "address" TDOC's protocol. Mr. Middlebrooks takes no issue with the Governor's decision to step in and take the reins from TDOC. Indeed, he recognizes that the Governor's intervention was necessary and may well have saved numerous individuals from torturous deaths. For the purposes of this litigation, however, the fact that the Governor had to step in set everything back. The Second 2018 Protocol was at the core of the claims that were proceeding to trial, and Mr. Middlebrooks was seeking prospective relief for those claims. The fact that the Second 2018 Protocol appeared likely to be scrapped or revised, accordingly, rendered any potential trial a fool's errand; there would be no reason to seek prospective injunctive relief against a protocol that would, in short order, be rescinded—as, in fact, it was.

Mr. Middlebrooks immediately filed an Emergency Motion for Protective Order to Preserve Evidence directed at materials surrounding the Smith execution and related events. R. 55. The court granted that motion. R. 57. However, that left at least two significant tasks undone: first, the parties and the Court would need to take steps to address the defendants' history of misstatements; and, second, the parties and the Court would need to determine how litigation should proceed, in light of both the substantial new issues introduced and the fact that Defendants were likely to be forced by the Governor to change their deficient protocol.

The importance of those considerations was confirmed on May 2, 2022, when the Governor directed former U.S. Attorney Ed Stanton to conduct an independent investigation of the circumstances surrounding the Smith execution, the clarity of the Second 2018 Protocol, and the adequacy of TDOC staffing, as related to executions. R. 59-2 at 2. In acknowledgment of the State's loss of confidence in the Second 2018 Protocol, as implemented by TDOC, Governor Lee "paus[ed] scheduled executions through the end of 2022 in order to allow for the review and corrective action to be put in place." *Id.*

### B. This matter was administratively closed, and all litigation was stayed by agreement of the parties.

Following discussion between counsel, Mr. Middlebrooks, Mr. King, and Defendants agreed that Defendants would seek a stay of proceedings and an administrative closure of the case until greater clarity could be reached. Although that course of action was necessary, it represented a substantial sacrifice by Mr. Middlebrooks. The revelations that emerged following the aborted attempt to execute Mr. Smith were highly relevant to Mr. Middlebrooks' claims, and he wished, ideally, to be able to investigate those revelations sooner rather than later—just as virtually any civil litigant would be eager to investigate newly uncovered wrongdoing by his opposing party that directly supported his claims. The best tool potentially available to him would have been discovery in this litigation. Mr. Middlebrooks recognized, however, that there was an unresolvable tension between his desire to pursue immediate discovery and the most effective management of his claims—which could

only go forward if there was some actual, existing protocol to challenge. Ultimately, he chose to put the viability of his claims first and agreed to a stay of discovery.

To that end, the parties entered into a written agreement drafted to go into effect if and when the Court granted the stay motion filed by Defendants. *See* R. 59-3 at 1 ("2022 Stay Agreement"). The 2022 Stay Agreement expressly acknowledges that both Mr. Middlebrooks and Defendants conveyed "valuable consideration" in support of the agreement's respective covenants. In particular, Mr. Middlebrooks (1) waived any right to oppose the stay of the case, including the stay of discovery, thereby forgoing his immediate right to court process directed at uncovering TDOC's newly revealed wrongdoing and (2) waived any right to object to Defendants' withdrawal of their motion for summary judgment directed at Mr. King's claims—thereby assisting the defendants in their efforts to try to walk back their various misstatements to the court. *Id.* at 2–3.

In exchange, Defendants agreed, among other things, that "[a]ll discovery will be stayed pending the conclusion of the independent investigation and the timely completion of related corrective action." *Id.* at 2. Defendants also agreed that, when matters resumed, "Defendants will not object to [a] Plaintiff—i.e., King or Middlebrooks—amending his complaint one time within ninety (90) days of such revision or adoption to address such a revision or adoption in one count asserting a facial challenge to the revised or new protocol." *Id.*

Consistently with the Agreement, Defendants filed an Unopposed Motion to Stay Proceedings on May 6, 2022. R. 59. In support of that request, Defendants

argued that "a stay would preserve resources for the parties and the Court because the result of the independent investigation may materially impact future proceedings in these cases." R. 59 at 2. They stressed the degree to which the stay would, in particular, serve the Defendants' interests by sparing them "considerable prejudice" and "fruitless expenditure of resources." R. 60 at 6. The 2022 Stay Agreement was included as an attachment to the motion. R. 59-3.

On the same day, the Defendants filed a notice to the Court acknowledging that "there may be factual inaccuracies or misstatements in some of Defendants' filings" and assuring the court that they would "correct any inaccuracies and misstatements once the truth has been ascertained." R. 58 at 1.

On May 10, 2022, the court granted Defendants' motion, administratively closed the case, and stayed proceedings "pending the outcome of the independent investigation." R. 61 at 2.

### C. The State's review uncovered pervasive wrongdoing that was highly relevant to Mr. Middlebrooks' Eighth Amendment rights.

The State's review took place over the ensuing months, and, on December 13, 2022, Mr. Stanton issued a report of the findings of his investigation. That report has been made public. *See* R. 65-1, *Tennessee Lethal Injection Protocol Investigation, Report and Findings* (Dec. 13, 2022) ("Stanton Report"). The Stanton Report not only uncovered numerous instances of misconduct by TDOC, but also concluded that the agency's failures were a direct result of the fact that "TDOC leadership viewed the lethal injection process through a tunnelvision, result-oriented lens." Stanton Report at 2. Mr. Stanton also set out a number of "concrete recommendations." *Id.* at 41.

On December 28, 2022, Governor Lee issued a formal statement in response to the Stanton Report, stating that he was "proactively sharing . . . [his] administration's next steps to ensure continued transparency for the people of Tennessee." *See* R. 73-2 at 1. The Governor identified four "proactive steps to ensure TDOC adheres to established protocol." R. 73-2 at 2, *Gov. Lee Announces Decisive Action to Ensure Proper Protocol at TDOC* (Dec. 29, 2022).

That multi-step directive would, inevitably, take time, and, on January 17, 2023, Defendants filed a Notice of Completion of the Independent Investigation of the Lethal Injection Process and Unopposed Motion To Extend Stay of the Proceedings. R. 72. Defendants explained that the parties "ha[d] consulted and agree[d] that reopening of the case and setting of a scheduling order would be premature at th[at] time," because "[t]he changes necessitated by the [Stanton Report] and the Governor's directives will likely affect the scope of Plaintiffs' complaints and undoubtedly will affect the course [of] the proceedings before this Court; since, most notably, the necessary development of the factual record is not feasible until these changes are complete." R. 72 at 2. Defendants, therefore, asked the court to "extend the stay of the proceedings until the completion of corrective actions called for by the report and the Governor's directives based on the report." *Id.* On January 27, 2023, the Court granted the defendants' motion. R. 78.

### D. Defendants completed their revision of the lethal injection protocol in total secrecy and attempted to keep the completed protocol under wraps in violation of Tennessee law.

For most of the next two years, this case remained stayed and administratively closed, awaiting the completion of actions that were entirely within the State's

control. Consistently with this Court's instructions, Defendants filed status reports every three months, but those status reports provided no meaningful information. *See* R. 82, 85–89.

On May 1, 2023, over a year after the aborted Smith execution, Defendants filed a Notice of Corrections of Inaccuracies and/or Misstatements admitting to numerous false statements made in the course of litigation. R. 81.

Finally, on December 27, 2024, TDOC issued a bare-bones press release informing the public that it had "completed its revision of the lethal injection protocol, which will utilize the single drug pentobarbital."[4] Defendants made no immediate contact with counsel for Mr. Middlebrooks in the wake of TDOC's announcement, nor did Defendants take immediate steps to inform the Court.

The December 27, 2024 press release did not include, and provided no link to, the protocol itself—revealing essentially nothing of the protocol's details, other than that TDOC intended to "utilize the single drug pentobarbital." The Associated Press ("AP") requested a copy of the written protocol pursuant to the Tennessee Public Records Act ("TPRA") and was immediately refused, despite the fact that TPRA grants TDOC no right to withhold its lethal injection protocol, only to redact certain identifying information. *See* Tenn. Code Ann. § 10-7-504(h). On January 9, 2025, TDOC reversed course and released a redacted copy of the written protocol to the AP. *See* Travis Loller and Kimberly Kruesi, *Tennessee reverses course, releases redacted*

---

[4] *Available at* https://www.tn.gov/correction/news/2024/12/27/tdoc-completes-lethal-injection-protocol-review.html.

*execution manual with vague details*, Associated Press (Jan. 9, 2025). Counsel for Mr. Middlebrooks has now obtained a copy of the unredacted protocol pursuant to this Court's Limited Agreed Protective Order of March 5, 2025. *See* R. 107.

The text of the 2025 Protocol suggests that TDOC has done very little to address the deep institutional challenges identified by the Stanton Report. Rather, TDOC has simply (1) changed the particular poison it intends to use to kill Mr. Middlebrooks and (2) attempted to solve the problem of its chronic failure to follow its own requirements by making sure there are fewer requirements for it to violate—effectively the opposite of the more thorough approach recommended by the Stanton Report. This case and Mr. King's case were *sua sponte* reassigned to different judges, severing the consolidation.

On January 10, 2025, Judge William Campbell recused himself in Mr. Middlebrooks' case, and it was reassigned. R. 90. The same day, Defendants filed a Notice informing the court that it had finalized the protocol and was in the process of working with Mr. Middlebrooks to discuss the path forward in this litigation. R. 91 at 1. They filed the same Notice in Mr. King's case. *King*, R. 237. On January 13, 2023, Judge Campbell recused himself in that case, as well. King, R. 238. Mr. King's case was reassigned to Judge Trauger, effectively ending the earlier partial consolidation—which, in any event, had been undertaken solely for the purposes of the trial that, because of the collapse of the originally challenged execution protocol, never took place. *See King*, R. 238. Counsel for Mr. Middlebrooks have been in contact

with counsel for Mr. King, and the respective teams agree that there is no need to pursue any reconsolidation of the two men's respective cases at this time.

### E. A U.S. Department of Justice report released after Tennessee drafted the 2025 Protocol refuted the defendants' assumptions regarding the reliability of pentobarbital as a method of execution.

Meanwhile, on January 15, 2025, U.S. Department of Justice ("DOJ") announced that it was withdrawing its own pentobarbital-based execution protocol, a decision that it supported with a report by the Department's Office of Legal Policy ("OLP"). *See* DOJ OLP, Review of the Federal Execution Protocol Addendum and Manner of Execution Regulations (Jan. 15, 2025) ("DOJ Report") (PSAC, Ex. 22). The OLP concluded, based on its "extensive review of available scientific, medical, and legal research[,] recent autopsies of individuals who have received lethal injections of pentobarbital[,] consultation with experts within and outside the Department[,] and solicitation and consideration of public comments," that "there remains significant uncertainty about whether the use of pentobarbital as a single-drug lethal injection causes unnecessary pain and suffering." *Id.* at 1–2. That uncertainty, the OLP concluded, justified the cessation of all pentobarbital-based executions "until that uncertainty is resolved." *Id.* at 2.

The DOJ Report identified three primary areas of concern regarding the use of pentobarbital: (1) the "risk of flash pulmonary edema" caused by the drug; (2) the "pain associated with the injection of a highly alkaline solution into the bloodstream"; and (3) the "lack of clarity as to whether pentobarbital causes individuals to become unconscious, and therefore incapable of feeling pain, or simply unresponsive." *Id.* at

11. The OLP emphasized that its concerns were not based simply on the historical information cited in earlier discussions or litigation regarding pentobarbital, but on, among other things, "recent medical research evaluating autopsy data from executions that used pentobarbital, information collected from autopsies conducted on two individuals recently executed by the federal government, [and] recent witness accounts from federal and state executions." *Id.*

### F. The parties agreed to extend the deadline for unopposed amendments to the Complaint to June 20, 2025, and Mr. Middlebrooks now seeks leave to amend.

According to the terms of the 2022 Stay Agreement, the finalization of the 2025 Protocol meant that litigation in this case could resume. On March 29, 2025, following discussions between the parties Mr. Middlebrooks filed an Unopposed Motion to Reopen Case and for Stay of Execution. R. 108. The Court granted that Motion on April 1, 2025. R. 109. The parties agreed by email to extend the deadline for filing an Amended Complaint to June 20, 2025. *See* Attachment A.

Mr. Middlebrooks now seeks leave to file a Supplemental and Amended Complaint asserting that the 2025 Protocol is inconsistent with the law in, broadly, three ways. Count 1.A asserts that the method of execution called for by the 2025 Protocol is, on its face, so poorly designed and conceived that execution pursuant to that protocol would violate the Eighth Amendment and corresponding protections under the Tennessee Constitution, even if the protocol were carried out perfectly. Count I.B simply takes the obvious, unavoidable step of acknowledging that there is overwhelming evidence that the entity to which the 2025 Protocol commends its responsibilities—TDOC—*will not* carry out the protocol faithfully, just as it never

carried out the previous policy faithfully. TDOC's now-demonstrated culture of recklessly disregarding even its own safeguards creates additional risk of superadded suffering, and Count 1.B asserts that, insofar as the flaws of the 2025 Protocol's design and conception do not themselves cause it to run afoul of the Eighth Amendment, the additional risks posed by TDOC's internal culture push those flaws over the line into unconstitutionality. Finally, Count 1.C challenges certain secondary aspects of the 2025 Protocol pursuant to the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Tennessee Constitution.

## II. Legal Standard

The Federal Rules of Civil Procedure state that the "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). In assessing a proposed amendment pursuant to that standard, a district court will typically consider several factors, including "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989)). The same analysis governs a motion for leave to supplement pursuant to Rule 15(d). *See Spies v. Voinovich*, 48 F. App'x 520, 527 (6th Cir. 2002) (citing *McHenry v. Ford Motor Co.*, 269 F.2d 18, 24 (6th Cir. 1959)); *Sunless, Inc. v. Selby Holdings, LLC*, No. 3:20-CV-00930, 2021 WL 3513871, at *3 (M.D. Tenn. Aug. 10, 2021) ("Although Rule 15(d) does not set out a specific standard regarding when leave to supplement should be granted, courts have generally proceeded under the assumption that leave to supplement should be 'freely

given,' just as leave should be freely given to good-faith, timely amendments, in the absence of a persuasive reason against granting such leave.").

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Parchman v. SLM Corp.*, 896 F.3d 728, 738 (6th Cir. 2018) (quoting *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

A Complaint is not required to address every issue that is likely to arise in litigation. Rather, Fed. R. Civ. P. 8(a) requires the plaintiff to state "(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief." Rule 8(a) does not require a plaintiff to anticipate or address potential affirmative defenses. Accordingly, a claim is only subject to dismissal based on an affirmative defense if (1) the applicability of the defense is "apparent from the face of the complaint" and (2) the plaintiff has failed to plead "allegations explaining why" the defense is plausibly inapplicable. *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

### III. The defendants have already consented to Mr. Middlebrooks' filing of an Amended Complaint challenging the 2025 Protocol, and most, if not all, of his proposed amendments fall within the scope of that consent.

Mr. Middlebrooks anticipates that Defendants will argue that they retain the right to object to this request because Mr. Middlebrooks (1) asserts grounds for unconstitutionality that Defendants do not consider "facial" and (2) seeks to state multiple "counts." Although Mr. Middlebrooks believes that he is entitled to leave to amend under Rule 15, regardless of whether his request is opposed, he disagrees with that interpretation.

Mr. Middlebrooks' proposed Counts 1.A and 1.C are unambiguously facial. Count 1.A alleges that the 2025 Protocol, as written, calls for executions to be performed in a manner that will violate the Eighth Amendment and corresponding protections under the Tennessee Constitution. Count 1.C, in turn, alleges that the 2025 Protocol, as written, calls on the Defendants to violate Mr. Middlebrooks' rights under the First Amendment, RLUIPA, and corresponding provisions of the Tennessee Constitution. The only claim that is even arguably non-facial—that is, in the ordinary parlance of litigation, "as applied"—is Count 1.B, which alleges that, insofar as the 2025 Protocol might be sufficient to permit *some* hypothetical agency to carry out executions consistently with the Eighth Amendment, it is not sufficient for TDOC, in light of TDOC's now well-demonstrated culture of recklessness, secrecy, and noncompliance.

Where such a claim falls on the facial/as-applied spectrum, however, is difficult to say. Even the most conventional "facial" challenge to a lethal injection protocol

requires the court to look beyond the protocol's language to consider the specific physical features and biological effects of the chemicals called for to be used, and there is little conceptual difference between looking at the details of a specific *drug* and looking at the details of a specific *agency*. Indeed, the Tennessee Supreme Court considered exactly this issue in *West v. Schofield*, 460 S.W.3d 113 (Tenn. 2015) ("*West I*"), and expressly "question[ed]" whether a claim based on Defendants' propensity for maladministration is "actually" an as-applied claim, before moving on from the question altogether without reaching an answer.[5] *Id.* at 130–31. Whether Count 1.C is "facial" is, therefore, ambiguous. That ambiguity should be construed in favor of Rule 15's policy of liberal amendment.

Rejecting this amendment on the ground that it involves multiple "counts" would be no more justifiable. As the Court undoubtedly knows from the thousands of complaints it has reviewed, the difference between one "count" and many "counts" in a civil lawsuit is purely a drafting decision. Complaints are not indictments, and "count" is not a meaningful unit of anything under the Federal Rules of Civil Procedure. Whether to consolidate or split apart supposed "counts" in a civil complaint is a stylistic question that hinges on convenience, not substance.

---

[5] One reason that resolving that ambiguity was unnecessary is that the "facial"/"as applied" distinction plays no substantive role in establishing the standard applicable to a claim under the Eighth Amendment. *See Bucklew v. Precythe*, 587 U.S. 119, 139 (2019). That substantive irrelevance is all the more reason not to give the distinction outsize importance here.

Mr. Middlebrooks believes that Rule 15 and the interests of justice support granting him leave to amend and supplement, regardless of whether his request is opposed. However, the simplest, most expeditious way to move this case forward would be to construe Defendants' ambiguous consent consistently with the "liberal amendment policy" of Rule 15, *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016), and to grant leave accordingly.

## IV. The proposed amendments are strongly supported by the interests of justice.

It is beyond reasonable dispute that an individual sentenced to death has a right to challenge the legality of his planned method of his execution. If that were not the case, the government would have a free hand to execute individuals sentenced to death in any manner it saw fit—up to and including gruesome, torturous methods of killing from the dark past, like drawing and quartering, burning, or drowning. When Tennessee planned to kill Mr. Middlebrooks pursuant to the Second 2018 Protocol, he challenged that protocol—which the Sixth Circuit held that he had the right to do. *See Middlebrooks v. Parker*, 15 F.4th 784, 797 (6th Cir. 2021). Now, he simply wishes to bring the same type of challenge to the new protocol, based on changed facts and law. It is overwhelmingly in the interests of justice that he be permitted to do so.

Indeed, every single issue that Mr. Middlebrooks now seeks to raise is necessitated by a change in circumstances that happened, or was uncovered, during the lengthy delay that Defendants caused.

First, and most obviously, TDOC rescinded the Second 2018 Protocol and replaced it with a wholly different document that both (1) selected a different poison

to be used as the government's killing agent and (2) changed numerous aspects of TDOC's policies, from its approach to spiritual advisors to the nature of the instructions to the individual who administers the killing injection. Mr. Middlebrooks could not have challenged the 2025 Protocol until the 2025 Protocol existed.

Second, Mr. Middlebrooks' proposed Claim 1.B involves TDOC's culture of noncompliance, recklessness, and secrecy, as uncovered by the Stanton Report and other revelations that occurred during the period while this matter was stayed.

Third, recent years have seen a wealth of new information demonstrating the risks of pentobarbital. As Defendants will surely point out, Mr. Middlebrooks previously suggested, in this litigation, that pentobarbital, if "properly compounded, stored, and administered," would have been a still-risky but superior option to Defendants' then-preferred three-drug method. R. 13 ¶ 234. Mr. Middlebrooks, however, made that assertion over five years ago, based on the limited evidence available at the time. As the Complaint explains at length, the medical and scientific evidence regarding the effects of pentobarbital poisoning has substantially improved in recent years, and those improvement belie any assumption that pentobarbital can be counted on  to avoid a torturous death. *See* PSAC ¶¶ 230–61 & Ex. 21–22. Mr. Middlebrooks should be able to assert his rights based on current science—not the far more incomplete picture that was available at the time that TDOC's actions waylaid his claims.

Finally, aspects of Count 1.A—specifically, those involving cruelty due to the superadded disgrace and injury to human dignity associated with execution by

poisoning, as viewed pursuant to the traditional standards underlying the Eighth Amendment when it was adopted—could not have been brought until changes in caselaw occurred that are still underway and which did not rise to the level of supporting a finding of unconstitutionality until recent years. It should be news to no one that American jurisprudence is currently in the midst of a revolution in how courts think about constitutional rights, with the Supreme Court reorienting those rights increasingly not merely around constitutional language and principles, but rather "this Nation's historical tradition of . . . regulation." *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The Eighth Amendment is not immune to revision pursuant to the Supreme Court's newly minted "standard grounds for constitutional decisionmaking." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 279 (2022). Mr. Middlebrooks is entitled to rely on these changes in the law.[6]

## V. The proposed amendments would not be futile

### A. Count 1.A

The Eighth Amendment forbids the State of Tennessee from executing any person in a manner posing an "'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)). A risk is "objectively intolerable" if the underlying harm is

---

[6] Indeed, the State of Tennessee itself recently filed an amicus brief in another case in which it contended that (1) the recent changes in constitutional caselaw on which Mr. Middlebrooks seeks to rely now provide "the proper foundation of all constitutional interpretation" and (2) there is already "an interpretive course correction in Eighth Amendment jurisprudence" underway based on that principle. *See* Attachment B at 13.

either "sure" or "very likely" to occur. *Glossip v. Gross*, 576 U.S. 863, 875 (2015). Whether a particular harm qualifies as cruel and unusual typically depends on two factors: (1) its severity; and (2) the extent to which it is over and above the injuries inherent to the sentence—that is, whether the harm is incidental, like the natural fear of an upcoming execution, or is "superadded," like the harm resultant from being killed in a needlessly torturous manner.[7] *See id.* at 48 (quoting *Wilkerson v. Utah*, 99 U.S. 130, 135 (1878)).

There are multiple types of harm that can meet the "superadded severe harm" test. Although courts, at times, use the word "pain" as a catch-all term for the injuries cognizable under the Eighth Amendment, it is well-settled that such "pain," in the Eighth Amendment context, encompasses more than raw physical pain of the type experienced when, for example, a person breaks a bone or is stabbed with a sharp object. The Supreme Court has repeatedly acknowledged that a punishment can be cruel not only because it "superadds" that type of physical pain, but alternatively because it superadds "terror" or "disgrace." *Bucklew*, 587 U.S. at 133.

---

[7] In addition to severity and superaddition, there is a third factor that courts sometimes consider in determining whether an Eighth Amendment injury has occurred—the State's subjective motivation in inflicting the harm, particularly whether the challenged policy was specifically "designed to" superadd pain, terror, or disgrace. *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 521 (2024). While a showing of such improper purpose may support an Eighth Amendment violation, it is not required. That is why, for example, settled caselaw establishes that it is unconstitutional to execute a minor or an intellectually disabled person, regardless of the state's motivation. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

The PSAC alleges facts that straightforwardly support a claim that, if Defendants execute Mr. Middlebrooks pursuant to the 2025 Protocol, that execution will violate the Eighth Amendment pursuant to the well-settled above principles. Specifically, Mr. Middlebrooks alleges that execution pursuant to the 2025 Protocol is very likely to cause severe pain due to the risk of pentobarbital entering soft issues, PSAC ¶¶ 310–17, 555; that it is very likely to cause severe pain and terror due to the experience of a death by pulmonary edema, *id.* ¶¶ 239–52, 554–56; and that it is likely to cause what the Framers would have considered execution by poisoning to involve severe disgrace and degradation, *id.* ¶¶ 5–6, 35–46, 558–60.

Mr. Middlebrooks anticipates that Defendants will argue that allowing his amendment would be futile because (1) other challenges to other pentobarbital-based protocols have failed in the past, including one decade-old challenge—*West v. Schofield*—in which Mr. Middlebrooks was a plaintiff; and (2) Mr. Middlebrooks previously suggested pentobarbital as an alternative method of execution, rather than the state's now-discredited and -abandoned three-drug protocol. The Defendants raised those exact arguments in other litigation challenging the 2025 Protocol—specifically, in the case *Burns v. Strada*, currently pending in Davidson County Chancery Court—and each argument was, correctly, rejected by the Chancellor. *See* Attachment C (*Burns v. Strada*, Case No. 25-414-IV (Davidson Cnty. Chancery), Order of May 15, 2025). The same should happen here, because none of the doctrines to which courts actually turn to evaluate such arguments—that is, precedent, preclusion, and estoppel—supports Defendants' position.

**Precedent.** There is no federal precedent establishing pentobarbital as a constitutionally sufficient method of execution, let alone one establishing the approach adopted by the 2025 Protocol as adequate. Defendants may cite *Barr v. Lee*, 591 U.S. 979 (2020), but, in that case, the U.S. Supreme Court merely held that the admittedly competing evidence regarding the risks of pentobarbital meant that the plaintiffs had "not made the showing required to justify last-minute intervention by a Federal Court." *Id.* at 981. Defendants may also try to rely on *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 289 (6th Cir. 2019), but that case did not involve pentobarbital at all. Its only relevance is that Judge Siler included some vague musing, in dicta, that chemically induced drowning "looks a lot like the risks of pain associated with hanging." *Id.* at 290. Superficial resemblance is not, and has never been, the governing test under the Eighth Amendment. And, in any event, whatever lethal injection "looks like" to an untrained eye, what it *is* is poisoning a person to death—a punishment that, as the PSAC explains at length, would unambiguously have been rejected by the Framers. Any suggestion that Judge Siler's comment ruled out *every* challenge to *every* form of chemically induced drowning as a method of execution would be ridiculous.

Moreover, even if precedent provided a sound basis for this Court to treat it as a settled matter that pentobarbital executions *can* be performed in a way that sufficiently reduces the risk of suffering, it would not be determinative of the pending motion, because Count 1.A does not challenge execution by pentobarbital in the abstract, but rather execution by pentobarbital *as called for by the 2025 Protocol. See*

PSAC ¶ 556 ("Insofar as there exists any way to mitigate that risk by altering the circumstances or details of how the pentobarbital is administered, the 2025 Protocol fails to do so.").

For example, Mr. Middlebrooks complains that Defendants have eliminated pages upon pages of explicit safeguards that appeared in earlier Tennessee protocols—including by eliminating all detailed testing requirements, despite the fact that drugs obtained under the prior protocol frequently failed potency testing. *Id.* ¶¶ 416–26. He complains that the 2025 Protocol "contains no minimum competency requirements for the pentobarbital supplier" and "no prohibition against TDOC obtaining pentobarbital from an entity with a history of safety violations[,] . . . fraud[,] . . . selling gray market drugs[,] . . . selling diluted drugs[,] . . . selling drugs that have been tampered with[,] . . . selling drugs with altered labeling[,] . . . storing drugs in improper conditions[, or] . . . selling drugs after their expiration date." *Id.* ¶¶ 287–95. Mr. Middlebrooks also complains that the pentobarbital is administered manually by a layperson, rather than with an IV infusion pump that would permit a controlled, consistent, and, if necessary, slowed infusion that would lower the risk of a ruptured vein. *Id.* ¶¶ 256–57. He complains about the vague and insufficient requirements for serving on the IV Team and the lack of expertise required for the executioner who prepares and administers the poison. *Id.* ¶¶ 304–08, 321–35. He complains that, for an individual of Mr. Middlebrooks' weight, the dosage called for by the 2025 Protocol is inconsistent with even the accepted standard of care for euthanizing *animals*. *Id.* ¶ 263. He complains that the extreme secrecy of the 2025 Protocol prevents oversight

or accountability. *Id.* ¶¶ 296–98, 456–69. He complains that the 2025 Protocol does not require the IV Team to actually practice live IV catheterization during their practice sessions. *Id.* ¶ 336–37. He complains that the 2025 Protocol inexplicably removes preexisting instructions for how the executioner should respond if he experiences unexpected pressure in pushing the drug through the syringe. *Id.* ¶¶ 338–39. Any suggestion that all that Mr. Middlebrooks has presented is a yes or no question about whether pentobarbital executions can conceivably be performed in a constitutional manner would be demonstrably false.

**Preclusion/res judicata.** Defendants may attempt to assert preclusion based on the fact that Mr. Middlebrooks challenged another, earlier protocol involving pentobarbital in *West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017). But as Defendants know from *this very case,* "the doctrine of res judicata 'does not prevent a re-examination of the same question between the same parties where in the interval the facts have changed or new facts have occurred which may alter the legal rights or relations of the litigants.'" *Middlebrooks*, 15 F.4th at 789.

Mr. Middlebrooks has explained, at great length, how the facts have changed here. The particular facts of Tennessee's approach to pentobarbital executions have changed, because this is an entirely new protocol that sacrifices preexisting safeguards. And the scientific facts have changed because the medical evidence regarding the effects of pentobarbital poisoning has vastly improved. *See Kaplun v. AG of the United States*, 602 F.3d 260, 269 (3rd Cir. 2010) (explaining that a

"prediction . . . [of] future pain and suffering" does not involve a past fact that cannot be revisited, but rather the "present probability of a future event").

Defendants may disagree with Mr. Middlebrooks' reading of the science and his concerns about the protocol's changes, but such disagreements pose questions of fact about the applicability of an affirmative defense and are, therefore, appropriately a subject for summary judgment or trial—not a motion for leave to amend.

**Estoppel.** Defendants will probably try—as they unsuccessfully did in the *Burns* litigation—to argue that, if a plaintiff has pleaded pentobarbital as an alternative method of execution at any point in the past, he is estopped from challenging it in the present. Such an argument is, in essence, an argument based on estoppel. But there is no estoppel doctrine applicable here.

Judicial estoppel is inapplicable, because none of the relevant statements were either (1) sworn by Mr. Middlebrooks or (2) adopted by any court, meaning that they do not give rise to judicial estoppel. *See Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 575 (6th Cir. 2020) ("The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted *under oath* in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.") (emphasis added) (quoting *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002)).

Equitable estoppel is inapplicable, because, among other reasons, equitable estoppel can only be asserted when a party that was "aware of the true facts" about an issue engaged in "conduct or language" that deceived a party that was "unaware

of the true facts" on that issue, resulting in reasonable reliance. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 521 (6th Cir. 2010). Mr. Middlebrooks never had any secret knowledge of the risks of pentobarbital that he concealed from or misrepresented to TDOC, a government agency that actually performs—and exercises near-absolute control over the flow of information about—lethal injection executions in Tennessee. Mr. Middlebrooke, like (if not more than) Defendants, has had to assess those potential effects based on the developing science. Surely, Defendants cannot expect this Court to believe that they were somehow tricked into thinking pentobarbital was reliable and effective by Mr. Middlebrooks.

In any event, any statements that Mr. Middlebrooks has made regarding pentobarbital as preferable to the abandoned three-drug protocol were expressly about pentobarbital *if appropriately obtained, stored, and administered. See, e.g.*, PSAC ¶ 161. And as the PSAC details at length, the 2025 Protocol fails to provide sufficient safeguards to ensure that that will be the case.

Moreover, as the PSAC explains, the scientific and medical understanding of the effects of pentobarbital poisoning has improved significantly in the years since this case began. *Id.* ¶¶ 236–61. There is no legal or factual reason to require Mr. Middlebrooks to ignore years of new information that bears on the inherently predictive question of how his execution is likely to proceed.

**B. Count 1.B**

Count 1.B simply takes the deficiencies identified in Count 1.A and adds an additional risk factor—TDOC's now-undeniable culture of recklessness, secrecy, and noncompliance. *See* PSAC ¶¶ 229–477, 587–99. It is well-settled that, where an

organization's leadership has fostered a culture that is a but-for cause of wrongful injury, a court may consider that factual causation just as it would any other. *See, e.g.*, *Nabors v. CRST Malone, Inc.*, 126 F. Supp. 3d 1027, 1036 (N.D. Ind. 2015) (denying summary judgment because question of whether company had fostered a culture of noncompliance was a contested issue of fact). For example, courts recognize that a corporate culture that is focused on internal objectives at the expense of compliance can be a but-for cause of fraudulent practices. *See, e.g.*, *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 290 (D. Conn. 2005). Indeed, issues of organizational culture have been recognized in the specific area of ensuring the integrity of medical materials. *See DeVries v. BioLife Plasma Servs., L.P.*, No. 1:05-CV-684, 2006 WL 2700902, at *5 (W.D. Mich. Sept. 19, 2006) (acknowledging that "if a culture of noncompliance is tolerated" in the handling of biological or medical materials, "contamination is the likely end result").

Recognizing that liability can arise from a culture of noncompliance is simply acknowledging a reality that all people ultimately know to be true: bad leadership and bad internal expectations lead, inevitably, to bad actions by an entity's personnel. But a claim based on that undeniable fact could not have been brought until after the release of the Stanton Report. Arguments about maladministration by state actors are typically stymied by the judge-created "presumption of regularity," which creates a rebuttable presumption that "public officials . . . . discharge their duties in good faith and in accordance with the law." *West v. Schofield*, 460 S.W.3d 113, 131 (Tenn. 2015). A claim based on TDOC's culture, therefore, could not have been brought until

after facts were revealed to rebut that presumption—facts that were not available until the Stanton Report.

Defendants will almost certainly oppose Count 1.B by trying to continue to hide behind the presumption of regularity. But that presumption is, and has always been, rebuttable. *See Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("The presumption perhaps is less a rule of evidence than a general working principle. However the rule is characterized, where the presumption is applicable, clear evidence is usually required to displace it."). The facts that Mr. Middlebrooks has alleged to rebut the presumption of regularity with regard to TDOC's approach to executions are voluminous and undeniable.

To wit: TDOC did not comply with its own procedures in any execution by lethal injection planned or performed for over a decade, spanning the last three protocols, PSAC ¶¶ 136–73, 193; it executed Billy Ray Irick with midazolam that was not tested for potency and which was obtained from a supplier whose product routinely failed potency testing when that testing was actually performed, *id.* ¶ 156.a; it taped Mr. Irick's hands down to make it impossible to tell whether he retained consciousness, *id.* ¶¶ 387–88; it repeatedly used a compounding pharmacy that it knew to have misrepresented its capabilities, *id.* ¶¶ 148–54; it repeatedly misrepresented its compliance with its own safeguards in federal litigation, *id.* ¶¶ 180, 202 & R.81; its General Counsel had to be fired for wrongdoing related to executions, PSAC ¶¶ 198–99; its Inspector General had to be fired for wrongdoing related to executions, *id.* ¶¶ 200–01; its departed CFO was federally indicted for his

coverup of the agency's faulty healthcare-related procurement practices, *id.* ¶¶ 377–80; and the review commissioned by the Governor himself found that "TDOC leadership viewed the lethal injection process through a tunnel-vision, result-oriented lens," *id.* ¶ 192 & Ex. 13 at 2, 40.

That list is non-exhaustive and is getting longer virtually by the day. Since TDOC decided to announce the 2025 Protocol it has: violated the Protocol's procedures by having an attorney prematurely approach Mr. Middlebrooks—without counsel present—in an attempt to get him to sign a form that Defendants almost certainly would have immediately pointed to in an attempt to moot this entire lawsuit, *id.* ¶¶ 462–75; falsely asserted a right to total secrecy regarding the entirety of the Protocol's contents, which Defendants were then forced to retract as unsupported, *id.* ¶¶ 222–29; and misrepresented the date on which the Protocol was finalized, possibly in an attempt to secure an advantage in other litigation, *id.* ¶¶ 212–17. To see all of those facts and still suggest that Mr. Middlebrooks' concerns about TDOC's culture are speculative would be impossible to defend.

Defendants are also probably going to cite the Sixth Circuit's statement, in *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009), that precedent has "has all but foreclosed" challenges based on "the possibility of negligent administration." *Id.* at 225. But Mr. Middlebrooks' claims are based on neither mere negligence nor mere possibility. They are based on TDOC's actual, demonstrated and repeated history of *recklessness*—that is, Defendants' and their employees' history of acting with "the conscious disregard of or indifference to a known or obvious risk of harm to another

that is unreasonable under the circumstances." *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Argabrite v. Neer*, 2016-Ohio-8374, ¶ 6, 149 Ohio St. 3d 349, 350, 75 N.E.3d 161, 164). For example, TDOC did not *negligently* execute Billy Ray Irick with midazolam that was, contrary to TDOC's own policies, not tested for potency. TDOC's drug procurer knew that no such testing had occurred and let the execution go forward anyway. That is not simple negligence. PSAC ¶¶ 176–77.

### C. Count 1.C

#### 1. The 12-Hour Blackout Policy

Under the 2025 Protocol's 12-Hour Blackout Policy, Defendants have banned all outside communication by the person facing execution, either by phone or through visitation, during the final twelve hours preceding the execution. The policy includes an express exception for counsel of record, but if an individual wants any other exception, he must ask TDOC for it, and TDOC has granted itself entirely unrestrained, unguided authority to grant or deny the exception for any reason. Because the 12-hour blackout occurs during the hours preceding the individual's execution, it is a restriction on his ability to communicate his thoughts and feelings while facing death for nearly the entire remainder of his life. PSAC ¶¶ 527–34.

Mr. Middlebrooks' challenge to the 12-Hour Blackout Policy is well within the bounds of cognizable First Amendment challenges in the prison setting. "Prison walls do not form a barrier separating prison inmates from the protections of" the First Amendment. *Turner v. Safley*, 482 U.S. 78, 84 (1987). The Supreme Court has held that the unique features of the prison environment support a "policy of judicial restraint" in enforcing such rights, but it is well-settled that that general policy of

restraint does not foreclose judicial enforcement. *Id.* at 85. Rather, the Supreme Court and the Sixth Circuit simply require the plaintiff in such a case to satisfy the so-called "*Turner* factors" governing the government's assertion of its penological interests:

> (1) whether there is a "valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives" to the regulation for prison officials.

*Bethel v. Jenkins*, 988 F.3d 931, 939 (6th Cir. 2021). Those factors strongly favor Mr. Middlebrooks' challenges to the 12-Hour Blackout Policy, and, insofar as the application of the factors remains in question, they present factual issues that cannot be resolved in connection with a motion to dismiss.

There is no apparent rational connection between the 12-Hour Blackout Policy's restrictions on telephone calls and any legitimate penological interest. And a person facing execution in twelve hours has no "alternative means" of communicating his message; he will be dead before his rights are restored. The impact on prison resources caused by allowing at least electronic communication would almost certainly be minimal, particularly considering that, under the 2025 Protocol, the individual to be executed is already placed under constant surveillance in the period leading up to the execution. PSAC ¶¶ 521–32; 2025 Protocol at 15 (directing TDOC to maintain "Continuous Observation Logs, which record all daily activities of the inmate beginning 14 days before the execution"). There would, therefore, be no need

to allocate additional resources to ensure that no improper communications occur. Finally, there is an obvious, ready available alternative to prison officials: simply allowing the person to be executed to contact his spiritual advisor and communicants in the outside world as he is already permitted to with regard to his attorney of record. Each of the four factors favors a finding of a First Amendment violation.

Defendants may suggest that the Twelve-Hour Blackout Policy can be salvaged by the fact that the 2025 Protocol gives TDOC the power to grant exceptions, although it sets out no standard for doing so. If anything, however, that fact makes the 12-Hour Blackout Policy more problematic. There is very little that is more offensive to the First Amendment guarantee of freedom of speech than a policy that makes a person's right to communicate subject to the unbounded discretion of a government official. That kind of "unrestricted delegation of power" necessarily "invites arbitrary [and] discriminatory" action by the official in whom that discretion is vested. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (citing *Leonardson v. City of*

*E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). The risks of such abuse in a prison setting are both obvious and profoundly distressing.[8]

Mr. Middlebrooks' right to freedom of speech, moreover, is not the only First Amendment right impeded by the 12-Hour Blackout Policy. That policy includes an exception for counsel of record but not for communication with a spiritual advisor—depriving the person facing execution of the right to free exercise of religion in violation of the First Amendment and RLUIPA. See *Ramirez v. Collier*, 595 U.S. 411, 424 (2022); *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) *Church of the Lukumi Blbao Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993). Even if the Court ultimately concludes that the 12-Hour Blackout Policy is generally permissible, there is no basis for refusing to extend its exception for contacting the attorney of record to include one or more spiritual advisors or co-worshippers. No compelling government interest—and quite possibly no government interest at all—exists for denying such exceptions.

---

[8] For example, if prison officials have an unrestrained veto over an imprisoned person's right to communicate with the outside world, that means that officials can: (1) prevent the person from communicating with his family as retaliation for raising concerns about prison conditions; (2) engage in viewpoint discrimination between imprisoned persons by permitting greater communications by those who have stated positions favored by the officials; (3) engage in viewpoint discrimination by forbidding communications with outside speakers who have taken or would be expected to take positions disfavored by the officials; and/or (4) restrict communications more aggressively based on the race, sex, or religion of the individual at issue, while hiding that discriminatory intent behind the veil of individualized discretion. The risk of such abuse is especially high under the 12-Hour Blackout Policy, because any decisions made during that period cannot be effectively grieved through TDOC policies prior to the prisoner's death.

### 2. Interference in access to courts

Finally, Count 1.C plausibly alleges that the 2025 Protocol calls on TDOC to violate Mr. Middlebrooks' constitutionally protected right to counsel by denying counsel the ability to monitor (1) TDOC's preparation of the syringes to be used, (2) the live video feed of the IV catheterization site during the execution, or (3) the physician's death check and, by extension, the assessment of whether a second administration of poison will be undertaken.

It is well established that "prisoners have a constitutional right to have meaningful access to the courts[,]" *Lewis v. Casey*, 518 U.S. 343, 347 (1996), even in the final moments of their life. Another judge of this Court has already held that such a prisoner's "right to meaningful access to the courts . . . requires that counsel have some access to the prisoner during the last hour before the execution and be permitted to witness his execution . . . ." *Coe v. Bell*, 89 F. Supp. 2d 962, 966 (M.D. Tenn.), vacated as moot, 230 F.3d 1357 (6th Cir. 2000). Count 1.C simply follows that guarantee to its logical conclusion—that counsel's ability to witness the execution must be actually effective.

## VI. Conclusion

For the foregoing reasons, Mr. Middlebrooks is entitled to leave to amend his Complaint in the manner proposed. If the Court ultimately concludes that any part of the proposed amendment is unsupported, Mr. Middlebrooks requests permission to revise his proposed amended complaint accordingly and leave to file it in amended form. The course of action most consistent with both Rule 15 and the efficient

litigation of this case, however, is to grant his motion in full and docket the proposed Amended and Supplemental Complaint.

Respectfully submitted,


Kelley J. Henry, BPR # TN 21113
Chief, Capital Habeas Unit

Amy D. Harwell, BPR # TN 18691
Asst. Chief, Capital Habeas Unit

Eli Swiney, BPR # TN 026626
Research and Writing Specialist
Katherine Dix, BPR # TN 22778
Kit Thomas, BPR # WV 13477
Drew Brazer, BPR # TN 042363
Asst. Federal Public Defender
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF
TENNESSEE
810 Broadway, Suite 200
Nashville, TN 37203
Phone: (615) 736-5047
Fax: (615) 736-5265
Email: Kelley_Henry@fd.org

/s/ Kelley J. Henry
Kelley J. Henry, BPR # TN 21113
Counsel for Plaintiff

## Certificate of Service

I, Kelley J. Henry, certify that on June 20, 2025, a true and correct copy of the foregoing was served via the Court's electronic filing system to Cody Brandon, Asst. Attorney General.

/s/ Kelley J. Henry
Kelley J. Henry