Exhibit A

# Exhibit 3

**In The Matter Of:**

*TERRY LYNN KING vs*
*TONY PARKER, et al.*

---

*VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DRUG PROCURER*

*July 19, 2021*

---

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



Gibson COURT REPORTING

Min-U-Script®

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DRUG PROCURER

July 19, 2021

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TERRY LYNN KING, )
)
          Plaintiff, ) CAPITAL CASE
)
vs. ) CASE NO.
) 3:18-CV-01234
TONY PARKER, et al., )
) VOLUME 1
          Defendants. )


APPEARANCES:

          FOR THE PLAINTIFF:

          ALEX KURSMAN, ESQ.
          HAYDEN NELSON-MAJOR, ESQ.
          LYNNE LEONARD, ESQ.
          ANA BALDRIDGE, ESQ.
          Assistant Federal Defenders
          Federal Community Defender Office
          for the Eastern District of Pennsylvania
          601 Walnut Street, Suite 545W
          Philadelphia, Pennsylvania  19106

          MICHAEL A. COTTONE, ESQ.
          Bass, Berry & Sims PLC
          150 Third Avenue South, Suite 2800
          Nashville, Tennessee  37201

**Gibson Court Reporting**

```
 1   APPEARANCES:   (Continued)

 2                  FOR THE DEFENDANTS:

 3                  ROBERT W. MITCHELL, ESQ.
                    SCOTT C. SUTHERLAND, ESQ.
 4                  MALLORY K. SCHILLER, ESQ.
                    MIRANDA H. JONES, ESQ.
 5                  CODY N. BRANDON, ESQ.
                    DEAN S. ATYIA, ESQ.
 6                  Tennessee Attorney General's Office
                    P.O. Box 20207
 7                  Nashville, Tennessee   37202

 8
     ALSO PRESENT: David Jenkins, Videographer
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    S T I P U L A T I O N S
 2              Volume 1 of the videotaped videoconference
 3    deposition of DRUG PROCURER, called as a witness at the
 4    instance of the Plaintiff, taken pursuant to all rules
 5    applicable to the Federal Rules of Civil Procedure by
 6    notice on the 19th day of July, 2021, at 9:47 a.m.
 7    Eastern Time, before Rhonda S. Sansom, RPR, CRR, CRC,
 8    Licensed Court Reporter, pursuant to stipulation of
 9    counsel.
10              It being agreed that Rhonda S. Sansom, RPR,
11    CRR, CRC, Licensed Court Reporter, may report the
12    deposition in machine shorthand, afterwards reducing
13    the same to typewriting.
14              All objections except as to the form of the
15    questions are reserved to on or before the hearing.
16              It being further agreed that all formalities
17    as to notice, caption, certificate, transmission, et
18    cetera, including the reading of the completed
19    deposition by the witness and the signature of the
20    witness, are expressly waived.
21
22
23
24
25
```

**Gibson Court Reporting**

```
1                           I N D E X

2                      E X A M I N A T I O N S

3

4    DRUG PROCURER                                          PAGE

5    Examination by Mr. Kursman                                9

6

7                        E X H I B I T S

8
```

```
9    NO.                  DESCRIPTION                       PAGE

10     1   Lethal Injection Execution Manual,
           Execution Procedures for Lethal
11         Injection                                          60

12     2   Midazolam storage and preparation
           instructions
13         Bates Ds' First Resp. to RPF
           001271-1273                                        110
14
       3   10/27/17 Email, Subject, RE:
15         Additional Info
           Bates Def. Int. Discl. 001936 to 1937             117
16
       4   Potassium Chloride preparation
17         instructions
           Bates Ds' First Resp. to RFP 001274 to
18         1275                                               132

19     5   8/13/2020 Log re Schedule of midazolam
           and potassium chloride injections with
20         lot number and discard after date                 137

21     6   9/7/17 Email, Subject: Updtae (sic)
           Bates Def. Int. Discl. 001975                      159
22
       7   9/7/17 Email, re Updtae (sic)
23         Bates Def. Int. Discl. 001973 to 1974             163

24     8   9/7/17 Email re Updtae (sic)
           Bates Def. Int. Discl. 001971 to 1972             173
25
```

```
1      9  9/21/17 Email re Fwd: Status Update
          Bates Ds' First Resp. to RSP 000143 to
2         144                                          177

3     10  4/6/17 Email, Subject:  Re:
          EXTERNAL-Inquiry
4         Bates Def. Int. Discl. 001979               193

5     11  4/6/17 Email, Subject:  Re: Inquiry
          Bates Def. Int. Discl. 001980               194
6
      12  4/6/17 Email, Subject:  Inquiry
7         Bates Def. Int. Discl. 001981               195

8     13  7/20/17 Email, Subject:  RE: Update
          Bates Def. Int. Discl. 001977               200
9
      14  7/24/17 Handwritten Notes of Drug
10        Procurer re Meeting at Field Office
          Bates Ds' First Resp. to RFP 000163 to
11        164                                          206

12    15  4/4/17 Email, Subject: RE: Your inquiry
          Bates Ds' First Resp. to RFP 000140 to
13        141                                          212

14    16  PowerPoint Presentation, TN Department
          of Correction, August 31, 2017
15        Bates Def. Int. Discl. 002143 to 2159       214

16    17  10/30/19 Email, Subject:  API
          Bates Ds' First Resp. to RFP 000007         237
17
      18  6/20/18 Email, Subject:  Productivity
18        Inquiry
          Bates Def. Int. Discl. 001911               238
19
      19  5/3/19 Slip Opinion "Whether the Food
20        and Drug Administration Has
          Jurisdiction over articles Intended for
21        Use in Lawful Executions"                    239

22    20  (No Exhibit Marked)                          N/A

23    21  11/26/19 Email, Subject: Lab Results
          Bates Ds' First Resp. to RFP 000004         243
24
      22  8/9/19 Email, Subject:  Results
25        Bates Ds' First Resp. to RFP 000013         244
```

**Gibson Court Reporting**

1   23   8/8/19 Email, Subject: Suitability
         Test
2        Bates Ds' First Resp. to RFP 000014          245

3   24   8/8/19 Email, Subject: KCl protocol
         Bates Ds' First Resp. to RFP 000016          247
4
    25   7/31/19 Email, Subject: Report
5        Bates Ds' First Resp. to RFP000018
                                                        251
6
    26   7/24/19 Email, Subject: Report
7        Bates Ds' First Resp. to RFP 000019          252

8   27   7/2/19 Email, Subject: kcl protocol
         Bates Ds' First Resp. to RFP 000021 to
9        22                                             254

10  28   5/9/19 Email, Subject: report
         Bates Ds' First Resp. to RFP 000035          255
11
    29   4/29/19 Email, Subject: Potency report
12       Bates Ds' First Resp. to RFP 000036          257

13  30   8/6/18 Email, Subject: USP 71
         Bates Ds' First Resp. to RFP 000051          258
14
    31   7/12/18 Email, Subject: Testing report
15       Bates Ds' First Resp. to RFP 000058          259

16  32   11/14/17 Email, Subject: Info
         Bates Ds' First Resp. to RFP 000082          261
17
    33   7/17/18 Email, Subject: sample Rx
18       Bates Ds' First Resp. to RFP 000055          263

19  34   12/15/17 Email, Subject: RE: info
         Bates Ds' First Resp. to RFP 000104          264
20
    35   6/26/19 Email, Subject: Proposed
21       Alternative
         Bates Ds' First Resp. to RFP 000024          266
22
    36   12/20/19 Invoice to TNDOC
23       Bates Mays' Supp. Int. and Prod.
         Responses 00075                               270
24
    37   10/26/17 Invoice to TNDOC
25       Bates Def. Int. Discl. 00229                 272

**Gibson Court Reporting**

1   38   8/16/18 Invoice to TNDOC
         Bates Def. Int. Discl. 00235            277
2
    39   12/28/17 Invoice to TNDOC
3        Bates Def. Int. Discl. 00233            281

4   40   10/31/18 Invoice to TNDOC
         Bates Def. Int. Discl. 000236           283
5
    41   9/7/18 Handwritten Inventory Notes
6        Bates Def. Int. Discl. 000448           285

7   42   12/30/17 Handwritten Inventory Notes
         Bates Def. Int. Discl. 000834 to 840    290
8
    43   2/11/20 Handwritten Notes re Received
9        Medications
         Bates Mays' Supp. Int. And Prod.
10       Responses 00226                         292

11  44   5/16/19 Chemical Preparation Time Sheet
         Bates Dft. Int. Discl. 000831           302
12
    45   8/13/20 Email, Subject:  requested info  310
13
    46   12/4/17 Pharmacy Services Agreement
14       Bates Def. Int. Discl. 000251 to 255    312

15  47   10/18/17 Email, Subject: Re: Question
         Bates Def. Int. Discl. 001944 to 1946   313
16
    48   Photograph of Storage Refrigerator and
17       Freezer
         Bates Ds' First Resp. to RFP 001292     104
18

19

20

21

22

23

24

25

```
 1                    THE VIDEOGRAPHER:  We're on record at
 2    9:47 a.m. Central Time on July 19th, 2021.
 3                    This is the deposition of Witness Doe
 4    taken in the matter of Terry Lynn King versus Tony
 5    Parker, et al., Case No. 3:18-CV-01234, filed in
 6    the U.S. District Court, Middle District of
 7    Tennessee, Nashville Division.
 8                    Counsel will state their names and
 9    affiliation for the record and the court reporter
10    will swear in the witness.
11                    MR. KURSMAN:  Good morning.  My name is
12    Alex Kursman from the Federal Public Defender in
13    Philadelphia.
14                    MR. COTTONE:  My name is Michael Cottone,
15    from Bass, Berry & Sims in Nashville, Tennessee,
16    for the plaintiff.
17                    MR. KURSMAN:  And also present for
18    plaintiffs in the room with me are Lynne Leonard,
19    Hayden Nelson-Major, and Ana Baldridge, all from
20    the Federal Defender in Philadelphia.
21                    MR. MITCHELL:  Good morning.  My name is
22    Rob Mitchell.  I represent the defendants,
23    Commissioner Tony Parker and Warden Tony Mays.
24    And I also represent the Drug Procurer.
25                    With me in my office is cocounsel Scott
```

```
 1              Sutherland.   And also listening in are cocounsel
 2              Dean Atyia, Cody Brandon, Mallory Schiller, and
 3              Miranda Jones.
 4                             DRUG PROCURER,
 5       having been first duly sworn, testified as follows:
 6                              EXAMINATION
 7       BY MR. KURSMAN:
 8              Q.     Okay.  Good morning.  As I said before,
 9       my name is Alex Kursman, and I'm an attorney at the
10       Federal Community Defender Office in Philadelphia.  And
11       I'm acting on behalf of Terry King in King versus
12       Parker, pending in the Middle District of Tennessee.
13                     Thank you.  Thank you for taking the time
14       to answer questions in this matter today.
15                     Do you understand that you are here today
16       to answer questions related to the King case?
17              A.     Yes.
18              Q.     And what is your understanding of what
19       the case is about?
20                     MR. KURSMAN:  I'm sorry.  Drug Procurer,
21              I think you're going to have to keep your hand on
22              the mouse, because everyone is getting feedback
23              when you're not speaking.  So I think you're going
24              to have to mute-unmute every time you answer.
25       BY MR. KURSMAN:
```

```
 1        Q.      So let -- so let me ask that question
 2   again.  So what is your understanding of what this case
 3   is about?
 4        A.      Regarding the State of Tennessee's lethal
 5   injection protocol.
 6        Q.      And do you know what the specific
 7   challenge in this case is?
 8        A.      That the protocol is unconstitutional.
 9        Q.      And do you understand the elements that
10   plaintiffs must prove to meet their burden to prove the
11   case?
12        A.      A little.
13        Q.      I'm sorry, could you repeat that answer?
14        A.      A little bit, yes.
15        Q.      A little bit?  Could you describe that
16   understanding?
17        A.      As I understand it, it has to be proven
18   that the protocol violates the Constitution in that it
19   is unconstitutional on its face and by the way it's
20   carried out.  That's my general understanding.
21        Q.      And do you understand the specific
22   elements that Mr. King would have to prove to make out
23   a constitutional violation?
24        A.      Sorry.  That -- well, one, that it's
25   unconstitutional; but two, that there's another readily
```

```
 1  available alternative proposed by him.
 2       Q.    And what is your understanding of what a
 3  readily available alternative is?
 4             MR. MITCHELL:  Objection, form.  You can
 5        answer.
 6             THE WITNESS:  I'm sorry, I couldn't hear.
 7  BY MR. KURSMAN:
 8       Q.    What is your understanding of what the
 9  readily available alternative is?
10             MR. MITCHELL:  Same objection.
11             THE WITNESS:  It would be an alternative,
12        a readily available alternative, that can be
13        obtained by TDOC to employ for execution.
14  BY MR. KURSMAN:
15       Q.    Okay.  Now, as you know, we are taking
16  this deposition on an anonymous basis.  What that means
17  is that I will not ask you any questions that are
18  intended to disclose your identity.
19             To be clear, though, my understanding is
20  that you are the individual responsible for procuring
21  lethal injection drugs for use in connection with
22  Tennessee's execution protocol.  Is that right?
23       A.    Yes.
24       Q.    Okay.  Did you decide yourself that you
25  did not want to be identified for this deposition?
```

Gibson Court Reporting

```
 1                    MR. MITCHELL:   Objection, relates to
 2         attorney-client communication.
 3   BY MR. KURSMAN:
 4         Q.     Did -- did somebody tell you not -- not
 5   to identify yourself?
 6                    MR. MITCHELL:   And Alex, I'm going to
 7         object again and instruct the witness not to
 8         answer pursuant to the Court's protective order,
 9         DE107 and DE108.
10   BY MR. KURSMAN:
11         Q.     Okay.  So let's -- let's cover some --
12   some ground rules before we get started.  Have you ever
13   had your deposition taken before?
14         A.     Yes.
15         Q.     How many times?
16         A.     Once.
17         Q.     And what was that case about?
18         A.     It was a lawsuit regarding conditions at
19   the Charles L. Turner Correctional Facility.
20         Q.     And when was that?
21                    MR. MITCHELL:   Objection.  This -- this
22         can get into, you know, information that would
23         lead to the identification of the individual.  So
24         I'm going to again instruct the deponent not to
25         answer this question, pursuant to the Court's
```

```
1              protective order.
2                    MR. KURSMAN:  Just so I'm clear on the
3              record, I'm not attempting to ask any questions
4              that would identify the Drug Procurer.  These are
5              just very standard questions in a deposition.  I
6              just want to know if the Drug Procurer has ever
7              taken a deposition before and what type of case
8              that deposition was taken.
9                    MR. MITCHELL:  And -- and the question's
10             been answered, and I think the answer was that it
11             was a civil case.
12                   But obviously some of these questions,
13             you know, we can't get into specifics because that
14             could be information calculated or likely to lead
15             to the Drug Procurer's identity, which again is
16             subject to the Court's protective order, DE107 and
17             108.
18                   MR. KURSMAN:  Sure.
19      BY MR. KURSMAN:
20             Q.    And Drug Procurer, do you understand
21      you're under oath?
22             A.    Yes.
23             Q.    And do you understand that means you need
24      to tell the truth, to the best of your ability?
25             A.    Yes.
```

```
 1          Q.      Is -- is there any reason you cannot
 2    testify truthfully or accurately today?
 3          A.      No.
 4          Q.      Are you feeling ill today?
 5          A.      No.
 6          Q.      Have you taken any medications today?
 7          A.      No.
 8          Q.      Have you consumed any alcohol in the last
 9    24 hours?
10          A.      No.
11          Q.      Have you consumed any drugs in the last
12    24 hours?
13          A.      No.
14          Q.      And are you represented by counsel today?
15          A.      Yes.
16          Q.      And who is that?
17          A.      Rob Mitchell.
18          Q.      And can you describe for the record where
19    you are right now?
20                  MR. MITCHELL:  I think, if I can just say
21          on the record, I mean, the Drug Procurer is in the
22          Attorney General's Office in Nashville, Tennessee,
23          on premises, in an office by him or herself.  No
24          one is in there.
25                  If the Drug Procurer, if you can ratify
```

```
 1              whether that's correct, that would be helpful.
 2                   THE WITNESS:  That is correct.
 3   BY MR. KURSMAN:
 4        Q.       And even though this deposition is taken
 5   over Zoom, the court reporter is making a record based
 6   on what you say.  So of course your face is blanked out
 7   now, but you will need to respond to questions
 8   verbally.  Do you understand that?
 9        A.       Yes.
10        Q.       And in order for the court reporter to
11   accurately record your testimony, please wait for me to
12   finish my question before you give an answer.  Okay?
13        A.       Understood.
14        Q.       And I will do the same for you.  I will
15   wait for you to finish your answers before I ask a
16   follow-up question.  Okay?
17        A.       Okay.
18        Q.       And if you don't understand a question,
19   just let me know and I will clarify -- I will do my
20   best to clarify that question.  Okay?
21        A.       Okay.
22        Q.       And if you -- if you need to take a break
23   at any time, just let me know and we can take a break.
24        A.       Okay.
25        Q.       But if there's a question pending, we'll
```

```
 1   ask that you answer the question before going off the
 2   record.  Do you understand that?
 3        A.      Understood.
 4        Q.      And from time to time your lawyer may
 5   object to my questions, but you'll still need to answer
 6   my questions unless the objection is based on a
 7   privilege assertion.  Do you understand that?
 8        A.      Yes.
 9        Q.      Okay.  And is there anybody in the room
10   with you today?
11        A.      No.
12        Q.      Okay.  And do you understand that you
13   cannot consult with your attorneys before you answer
14   any of my questions?
15        A.      Yes.
16        Q.      And before we begin, do you have any
17   questions for me?
18        A.      No.
19        Q.      Okay.  What did you do to prepare for
20   this deposition?
21        A.      Consulted with my attorney and reviewed
22   some discovery documents.
23        Q.      Okay.  Who -- who did you consult with,
24   without telling me the contents of those discussions?
25        A.      Rob Mitchell.
```

```
 1          Q.      And how many times did you and Rob -- you
 2   and Mr. Mitchell meet?
 3          A.      Once.
 4          Q.      And when was that?
 5          A.      Last Friday.
 6          Q.      And how long was that meeting?
 7          A.      Approximately two and-a-half hours.
 8          Q.      Was anyone else present at that meeting?
 9          A.      Yes.
10          Q.      Who?
11          A.      Scott Sutherland.
12          Q.      And did you take notes during that
13   meeting?
14          A.      No.
15          Q.      Okay.  And in that -- in that meeting
16   with Mr. Mitchell and Mr. Sutherland, did you review
17   any documents?
18          A.      Yes.
19          Q.      What documents did you review?
20          A.      The lethal injection protocol, some
21   invoices, and emails.
22          Q.      How many documents would you say you
23   reviewed?
24          A.      Altogether, in preparation for this, a
25   couple hundred pages.
```

1    Q.    Now, you said "in preparation for this."
2  Did you review documents aside from preparation for
3  this specific deposition?
4    A.    No.
5    Q.    And did any of those documents that you
6  reviewed refresh your recollection of any specific
7  issues?
8    A.    Possibly.
9    Q.    And do you recall what they refreshed
10  your recollection about?
11    A.    With regard to dates of certain
12  occurrences.
13    Q.    And could you describe what -- what those
14  dates were, if you remember right now?
15    A.    I don't remember the specific dates, just
16  that they were contained in the documents I reviewed.
17    Q.    And do you -- were there any dates you
18  couldn't remember or events you couldn't remember until
19  you reviewed a specific document?
20    A.    I wasn't able to remember specific dates
21  that items were received without reviewing those
22  documents.
23    Q.    Okay.  And so -- so tell me if my
24  understanding is wrong.  So -- so once you reviewed
25  those documents, you remembered receiving emails on

```
1   certain dates?  Is that what you're saying?
2          A.      It refreshed my recollection of the dates
3   emails were received.  Also dates that items were
4   received and stored at Riverbend, those sorts of
5   things.
6          Q.      Okay.  Did -- did you also review a
7   PowerPoint presentation?
8          A.      Yes.
9          Q.      Okay.  And did that refresh your rec- --
10  your recollection on anything?
11         A.      Yes.
12         Q.      And can you describe how that refreshed
13  your recollection?
14                 MR. MITCHELL:  Objection to form.  You
15         can answer.
16                 THE WITNESS:  It refreshed my
17         recollection as to the contents of that
18         PowerPoint, what the PowerPoint itself described.
19  BY MR. KURSMAN:
20         Q.      And did -- did you create that
21  PowerPoint?
22         A.      Yes.
23         Q.      And did you present that PowerPoint?
24         A.      Yes.
25         Q.      Okay.  Did you review any materials on
```

```
 1   your own to prepare for this deposition?
 2        A.      Yes, the same documents I referenced, the
 3   discovery documents.
 4        Q.      Can you describe how -- how you reviewed
 5   them on your own?
 6        A.      I printed them off and read through them.
 7        Q.      And where did you do that?
 8        A.      I'm sorry, could you repeat?
 9        Q.      Yeah, I'm sorry.  Where did you do that?
10        A.      In my office and at home.
11        Q.      Okay.  And how many hours would you say
12   you spent reviewing those materials?
13        A.      Approximately three to four.
14        Q.      Okay.  And did you review any other
15   materials than -- than the ones you just discussed
16   reviewing with Mr. Mitchell and Mr. Sutherland?
17        A.      No.
18        Q.      And did you discuss this deposition with
19   anybody else?
20        A.      No.
21        Q.      Did you discuss it -- I don't want to get
22   into any identifying information, but did you discuss
23   it with a spouse or a friend before coming in today?
24        A.      Only that I had one.  Nothing of
25   material.
```

1       Q.     And when was that?

2       A.     Over the weekend.

3       Q.     Okay.  And what was said in that

4 conversation?

5       A.     Just that I had a deposition Monday.

6       Q.     And why did you discuss that with this

7 person?

8       A.     To let my spouse know that I would not be

9 reachable.

10      Q.     And did they at all help you prepare for

11 this deposition?

12      A.     No.

13      Q.     Did they give you any words of

14 encouragement?

15      A.     No.

16      Q.     Okay.  Did anyone consult with you to

17 prepare for another deposition in this case?

18      A.     No.

19      Q.     And what I mean by -- what I mean by that

20 is did a person like the warden or the director contact

21 you to help them prepare for any future depositions?

22      A.     No.

23      Q.     And did you review transcripts of any

24 other depositions before testifying today?

25      A.     No.

```
 1          Q.        Did you review any of the papers that
 2    have been filed in court in this case?
 3          A.        Responses to interrogatories.
 4          Q.        Did you -- did you review the Amended
 5    Complaint?
 6          A.        No.
 7          Q.        Can you tell me why you reviewed the
 8    responses to the interrogatories?
 9          A.        Some of the information pertained to
10    lethal injection chemicals.
11          Q.        And why exactly did you think that would
12    be relevant to your deposition today?
13          A.        Because the information was regarding the
14    procurement of the lethal injection chemicals.
15          Q.        And did -- did -- in the responses to
16    those interrogatories that you reviewed, were you the
17    one who came up with the answers to those responses?
18               MR. MITCHELL:  I'm going to object and
19          instruct the witness not to answer on the basis of
20          attorney-client privilege.
21               MR. KURSMAN:  Well, Mr. Mitchell, all --
22          all I'm asking here is whether he -- he or she is
23          the person who came up with the answers on the
24          interrogatories.  I'm not asking for any -- any
25          communication between he or she and you or any
```

```
 1           matters discussed.
 2                   MR. MITCHELL:   The answers are the
 3           answers of the two defendants in this case,
 4           Commissioner Parker and Warden Mays, who I
 5           represent.  And who Commissioner Parker and Warden
 6           Mays talked to and how they came up with their
 7           answers is covered by attorney-client privilege.
 8                   MR. KURSMAN:   Just -- just to be clear
 9           for the record, are you asserting that your client
10           has an attorney-client privilege based on who that
11           client talks to, although that person is not their
12           attorney?
13                   MR. MITCHELL:   The formulation of the
14           interrogatories by the two named defendants I'm
15           saying is an attorney-client privilege, and we're
16           not waiving it and not permitting the Drug
17           Procurer to testify about what the Drug Procurer
18           may or may not know about the formulation of those
19           responses.
20                   MR. KURSMAN:   Well, let me -- let me see
21           if I can rephrase this a bit.
22      BY MR. KURSMAN:
23           Q.      The -- the interrogatories were -- were
24      questions posed to defendants in this case.  Did the
25      defendants -- not the attorneys -- did the defendants
```

```
 1   consult with you before answering those questions?
 2              MR. MITCHELL:  Are you asking me or the
 3         Drug Procurer?
 4              MR. KURSMAN:  No, I'm asking the Drug
 5         Procurer there.
 6              MR. MITCHELL:  Again, same basis; to
 7         preserve the attorney-client privilege, I'm going
 8         to instruct the Drug Procurer not to answer.
 9              MR. KURSMAN:  I'm -- right now, just for
10         the record, I'm asking the Drug Procurer whether
11         he or she spoke with the defendants in this case.
12         I'm -- this has nothing to do with any meetings
13         with -- with attorneys in this case.
14              Unless the Drug Procurer represents the
15         warden or the other defendants in this case and
16         they -- they let us know that, these
17         certainly wouldn't be -- these certainly wouldn't
18         be protected by any attorney-client privilege
19         right now.  And the Drug Procurer, of course, is a
20         fact witness right now.
21              MR. MITCHELL:  And I'm still going to
22         maintain the objection -- or repeat the objection,
23         attorney-client privilege, and instruct the Drug
24         Procurer not to answer.
25              MR. KURSMAN:  And Mr. Mitchell, can --
```

```
1            you went off the screen for a bit.  Can I ask
2            where -- where you were going?
3                    MR. MITCHELL:  I was talking with General
4            Sutherland.
5                    MR. KURSMAN:  Okay.
6       BY MR. KURSMAN:
7            Q.    Drug Procurer, did you do anything else
8       to prepare for your deposition?
9            A.    No.
10           Q.    How much time in total do you estimate
11      you spent preparing for this deposition?
12           A.    Approximately six hours.
13           Q.    Six hours?  Okay.
14                   Now, let's talk a bit about -- about your
15      background without getting into your identity at all.
16      What is your highest legal of education?
17           A.    Postgraduate.
18           Q.    Okay.  And what is that in?
19                   MR. MITCHELL:  And I'm going to object,
20           again pursuant to protective orders DE107 and 108,
21           and instruct the witness not to answer.
22                   MR. KURSMAN:  Well, just for -- for the
23           record, I'm not really concerned about where the
24           Drug Procurer went to school.  All I'd like to
25           know is what their -- their -- their background is
```

```
1           in; what expertise they have to be the Drug
2           Procurer, if any.
3                   MR. MITCHELL:  And I'm going to -- I'm
4           going to repeat the objection; because depending
5           on what the answer is to that, that could really,
6           you know, narrow down the scope of individuals --
7           I mean, if it was in art history or something like
8           that.
9                   So I'm going to instruct -- you know, the
10          witness has said "postgraduate"; but I'm going to
11          instruct the Drug Procurer not to answer, again
12          pursuant to the Court's protective order.
13                  MR. KURSMAN:  Well, Rob, I'm going to
14          keep asking these questions, so feel free to keep
15          objecting.
16    BY MR. KURSMAN:
17          Q.      What type of training did you get as
18    your -- as part of that postgraduate degree?
19                  MR. MITCHELL:  And again, I'm going to
20          object pursuant to the protective order and
21          instruct the witness not to answer.
22    BY MR. KURSMAN:
23          Q.      And what type of information did you
24    learn as part of that postgraduate degree?
25                  MR. MITCHELL:  I'm going to object to
```

```
 1          both the form and also pursuant to the protective
 2          order again.   Instruct the witness not to answer.
 3   BY MR. KURSMAN:
 4          Q.     So if you have a postgraduate degree, I
 5   assume you also have a high school and college degree.
 6   Right?
 7          A.     Yes.
 8          Q.     Did you get any specialized training at
 9   your high school?
10          A.     No.
11          Q.     Did you got any specialized training at
12   your college?
13          A.     Can you be specific as to what you mean
14   by "specialized training?"
15          Q.     Sure.   What did you major in?
16                 MR. MITCHELL:   And I'm going to object
17          again pursuant to the protective order and
18          instruct the witness not to answer.
19   BY MR. KURSMAN:
20          Q.     Have you completed any coursework beyond
21   your postgraduate degree?
22          A.     No.
23                 MR. MITCHELL:   Same objection.
24                 MR. KURSMAN:   If they completed any
25          coursework beyond their postgraduate degree?   I'm
```

```
 1             not asking what it's in, I'm just asking if they
 2             completed any coursework.
 3                     MR. MITCHELL:  You may answer.
 4                     THE WITNESS:  No.
 5    BY MR. KURSMAN:
 6           Q.     Do you hold any certifications or
 7    certificates in any field?
 8           A.     No.
 9           Q.     Have you ever had any license of yours
10    suspended?
11                     MR. MITCHELL:  Objection.  I'll instruct
12             the witness not to answer.
13    BY MR. KURSMAN:
14           Q.     Do you have any military training?
15                     MR. MITCHELL:  Objection.  I'm going to
16             instruct the witness not to answer.
17    BY MR. KURSMAN:
18           Q.     Do you -- do you have any medical
19    training?
20                     MR. MITCHELL:  Objection.  I'm going to
21             instruct the witness not to answer.
22    BY MR. KURSMAN:
23           Q.     Do you participate in volunteer programs?
24           A.     No.
25           Q.     Do you have any legal training?
```

```
 1                    MR. MITCHELL:   Objection.   I'm going to
 2          instruct the witness not to answer.
 3   BY MR. KURSMAN:
 4          Q.       And do -- do you have any pharmaceutical
 5   training?
 6                    MR. MITCHELL:   Same objection.   Don't
 7          answer.
 8   BY MR. KURSMAN:
 9          Q.       Now, are you currently employed?
10          A.       Yes.
11          Q.       Where?
12                    MR. MITCHELL:   Objection.   Don't answer.
13   BY MR. KURSMAN:
14          Q.       How -- how long have you had your current
15   job at wherever you're employed?
16                    MR. MITCHELL:   Same objection.   Don't
17          answer, pursuant to the Court's protective order.
18                    MR. KURSMAN:   So, Mr. Mitchell, I don't
19          know where the Drug Procurer works.   All I'm
20          asking is how long they've held their -- their
21          most recent job.
22                    MR. MITCHELL:   And again, one by one,
23          those questions can chip away at discovery.
24          Pursuant to the Court's protective order,
25          information calculated or likely to lead to
```

```
 1              identifying information of individuals involved in
 2              carrying out executions in Tennessee is protected.
 3              Again, DE107, and I'm reading from the protective
 4              order.  So I'm going to instruct the witness not
 5              to answer.
 6      BY MR. KURSMAN:
 7              Q.     Okay.  How long have you been the Drug
 8      Procurer for Tennessee?
 9                     MR. MITCHELL:  Objection.  Don't answer,
10              pursuant to the protective order.
11                     So actually, I'll withdraw that
12              objection.
13                     THE WITNESS:  Can you repeat the
14              question, please?
15      BY MR. KURSMAN:
16              Q.     Sure.  How long have you been the Drug
17      Procurer for the State of Tennessee?
18              A.     Since 2016.
19              Q.     And before you became the Drug Procurer,
20      did you speak with the person who was the Drug Procurer
21      before you?
22              A.     No.
23              Q.     Did you review any of the Drug Procurer's
24      notes, the Drug Procurer who was there before 2- --
25      before you took over in 2016?
```

```
 1        A.      No.

 2        Q.      Did you ask anyone for all of the -- the

 3   contact information that the prior Drug Procurer had as

 4   it related to obtaining lethal injection chemicals?

 5        A.      No.

 6        Q.      Did you receive the prior Drug Procurer's

 7   Rolodex or any notebook with phone numbers of -- of

 8   pharmacies or places to obtain the lethal injection

 9   chemicals?

10        A.      No.

11        Q.      So when -- when you took over as -- as

12   the Drug Procurer in 2016, how exactly did -- did you

13   start attempting to obtain lethal injection chemicals?

14             MR. MITCHELL:  Objection, form.  You can

15        answer.

16             THE WITNESS:  I started with Google and

17        learning -- or trying to find out where there were

18        compounding pharmacies and also where there may be

19        supplies of certain chemicals, mainly

20        pentobarbital.

21   BY MR. KURSMAN:

22        Q.      And what -- what did you do on Google?

23        A.      Searched for compounding pharmacies.

24        Q.      And why -- why at that time were you

25   looking for pentobarbital?
```

```
1         A.       That was the drug for our lethal
2    injection at the time.
3         Q.       Did you contact any of the states at that
4    time that were using pentobarbital to perform
5    executions?
6         A.       Yes.
7         Q.       Which states were that?
8              MR. MITCHELL:  Objection.  Don't answer,
9         pursuant to the protective order.
10             MR. KURSMAN:  And, Mr. Mitchell, could --
11        could you state on the record how -- how that
12        would violate the protective order, whether the
13        Drug Procurer contacted states who were using
14        pentobarbital?
15             MR. MITCHELL:  Sure.  Pursuant to the
16        Court's protective order, DE107, Page ID 5,117,
17        quote:
18                  Defendants will be granted a protective
19                  order against the discovery of the
20                  identities or identifying information about
21                  the individuals and entities involved with
22                  supplying, delivering, maintaining, or
23                  administrating the chemicals in question.
24   BY MR. KURSMAN:
25        Q.       Well, I already know the answer to this,
```

```
 1   of course.  But did any states provide you with
 2   pentobarbital?
 3            A.     No.
 4                   MR. KURSMAN:  Okay.  So if none of the
 5         states provided you with pentobarbital, I don't
 6         see how -- how that would violate the protective
 7         order, which states the Drug Procurer contacted.
 8                   MR. MITCHELL:  I'm still, I mean, DE --
 9         the quote I just read, as well as the previous
10         page:
11                   "To the extent it seeks the identity of any
12                   individual involved in the process of
13                   acquiring, transporting, or storing
14                   execution drugs, subject to the Court's
15                   requirement of pseudonyms as explained with
16                   regard to Interrogatories 8 or 9."
17                   So we're talking about the
18         transportation, acquisition, supplying of drugs.
19         And so proper nouns, who the Drug Procurer
20         contacted, are all protected.
21                   MR. KURSMAN:  None of the states were
22         involved in any of the above-mentioned things that
23         you just noted were listed in the protective
24         order.
25                   MR. MITCHELL:  They were involved with
```

```
 1          the process of trying to acquire the drugs.
 2                  MR. KURSMAN:  Okay.
 3    BY MR. KURSMAN:
 4          Q.      Does -- does anybody report to you in
 5    your role as the Drug Procurer?
 6          A.      No.
 7          Q.      Do you report to anybody in your role as
 8    the Drug Procurer?
 9                  MR. MITCHELL:  And -- well, you may
10          answer in your role as Drug Procurer.
11                  THE WITNESS:  Yes.
12    BY MR. KURSMAN:
13          Q.      And who are those people, without --
14    without identifying them, unless they are the
15    defendants in this case?
16                  MR. MITCHELL:  And at this point I'm
17          going to instruct the witness not to answer,
18          pursuant to the protective order.
19    BY MR. KURSMAN:
20          Q.      Okay.  Do you report to the warden?
21          A.      No.
22          Q.      Do you report to the commissioner?
23          A.      Yes.
24          Q.      Do you report to the governor?
25                  MR. MITCHELL:  Objection.  Do not answer,
```

```
 1          pursuant to the protective order.
 2    BY MR. KURSMAN:
 3          Q.      And how did -- how did you get the
 4    position of the Drug Procurer?
 5                  MR. MITCHELL:  Again, I'm going to object
 6          pursuant to the protective order and instruct the
 7          witness not to answer that question.
 8                  MR. KURSMAN:  Well, okay, let me see if I
 9          can -- let me see if I can ask it a bit
10          differently.  I don't see how that would violate
11          the protective order at all.
12    BY MR. KURSMAN:
13          Q.      Did you seek out the position of Drug
14    Procurer?
15                  MR. MITCHELL:  Same objection.  Don't
16          answer.
17    BY MR. KURSMAN:
18          Q.      Did -- did you apply for the position as
19    Drug Procurer?
20                  MR. MITCHELL:  Same objection.  Don't
21          answer.
22                  MR. KURSMAN:  Mr. Mitchell, every --
23          every objection you're making now seems to have
24          almost -- well, I don't even want to say "almost,"
25          but nothing to do whatsoever with anything you
```

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DRUG PROCURER 36

1              just read in DE107, so it almost seems as you're

2             objecting to every question.

3                  The last question I asked was "Did you

4             apply for the position of the Drug Procurer?"  I'm

5             not sure how at all that would identify the

6             identity of the Drug Procurer.

7                  MR. MITCHELL:  I think it's calculated or

8             is likely to lead to discoverable information.

9             Again, this -- this background, this context about

10            the Drug Procurer and how the Drug Procurer got

11            the job is all right around the protective order.

12            I mean, if you want to ask the Drug Procurer

13            certain steps the Drug Procurer took to try to

14            procure drugs, that's a different line of inquiry.

15                 But right now this background information

16            is all nibbling around the heart of the Court's

17            protective order, if not striking at the heart of

18            it.

19                 MR. KURSMAN:  Sure, but part -- part and

20            parcel of how the Drug Procurer attempted to get

21            drugs has to do with the Drug Procurer's

22            background.

23                 If -- if the State of -- if the State of

24            Tennessee hired a pharmacist to do it or a doctor

25            to do it, it would be a bit different than if they

Gibson Court Reporting

Case 3:18-cv-01234   Document 184-3   Filed 03/13/23   Page 39 of 328 PageID #: 6098

```
 1              hired, you know, a librarian or -- or somebody
 2              who, you know, just graduated high school.
 3                     So this is all I'm asking you.  It has
 4              nothing to do with getting the Drug Procurer's
 5              identity.  I just am trying to find out how the
 6              Drug Procurer came into the role that they came
 7              into.
 8                     MR. MITCHELL:  And I'm going to repeat my
 9              objection and instruct the Drug Procurer you are
10              not to answer whether the Drug Procurer applied
11                 for the role.
12     BY MR. KURSMAN:
13              Q.     Do -- do you get paid to be the Drug
14     Procurer?
15                     MR. MITCHELL:  Objection.  Do not answer.
16     BY MR. KURSMAN:
17              Q.     What -- what motivated you to become the
18     Drug Procurer?
19                     MR. MITCHELL:  Objection.  Do not answer,
20                 pursuant to the Court's protective order.
21     BY MR. KURSMAN:
22              Q.     Did -- do you receive any -- any training
23     to be the Drug Procurer?
24              A.     No.
25              Q.     When -- when you got the job as the Drug
```

```
 1    Procurer in 2016, did anybody give you instructions on
 2    how to procure the drugs?
 3         A.    No.
 4         Q.    Did you have any prior experience
 5    procuring drugs?
 6         A.    No.
 7         Q.    Were you familiar at that time with the
 8    drug pentobarbital?
 9         A.    Only by name.
10         Q.    Were you familiar with the drug
11    midazolam?
12         A.    Only by name.
13         Q.    Were you familiar with the drug
14    vecuronium bromide?
15         A.    No.
16         Q.    Were you familiar with the drug potassium
17    chloride?
18         A.    Only by name.
19         Q.    Were -- were you aware of the difference
20    between a compounded drug and a manufactured drug?
21         A.    No.
22         Q.    Are you aware of that difference today?
23         A.    Yes.
24         Q.    Can you describe that difference for me?
25         A.    By its name, commercially manufactured
```

```
 1    drugs are just that; commercially manufactured and
 2    available from wholesalers and companies.
 3                  Compounded preparations are using active
 4    pharmaceutical ingredients to compound a substance that
 5    is either similar strength or a higher potency.
 6         Q.       And you mentioned the term "active
 7    pharmaceutical ingredient."  Can -- can you describe
 8    for me what that is?
 9                  MR. MITCHELL:  I'm going to object that
10         that calls for an expert opinion.  You can answer.
11                  You can answer.
12                  THE WITNESS:  Yes.  A -- my description
13         is it's a building block to the completed
14         preparation.  So it's the main component or
15         ingredient, and then it's compounded to become a
16         solution or a pill or injectable.
17    BY MR. KURSMAN:
18         Q.       And can you tell me what forms of active
19    pharmaceutical -- what forms do active pharmaceutical
20    ingredients come in?
21                  MR. MITCHELL:  Same objection, expert
22         opinion.  You can answer.
23                  THE WITNESS:  The ones I'm aware of and
24         I've dealt with in this role are in powder form.
25    BY MR. KURSMAN:
```

```
 1          Q.      And have you ever handled an active
 2    pharmaceutical ingredient?
 3          A.      No.
 4          Q.      Have you ever stored an active
 5    pharmaceutical ingredient?
 6          A.      No.
 7          Q.      Have you ever seen an active
 8    pharmaceutical ingredient?
 9          A.      No.
10          Q.      Have you seen any of the products once
11    they are compounded?
12          A.      Yes.
13          Q.      Have you been involved in prior
14    executions?
15                  MR. MITCHELL:  Objection.  Do not answer.
16    BY MR. KURSMAN:
17          Q.      Are you -- are you involved --
18                  MR. MITCHELL:  Pursuant to the protective
19          order.
20    BY MR. KURSMAN:
21          Q.      Are you involved in this execution
22    protocol in any other capacity, aside from the Drug
23    Procurer?
24                  MR. MITCHELL:  Objection.  Do not answer,
25          pursuant to the protective order.
```

```
 1   BY MR. KURSMAN:
 2        Q.      Is there anyone else in Tennessee who is
 3   responsible -- without identifying their name, is there
 4   anyone else in Tennessee who is responsible for
 5   procuring lethal injection drugs for use in executions?
 6        A.      No.
 7        Q.      Is there a certain time at which you will
 8   no longer be responsible for procuring lethal injection
 9   drugs?
10             MR. MITCHELL:  Objection.  Do not answer,
11        pursuant to the protective order.
12   BY MR. KURSMAN:
13        Q.      Are -- are you responsible for procuring
14   the equipment used in an execution?
15             MR. MITCHELL:  Objection, form.
16             THE WITNESS:  Can you be more specific,
17        what you mean by "equipment?"
18   BY MR. KURSMAN:
19        Q.      Sure.  Are you responsible for obtaining
20   the syringes?
21        A.      No.
22        Q.      Are you responsible for obtaining gloves?
23        A.      No.
24        Q.      Are you responsible for obtaining the --
25   the -- the water that is used to mix the lethal
```

```
 1   injection chemicals?
 2        A.      Yes.
 3        Q.      And what other equipment are you
 4   responsible for obtaining?
 5        A.      The lethal injection chemicals, the
 6   bacteriostatic water, and the saline.
 7        Q.      And was there ever a point during your
 8   time as the Drug Procurer that you obtained drugs
 9   but -- but not the static water?
10        A.      We would obtain bacteriostatic water, and
11   it wouldn't be every time because we would order enough
12   to cover several executions.  So it would be an order
13   that would cover a span of time, so it wasn't ordered
14   every single time.
15        Q.      And how did you store the bacteriostatic
16   water?
17        A.      Stored it in a secure cabinet at room
18   temperature.
19        Q.      And has the static water been secured the
20   same way since 2016, when you took over as the Drug
21   Procurer?
22        A.      Since we've gotten it, since I've ordered
23   it and it's been received in my role, yes, it's been
24   stored the same way.
25        Q.      And what about for midazolam?  Has -- has
```

```
1   that been stored the same way since 2016?
2              MR. MITCHELL:  Objection, form.  You can
3         answer.
4              THE WITNESS:  No.
5   BY MR. KURSMAN:
6         Q.    And can you describe the difference
7   between how it was stored once, compared to how it is
8   stored now?
9              MR. MITCHELL:  Same objection.  You can
10        answer.
11             THE WITNESS:  At first, midazolam that
12        was received was commercially manufactured.  That
13        midazolam was stored at room temperature in a
14        secured cabinet.
15             Compounded preparations of midazolam that
16        have been received are stored in the freezer.
17  BY MR. KURSMAN:
18        Q.    And when was the first time that you
19  received compounded midazolam?
20        A.    It would have been, without referring to
21  anything, late July-early August of 2018.
22        Q.    And was the vecuronium bromide stored the
23  same way since 2016?
24        A.    Yes.
25        Q.    Is the vecuronium bromide that you have
```

```
1   now, is that compounded or manufactured?
2          A.      That is commercially manufactured.
3          Q.      Okay.  And the potassium chloride that --
4   that you currently procure, is that compounded or
5   manufactured?
6          A.      It is compounded.
7          Q.      Okay.  And the potassium chloride, has
8   that been stored the same way since 2016?
9          A.      No.  Similar to midazolam, the first
10  amounts we received were commercially manufactured.
11  Those were stored at room temperature in a secure
12  cabinet.
13              Now, with compounded preparations, once
14  received they are stored in the freezer.
15         Q.      And are you responsible for putting those
16  lethal injection chemicals in the freezer?
17         A.      Yes.
18         Q.      And are you responsible for moving them
19  to -- well, I apologize.  Strike that.
20              What -- what happens?  Can you describe the
21  process of what happens within 72 hours of an execution,
22  where those lethal injection drugs go from the freezer?
23              MR. MITCHELL:  Objection, form.  You can
24      answer.
25              THE WITNESS:  I'm not involved in the
```

```
 1              movement of the lethal injection chemicals at that
 2              point.  My understanding is they are moved from
 3              the freezer to the refrigerator to thaw prior to
 4              being used in the execution.
 5    BY MR. KURSMAN:
 6         Q.      And after -- after you put the lethal
 7    injection chemicals in the freezer or at room
 8    temperature, do you have any more involvement with the
 9    lethal injection chemicals at all?
10         A.      I'm involved in inventory.
11         Q.      Do you create the inventory logs?
12         A.      It's a logbook maintained in the secure
13    cabinet that I will enter information into.
14         Q.      Does anybody else enter information into
15    that log?
16         A.      Yes, the warden.
17         Q.      And how do you know who is responsible
18    for entering what information?
19         A.      The warden is present when the lethal
20    injection chemicals are received and placed into the
21    freezer and is present when they are logged into the
22    logbook.
23         Q.      And does the warden ever write anything
24    in the logbook?
25         A.      Yes.
```

```
 1        Q.       And what does the warden write in the
 2   logbook?
 3        A.       He will write the name of the chemical
 4   received, the lot number, the expiration date, and will
 5   record the temperature of the freezer.
 6        Q.       And what -- what do you write in the
 7   logbook?
 8        A.       Sometimes I'll write the same
 9   information.  It just depends.  Sometimes I'll actually
10   log it in there.
11        Q.       How do you decide, between you and the
12   warden, who is going to write that information you just
13   described?
14             MR. MITCHELL:  Objection, form.  You can
15        answer.
16             THE WITNESS:  There's no real discussion
17        about it.  It's just whoever happens to have the
18        book and a pen in their hand.
19   BY MR. KURSMAN:
20        Q.       And does anybody double-check that
21   information?
22        A.       Yes.  Whichever one of us is not the one
23   writing it double-checks the information before it's
24   signed off on.
25        Q.       And are -- are you responsible for
```

```
 1    discarding the lethal injection drugs if they expire?
 2         A.        Yes, I'm present when we do that.
 3         Q.        And who else is present when you do that?
 4         A.        The warden.
 5         Q.        And can you describe how you dispose of
 6    those chemicals?
 7         A.        The expired chemicals are removed from
 8    where they're stored, whether it be the freezer,
 9    refrigerator, or locked cabinet.  Any identifying
10    labels or numbers, et cetera, are removed from the
11    boxes and the vials and are put into a medical waste
12    bag.  And that medical waste bag is then included with
13    the facility's medical waste.
14         Q.        And do you put that in the logbook, as
15    well?
16         A.        We indicate when -- yes, when they are
17    removed.
18         Q.        And I -- I think we -- you talked about
19    this at the beginning.  But are you aware of the
20    current -- Tennessee's lethal injection execution
21    manual?
22         A.        And just to be clear, if I may, you are
23    meaning the protocol; is that correct?
24         Q.        I did.
25         A.        Yes.
```

```
 1          Q.      And if I refer to what I'm calling a
 2   manual and what you're calling a protocol; if I refer
 3   to it as a protocol, will you know what I'm talking
 4   about?
 5          A.      Yes.
 6          Q.      Okay.  And can you describe for me how
 7   you're aware of the protocol?
 8          A.      I've reviewed it.
 9          Q.      And when was the first time that you
10   reviewed the protocol?
11          A.      I reviewed the protocol back in 2016,
12   when it was the current protocol.  And I reviewed the
13   current protocol when it was created in 2018.
14          Q.      And have you reviewed it since 2018?
15          A.      Yes.
16          Q.      When was that?
17          A.      Several times, and I don't know
18   specifically when or an exact number of how often.
19          Q.      And can you explain to me why you
20   reviewed it several times since 2018?
21          A.      It was in the subject of court action
22   since then and just periodic review.
23          Q.      And why were you reviewing it if it was
24   the subject of court action?
25                  MR. MITCHELL:  Objection.  I'll instruct
```

```
1          the witness not to answer, pursuant to DE107.
2    BY MR. KURSMAN:
3          Q.     Why were you reviewing it for periodic
4    review?
5          A.     Just to make sure I had a current
6    knowledge of it and make sure things, at least for my
7    role, were being done accordingly.
8          Q.     Did the protocol change from 2018 until
9    now?
10         A.     No.
11         Q.     And is -- is your role mentioned in the
12   protocol?
13         A.     With regard to the procurement and
14   storage of the lethal injection chemicals.
15         Q.     And is it your understanding that the
16   protocol is mandatory in nature?
17              MR. MITCHELL:  I'm going to object to the
18         form.  You can answer.
19              THE WITNESS:  If I'm understanding your
20         question correctly, it's that the protocol
21         requirements, are they mandatory and binding upon
22         TDOC and how they operate?
23   BY MR. KURSMAN:
24         Q.     Yes.
25         A.     Yes.
```

```
 1         Q.      And are they binding on you, as well?
 2                 MR. MITCHELL:  Same objection.
 3                 THE WITNESS:  Yes.
 4    BY MR. KURSMAN:
 5         Q.      All right.  Can you deviate from the
 6    protocol?
 7         A.      Sorry, I had you on mute.  No.
 8         Q.      Have you ever deviated from the protocol?
 9         A.      No.
10         Q.      And what would happen if you did deviate
11    from the protocol?
12         A.      Deviating from the protocol could affect
13    the integrity of the execution process.
14         Q.      And can you describe why it would affect
15    the integrity of the execution process?
16                 MR. MITCHELL:  Objection, form.  You can
17         answer.
18                 THE WITNESS:  Well, that would depend on
19         what the deviation is.  So that is a good example.
20         It all depends on what the specific deviation
21         would be.
22    BY MR. KURSMAN:
23         Q.      Well, let's say you deviated by not
24    discarding expired drugs.  Could you describe how that
25    would affect the execution protocol?
```

```
1                    MR. MITCHELL:   Objection, form.   You can
2          answer.
3                    THE WITNESS:   The drug protocol requires
4          us to discard the drug, and that would mean that
5          you wouldn't want to risk mixing or using an
6          expired drug in place of a nonexpired drug in an
7          execution.
8     BY MR. KURSMAN:
9          Q.    And can you explain for me the risk
10    behind using an expired drug?
11                   MR. MITCHELL:   Objection, form, and also
12         that it calls for an expert opinion.   You can --
13         you can answer, though, Drug Procurer.
14                   THE WITNESS:   If a drug is expired or
15         past the expiration date, then it calls into
16         question the efficacy of that drug and whether it
17         will perform as it is supposed to.
18    BY MR. KURSMAN:
19         Q.    And are you aware of what happens --
20    strike that.   Strike that.
21                   Were -- were you involved in the creation
22    of the execution protocol?
23                   MR. MITCHELL:   Objection.   Pursuant to
24         the protective order -- protective order, do not
25         answer.
```

```
 1   BY MR. KURSMAN:
 2        Q.     Do you know if any professionals were
 3   consulted during the creation of the execution
 4   protocol?
 5               MR. MITCHELL:  I'm going to object.  I'm
 6        going to object to the form, but you can answer.
 7               THE WITNESS:  Yes.
 8   BY MR. KURSMAN:
 9        Q.     Okay.  And without disclosing any names,
10   what type of professionals were they?
11        A.     Medical.
12        Q.     Were lawyers consulted, do you know?
13        A.     I'm sorry, I didn't hear that.
14        Q.     Lawyers?  Were lawyers consulted?
15        A.     Yes.
16        Q.     Were -- were pharmacologists consulted?
17        A.     Yes.
18        Q.     Were pharmacists consulted?
19        A.     Yes.
20        Q.     Okay.  So let's take this step by step.
21               Why -- you said "medical."  Does that mean
22   doctors?
23        A.     Yes.
24        Q.     Why were doctors consulted?
25               MR. MITCHELL:  And I'm going to object,
```

```
1              lack of personal knowledge.  But you can answer,
2         if you know.
3                   THE WITNESS:  I was not involved in those
4         consultations.
5    BY MR. KURSMAN:
6         Q.    Why were lawyers consulted?
7                   MR. MITCHELL:  Same objection.  You can
8         still answer.
9                   THE WITNESS:  They were consulted in the
10        drafting of the protocol.
11   BY MR. KURSMAN:
12        Q.    Right.  But my question is:  Why?
13                  MR. MITCHELL:  Same objection.  You can
14        answer.
15                  THE WITNESS:  To ensure that the protocol
16        is sound legally.
17   BY MR. KURSMAN:
18        Q.    And why were pharmacists consulted?
19                  MR. MITCHELL:  Same objection.  You can
20        answer.
21                  THE WITNESS:  Because we were dealing
22        with the procurement of lethal injection
23        chemicals, so they were consulted to procure
24        drugs.
25   BY MR. KURSMAN:
```

Gibson Court Reporting

```
 1          Q.      And what about pharmacologists?  Why were
 2   they consulted?
 3                  MR. MITCHELL:  Same objection.
 4                  THE WITNESS:  With regard to compounding.
 5   BY MR. KURSMAN:
 6          Q.      And how do you know that all these people
 7   were consulted?
 8                  MR. MITCHELL:  Objection.  Pursuant to
 9          the protective order, do not answer.
10   BY MR. KURSMAN:
11          Q.      Do you know what -- what research was
12   relied on for the execution protocol?
13                  MR. MITCHELL:  Same objection.  Pursuant
14          to the protective order, do not answer.
15   BY MR. KURSMAN:
16          Q.      Were -- were medical texts reviewed?
17                  MR. MITCHELL:  Same objection.  Do not
18          answer, pursuant to the protective order.
19   BY MR. KURSMAN:
20          Q.      Did -- do you know if other states'
21   protocols were reviewed?
22                  MR. MITCHELL:  Same objection.  Pursuant
23          to the protective order, do not answer.
24   BY MR. KURSMAN:
25          Q.      Are -- are you aware of any past botched
```

```
 1    executions using midazolam?
 2              MR. MITCHELL: Objection to form.
 3              THE WITNESS: I believe it was in
 4         Oklahoma.
 5    BY MR. KURSMAN:
 6         Q.    And can you describe what happened?
 7              MR. MITCHELL: Same objection. You can
 8         answer.
 9              THE WITNESS: I don't know the specific
10         details of what the issue was with that particular
11         execution.
12    BY MR. KURSMAN:
13         Q.    How did you learn of that Oklahoma
14    execution that -- that you just discussed?
15         A.    It's been a while. If I remember
16    correctly, I read about it online.
17         Q.    Was that while looking for pharmacies on
18    Google?
19         A.    Yes.
20         Q.    Okay. And when you read about that
21    execution in Oklahoma, did you tell anybody in TDOC
22    about that?
23         A.    They already knew, but yes.
24         Q.    Okay. Did that make you question whether
25    you should be attempt -- attempting to obtain the same
```

```
 1   three-drug midazolam protocol?
 2        A.      Because I didn't know the specifics of
 3   what occurred in the execution, it didn't necessarily
 4   make me question it.
 5        Q.      Okay.  So you didn't -- did you read
 6   about the specifics of what occurred in that execution?
 7        A.      I have not.
 8        Q.      You weren't interested in what happened
 9   during that execution?
10              MR. MITCHELL:  Objection, form.  You can
11        answer.
12              THE WITNESS:  Sorry.  Repeat that.
13   BY MR. KURSMAN:
14        Q.      I asked:  Were you not interested in what
15   occurred in that execution?
16              MR. MITCHELL:  Same objection.  You can
17        answer.
18              THE WITNESS:  I was interested.
19   BY MR. KURSMAN:
20        Q.      But you didn't have the facts about what
21   occurred during that execution?
22              MR. MITCHELL:  Same objection.
23              THE WITNESS:  I'm sorry, I couldn't hear
24        the last part of that question.
25   BY MR. KURSMAN:
```

```
 1          Q.      I'm sorry, my question is just although
 2    you were interested in that execution, you didn't then
 3    read about the facts of what occurred during that
 4    execution?
 5          A.      Not in detail, no.  Just the general
 6    story, that it did not go according to plan or
 7    according to what was expected.
 8          Q.      Did you ensure that the drugs you were
 9    acquiring weren't the same drugs that were used during
10    that Oklahoma execution?
11                  MR. MITCHELL:  Objection, form.  You can
12         answer.
13                  THE WITNESS:  I -- I don't know who or
14         what the source was for Oklahoma.
15    BY MR. KURSMAN:
16          Q.      Did -- did you ask the pharmacy that is
17    providing TDOC with the drugs whether they are also the
18    pharmacy that provides Texas with the drugs?
19          A.      I did ask.
20          Q.      I'm sorry, you said you did ask?
21          A.      Yes, sir.
22          Q.      Okay.  And what was their response?
23                  MR. MITCHELL:  Objection.  Do not answer,
24         pursuant to the Court's protective order.
25    BY MR. KURSMAN:
```

```
 1          Q.     Do -- do you think that -- that you
 2    should have been consulted on the creation of this
 3    protocol?
 4                  MR. MITCHELL:  Objection, form.  You can
 5          answer.
 6                  THE WITNESS:  I did, yes, contribute in
 7          terms of in the section dealing with procurement
 8          and storage of the lethal injection chemicals.
 9    BY MR. KURSMAN:
10          Q.     And can you describe how you contributed
11    to that section?
12                  MR. MITCHELL:  Objection.  Do not answer,
13          pursuant to the protective order.
14                  MR. KURSMAN:  Mr. Mitchell, I think we've
15          been going about an hour or so.  Could we -- could
16          we take a 10-minute break or so?
17                  MR. MITCHELL:  Sure thing.  Do you want
18          to be back at 11:05 Central/12:05 Eastern?
19                  MR. KURSMAN:  Yeah, that is perfect.  So
20          if we could go off the record.
21                  THE VIDEOGRAPHER:  We're going off the
22          record at 11:54 a.m.
23                  (Recess at 11:54 to 12:06 p.m.)
24                  THE VIDEOGRAPHER:  We are back on the
25          record at 12:07 p.m.
```

```
1   BY MR. KURSMAN:
2        Q.    Drug Procurer, we just went on a
3   10-minute break.  During that break, did you speak with
4   your counsel?
5        A.    No.
6        Q.    Okay.  Did -- did you have time to think
7   about any of the answers that you gave me during that
8   first part of the deposition?
9        A.    I really just went to the bathroom.  I
10  really didn't have time to think of anything else.
11       Q.    Did any of those answers change?
12       A.    No.
13             MR. KURSMAN:  Okay.  And before I begin,
14       I just want to put on the record, Mr. Mitchell,
15       that -- that I think a lot of your objections so
16       far have been outside the scope of the protective
17       order.  So I just want to put on the record that
18       at some point, if this continues, we may either
19       call the Judge or reserve our right to file a
20       motion after the deposition is over.
21             MR. MITCHELL:  Okay.
22  BY MR. KURSMAN:
23       Q.    Now, Drug Procurer, do you have the
24  exhibits in front of you?
25             I'm sorry.  Do you have the exhibits in
```

```
 1   front of you?
 2        A.      Yes.
 3        Q.      Okay.  Did you review these exhibits
 4   before today?
 5        A.      No.
 6                (Exhibit No. 1 marked.)
 7   BY MR. KURSMAN:
 8        Q.      Okay.  Could you turn to Exhibit 1?
 9        A.      Stand by.
10        Q.      Sure.
11                (Pause.)
12                THE WITNESS:  Okay.  I have the exhibit.
13   BY MR. KURSMAN:
14        Q.      Have you seen this before today?
15        A.      Yes, I did.
16        Q.      And is this your understanding of what
17   the protocol is in Tennessee?
18        A.      Yes.
19        Q.      When was the last time you saw this
20   document?
21        A.      During prep over the weekend.
22        Q.      So are you familiar with the protocol's
23   contents?
24        A.      I don't have it memorized, but I am
25   familiar.
```

```
 1          Q.       Have you read the entire thing?
 2          A.       Yes.
 3          Q.       When was the last time you read the
 4   protocol in its entirety?
 5          A.       Over the weekend.
 6          Q.       And what do you understand the purpose of
 7   the protocol to be?
 8                   MR. MITCHELL:  Objection, form.  You can
 9          answer.
10                   THE WITNESS:  It is to be exactly what it
11          is:  The protocol for how an execution, a lethal
12          injection execution, should -- protocol should be
13          followed.
14   BY MR. KURSMAN:
15          Q.       And I think we discussed this before, but
16   is it your understanding that the State of Tennessee is
17   required to follow this protocol?
18          A.       Yes.  As the current protocol in place,
19   we are required to follow it.
20          Q.       And do you have any understanding of who
21   authorized the State to conduct executions under this
22   protocol?
23          A.       The commissioner is the one who signs it.
24   I'm honestly not sure if the governor approves it as
25   well or not.
```

```
 1          Q.        Are you aware whether the State is
 2   allowed to conduct executions by any other method than
 3   what's in this protocol?
 4          A.        Electrocution.
 5          Q.        And is there a protocol for
 6   electrocution?
 7          A.        Yes.
 8          Q.        Do you know why there's not other methods
 9   of execution?
10          A.        Sorry.  Electrocution is specifically
11   mentioned in statute and other methods are not.
12          Q.        Okay.  Could you turn to Page 8 of the
13   protocol.
14          A.        Stand by.
15                    (Pause.)
16                    THE WITNESS:  Okay.
17   BY MR. KURSMAN:
18          Q.        Okay.  Five lines up from the bottom, it
19   says "Inventory Ledger."
20          A.        Sorry, I'm going between screens so it
21   takes me a second.  Yes, I see it.
22          Q.        And it says:  "Permanent record of lethal
23   injection chemicals maintained in a keyed control area
24   of the armory area of Building 7 at RMSI."
25          A.        Yes, that's what it says.
```

```
1              Q.      What does "RMSI" stand for?
2              A.      Riverbend Maximum Security Institution.
3              Q.      And are you familiar with the inventory
4      ledger?
5              A.      Yes.
6              Q.      And are you the one who records notes in
7      the inventory ledger?
8              A.      I, along with the warden.
9              Q.      Is -- is this just a running ledger?
10             A.      It's in -- it's in book form, yeah.  It's
11     a logbook.
12             Q.      What type of book?
13             A.      A logbook.
14             Q.      What is a lock book?
15             A.      Log ---L-O-G -- book.
16             Q.      Logbook?  Is it like in a composition
17     notebook?
18             A.      It's a permanently bound book.
19             Q.      And when is the last time you recorded an
20     entry in that book?
21             A.      I believe August of 2020.
22             Q.      And when was the last time the warden
23     recorded an entry in that book?
24                     MR. MITCHELL:  Objection, form.  You can
25         answer.
```

```
 1                    THE WITNESS:  Well, I can only speak to
 2          the time that he was there with me, and it was the
 3          same day.
 4   BY MR. KURSMAN:
 5          Q.     And why haven't you recorded an entry
 6   since August of 2020?
 7          A.     We have not received any other inventory.
 8          Q.     Are all of the drugs in inventory now
 9   expired?
10          A.     No.
11                 MR. KURSMAN:  I ask that this ledger be
12          produced to plaintiff's counsel.
13                 MR. MITCHELL:  We'll confer and get back
14          with you on about that offline.
15   BY MR. KURSMAN:
16          Q.     Are you aware that the protocol requires
17   a January and July inventory?
18          A.     Yes.  It requires a semiannual or
19   biannual inventory, and I think in parentheses it says
20   January and July.
21          Q.     But you haven't made any entry to that
22   protocol in 11 months; is that correct?
23          A.     Correct.
24          Q.     Why didn't you do the biannual inventory,
25   as required by the protocol?
```

```
 1        A.       It was not done in January, part of the
 2   reason being is COVID restrictions and limited travel
 3   and access to the prison facilities.  Part of that
 4   reason why the January one was not done.  And the July
 5   one is set to be done.
 6        Q.       When is July 1 set to be done?
 7        A.       Sorry, I keep muting and unmuting.
 8                 Next week.
 9        Q.       And why didn't you perform that inventory
10   once the COVID restrictions were raised?
11        A.       I don't have an answer to that.  Just
12   didn't.
13        Q.       Okay.  And can -- do you have any
14   midazolam in inventory that is unexpired?
15        A.       No.
16        Q.       Do you have any potassium chloride in
17   inventory that is unexpired?
18        A.       No.
19        Q.       So the only drug that you have in
20   inventory is the vecuronium bromide; is that right?
21        A.       The only unexpired drug in the inventory
22   at Riverbend is vecuronium bromide.
23        Q.       And the other drugs in inventory, they
24   are all expired; is that right?
25        A.       The ones at Riverbend, yes.
```

```
 1          Q.     And are they all going to be discarded at
 2   your July inventory?
 3          A.     Yes.
 4          Q.     Okay.  And -- you said a few times "at
 5   Riverbend."  Where else are the lethal injection
 6   chemicals stored?
 7          A.     At the source.
 8          Q.     And when you say "the source," do you
 9   mean the pharmacy?
10          A.     Yes.
11          Q.     And are these lethal injection chemicals
12   compounded already?
13          A.     No.
14          Q.     So at the -- at the pharmacy, what you're
15   saying -- just so I understand -- is that they have an
16   active pharmaceutical ingredient.  Is that right?
17          A.     Yes.
18          Q.     And they have not compounded that active
19   pharmaceutical ingredient?
20          A.     No.  There's no executions set as of
21   right now; so, no, it's in API form.
22          Q.     Okay.  And is there an expiration date on
23   the active pharmaceutical ingredients?
24          A.     Yes.
25          Q.     And is there a log for the active
```

```
 1   pharmaceutical ingredients, as well?
 2                MR. MITCHELL:  Sorry, Alex.  Can you
 3        restate the question?  I just didn't hear.
 4                MR. KURSMAN:  Yes.  If at any time you
 5        don't hear me, please let me know.
 6   BY MR. KURSMAN:
 7        Q.      Is there a log for the active
 8   pharmaceutical ingredients at the pharmacy?
 9        A.      I would assume that they have an
10   inventory log, yes.
11        Q.      And does the pharmacy order the active
12   pharmaceutical ingredient before you obtain a
13   physician's order for the drug?
14        A.      I'm sorry, you broke up there for a
15   second.  Can you repeat?
16        Q.      Sure.  Does the pharmacy obtain an active
17   pharmaceutical ingredient before you obtain the
18   physician's order for the drug?
19                MR. MITCHELL:  Drug Procurer, did you
20        hear the question?
21                THE WITNESS:  Everybody froze, so I
22        didn't hear the question.
23                MR. KURSMAN:  I apologize.  Can you hear
24        me now?
25                THE WITNESS:  Yes.
```

```
 1   BY MR. KURSMAN:
 2         Q.     Does the pharmacy obtain the active
 3   pharmaceutical ingredient --
 4         A.     Yes.
 5         Q.     -- before the physician's order for the
 6   drug?
 7         A.     Yes, they obtain it pursuant to the
 8   order.
 9         Q.     Pursuant to what order?
10                Drug Procurer, did you hear the question?
11         A.     I'm sorry, I hit -- I hit unmute and it
12   mutes itself.
13                I thought I heard the question was "Does
14   the pharmacy compound it pursuant to an order?" and the
15   answer was "Yes." Was that the question?
16         Q.     But my question was:  Does the pharmacy
17   obtain the active pharmaceutical ingredient before you
18   obtain the physician's order for a certain inmate?
19         A.     Yes, they obtain API prior to a
20   physician's order to compound.
21         Q.     And can you explain for me how that
22   works?
23                MR. MITCHELL:  Objection, form.  You can
24         answer.
25                THE WITNESS:  My understanding is is that
```

```
 1          they order it from a supplier and receive it at
 2          their facility.
 3   BY MR. KURSMAN:
 4          Q.      And how do they know how much to order?
 5          A.      They know how much to compound per
 6   execution, so they order enough to cover several
 7   executions.
 8          Q.      And how many is "several?"
 9                  MR. MITCHELL:  Objection, form.  You can
10          answer.
11                  THE WITNESS:  It just depends.  It's
12          four, five, six.
13   BY MR. KURSMAN:
14          Q.      Do -- do you pay them for the API or do
15   you only pay them once you receive the compounded
16   chemicals?
17                  MR. MITCHELL:  Objection, form.
18                  THE WITNESS:  We pay for the API.
19   BY MR. KURSMAN:
20          Q.      So you -- just so I'm clear.  So you
21   order the API before you receive the physician's order?
22          A.      The pharmacy orders it and receives it,
23   yes.
24          Q.      And you pay for that API before you
25   receive the physician's order?
```

```
1           A.       Yes.   And then we pay for it to be
2    compounded, as well.
3           Q.       Okay.   Now, can you turn to Page 32 of
4    the protocol.
5           A.       Stand by.
6           Q.       Sure.
7                    (Pause.)
8                    THE WITNESS:   Okay.   Page 32.
9    BY MR. KURSMAN:
10          Q.       Do you see at the top it defines
11   "execution team?"
12          A.       Yes.
13          Q.       Do you consider yourself a member of the
14   execution team?
15          A.       Not in the sense I did not actively
16   participate in the execution itself.
17          Q.       Okay.   Can you -- can you turn to Page 34
18   of the protocol.   It's titled "Chemicals Used in Lethal
19   Injection."
20          A.       I'm there.
21          Q.       Okay.   Do you see it says:
22                   "Chemicals used in lethal injection will
23                   either be FDA-approved commercially
24                   manufactured drugs; or, shall be compounded
25                   preparations prepared in compliance with
```

```
 1                    pharmaceutical standards consistent with
 2                    the United States Pharmacopoeia guidelines
 3                    and accreditation Departments, and in
 4                    accordance with applicable licensing
 5                    regulations."
 6                    Do you see that?
 7        A.     Yes.
 8        Q.     What does that mean to you?
 9               MR. MITCHELL:  Objection, form.  You can
10     answer.
11               THE WITNESS:  So the -- the drugs will be
12     one of two things.  Either they will be
13     obtained -- or they will be FDA-approved
14     commercially manufactured drugs sent over to be
15     compounded.  And specifically, the drugs
16     compounded have to meet the guidelines set by the
17     USP accreditation departments and consistent with
18     licensing.
19  BY MR. KURSMAN:
20        Q.     Are you familiar with the USP guidelines?
21        A.     Very, very limited.
22        Q.     Have you read the USP guidelines?
23        A.     Only parts.
24        Q.     Do -- are you the one who is tasked with
25     ensuring that the compounded preparations are prepared
```

```
 1   in compliance with pharmaceutical standards consistent
 2   with the USP guidelines?
 3                  MR. MITCHELL:  Objection, form.
 4                  THE WITNESS:  I don't have direct
 5        oversight as to the USP.  The pharmacy itself, as
 6        part of its license, is -- has to follow their
 7        licensing.  And if they were licensed, then they
 8        would be following the USP.
 9   BY MR. KURSMAN:
10        Q.     Do you know what their license is?
11        A.     I'm sorry, you broke up there.
12        Q.     Do you know what their license is?
13        A.     They're licensed for sterile compounding.
14        Q.     And do you know what type of license they
15   have?
16        A.     Like a sterile compounding license.
17        Q.     But you don't know the specific type of
18   license that they have?
19        A.     Not beyond -- not beyond they have a
20   license to sterile compound the chemicals that are --
21   the level of chemicals that are used for an execution.
22        Q.     Did they ever send you that license?
23        A.     Yes.
24        Q.     And when was the last time they sent you
25   that license?
```

```
 1          A.       I believe it was two years ago.
 2          Q.       Have you asked for an updated copy of
 3    that license?
 4          A.       No.
 5                   MR. KURSMAN:   And we -- we will be
 6          requesting that license as part of discovery, as
 7          well.
 8                   MR. MITCHELL:   Understood.  We'll confer
 9          about that.
10                   MR. KURSMAN:   Okay.
11    BY MR. KURSMAN:
12          Q.       And do you see where it says that the
13    pharmacy will compound preparations, and then at the
14    bottom it says "in accordance with applicable licensing
15    regulations?"
16          A.       Yes.
17          Q.       What does that mean to you?
18          A.       The licensing regulations applicable to
19    the -- at the state level.
20          Q.       And who is in charge of ensuring that
21    that is all done in accordance with applicable
22    licensing regulations?
23                   MR. MITCHELL:   Objection, form.  You can
24          answer.
25                   THE WITNESS:   The applicable state Board
```

```
 1              of Pharmacy would have oversight on that.
 2    BY MR. KURSMAN:
 3         Q.      But it's nobody at TDOC; is that what
 4    you're saying?
 5                 MR. MITCHELL:   Same objection.
 6                 THE WITNESS:    No.
 7    BY MR. KURSMAN:
 8         Q.      Now, at the -- at the -- earlier in this
 9    deposition, you said you were partly responsible for
10    writing the storage -- storage and procurement
11    instructions.  Is this part of that storage and
12    procurement instructions that you were responsible for?
13                 And what I'm specifically talking about is
14    Page 34.
15         A.      Stand by.  I'll turn to it.
16         Q.      That's the page that we're on right now.
17                 (Pause.)
18                 THE WITNESS:  Sorry, I made a mess.  Yes.
19    BY MR. KURSMAN:
20         Q.      Okay.  So you wrote Page 34?
21         A.      I -- it was information that was provided
22    to me from the source that I then had contributed to
23    writing this page.
24         Q.      And did you also write pages 35, 36, 37,
25    and 38?
```

```
 1          A.        Not all of it.  The portions that are
 2   similar or contributed, once again, information from
 3   the source with regard to compounds, meeting those
 4   regulations, and how they are to be stored in a locked
 5   cabinet or in the fridge, pursuant to guidelines.
 6          Q.        And what about pages 39, 40, 41, 42, and
 7   43?
 8          A.        The portions that deal with the LIC
 9   preparation was information from the source and put
10   into this protocol.
11                    The information related to IV setup and
12   insertion of the IV, I did not have any input on.
13          Q.        So the pharmacy -- just so I understand,
14   the pharmacy gave you information that was then put
15   into the protocol; is -- is that right?
16          A.        Yes.
17          Q.        Okay.  Is there a communications record
18   of that?
19          A.        It would either be in an email or via
20   phone.
21          Q.        So if we turn to Page 35, are you saying
22   that some of what is in Page 35 you received from the
23   pharmacy over the phone?
24          A.        Sorry, I'll turn the page.  Yes.
25          Q.        So they told you over the phone, which
```

```
 1  you then put into the protocol?
 2          A.      It was either by phone and/or email.  I
 3  don't specifically remember.
 4                  MR. KURSMAN:  Okay.  I will -- again, I
 5          will request all of those emails, to the extent
 6          they haven't been provided.
 7  BY MR. KURSMAN:
 8          Q.      Did -- did you then send the protocol to
 9  the pharmacy?
10          A.      I believe I sent not the full protocol.
11  I believe I sent these pages to make sure the wording
12  was correct.
13          Q.      And was it correct?
14          A.      Yes.
15          Q.      Did the -- did the pharmacy make any
16  edit?
17          A.      Not that I remember.
18          Q.      Okay.  And the pharmacy that provides you
19  the compounded chemicals, are they the same pharmacy
20  that provides you the vecuronium bromide?
21          A.      Yes.
22          Q.      Okay.  Now, what does TDOC do to ensure
23  that the vecuronium bromide is FDA approved?
24                  MR. MITCHELL:  Objection, form.  You can
25          answer.
```

```
 1                THE WITNESS:   The source obtains it from
 2        their supplier.  And as I understand it, they only
 3        use FDA-approved suppliers.
 4   BY MR. KURSMAN:
 5        Q.     Okay.  And -- and how is that your
 6   understanding?
 7        A.     That's what they told me.
 8        Q.     Okay.  And are you the person who is in
 9   charge -- in charge of ensuring that the chemicals are
10   FDA approved?
11                MR. MITCHELL:  Objection, form.  You can
12        answer.
13                THE WITNESS:  Well, in a manner.  They --
14        by operation of their business, they are required
15        to use FDA-approved materials.  So, you know, I
16        trust them to do their job.  I don't call the FDA
17        once the LIC is received.
18   BY MR. KURSMAN:
19        Q.     And do you talk to any of your
20   supervisors to ensure that the chemicals are FDA
21   approved?
22        A.     No.
23        Q.     Okay.  Are you aware whether compounded
24   drugs have to be FDA approved?
25        A.     I don't know.
```

```
 1          Q.       What -- what is done to ensure that
 2   compounded chemicals are prepared in compliance with
 3   USP guidelines?
 4               MR. MITCHELL:  Objection, form.  You can
 5          answer.
 6               THE WITNESS:  The pharmacy has a
 7          compounding methodology or protocol that initially
 8          is created I believe from the drug company, the
 9          company that has the API.  They follow that
10          protocol in compounding.  They then send it to a
11          third party to have it tested for efficacy.
12   BY MR. KURSMAN:
13          Q.       And who chooses that third party?  Is it
14   TDOC or is it the pharmacy?
15          A.       The pharmacy.
16          Q.       Do they -- do they test it for sterility,
17   as well?
18          A.       Yes.
19          Q.       Is there anything else that they test it
20   for?
21          A.       Potency and endotoxins.
22          Q.       Do -- do they test it for a beyond use
23   date?
24          A.       Yeah.  So the testing is done and they
25   tell you, based on the compound, what the beyond the
```

```
 1    date of use is, yes.
 2         Q.    Now, what is done to ensure that the
 3    compounded materials are prepared in compliance with
 4    standards from accreditation departments?
 5              MR. MITCHELL:  Same -- or objection,
 6         form.  You can answer.
 7              THE WITNESS:  The pharmacy really would
 8         be the one to answer that question.  They -- they
 9         follow their guidelines, and I'm assuming that
10         they -- that the Board of Pharmacy checks that.
11    BY MR. KURSMAN:
12         Q.    Do you know what the term "accreditation
13    departments" means, as used in this paragraph on Page
14    34?
15         A.    I don't know what specific accreditation
16    departments apply to pharmacies.
17         Q.    Okay.  But you are the one who wrote Page
18    34 in the lethal injection protocol, correct?
19         A.    It was from information given to me by
20    the pharmacy.
21         Q.    Okay.  So is it the pharmacy who wrote
22    Page 34 in the lethal injection protocol?
23         A.    It's the -- it's the wording provided by
24    the pharmacy that was then put into the page.
25         Q.    Okay.  I just want to -- I just want to
```

```
 1    sort of understand what happened.
 2              So the pharmacy calls you or emails you and
 3    gives you these instructions; is that right?  Am I right
 4    so far?
 5         A.    Yes.
 6         Q.    And then those were -- are put into the
 7    lethal injection protocol?
 8         A.    Yes.
 9         Q.    But you don't know what those words mean?
10         A.    I couldn't hear the end of your question.
11         Q.    I'm sorry.  But you don't know what some
12    of those words mean, right?
13         A.    Well, I don't know what the specific name
14    of an accreditation department is.
15         Q.    Oh, so let me ask you this:  What -- what
16    is your understanding of what an accreditation
17    department is?
18         A.    My understanding is it would be something
19    similar to like what Corrections has, which is the
20    American Correctional Association.  It's an entity that
21    -- that reviews -- well, let's just say a pharmacy.  So
22    it would be an entity that would come and review or
23    audit the pharmacy and then decide if they are
24    accredited under the standards of that society.
25         Q.    Okay.  Did you -- did you Google the term
```

```
 1   "accreditation" -- "accreditation department" to find
 2   out what that term meant?
 3        A.      No.
 4        Q.      Did you ask the pharmacy what that term
 5   meant?
 6        A.      No, I did not ask them what the specific
 7   name of the accreditation entity was.
 8        Q.      Okay.  And how do you know that the
 9   compounded preparations are prepared in compliance with
10   standards from accreditation departments?
11        A.      By the fact that they are licensed, they
12   prepare preparations, and we have seen the results of
13   the testing for the sterility, potency, and the
14   endotoxins.
15        Q.      And -- and what is done to ensure that
16   the compounded chemicals are prepared in compliance
17   with applicable licensing regulations?
18             MR. MITCHELL:  Objection, form.  I'll let
19        you answer.
20             THE WITNESS:  That would be the final
21        compounding.  That would be a question for the
22        pharmacist to answer.
23   BY MR. KURSMAN:
24        Q.      Are you aware what the applicable
25   licensing regulations are?
```

```
 1          A.      No.
 2          Q.      Do you know what the term "applicable
 3    licensing regulations" means in this paragraph on Page
 4    34?
 5          A.      As stated previously, it would reference
 6    state licensing guidelines.
 7          Q.      Do you -- do you think it also references
 8    federal licensing guidelines?
 9                  MR. MITCHELL:  Objection, form.  You can
10          answer.
11                  THE WITNESS:  Yes.
12    BY MR. KURSMAN:
13          Q.      Okay.  Can you turn to the next page of
14    the protocol, Page 35?  Just let me know.
15          A.      I'm there.
16          Q.      Do you see where it says "Procurement" at
17    the top?
18          A.      Sorry, you broke up.  Where?
19          Q.      I apologize.  Do you see where it says
20    "Procurement" at the top?
21          A.      Yes.
22          Q.      All right.  Did -- did you write this
23    section of the protocol, as well, Page 35?
24          A.      Yes.
25          Q.      And was that based also on what the
```

```
 1  pharmacy told you?
 2       A.     Yes.
 3       Q.     Did -- did the pharmacy tell you to
 4  contact a physician to obtain a physician's order for
 5  the lethal injection chemicals?
 6       A.     Yes.   In our discussions they informed me
 7  that, for a compounding, they would need a physician's
 8  order.
 9       Q.     And are you the person tasked with
10  contacting a physician to obtain an order for the
11  lethal injection chemicals?
12       A.     Yes.
13       Q.     And is that physician the same physician
14  in the execution protocol?
15       A.     Sorry.  No.
16       Q.     Okay.  And then you see it says:   "The
17  commissioner or his designee shall" -- "shall submit
18  the physician's order to a licensed pharmacy or
19  pharmacist to be filled."
20              Do you see that?
21       A.     Yes.
22       Q.     What's -- what's the difference between a
23  licensed pharmacy, as compared to a pharmacist?
24       A.     A licensed pharmacy would be the -- the
25  business, the pharmacy where the pharmacist works.
```

```
 1          Q.      Okay.  And are you the designee?

 2          A.      Yes.

 3          Q.      And is this how -- how it's been done?

 4          A.      Yes.

 5          Q.      Do -- do you always use the same

 6  physician to obtain the order?

 7          A.      Yes.

 8          Q.      Is this physician known by the public?

 9          A.      No.

10          Q.      Do you always use the same pharmacy?

11          A.      Yes.

12          Q.      Have you used a different pharmacy since

13  2016?

14          A.      No.

15          Q.      Is -- do you -- do you know if this is

16  the same pharmacy that Tennessee used to obtain

17  pentobarbital from?

18          A.      I don't know.

19          Q.      And have you ordered bulk orders before

20  execution dates were set?

21          A.      I'm sorry, what kind of orders?

22          Q.      Bulk, B-U-L-K.

23          A.      We've ordered API in larger quantities.

24  I don't know how many grams constitutes bulk.  Over 100

25  grams of API each.
```

```
 1        Q.        And why would you order so much API?
 2        A.        Once again, it's to have it for
 3   executions so that we have plenty to do an execution as
 4   they are set and don't have to order per execution.
 5        Q.        Is there -- is there anything in the
 6   execution protocol that discusses ordering the API?
 7        A.        Not that I remember.
 8        Q.        And what do you do with the drugs if
 9   they're ordered and then not used in the executions?
10        A.        Any drug that's not used is at the
11   pharmacy.  And if it's not used or expires, they would
12   dispose of it.
13        Q.        I'm sorry, my question was a bit
14   confusing.  What do you do with the drugs if -- if you
15   order a compounded or manufactured drug for a specific
16   execution and then that execution ends up not going
17   forward?  What do you do with those drugs?
18        A.        They're disposed of.
19        Q.        Okay.  And do you see -- if you -- if you
20   stay in this "Procurement" paragraph on Page 35, do you
21   see the last sentence in this paragraph, it's four
22   lines up.  It says:
23                  "Compounded preparations shall be
24                  transferred, stored, and maintained in
25                  accordance with the directions of the
```

```
 1                    pharmacy with which the Department has a
 2                    pharmacy service agreement, which shall be
 3                    in compliance with pharmaceutical standards
 4                    and consistent with United States
 5                    Pharmacopoeia guidelines."
 6        A.      Yes.
 7        Q.      What do those standards and guidelines
 8   require in terms of how the compounded lethal injection
 9   chemicals are transferred, stored, and maintained?
10                MR. MITCHELL:  Objection, calls
11           for expert opinion and also personal knowledge.
12           You can answer.
13                THE WITNESS:  Specific standards are with
14           regard to how it's transported and
15           temperature-wise how it is maintained at certain
16           temperatures so that it remains -- so it maintains
17           its efficacy.
18   BY MR. KURSMAN:
19        Q.      And are you the person who is responsible
20   for carrying out that, that portion of the protocol?
21        A.      The pharmacy ships the LIC to us, and I
22   receive it and store it at Riverbend.
23        Q.      So are you the person who is responsible
24   for ensuring that it's stored and maintained in
25   accordance with the directions of the pharmacy with
```

1   which the Department has a Pharmacy Services Agreement
2   and which shall be in accordance with pharmaceutical
3   standards and consistent with USP?

4       A.      Yes, I'm responsible upon receipt in
5   ensuring that it is being taken and stored at Riverbend
6   according to the standards.

7       Q.      Okay.  And what do you do to ensure that
8   the lethal injection chemicals are stored in compliance
9   with the pharmaceutical standards and consistent with
10  USP guidelines?

11      A.      When it is received, it's taken to the
12  armory at Riverbend.  It's -- the container is then
13  opened, and in the process of opening it I ensure that
14  it hasn't been -- no seal has been broken or been
15  tampered with.

16              The compounded preparations are stored on
17  dry ice in the container.  Upon taking them out of the
18  container and moving them into the freezer, I ensure that
19  the temperature of the freezer will maintain the
20  preparations in a frozen state.

21              And I ensure that when I remove them from
22  the container that they are, in fact, frozen.  And I
23  place them into the freezer.  The temperature is logged
24  and the inventory is logged in the logbook.  And the
25  freezer is closed and locked at that time.

```
1          Q.        Is -- is there a temperature gauge on the
2     transportation device where the dry ice is contained?
3          A.        There is no temperature gauge on the
4     container that the drugs come in.
5          Q.        So you're unaware how cold the drugs are
6     stored in that container?  You're unaware of what that
7     temperature is; is that right?
8          A.        Given the fact that it's on dry ice, I
9     would assume at subzero temperatures.
10         Q.        But you don't know how -- how cold it is?
11         A.        Sorry, you broke up there at the end.
12         Q.        I'm sorry.  But do you know how cold it
13    is?
14         A.        I do not have a temperature gauge on
15    that, no.
16         Q.        Okay.  And then you said you ensure that
17    chemicals are still frozen.  How do you do that?
18         A.        When the vials are removed from the
19    container that they're shipped in, I'm able to -- I'm
20    able to tell by holding them that they are frozen.
21         Q.        How are you able to tell?
22         A.        Because the liquid in the vial is frozen
23    and it does not move.
24         Q.        Do you have any training on how to tell
25    if a lethal injection chemical is frozen?
```

```
1          A.        Other than common sense of holding a vial
2     that has a frozen liquid in it, no.
3          Q.        Okay.  And where are the compounded drugs
4     transferred to?
5          A.        To the armory at Riverbend Maximum
6     Security Institution.
7          Q.        And where do you put the compounded drugs
8     once they get to the armory?
9          A.        They are stored in the freezer.
10          Q.        And what -- what temperature is that
11     freezer?
12          A.        It's fluctuates between 1 and 4 degrees,
13     usually.
14          Q.        And is that Celsius or Fahrenheit?
15          A.        Fahrenheit.
16          Q.        And you said you "usually."  Are there
17     times where it fluctuates even more than the 4 degrees?
18          A.        Without looking specifically at the -- at
19     the logs, I -- I don't know.  It may.
20          Q.        And is there a -- is there a monitor on
21     the freezer?
22          A.        There is a thermometer kept inside the
23     freezer.
24          Q.        Okay.  And is -- how is it ensured that
25     the freezer's electricity stays on?
```

1    A.       There is -- should that room or the
2  building use power -- lose power, there is a backup
3  generator.

4    Q.       And how long are the lethal injection
5  compounds stored in the freezer?

6    A.       We usually receive them approximately a
7  week or two weeks before an execution date.  So they're
8  stored in the freezer until, per protocol, it's time to
9  take them out of the freezer and put them into the
10 refrigerator.

11   Q.       And after they are stored in the freezer,
12 do you test them again for potency, sterility, and
13 endotoxins?

14           MR. KURSMAN:  I believe you're on mute if
15      you're trying to answer.

16           THE WITNESS:  I'm sorry.  I froze again,
17      so I didn't hear the last question.

18 BY MR. KURSMAN:

19   Q.       Okay.  After you store them in the
20 freezer, are they tested for potency, sterility, and
21 endotoxins again?

22   A.       Once we've received them and put them in
23 the freezer, no.

24   Q.       Okay.  And when you talk about a freezer,
25 is -- is it an actual freezer?

```
 1          A.       Yes, like a -- it's -- it has a
 2     refrigerator section and a freezer section.
 3          Q.       So is it -- is it a mini-fridge?
 4          A.       Yes.
 5          Q.       Okay.  And so is the freezer contained
 6     within the mini-fridge?
 7          A.       No, it's like a -- it's like a
 8     miniaturized -- like a real big refrigerator.  It has a
 9     separate door for the fridge, a separate door and
10     compartment for the freezer.
11          Q.       Okay.  And I'm sorry, I missed your --
12     your last answer.  Were they tested for potency,
13     sterility, and endotoxins after they're stored in the
14     freezer?
15          A.       No, they are not tested a second time
16     after they're stored in the freezer.
17          Q.       Okay.  Now, if we go back to Page 35, you
18     see it says "Storage of LIC" on Exhibit 1?
19          A.       I'm there.
20          Q.       Okay.  Did you write this portion, as
21     well?
22          A.       Some of this portion was also in place
23     for the previous pentobarbital protocol, so I didn't
24     write all of it.
25          Q.       Okay.  So how do you decide which
```

```
 1   portions of the previous pentobarbital protocol to keep
 2   and which portions to delete?
 3                    (Pause.)
 4                    THE WITNESS:   Sorry, I'm looking at it
 5          now so I can answer your question.
 6                    MR. KURSMAN:   That's all right.  Take
 7          your time.
 8                    (Pause.)
 9                    THE WITNESS:   Without having the
10          injection protocol in front of me, I think this is
11          the same language.
12   BY MR. KURSMAN:
13          Q.      Okay.  Do you see under "Storage of LIC"
14   at No. 1, the last sentence says:   "The LIC is placed
15   in an unmovable heavy gauge steel container with
16   security grade locks?"
17          A.      Yes.
18          Q.      Is the fridge a steel container?
19          A.      The fridge is not a -- is not itself a
20   steel container.  The fridge has a steel bar that locks
21   its doors into place, and that is secured with a lock.
22          Q.      So is there -- is there also an unmovable
23   heavy gauge steel container?
24          A.      Yes.
25          Q.      And is that different than the fridge?
```

1          A.     Yes.

2          Q.     And can you describe that?

3          A.     Yes.   It is a -- exactly what it sounds

4   like.   It's a steel wall-mounted box that is secured

5   with locks.

6          Q.     Okay.  And when you receive the LIC --

7   the midazolam and the potassium chloride -- are they

8   compounded at this point?

9          A.     Yes.

10         Q.     Okay.  And are they then put into the

11  steel-gauge container?

12         A.     No, they are put into the freezer.

13         Q.     Okay.  Why are they -- why do you not

14  follow the protocol at this step of the execution?

15                MR. MITCHELL:  Objection, form.  You can

16         answer.

17                THE WITNESS:  I'm sorry, what was that?

18  BY MR. KURSMAN:

19         Q.     Why do you not follow the protocol at

20  this stage of the execution?

21                MR. MITCHELL:  Objection, form.  You can

22         answer.

23                THE WITNESS:  The steel box is -- does

24         not have the capability to keep the LIC which is

25         compounded at above freezing temperatures, so it

Gibson Court Reporting

```
 1            is placed into the freezer.
 2    BY MR. KURSMAN:
 3         Q.      So who decided at this point that you
 4    could deviate from the mandatory protocol?
 5                MR. MITCHELL:  Objection, form.  You can
 6         answer.
 7                THE WITNESS:  I did not make that
 8         decision and I was not present when that decision
 9         was made.
10    BY MR. KURSMAN:
11         Q.      Okay.  Who told you to put the drugs in
12    the freezer rather than the heavy gauge steel
13    container?
14         A.      Well, the -- the instruction of how it
15    had to be stored was provided by the pharmacy, that it
16    had to be stored frozen.  So it was -- it was -- there
17    was a need to add a freezer in that armory room, and
18    the box came out of the freezer.
19         Q.      So who decides when there's a need that
20    you should no longer follow the protocol?
21         A.      That would be a decision made by the
22    commissioner, in consultation with general counsel.
23         Q.      And can you explain to me how that
24    decision was made in this instance?
25                MR. MITCHELL:  Objection, on a couple
```

```
1              bases.  Lack of personal knowledge.  And also, you
2         know, that could get into attorney-client.
3                   So I'm going to instruct the witness not
4         to answer, based on the privilege.
5    BY MR. KURSMAN:
6         Q.    When -- let me see if I can ask this.
7               When -- when -- when you first received
8    the -- the lethal injection chemicals from the
9    pharmacist, did you speak with any lawyers about how to
10   store those chemicals?
11        A.    Sorry, I didn't move my mouse.  Yes.
12        Q.    And did you -- did you ask those lawyers
13   whether you should follow the protocol?
14              MR. MITCHELL:  And I'm -- I'm going
15         to instruct -- I'm going to instruct him not to
16         answer again.  Attorney-client privilege.
17   BY MR. KURSMAN:
18        Q.    Can you tell me how many lawyers you
19   talked to about where to store the lethal injection
20   chemicals?
21        A.    I don't remember a specific number but
22   one.
23        Q.    Do you remember when this conversation
24   occurred?
25        A.    Sorry, you broke up there.
```

```
 1            Q.        Do you remember when this conversation
 2    occurred?
 3            A.        2018, in the summer.
 4            Q.        And at that point, did you realize that
 5    the pharmacy instructions conflicted with the protocol?
 6                      MR. MITCHELL:   Object to the form.   You
 7         can answer.
 8                      THE WITNESS:   Yes, I knew that the steel
 9         gauge box could not maintain a freezing
10         temperature.
11    BY MR. KURSMAN:
12            Q.        Right, but my question is a bit different
13    than that.   My question is:   Did you know that the
14    pharmacy instructions conflicted with the protocol?
15                      MR. MITCHELL:   Same objection.   You can
16         answer.
17    BY MR. KURSMAN:
18            Q.        Drug Procurer, you're muted.   I don't
19    know if you heard that.
20            A.        Okay.   Can you hear me now?
21            Q.        Yes.
22            A.        All right.   Sorry about that.
23                      All right.   Yes, I was aware it
24    conflicted with the portion pertaining to storage in
25    the steel container but not conflicting with storage in
```

 1  accordance with USP guidelines.

 2       Q.      And who told you not to follow the

 3  protocol?

 4            MR. MITCHELL:  Objection to form and --

 5       at least that form.  You can maybe ask other

 6       questions to illuminate that; but at this point,

 7       I'm going to object subject to the protective

 8       order.

 9  BY MR. KURSMAN:

10       Q.      For the record, I just want to -- I'm

11  inquiring as to who has the authority right now to

12  override the protocol.  I don't want to know any

13  conversations you have with your attorneys regarding

14  any legal advice.

15            My only question is:  What individuals

16  said or gave you the authority to override the

17  protocol?

18            MR. MITCHELL:  And -- and maybe -- maybe

19       what I would suggest instead is probing whether he

20       spoke with general counsel's office or general

21       counsel, or something like that, or whether the

22       Drug Procurer spoke with the commissioner.

23            And maybe you can ask those yes-nos and

24       go that way, instead of just asking.

25            MR. KURSMAN:  Sure.  Let's try that.

Case 1:18-cv-02439 Document 18-1 Filed 03/17/25 Page 91 of 328 PageID #6459
3194

1        Let's try that.

2    BY MR. KURSMAN:

3        Q.      Did you -- did you speak with -- with the

4    commissioner when you realized there was a conflict

5    with the protocol and the pharmacy?

6        A.      It was discussed with the commissioner

7    and general counsel.

8        Q.      Okay.  And did the commissioner tell you

9    to not follow the protocol?

10       A.      I don't remember if those words were

11   used.  But when it was discussed, I was told that it

12   needed to be stored in a freezer.

13       Q.      Did general counsel tell you not to

14   follow the protocol?

15       A.      Once again, those words -- I don't

16   remember those words being used.  It was that based on

17   the requirements given to us by the pharmacist that we

18   had to put it in the freezer.

19       Q.      Was there any discussion about amending

20   the protocol?

21       A.      I don't know if there was.

22       Q.      Now, if you go to No. 3 on that same page

23   under "Storage of LIC," do you see it says:  "The LIC

24   on hand is monitored for expiration dates?"

25       A.      Yes.

1       Q.     Who -- who monitors the chemicals for

2  expiration dates?

3       A.     They are kept in inventory with the log,

4  so we obviously record an expiration date in the log.

5  And then during inventory, they would -- you know, any

6  that are expired would be disposed of.

7       Q.     So when you say it's recorded in the log,

8  does that mean you and the commissioner monitor the

9  lethal injection chemicals for the expiration dates?

10      A.     No, the commissioner is not there when

11  they're logged in.  It's the warden who is present.

12      Q.     Right.  I meant the warden.

13           How do you monitor for expiration dates?

14      A.     When we do inventory or when we receive

15  -- receive chemicals and those are logged away, we

16  check that and look at the expiration dates.

17      Q.     Are -- are the dates printed on the

18  lethal injection chemicals?

19      A.     Yes.

20      Q.     On the actual vial?

21      A.     Yes.

22      Q.     And do you pull those vials out of the

23  freezer every time you record something in the lab?

24      A.     No.

25      Q.     So how do you check the lethal injection

```
1    chemicals, other than by annual recordings?
2         A.     So we -- once again, when it's originally
3    logged in the expiration date is referenced on the
4    logbook.
5                There is also a log that indicates a seal
6    that is put on the lock.  So if -- when we check the
7    locks, or log the chemicals in, if the seal has been
8    broken and there is nothing that would indicate any
9    tampering, and so the date would remain the same since
10   it was reported from the log into the logbook.
11        Q.     So the log with the seal that you just
12   described, is that a separate log?
13        A.     Yes.
14               MR. KURSMAN:  We would request that log,
15        as well, in discovery.
16               MR. MITCHELL:  We'll confer offline.
17   BY MR. KURSMAN:
18        Q.     How do you know whether the seal is
19   broken if you don't take the lethal injection chemicals
20   out of the freezer?
21               You're -- you're muted, if you're trying
22   to answer.
23        A.     So the seal has a number, and if that
24   same-numbered seal is still intact on the lock then
25   that's how we know it hasn't been broken.
```

```
 1        Q.      Maybe I'm missing something.  I'm a bit
 2   confused by this.  The seal has a number; when you say
 3   "the seal," are you talking about the actual vial is
 4   sealed?
 5        A.      No, I'm sorry.  This is a seal that is
 6   put on the lock of the container.  So the container is
 7   locked, and the seal is then put around the lock to
 8   ensure that the cabinet or the freezer is not opened.
 9        Q.      Okay.  Okay.  So you put -- just so I'm
10   clear, you put the lethal injection chemicals into the
11   freezer, and then you seal the freezer shut and you
12   don't open it?
13        A.      Correct.
14        Q.      Okay.  What happens, though, if you have
15   more than one execution in a -- in a few weeks' span?
16             MR. MITCHELL:  Object to form.  You can
17        answer.
18             THE WITNESS:  I'm -- I'm not really sure
19        what you're asking.  Are you asking if there's
20        more than one, I guess, set of chemicals for more
21        than one execution at one time?  Is that what
22        you're -- what you're asking?
23   BY MR. KURSMAN:
24        Q.      Yes, that's what I'm asking.
25        A.      Okay.  The -- the LICs are specific to
```

1   the inmate, so they are identified with the inmate's

2   name on it.  So we are able to -- to identify it that

3   way, which vials belong to which execution.

4         Q.      And do you know if TDOC would execute

5   anyone using expired lethal injection chemicals?

6              MR. MITCHELL:  Objection, form.  You can

7       answer.

8              THE WITNESS:  They do not.

9   BY MR. KURSMAN:

10        Q.      And how do you know that?

11        A.      Because the commissioner has said so,

12   that we're not going to use expired drugs.

13        Q.      And then do you see in -- in No. 3, it

14   says: "As the LIC reaches its expiration date, it

15   shall be disposed of by hazardous waste pickup?"

16        A.      Yes.

17        Q.      What does that mean?

18        A.      That's what I described earlier, where

19   the labels are removed, any identifying information is

20   removed.  It's placed into a medical waste bag and it's

21   thrown away in the medical waste hazardous waste can.

22        Q.      And can we jump back to the expired drugs

23   for a second?  Why would you department ensure that it

24   doesn't attempt -- attempt to execute anyone with

25   expired drugs?

```
1              MR. MITCHELL:  Objection.  You can
2         answer.
3              THE WITNESS:  You broke up.  How do we
4         ensure that you don't?
5              MR. KURSMAN:  No, why -- how do you
6         ensure that you don't.
7              THE WITNESS:  Why we make sure?  Okay.
8              MR. MITCHELL:  Objection, form.  You can
9         answer.
10             THE WITNESS:  Because expired drugs --
11        you know, I'm not an expert, but if they're
12        expired it calls into question their -- their
13        efficacy, potency, all sorts of things.
14             And we would not execute anybody with a
15        chemical that had been -- that has expired.
16   BY MR. KURSMAN:
17        Q.    Now, let's turn to Page 36.  Do you see
18   at the top, it says "Accountability of LIC?"
19        A.    Yes.
20        Q.    And if you go down to No. 4, the second
21   full sentence, you see it says:
22             "Prior to the LIC being placed in storage,
23              the expiration date and lot number or other
24              identifying marking is recorded to ensure
25              that the LIC is properly disposed of at the
```

1          time of expiration."

2      A.      Yes.

3      Q.      And are you the one who records this

4   information?

5      A.      Both myself and the warden.

6      Q.      Okay.  And did -- does this information

7   have to be accurate?

8      A.      I'm sorry, did you say does this have to

9   be accurate?

10     Q.      Yes.

11     A.      Yes.

12             MR. KURSMAN:  Okay.  Now, what I'm going

13         to do real quickly is share my screen with you.

14         And I'm going to mark this -- this wasn't an

15         exhibit in your file.

16             So I'm going to mark this actually out of

17         order, if that's okay, Rhonda, at Exhibit 48.

18             (Exhibit No. 48 marked.)

19             MR. KURSMAN:  Could you pull up the

20         picture of the -- now it works.

21   BY MR. KURSMAN:

22     Q.      What I see here, is this the -- is this

23   the freezer that I'm looking at?

24     A.      Sorry.  Yes.

25     Q.      And is this the freezer right next to it?

```
 1           A.      I didn't hear the end of your question.
 2           Q.      I apologize.  So this -- this -- this
 3    thing on the right of what's titled at the bottom "Ds'
 4    First Resp. to RFP 001289," is that the
 5    freezer/refrigerator we just talked about?
 6           A.      Yes, on top of that filing cabinet.
 7           Q.      Okay.  This looks like it only has one
 8    door.
 9           A.      Well, you can't see it clearly on the
10    picture because of the grain, but there are two doors
11    you're seeing.  That's why in the center there you see
12    that black bar going up.  That's the purpose of that
13    black bar, is to secure that top door.
14           Q.      Okay.  And where is the seal on this
15    freezer?
16           A.      Where is the freezer door?
17           Q.      No, the seal.
18           A.      You can't, once again, because of the
19    grain.  So the -- the lock, so the horizontal bar, you
20    can kind of see the lock.  So it's -- it's wrapped
21    through the opening with that lock.
22           Q.      Okay.  So there's a seal on both the
23    refrigerator and freezer?
24           A.      There's one seal for that lock, because
25    that lock locks both the refrigerator and the freezer.
```

1        Q.      Okay.  And did you say earlier that the
2   freezer has a thermometer inside of it?
3        A.      Yes.
4                MR. KURSMAN:  Okay.  So we can -- we can
5        pull this down.
6   BY MR. KURSMAN:
7        Q.      Now, let's go to -- back to Page 36 of
8   Exhibit 1, which is the protocol.
9        A.      Okay.
10       Q.      And do you see where it says "Transfer of
11  Location?"
12       A.      Yes.
13       Q.      And do you see next to No. 2, it says:
14               "If the LIC is not used and compromised in
15               any way, the LIC is returned to the armory,
16               reentered on the perpetual inventory
17               ledger, and secured in the refrigerator.
18               The LIC is used only for the execution of
19               the inmate for whom it was ordered."
20               Do you see that?
21       A.      Yes.
22       Q.      Is this your understanding of what
23  happens if the LIC is transferred but not used?
24       A.      Sorry.  Yes.
25       Q.      And what does the term "not used" mean?

```
1          A.      Not used in an execution.
2          Q.      Okay.  What if it's drawn into syringes
3    but not administered?
4                  MR. MITCHELL:  Objection, form.  You can
5          answer.
6                  THE WITNESS:  If it's drawn into the
7          syringes, the syringes are then disposed of.  This
8          is referring to instances where it's still in the
9          vial, hadn't been taken out of the vial.
10   BY MR. KURSMAN:
11         Q.      And is it transferred to the execution
12   chamber at room temperature?
13         A.      It's transferred at -- what was the last?
14         Q.      At room temperature?
15         A.      Yes.  Once it gets moved to the execution
16   chamber, that is room temperature.
17         Q.      And if it's not used, then you place it
18   back into the fridge; is that right?
19         A.      If it's not taken out of the vial, it's
20   brought back and put back in the fridge to be disposed
21   of.
22         Q.      Oh, but it's -- once it's in the fridge
23   for the second time, can it be used again?
24         A.      No.
25         Q.      So what -- what is the purpose of putting
```

1    the LIC in the fridge after it's not used for an
2    execution?

3           A.      It's simply placed back there for it to
4    then be disposed of via medical waste.

5           Q.      And why are -- why does the protocol call
6    for drugs that will never be used to be stored in the
7    fridge but direct chemicals that will be used to be
8    stored in the heavy gauge steel container?

9                   MR. MITCHELL:  Objection, form.  You can
10          answer.

11                  THE WITNESS:  I'm a little confused by
12          your question.  Could you restate that?

13   BY MR. KURSMAN:

14          Q.      Sure.  The protocol calls for LIC that
15   has been transferred but not used to be stored back
16   into the refrigerator, and you testified that those
17   drugs will then be exposed of.

18                  But the L- -- the protocol also directs
19   that when the LIC is received by TDOC it's to be stored
20   in the heavy gauge steel container.

21                  My question is:  Why does the protocol call
22   for drugs that are supposed to be used in executions to
23   be stored in a heavy gauge steel container but drugs that
24   are not going to be used in executions be stored in the
25   refrigerator?

1          A.      I can't explain that discrepancy.

2          Q.      Okay.  You wrote this section of the

3    protocol, as well.  Right?

4          A.      I honestly don't remember if I wrote this

5    portion or not.

6          Q.      Well, who else would have wrote it, if it

7    wasn't you?

8                  MR. MITCHELL:  And I'm going to object,

9          pursuant to the protective order, because that

10         could lead to identifying individuals involved.

11   BY MR. KURSMAN:

12         Q.      Well, how do you decide which sections of

13   this portion of the protocol you would write and which

14   sections that you wouldn't write?

15                 MR. MITCHELL:  And I'm going to object to

16         the form.

17   BY MR. KURSMAN:

18         Q.      But you can still answer.

19         A.      So the -- yes, I just -- I just don't

20   remember.  If there was a portion that I contributed to

21   or wrote, it would have been -- and I don't know that I

22   did, but it would have been with regard to the

23   refrigerator.

24                 The rest of it, I think, would still be

25   consistent with prior protocol -- protocol.

```
1            Q.       Okay.  So that section, your belief is
2    that section just wasn't changed?
3            A.       As far as I know; but, you know, I don't
4    know.
5                     (Exhibit No. 2 marked.)
6    BY MR. KURSMAN:
7            Q.       Okay.  Now, if -- if you could turn to
8    Exhibit 2.
9            A.       Stand by.
10                    (Pause.)
11                    THE WITNESS:  Okay.
12   BY MR. KURSMAN:
13           Q.       Okay.  Do you -- do you have it in front
14   of you, Exhibit 2?
15           A.       Yes.
16           Q.       And do you see at the top it says
17   "Midazolam storage and preparation instructions?"
18                    THE WITNESS:  Yes.
19   BY MR. KURSMAN:
20           Q.       Are you familiar with this document?
21           A.       Yes.
22           Q.       And is this the storage and preparation
23   instructions for midazolam?
24           A.       Yes.
25           Q.       And was -- was this provided by the
```

```
 1   pharmacist?
 2        A.      Yes.
 3        Q.      And do you recall when it was provided by
 4   the pharmacist?
 5        A.      I don't specifically remember.
 6        Q.      If I told you that it was provided in
 7   October of 2017, would that seem reasonable to you?
 8        A.      Sure.
 9        Q.      Okay.  Is this the same pharmacist that
10   still provides the drugs?
11        A.      Yes.
12        Q.      So did -- did you have these instructions
13   before writing the protocol?
14        A.      Yes.
15        Q.      Okay.  And are the drugs that the
16   Department has the same drugs that were provided in
17   2017?
18        A.      The drugs at the time were commercially
19   manufactured -- at that time.
20        Q.      So these instructions that I'm looking
21   at, are these instructions for commercially
22   manufactured drugs or for compounded drugs?
23        A.      These are instructions for compounded.
24   And maybe I misunderstood your question; that at the
25   time -- 2017 -- the drugs that were obtained at that
```

1   time were commercially manufactured.

2       Q.      Could -- could you explain to me why, in

3   October of 2017, you would have gotten pharmacy

4   instructions for how to store compounded drugs if you

5   were using commercially available drugs at that time?

6       A.      Well, it was while we had commercially

7   manufactured drugs at the time, we also understood that

8   we may and probably would be using compounded drugs

9   that we weren't able to get commercially manufactured.

10  And so we wanted to have the instructions on hand for

11  those.

12      Q.      And why would you believe you would no

13  longer be able to obtain manufactured midazolam?

14      A.      Either the supply had run out, or the

15  pharmacist simply wouldn't be able to get it, or -- I

16  can't remember the reasons.

17      Q.      And was there any talk about going to a

18  different pharmacist?

19      A.      No.

20      Q.      Have you -- have you reached out to any

21  other pharmacists since 2017?

22      A.      Yes.

23      Q.      How many?

24      A.      I don't specifically remember how many.

25      Q.      Could you approximate how many?

1           A.      I would say maybe somewhere around like
2    five to ten, maybe.
3           Q.      And when was that?
4           A.      Um, it would have been in the -- once
5    again, I'm approximating.  But maybe winter of '17,
6    early '18.
7           Q.      And was that the last time you reached
8    out to any pharmacists, aside from the pharmacist who
9    wrote these preparation instructions?
10          A.      I think so.  I'm not -- I don't think I
11   directly reached out to any other ones, other than
12   them.
13          Q.      Okay.  And when did the Department last
14   procure the lethal injection chemicals from this
15   pharmacy?
16          A.      Now, when you say that, like the last
17   time we ordered a compounded preparation?  Is that what
18   you're asking?
19          Q.      Yes.
20          A.      Okay.  Off the top of my head, I believe
21   it was February of 2020.
22          Q.      And why did you order a compounded
23   preparation in February of 2020?
24          A.      I mean, I think that was the last
25   execution that was set, and so we had ordered the

```
 1    compounded preparation.
 2         Q.     And did that execution go forward?
 3         A.     I'm sorry, what was that?
 4         Q.     Did that execution go forward?
 5         A.     No.
 6         Q.     Okay.  What did you do with those lethal
 7    injection chemicals that you ordered for that
 8    execution?
 9         A.     They are still in the
10    freezer-slash-fridge.
11         Q.     Are they in the freezer or are they in
12    the fridge?
13         A.     I don't remember.
14         Q.     Okay.  And what about for the
15    manufactured chemicals that you have for that
16    execution?  Is -- is that -- does the Department still
17    have that chemical, as well?
18         A.     The vecuronium, yes.
19         Q.     Okay.  Do you know if any of those drugs
20    are currently expired?
21         A.     Some of the vecuronium is.
22         Q.     Okay.  And what about the midazolam?
23         A.     Yes.  And since midazolam is inmate
24    specific, it can only be -- it could have only been
25    used in the execution that it was ordered for.
```

```
1         Q.      And what about the potassium chloride?
2         A.      Same as the midazolam.
3         Q.      Okay.  So is what you're telling me the
4    vecuronium bromide is not inmate specific?
5         A.      No.
6         Q.      So you can use the vecuronium bromide
7    that you currently have on any inmate; is that right?
8         A.      For an execution, yes.
9         Q.      Right, sure.
10               The midazolam that is expired but either
11   in the fridge or the freezer, why hasn't that been
12   discarded yet?
13        A.      It hasn't been discarded because it was
14   partially about timing with the medical waste disposal
15   on the August date.  The medical waste disposal wasn't
16   done on that date.  And also COVID restrictions kept us
17   from being at the facility to do the things.  It will
18   be disposed of at the next inventory, which is next
19   week.
20        Q.      And is that also true for the potassium
21   chloride?
22        A.      I'm sorry, could you repeat?
23        Q.      Is that also true for the potassium
24   chloride?
25        A.      Yes.
```

1       Q.     Okay.  And when did you receive the

2  midazolam and the potassium chloride for that February

3  execution?

4       A.     It would have been approximately -- and

5  without looking at specific documents -- approximately

6  two weeks or a week or two prior to the execution date.

7       Q.     Okay.  So either January or February of

8  2020?

9       A.     Yes.

10      Q.     When were the COVID restrictions lifted

11  for TDOC?

12            MR. MITCHELL:  Objection to the form.

13         You can answer.

14            THE WITNESS:  Some are still in place.

15         We're still instructed to be, I guess, more

16         careful about the different facilities.  But for

17         the most part, the restrictions were lifted in

18         March of this year.

19  BY MR. KURSMAN:

20      Q.     And how often does medical waste come to

21  pick up disposed waste, disposed medical waste?

22      A.     Did you say how or how often?

23      Q.     How often?

24      A.     That, I don't know.

25      Q.     Okay.  Do you know when these drugs would

```
 1   have expired?
 2        A.      Specifically, are you referring to the
 3   midazolam and the potassium chloride?
 4        Q.      Yes.
 5        A.      Approximately they would have expired in
 6   late February.  That's just an approximation, without
 7   looking at it.
 8        Q.      Okay.  So they would have expired almost
 9   17 months ago; is that right?
10        A.      Yes.
11        Q.      But they are still not -- they are still
12   in your refrigerator or freezer?
13        A.      Yes.
14        Q.      Okay.  Did you help to write these
15   pharmacy instructions?
16        A.      No, it was written by the pharmacist.
17                (Exhibit No. 3 marked.)
18                MR. KURSMAN:  Can we -- can you pull
19        up -- can you look at Exhibit 3?
20                THE WITNESS:  Stand by.
21                (Pause.)
22                THE WITNESS:  All right.
23   BY MR. KURSMAN:
24        Q.      And this is email between you and your
25   source?
```

```
1          A.      Yes.
2          Q.      Okay.  Now, is this the same pharmacist
3     that provided you with the pharmacy instructions?
4          A.      Yes.
5          Q.      Okay.  And you see that your source says
6     "All drugs required to be stored in a secure location
7     at room temperature between 15 and 30 degrees Celsius?"
8          A.      Yes.
9          Q.      What did the source mean by that?
10              MR. MITCHELL:  Objection, form.  You can
11         answer.
12              THE WITNESS:  I'm sorry, you broke up
13         there at the end.
14    BY MR. KURSMAN:
15         Q.      I'm sorry.  What did the source mean by
16    that?
17              MR. MITCHELL:  And objection, form.  You
18         can answer.
19              THE WITNESS:  They were referring to
20         commercially manufactured preparations.
21    BY MR. KURSMAN:
22         Q.      Okay.  And do you see they also ask for
23    "a copy of the current DEA and pharmacy/state license
24    for the facility where we will be shipping the
25    medication to."
```

1              Do you see that?

2     A.     Yes.

3     Q.     Do you know why a DEA number would be

4  needed?

5     A.     Sorry, you broke up there.

6     Q.     Do you know why a DEA number would be

7  needed?

8     A.     My under- -- my understanding is that a

9  DE- -- a DEA number to show what types of chemicals you

10 can receive at a location.  So they needed it for the

11 drugs.

12    Q.     Did you provide a DEA number?

13    A.     Yes.

14    Q.     And did you provide the pharmacy license?

15    A.     Yes.

16    Q.     And did you do that via email?

17    A.     Yes.

18           MR. KURSMAN:  Okay.  We will be

19       requesting that in discovery, as well.

20 BY MR. KURSMAN:

21    Q.     Now, can we -- can we go back to Exhibit

22 2?  Just let me know when you get there.

23    A.     Okay.

24    Q.     Do you see at the top:  "USP Chapter 797

25 sets the following BUDs on high-risk compounded

```
 1   preparations."  And then it says:
 2                   "1, 24 hours at room temperature; 2, three
 3                   days at cold temperature" -- in
 4                   parentheses, "refrigerated"; and "3, 45
 5                   days frozen.  Once thawed at room
 6                   temperature, the preparation must be used
 7                   within 24 hours and cannot be refrozen to
 8                   extend that time.  If thawed in
 9                   refrigerator, the preparation must be used
10                   within three days."
11                   Do you see that?
12        A.         Yes.
13        Q.         What does that mean to you?
14        A.         Exactly what it says for compounded
15   preparations.  That's how it's stored at these
16   temperatures.  And depending on what temperature it's
17   at is how good it's -- how long it's good for.
18        Q.         And how do you know what temperature to
19   keep it at when it is refrigerated?
20        A.         There's not a specific temperature
21   listed.
22        Q.         So what temperature?
23        A.         On the logs, I know they log the
24   refrigerated temperature pertaining to the
25   refrigerator.
```

```
 1          Q.      But my question is:   What temperature do
 2   you try to use when you put the injection chemicals
 3   into the refrigerator?
 4          A.      I believe it's 40 degrees -- 40-something
 5   degrees.
 6          Q.      Do you look for that temperature in your
 7   refrigerator when you put the lethal injection
 8   chemicals in that refrigerator?
 9          A.      There's a thermometer in the
10   refrigerator, yes.
11          Q.      But do you look to make sure that -- that
12   the degrees that you want the refrigerator to be at is
13   actually achieved by the refrigerator when you put the
14   lethal injection chemicals in the refrigerator?
15          A.      Yes, and it's logged.
16          Q.      And then it also says:   "3, 45 days
17   frozen."   At what temperature do you believe it needs
18   to be kept at to be frozen?
19          A.      Lower than 32 degrees.
20          Q.      Now, aside from USP Chapter 77, did you
21   review any other USP chapters?
22          A.      Not that I remember.
23          Q.      Okay.   Did you -- did you review USP
24   Chapter 77?
25          A.      Yes.   Chapter 797?
```

1          Q.        Yeah, I apologize.

2          A.        Yes, I did review that with regard to the

3     frozen, 45 days, 24 hours.

4          Q.        Okay.  Now, did you look anywhere in USP

5     to determine what -- what temperature they require for

6     a LIC to be considered frozen?

7          A.        If it was in 797, I -- I did look at it,

8     but I don't remember off the top of my head.

9          Q.        Okay.  And the same question for the

10    refrigerator.  Did you --

11         A.        Same answer.

12         Q.        Okay.  And then do you see under "Items

13    you will need," it says "gloves, alcohol swabs, bags of

14    saline, and syringes."  Do you see that?

15         A.        Yes.

16         Q.        Who procures these items for TDOC?

17         A.        Riverbend.

18         Q.        So you don't receive these items from the

19    pharmacist?

20         A.        No.

21         Q.        Now, do you see where it says

22    "Preparation" in the instructions?

23         A.        Yes.

24         Q.        Do you see No. 1, it says:  "Remove 4

25    vials of midazolam from the freezer and place in

1  refrigerator 24 hours prior to use as to allow to

2  thaw?"

3        A.      Yes.

4        Q.      What does that mean?

5        A.      It means that the vials of midazolam are

6  removed from the freezer and put into the refrigerator

7  24 hours before the execution.

8        Q.      Is this consistent with the protocol?

9        A.      This is what I pulled up.  I don't

10  remember the protocol specifically speaking to this.

11        Q.      But do you recall that the protocol

12  instructs that the lethal injection chemicals are

13  required to be placed in a heavy gauge steel container?

14        A.      Yes.

15        Q.      So wouldn't that be inconsistent with the

16  pharmacist's instructions?

17        A.      Well, it seems inconsistent in the fact

18  that it's not referencing the steel cage.  It is

19  consistent with following the instructions of the

20  pharmacist and the pharmacopoeia guidelines.

21        Q.      Right.  But my question to you is:

22  Aren't the pharmacy preparation instructions

23  inconsistent with the protocol?

24              MR. MITCHELL:  Objection, form.  You can

25        answer.

```
 1              THE WITNESS:  I would say no, because
 2         their instructions are by their standards and by
 3         pharmacopoeia standards.  So how we store it is
 4         consistent with their instructions and those
 5         standards.  It's not consistent because it's not
 6         steel gauge.
 7  BY MR. KURSMAN:
 8         Q.     Right.  So let me try to -- maybe my
 9  question is confusing.  My question is:  Are the
10  preparation instructions inconsistent with the
11  protocol?
12              MR. MITCHELL:  And again, form objection.
13         You can answer.
14              THE WITNESS:  I don't believe so.
15  BY MR. KURSMAN:
16         Q.     So you believe that instructions that
17  instruct you to place the preparations in the freezer
18  is consistent with the protocol that says "Place the
19  preparations in a steel gauge container?"
20         A.     I'll repeat my answer.  It's not
21  consistent with being in a steel container.  It is
22  consistent with the State saying they will follow their
23  instructions and the standards.
24         Q.     Let's -- let's go back to Exhibit 1.  And
25  when you get there, turn to Page 37.
```

1                    (Pause.)

2                    THE WITNESS:  I'm there.

3     BY MR. KURSMAN:

4          Q.      And do you see where it says "Storage of

5     LIC?"

6          A.      Yes.

7          Q.      Okay.  Show me where it says in -- in

8     that section, "Storage of LIC," where it says you will

9     follow the pharmacy's instructions.

10         A.      Stand by.  I lost it for a second.  Let

11    me reopen.

12                   (Pause.)

13                   THE WITNESS: Okay.  Sorry.  It does not

14         say it there.  That's the section that deals with

15         commercially manufactured.

16                   It does say it on the page dealing with

17         compounded preparations.

18    BY MR. KURSMAN:

19         Q.      Okay.  So I -- I understand your point.

20    So what you're -- what you are saying is the -- the

21    protocol itself is internally inconsistent?

22                   MR. MITCHELL:  Objection, form.  You can

23         answer.

24                   THE WITNESS:  Yes.  So once again, I'll

25         repeat my answer.  There is a discrepancy between

```
1            stating "contained in a steel container"; but at
2            the same page it says "stored at the directions of
3            the pharmacy," meaning fridge and freezer.
4       BY MR. KURSMAN:
5            Q.       And when there is something that's
6       internally inconsistent in the protocol, who decides
7       which direction to follow?
8            A.       As previously stated, that would be a
9       decision made by the commissioner, in consultation with
10      general counsel.
11           Q.       Okay.  Now, let's -- let's go back to the
12      exhibit we were just on.  I believe that was Exhibit 2.
13               MR. MITCHELL:  And, Alex, just real
14           quick, are you planning on taking a lunch break at
15           any point or were you just going to work straight
16           through?
17               MR. KURSMAN:  Whatever you all prefer.  I
18           assume you'll be hungry at some point, so I'm
19           happy to take one.
20               MR. MITCHELL:  At some point now, or when
21           we're switching exhibits, or if you wanted to wait
22           like 20 minutes or so.
23               MR. KURSMAN:  So I don't actually have
24           that many questions left on -- well, I don't have
25           that many questions left on Exhibit 2, so how
```

```
 1         about if we go until I'm done on Exhibit 2?
 2                 MR. MITCHELL:  Sounds good.
 3                 MR. KURSMAN:   Thanks.
 4   BY MR. KURSMAN:
 5         Q.      All right.  Are you back at Exhibit 2?
 6         A.      Yes.
 7         Q.      Okay.  Do you see next in No. 3, it says:
 8   "On the day of use, retrieve the necessary vials of
 9   midazolam from the refrigerator and remove the blue
10   seal from the top of each vial of midazolam?"
11         A.      Yes.
12         Q.      Who is removing the blue seal?
13         A.      Members of the execution team.
14         Q.      Are you involved at this point?
15         A.      No.
16         Q.      Is -- how does the Department ensure that
17   the lethal injection chemicals are sterile at the time
18   of use?
19                 MR. MITCHELL:  Objection to form and
20         personal knowledge.
21                 THE WITNESS:  When we have received the
22         results from the third-party testing.  Also, the
23         members of the execution team follow the
24         instructions of the pharmacy in preparation of the
25         syringes.
```

1    BY MR. KURSMAN:
2         Q.    So the -- when do the sterility tests
3    occur from the pharmacy?
4         A.    When the LIC is compounded.
5         Q.    And how long after the LIC is compounded
6    does TDOC obtain it?
7         A.    Generally, about two weeks.
8         Q.    And once it's obtained by TDOC, is that
9    when the 45-day clock begins?
10        A.    The 45-day clock begins when it's
11   compounded and frozen.
12        Q.    Okay.  Is -- does the sterility test
13   happen while the LIC is frozen or before it's frozen?
14        A.    And this is more of a question for the
15   pharmacist, but my understanding is that the LIC is
16   compounded.  A portion of that compound is sent for
17   testing.  And then the remainder, which is in vials, is
18   frozen at that time.
19             MR. KURSMAN:  Okay.  I think maybe we can
20        break now for lunch.  Maybe we can come back in a
21        half hour or so?  Is that fine?
22             MR. MITCHELL:  Okay.  Should we say
23        1:30/2:30?
24             MR. KURSMAN:  That sounds fine.  Thank
25        you.

```
1              MR. MITCHELL:  Okay.
2              THE VIDEOGRAPHER:  We're going off the
3         record at 1:52 p.m.
4              (Recess at 1:52 p.m. to 2:31 p.m.)
5              THE VIDEOGRAPHER:  We're back on the
6         record at 2:31 p.m.
7  BY MR. KURSMAN:
8         Q.   So Drug Procurer, we just went on break.
9  During the break, did you discuss anything with your
10 attorneys?
11        A.   No.
12        Q.   And are you still in a room by yourself?
13        A.   I'm sorry, I can't hear you.
14        Q.   I apologize.  Are you still in a room by
15 yourself?
16        A.   Yes, I am.
17             MR. KURSMAN:  Okay.  And before I get
18        into questions, I just want to make a request to
19        Mr. Mitchell on the record, which is there have
20        been several speaking objections during this
21        deposition.  If you could just try to refrain from
22        doing that and object to form, I'd greatly
23        appreciate that.
24             MR. MITCHELL:  Okay.  Sure thing.
25             MR. KURSMAN:  Thanks.
```

```
 1    BY MR. KURSMAN:
 2         Q.     Could we go back to Exhibit 48, which is
 3    an exhibit that you don't have, Drug Procurer, but that
 4    we put up on the screen.  And I'll have
 5    Ms. Nelson-Major share that again.
 6                Do you see Exhibit 48?
 7         A.     Yes.
 8         Q.     Okay.  And do you see the refrigerator
 9    and freezer in the picture?
10         A.     Yes.
11         Q.     Okay.  So my understanding is there's
12    supposed to be a seal on the lock; is that right?
13         A.     Yes.
14         Q.     Why is there no seal on this lock?
15         A.     Well, it's really hard to see, honestly.
16    I can't tell, one way or the other, if there's a seal
17    on there.
18         Q.     Let's zoom a bit.  Can you see now?
19         A.     Yes, it appears that there is a seal on
20    there when you look.  So you see the lock there in
21    somewhat of a lighter color?
22         Q.     Right.
23         A.     So right above it, it looks -- it almost
24    looks like kind of a string almost coming off of it,
25    going toward the right and up a little bit.  That is --
```

```
 1   that's the plastic seal.
 2                MR. KURSMAN:   Okay.   And
 3        Ms. Nelson-Major, if you could go up a little bit
 4        and scroll up a little to the freezer.
 5   BY MR. KURSMAN:
 6        Q.      When I go back a little, there's a
 7   thermometer in the freezer?
 8        A.      Correct.
 9        Q.      So while the freezer and refrigerator are
10   sealed, is there any way for you or anyone from TDOC to
11   determine what the temperature in the freezer is?
12        A.      Not with it closed, no.
13        Q.      Okay.  So you can only determine the
14   temperature once you open the freezer?
15        A.      Correct.
16        Q.      Okay.  So if the freezer fluctuates in
17   temperature, you would have no idea unless the freezer
18   was open, correct?
19        A.      Correct.
20        Q.      Okay.  Is there a reason that -- that you
21   didn't purchase a freezer with an external temperature?
22        A.      I don't know.  I wasn't involved in
23   purchasing the freezer.
24        Q.      Oh, you weren't?  Do you know who was,
25   without -- without giving me any identifying
```

```
 1    information?
 2         A.      I do not.
 3         Q.      Okay.  Were there any instructions for
 4    which freezer or refrigerator to buy?
 5         A.      I don't know.  I wasn't involved in it.
 6         Q.      I apologize.  That's a -- that's a bad
 7    question.
 8                 Did -- did the pharmacist give you any
 9    instructions on which freezer or refrigerator to buy?
10         A.      No.
11                 (Exhibit No. 4 marked.)
12    BY MR. KURSMAN:
13         Q.      Okay.  Could we go to Exhibit 4, which
14    you have in your set of exhibits.
15                 And just --
16         A.      I've got it.
17         Q.      Okay.  And this at the top, do you see it
18    says "Potassium Chloride preparation instructions?"
19         A.      Yes.
20         Q.      And was this also provided by the
21    pharmacist?
22         A.      Yes.
23         Q.      Okay.  And the -- in No. 1, it says:
24    "Remove 2 vials of potassium chloride from the freezer
25    and place in refrigerator 24 hours prior to use as to
```

```
 1    allow it to thaw."
 2         A.      Yes.
 3         Q.      And like my questions before, did you see
 4    -- do you see how this is inconsistent with the storage
 5    of the lethal injection chemicals in the protocol?
 6              MR. MITCHELL:  Objection, form.  You can
 7         answer.
 8              THE WITNESS:  Well, it's the same answer
 9         as before in speaking about midazolam.  It's
10         inconsistent with regard the sealed container,
11         consistent with following the instructions of the
12         pharmacy.
13    BY MR. KURSMAN:
14         Q.      And who determined, as it relates to
15    potassium chloride, whether to follow the instructions
16    from the pharmacy or what the protocol directed as to
17    storing the lethal injection chemicals in the -- in the
18    sealed container?
19         A.      As stated before, that would have been
20    the decision of the commissioner, in consultation with
21    general counsel.
22         Q.      Okay.  And how do they determine when to
23    deviate from the protocol?
24              MR. MITCHELL:  Objection, form.  And
25         also -- and again, I'm not trying to -- per your
```

```
 1          comment, also lack of personal knowledge, which I
 2          don't believe is a form objection.
 3                  THE WITNESS:  And I cannot tell you what
 4          their thinking was.
 5                  MR. KURSMAN:  Mr. Mitchell, I think any
 6          objection that isn't a privilege objection or
 7          objection based on -- based on the secrecy
 8          statute, or the secrecy -- the --
 9                  MR. MITCHELL:  Protective order?
10                  MR. KURSMAN:  Exactly, the protective
11          order, would be an objection to form.
12                  MR. MITCHELL:  Okay.  Because I thought,
13          for instance, like personal knowledge, expert
14          opinion, lack of foundation are not formal
15          objections.  Do we want to encompass those within
16          the form objections for purposes of this
17          deposition?
18                  MR. KURSMAN:  Yes.
19                  MR. MITCHELL:  Okay.  Will do.
20   BY MR. KURSMAN:
21          Q.      Could we go to No. -- No. 14 on Exhibit
22   4?  Do you see it says:
23                  "Inspect the syringe now filled with
24                  potassium chloride, inspect to ensure you
25                  see no particles or discoloring (should be
```

```
 1                    clear liquid" -- "liquid without debris?)"
 2                    Do you see that?
 3          A.        Yes.
 4          Q.        Who is responsible for doing that
 5   inspection?
 6          A.        A member of the execution team.
 7          Q.        So that's not you?
 8          A.        Correct.
 9          Q.        Okay.  Do you know what happens if
10   particles or discoloring are present?
11          A.        Then it would not be able to be used.
12          Q.        Okay.  And do members of the execution
13   team have expertise to be able to inspect this syringe?
14                    MR. MITCHELL:  Objection.
15                    THE WITNESS:  They have these
16          instructions and were instructed on how to inspect
17          it.  That's, as far as I know, the extent of their
18          training.
19   BY MR. KURSMAN:
20          Q.        Do you know why the instructions don't
21   say what to do if there is discoloration?
22          A.        No.
23          Q.        Do you know why the instructions don't
24   say what to do if there are particles?
25          A.        No.
```

```
 1        Q.      So how would the execution team know what
 2   to do if there were discoloration or particles in the
 3   syringe?
 4                MR. MITCHELL:  Objection, form.
 5                THE WITNESS:  As I understand it, they
 6           were told that if there are particles in it, or
 7           discoloration, it can't be used.
 8   BY MR. KURSMAN:
 9        Q.      Okay.  And who would have told them that,
10   without revealing any identities?
11        A.      The pharmacist.
12        Q.      So let -- let me understand this right.
13   You speak directly to the pharmacist, right?
14        A.      Yes.
15        Q.      Do members of the execution team also
16   speak directly to the pharmacist?
17        A.      Generally, no; but on this occasion or
18   these instructions, they did.
19        Q.      And does the -- does the pharmacist
20   attend any execution trainings?
21        A.      No.
22        Q.      Okay.  Were the conversations between
23   members of the execution team and the pharmacy, what --
24   were they through email?
25        A.      No.
```

```
1        Q.      Were they through the phone?
2        A.      Yes.
3        Q.      Were you in that conversation?
4        A.      No.
5        Q.      Who provided the pharmacist's number to
6    the execution team?
7        A.      I did.
8        Q.      Okay.  And why did you do that?
9        A.      For the purposes of them speaking to the
10   pharmacist about these instructions.
11       Q.      And do you know why the pharmacist didn't
12   give more detailed instructions after speaking to the
13   execution team?
14               MR. MITCHELL:  Objection, form.
15               THE WITNESS:  No.
16               (Exhibit No. 5 marked.)
17   BY MR. KURSMAN:
18       Q.      And are there any instructions that the
19   pharmacist told them orally that are not contained in
20   the instructions in either Exhibit 4 or Exhibit 5?
21               MR. MITCHELL:  Same objection.
22               THE WITNESS:  I was not part of the
23          conversation.  The part that I know was what we
24          just discussed; that if there was discoloration or
25          particles, then the substance can't be used.
```

```
 1  BY MR. KURSMAN:
 2      Q.      And which members of the execution team
 3  had this conversation with the pharmacy, without
 4  disclosing any identities?
 5      A.      The executioner.
 6      Q.      Okay.  Could you pull up Exhibit 6 now.
 7  And let me know when you're there.
 8      A.      I'm there.
 9      Q.      Okay.  Do you see this is a -- what looks
10  like a type of log dated August 13, 2020?
11              MR. MITCHELL:  I'm sorry, which number?
12      Did you say Exhibit 6?
13              MR. KURSMAN:  I apologize.  Exhibit 5.
14              THE WITNESS:  Okay.
15  BY MR. KURSMAN:
16      Q.      Do you see this is dated August 13 of
17  2020?
18      A.      Yes.
19      Q.      Do you know what this was?
20      A.      I'm sorry, could you repeat?
21      Q.      Yeah, I'm sorry.  Do you know what this
22  log is?
23              And you're muted, if you're talking.
24      A.      It's a log of the midazolam compounds.
25      Q.      Okay.  And who made this log?
```

```
 1          A.       The pharmacist.
 2          Q.       The pharmacist?  And this is after the
 3    injection, the chemicals are compounded; is that right?
 4          A.       I'm sorry, they're compounded when?
 5          Q.       This -- this log is made after the
 6    chemicals are compounded, right?
 7          A.       Yes, it was made after.
 8          Q.       Okay.  And is this the entirety of the
 9    lethal injection compounds that you received?
10          A.       Yes.
11          Q.       Okay.  Now, let's go to -- well, let me
12    ask you this:  Are there any other logs that look like
13    this?
14          A.       Not that I'm aware of.
15          Q.       Okay.  Now, do you see on April 24th,
16    2019, 55 milliliters of midazolam was made?
17          A.       Yes.
18          Q.       And do you see that it says it expires
19    May 1st, 2019?
20          A.       Yes.
21          Q.       And then do you see that the next item on
22    this page was 7/15/2019?  Do you see that?
23          A.       Yes.
24          Q.       And it says discard after 7/22?
25          A.       Yes.
```

```
 1          Q.       So there was no nonexpired midazolam
 2   between May 1st, 2019, and July 16th, 2019.  Right?
 3                   MR. MITCHELL:  Objection, form.
 4                   THE WITNESS:  Let me make sure.  Okay.
 5          The question is:  Did we have any midazolam that
 6          was not expired between -- according to this log,
 7          between May 1st and July 15th?  Is that your
 8          question?
 9   BY MR. KURSMAN:
10          Q.       That's my question.
11          A.       Based on this log, that would be correct.
12          Q.       Okay.  Were there any other logs that
13   were made by the pharmacy?
14          A.       Not that I'm aware of.
15          Q.       Okay.  Were there any other logs made by
16   the pharmacist that TDOC has?
17                   MR. MITCHELL:  Objection, form.
18                   THE WITNESS:  Not that I'm aware of.
19   BY MR. KURSMAN:
20          Q.       Okay.  Are you aware that Donnie Johnson
21   was executed by the State of Tennessee on May 16th,
22   2019?
23          A.       I'm sorry, you broke up.
24          Q.       Are you aware that Donnie Johnson was
25   executed by the State of Tennessee on May 16th, 2019?
```

```
 1           A.      I don't have the date in front of me; but
 2    if that's the date you have, fine.
 3           Q.      Do you know what midazolam was used to
 4    execute Donnie Johnson on May 16th, 2019?
 5           A.      The midazolam reference that was made on
 6    4/24/2019.
 7           Q.      Okay.  Do you know why the -- the
 8    pharmacist would have indicated to discard that
 9    midazolam after May 1, 2019?
10               MR. MITCHELL:  Objection, form.
11               THE WITNESS:  I do not, considering that
12          is before the 45-day BUD date.
13               MR. KURSMAN:  Okay.  Can we go back to
14          Exhibit 1, which would be the protocol.
15    BY MR. KURSMAN:
16           Q.      And before we get there, let me ask you
17    this:  When you receive logs from the pharmacist, do
18    you follow the BUD date or do you follow the
19    pharmacist's discard after date?
20           A.      I'm sorry, I didn't have my mouse clicked
21    over.  I follow the USP BUD date.
22           Q.      Even if the pharmacist says otherwise
23    about the drugs that that pharmacist compounded?
24               You're on mute, if you're answering.
25           A.      I'm sorry, you broke up.
```

```
1        Q.        I said even when the pharmacist says
2     otherwise about the pharmacist's own drugs that he or
3     she compounded?
4        A.        Well, on this log, which doesn't expire
5     until August of 2020.  But whenever it was received,
6     the pharmacist would confirm that it was a 45-day date.
7     So I don't -- and I'm not the pharmacist.  I can't tell
8     you why that date's on that log.
9        Q.        Okay.  Let's -- let's look at Exhibit 1.
10    Let's go back to Exhibit 1, which would be the
11    protocol, and Page 36.
12       A.        Okay.
13       Q.        Are you there?
14       A.        Yes.
15       Q.        Do you see where it says "Accountability
16    of OIC?"
17       A.        Yes.
18       Q.        Do you see No. 4?
19       A.        Yes.
20       Q.        The log that is being talked about in No.
21    4, that's not the -- that's not the log we just
22    discussed in Exhibit 5, right?
23       A.        Right.
24       Q.        Okay.  Now, let's go to -- let's go to
25    Page 37 on the protocol, which would just be the next
```

```
 1   page.
 2        A.      Okay.
 3        Q.      And do you see the heading "Procurement?"
 4        A.      Yes.
 5        Q.      Do you see it says:
 6                "The commissioner or his designee ensures
 7                there are enough lethal injection chemicals
 8                kept in the inventory at RMSI to carry out
 9                three executions."
10                Do you see that?
11        A.      Yes.
12        Q.      And this -- this section is for
13   commercially manufactured drugs, correct?
14        A.      Yes.
15        Q.      Why does the protocol instruct that there
16   are enough manufactured lethal injection chemicals to
17   carry out three executions?
18                MR. MITCHELL:  Objection, form.  You can
19          answer.
20                THE WITNESS:  So that there is a ready
21          supply on hand to be able to carry out more than
22          one execution at a time; for instance, if they
23          were having executions that were scheduled closer
24          together.
25   BY MR. KURSMAN:
```

1    Q.    But if -- if we turn to Page 35 of

2  Exhibit 1, you see this is for compounded preparations?

3    A.    Yes.

4    Q.    Why is it silent as to how many drugs

5  should be on hand?

6            MR. MITCHELL:    Form objection.

7            THE WITNESS:    The preparations can only

8        be made for the specific inmate, so we wouldn't be

9        able to -- especially with the way they have been

10       scheduled, we wouldn't be able to have more than

11       one execution's worth of compounded drugs on hand

12       at a time.

13  BY MR. KURSMAN:

14       Q.    Can you explain to me why compounded

15  drugs can only be ordered for the specific inmate but

16  manufactured drugs can be ordered in bulk?

17           MR. MITCHELL:    Form objection.

18           THE WITNESS:    That's the stated

19       regulations as was explained to me by the doctor

20       and the pharmacist, so it's more so a question for

21       them than me.

22  BY MR. KURSMAN:

23       Q.    And the answer, though -- are you there?

24           And how -- how does TDOC know which drugs

25  are ordered for which inmate?

1       A.      Could you rephrase your question?  I'm a

2  little confused about what you're asking.

3       Q.      How does TDOC know which drugs are

4  ordered for which inmate?

5       A.      The -- of course, we're aware of our

6  supply of, for instance, vecuronium bromide.  So if I

7  know that, for each execution we would need to order

8  midazolam and potassium chloride.

9       Q.      Right, that's kind of confusing.  So what

10  I mean is, let's say you order midazolam for one inmate

11  and then, a week later, midazolam for another inmate.

12  How do you know which midazolam is supposed to be for

13  which inmate?

14       A.      As explained earlier, when we get those

15  vials they are identified by the inmate's name.  So

16  we're able to keep them segregated by the inmate's

17  name.

18       Q.      Oh.  So do you place a sticker on the

19  vial with the inmate's name or it already has their

20  name on the vial?  Is that what you're saying?

21       A.      It comes with it.

22       Q.      Okay.  Could we turn to Page 37 of

23  Exhibit 1.

24       A.      Okay.

25       Q.      Do you see where it says when the

```
 1   chemicals are picked up from DSNF or RMSI warehouse, in
 2   quotations, a member of the execution team checks the
 3   supply of the chemicals, the concentrate, and
 4   expiration dates.
 5            It's the second-to-last line after
 6   "Procurement," in that first section.  Let me know when
 7   you see it.
 8        A.      Yes, I see it.
 9        Q.      Do you know if that member -- first, are
10   you that person?
11        A.      Yes.  If it's a commercially manufactured
12   that's ordered, I -- I receive it and take it to where
13   it goes.
14        Q.      And are you the person that checks the
15   supply of the chemicals, the concentration, and the
16   expiration date?
17        A.      Yes.  The warden and I both do.
18        Q.      Okay.  Now, the protocol, though, does
19   not define you as a member of the execution team.
20   Right?
21        A.      The title of Drug Procurer is not
22   included in the definition.
23        Q.      Okay.  But even though you're not a
24   member of the execution team according to the protocol,
25   you're the person who does this for commercially
```

1  manufactured drugs?

2      A.      Yes.

3      Q.      Okay.  So in this case, it would be for

4  vecuronium bromide?

5      A.      Yes.

6      Q.      Okay.  Do you do it also for potassium

7  chloride and midazolam?

8      A.      Yes.

9      Q.      And how do you check the concentration?

10     A.      On the commercially manufactured it's on

11 the label of the box and the vials, what the

12 concentration is.

13             On the compounded LICs, the concentration

14 is also on the vial.

15     Q.      And why does the protocol require the

16 concentration to be checked?

17             MR. MITCHELL:  Objection, form.

18             THE WITNESS:  The protocol requires --

19     requires a certain concentration of LIC to be

20     used, and so it's to confirm that the

21     concentration that's ordered and received matches

22     what was on the labels.

23 BY MR. KURSMAN:

24     Q.      And you think this is an important part

25 of the protocol?

```
1          A.      Yes.
2          Q.      Okay.  And what does it help ensure?
3          A.      That we're using the right concentration
4    of manufactured chemicals, as is required by the
5    protocol.
6          Q.      Okay.  So can we go back to Page 35 of
7    Exhibit 1.  Now, this is for compounded preparations.
8    Are you there?
9          A.      Yes.
10         Q.      You see the section regarding compounded
11   preparations?  The protocol does not require the
12   concentrations of these chemicals to be checked.
13         A.      Give me one minute.  I'll read it.
14         Q.      Take your time.
15                 (Pause.)
16                 MR. KURSMAN:  You're on mute, so whenever
17         you're ready you'll have to unmute.
18                 THE WITNESS:  Okay.  It's not as clear
19         language, but under "Accountability" in No. 4 it
20         does reference documentation and expiration date,
21         lot number, and other identifying marking is
22         recorded.
23   BY MR. KURSMAN:
24         Q.      Okay.  How would the -- how would the
25   concentration fall into lot number for identifying
```

1 marking?

2          A.          Because it's written on the label on the

3 vial.

4          Q.          Aren't all the concentrations of

5 midazolam that you receive the same?

6          A.          Yes.

7          Q.          Okay.  So how -- so the concentration is

8 not the expiration date, right?

9          A.          Correct.

10          Q.          And it's not the lot number, right?

11          A.          Correct.

12          Q.          And it's not the marking, right?

13          A.          It would be identifying the potency of

14 the chemical -- the concentration, I mean.

15          Q.          Okay.  And are you the person who does

16 this, as well?

17          A.          Myself and the warden, yes.

18          Q.          And do you or the warden have any medical

19 or pharmacological training?

20                    MR. MITCHELL:  Objection, as far as the

21          Drug Procurer is concerned, pursuant to the

22          protective order.  But if the Drug Procurer knows

23          with respect to the warden, he can answer that

24          portion of the question.

25                    THE WITNESS:  I have no knowledge of the

```
1              warden's training.
2    BY MR. KURSMAN:
3         Q.      Okay.  Let's stay on Exhibit 1 and go to
4    Page 38.  And do you see where it says after "Transfer
5    of Location," No. 2:
6                     "In the event the LICs are not used and not
7                     compromised in any way, the LICs are
8                     returned to the armory, reentered on the
9                     perpetual inventory log, and secured in the
10                    appropriate container."
11        A.      Yes.
12        Q.      And this is for commercially manufactured
13   drugs, right?
14        A.      Yes.
15        Q.      Why would the protocol instruct that the
16   commercially manufactured drugs be restored in a
17   container?
18                MR. MITCHELL:  Objection, form.
19                THE WITNESS:  If it had not been
20        compromised or seals broken and it's still able to
21        be used at another date and time, as long as it's
22        within its expiration date.
23   BY MR. KURSMAN:
24        Q.      And is that with the compounded drugs in
25   the event that they are taken to the execution chamber?
```

```
1              MR. MITCHELL:  Same objection.
2              THE WITNESS:  Yes.
3    BY MR. KURSMAN:
4         Q.    And why aren't the execution -- the
5    compounded drugs just put in the armory with the
6    manufactured drugs --
7              MR. MITCHELL:  Same objection.
8    BY MR. KURSMAN:
9         Q.    -- once they're returned?
10        A.    I'm not -- I'm not sure that I understand
11   your question.  They -- they are taken back to the
12   armory.  Are you asking why they aren't put in the
13   steel cage?
14        Q.    Yes, exactly.  Thank you.
15        A.    I can't tell you why we made that
16   decision to put them in the fridge.
17        Q.    Now, are -- we can -- you can put down
18   Exhibit 1.
19             Can -- can you describe for me your --
20   your process for obtaining midazolam?
21             MR. MITCHELL:  Objection, form.
22             THE WITNESS:  So let me be clear so I
23        know what I'm describing for you.  Do you want me
24        to just kind of take you through the process of
25        ordering it, et cetera?
```

```
 1  BY MR. KURSMAN:
 2      Q.     Well, if you could, take me through the
 3  process of first finding out how to get it and where to
 4  get it.
 5              MR. MITCHELL:  Same form objection.
 6              THE WITNESS:  The -- the pharmacist is
 7      the one who -- as far as the API goes, is the one
 8      who finds and orders it.  So they would be the
 9      ones that have specific knowledge as to that.
10  BY MR. KURSMAN:
11      Q.     And is that the same for the potassium
12  chloride, as well?
13      A.     Yes.
14      Q.     Have -- have you ever attempted to obtain
15  the API for midazolam?
16      A.     No.
17      Q.     Have you ever attempted to obtain the API
18  for potassium chloride?
19      A.     No.
20      Q.     Have you ever attempted to obtain the API
21  for pentobarbital?
22      A.     Yes.
23      Q.     When was the last time you did that?
24      A.     Approximately -- I don't know an exact
25  date.  It would have been late -- probably late 2018,
```

1    but I can't remember specifically.

2         Q.    And have you ever attempted to obtain the

3    API for secobarbital?

4         A.    Sorry, you broke up on that one.

5         Q.    Have you ever attempted to obtain the API

6    for secobarbital?

7         A.    No.

8         Q.    Did you ever attempt to obtain the API

9    for sodium thiopental?

10        A.    No.

11        Q.    Did you ever attempt to obtain morphine?

12        A.    No.

13        Q.    And did you ever attempt to obtain

14   etomidate?

15        A.    No.

16        Q.    Okay.  When -- when was the last time

17   that you personally attempted to obtain any drugs?

18        A.    It would have been that same time in

19   2018.  I don't remember a specific date.

20        Q.    And has the pharmacist who obtains and

21   orders the API for midazolam and potassium chloride,

22   have they attempted to obtain the API for any other

23   drugs?

24        A.    Yes, pentobarbital.

25        Q.    Do you know when the last time they

```
 1   attempted to obtain an API for pentobarbital?
 2        A.      Approximately three weeks ago.
 3        Q.      And do you know what they did to attempt
 4   to obtain the API for pentobarbital?
 5        A.      They attempted to order pentobarbital.
 6        Q.      Do you know from whom?
 7                MR. MITCHELL:  And I'm going to object,
 8        pursuant to the protective order, and instruct the
 9        Drug Procurer again not to answer.  Sorry.
10   BY MR. KURSMAN:
11        Q.      Did you ask them to attempt to obtain
12   pentobarbital three weeks ago?
13        A.      I didn't ask them three weeks ago.  They
14   have been trying to find it.
15        Q.      When was the last time you asked them to
16   attempt to obtain the API for pentobarbital?
17        A.      I don't remember the last time I told
18   them to do it.
19        Q.      Why is this person still attempting to
20   obtain the API for pentobarbital?
21        A.      Because I asked them to continue to try
22   to find it.
23        Q.      Tennessee's current lethal injection
24   protocol does not include pentobarbital, correct?
25        A.      Correct.
```

1          Q.        So why do they continue to attempt to
2    obtain the API for pentobarbital?
3          A.        It was an instruction given, to continue
4    to try to obtain it.
5          Q.        And why?  Why did you give that
6    instruction?
7          A.        Because that instruction was given to me.
8          Q.        And who gave you that instruction?
9          A.        The commissioner, in consultation with
10   general counsel.
11         Q.        Okay.  And does the commissioner, is
12   it -- does the commissioner want to use pentobarbital
13   instead of the three-drug midazolam protocol?
14                   MR. MITCHELL:  Objection, speculation.
15              Objection, form.  And also possibly
16              attorney-client.  I'm going to instruct the Drug
17              Procurer not to answer that.
18                   MR. KURSMAN:  I'm not asking about any
19              conversations between the Drug Procurer and an
20              attorney.
21   BY MR. KURSMAN:
22         Q.        I'm just asking whether, to your
23   knowledge, whether the commissioner would rather use
24   pentobarbital in an execution over the three-drug
25   midazolam protocol.

```
 1                    MR. MITCHELL:  And same objection.  I'm
 2          going to instruct the Drug Procurer not to answer
 3          that.
 4     BY MR. KURSMAN:
 5          Q.      And you don't -- don't know who the
 6     pharmacist tried to get the API pentobarbital from
 7     three weeks ago?
 8                    MR. MITCHELL:  Objection, both form and
 9          foundation.  I had instructed the pharmacist not
10          to answer, pursuant to the protective order.
11                    MR. KURSMAN:  Oh, I apologize.  I saw it.
12     BY MR. KURSMAN:
13          Q.      Do you know how many entities the
14     pharmacist contacted?
15          A.      No.
16          Q.      Do you know if the pharmacist attempted
17     to obtain any other drugs, aside from pentobarbital?
18          A.      Not that I'm aware of.
19          Q.      Do you know if the pharmacist attempt --
20     attempted to obtain any drugs from sources outside the
21     United States?
22          A.      Not that I'm aware of.
23          Q.      Okay.  Have -- have you had discussions
24     with the pharmacist about the -- the legal landscape of
25     obtaining pentobarbital?
```

1      A.      Yes.

2      Q.      And what were those discussions?

3      A.      With regard to A, trying to find it in

4  the United States; and then the possibility of

5  importing.

6      Q.      And what did you discuss when you

7  discussed the possibility of importing the API

8  pentobarbital?

9      A.      It was more asking, to their knowledge,

10  what the requirements would be and the processes to do

11  that.

12      Q.      And what -- what did the pharmacist say?

13      A.      That -- I'm summarizing, but they would

14  have to apply to the DEA for a license to import a

15  controlled substance.

16      Q.      And did you ask them if that was even if

17  the drugs were used for executions?

18      A.      I'm sorry, I don't really understand your

19  question.

20      Q.      Yeah, I apologize.  It was a poorly

21  worded question.

22              So the pharmacist told you that they'd have

23  to apply for an exception from the DEA to import

24  pentobarbital.  My question is:  Do you know if the

25  pharmacist told the DEA that these are for executions?

1        A.      I have no knowledge of what they would
2    have told the DEA.
3        Q.      Okay.  And do you know the last time that
4    the pharmacist looked for the API pentobarbital from a
5    source outside the United States?
6        A.      I don't know that.
7        Q.      Do you know if the pharmacist has sources
8    of pentobarbital outside the United States?
9        A.      I don't know.
10       Q.      Let's go to -- and have you had more
11   recent conversations with the pharmacist that -- that
12   the recent conversations that you've had with the
13   pharmacist about their search for pentobarbital, were
14   those by email?
15       A.      No.
16       Q.      What -- what mode of communication were
17   they by?
18       A.      Telephone.
19       Q.      Is there a reason that you're having all
20   these conversations with the pharmacist over the phone,
21   rather than by email?
22       A.      Because it's easier to talk on the
23   telephone.
24       Q.      Did anybody instruct you to have as
25   little communication as possible via email?

```
1          A.      No.

2                  (Exhibit No. 6 marked.)

3   BY MR. KURSMAN:

4          Q.      Let's go to Exhibit 6.  Let me know when

5   you're there.

6                  (Pause.)

7                  THE WITNESS:  Okay.

8   BY MR. KURSMAN:

9          Q.      And do you see it says it's an email from

10  September 7th of 2017?  Do you see that?

11         A.      Yes.

12         Q.      Did you write this email?

13         A.      Yes.

14         Q.      And did this email go to the pharmacist?

15         A.      I'm sorry, I can't hear your question.

16         Q.      I apologize.  Was the recipient of this

17  email the pharmacist?

18         A.      Yes.

19         Q.      Okay.  And it says:  "The word from the

20  powers that be is that they first try to find midazolam

21  and then go from there if there are none out there to

22  get."  Do you see that?

23         A.      Yes.

24         Q.      Okay.  Who are "the powers that be?"

25                 MR. MITCHELL:  Objection.  I'm going to
```

1          instruct the witness not to answer that, pursuant
2          to the protective order.
3    BY MR. KURSMAN:
4          Q.      Okay.  Well, is it -- is it the
5    commissioner?
6                  MR. MITCHELL:  If I may, how about asking
7          who it includes and doing it that way?  I think
8          that might be a way around that objection, whether
9          you include the commissioner.
10                 MR. KURSMAN:  Okay.
11   BY MR. KURSMAN:
12         Q.      Does -- does the powers that be -- does
13   the powers that be include the commissioner?
14         A.      Yes.
15         Q.      Does it include general counsel's office?
16         A.      Yes.
17         Q.      Does it include the warden?
18         A.      Not that I'm aware of.
19         Q.      Does it include the governor?
20         A.      I don't know.
21         Q.      Okay.  And did the conversation you had
22   with the powers that be, was that conversation via
23   email?
24         A.      No.
25         Q.      Well, how was that conversation -- how

```
 1   did that conversation happen?
 2          A.      If I remember correctly, in person.
 3          Q.      And was that with all -- all of the
 4   people I just mentioned present?
 5          A.      No.
 6          Q.      Okay.  Who wasn't present at that meeting
 7   out of the people I just mentioned?
 8          A.      The warden and the governor.
 9          Q.      And why did they want to first try to
10   find midazolam?
11              MR. MITCHELL:  Objection, form.  And the
12          deliberative process involves attorney-client
13          privilege, so I'm going to instruct the Drug
14          Procurer not to answer.
15   BY MR. KURSMAN:
16          Q.      Did you agree with their assessment?
17          A.      Yes.
18          Q.      Did you -- did you suggest that they
19   first try midazolam before looking for pentobarbital?
20          A.      I'm sorry, before looking for what?
21          Q.      Pentobarbital.
22          A.      We looked for pentobarbital first.  When
23   we couldn't find that is when the decision was made to
24   go with midazolam.
25          Q.      Right.  At that time -- at that time,
```

1   around when this email was created, did you tell the
2   powers that be "I think it's time to start looking for
3   midazolam?"
4       A.      No.
5       Q.      Okay.  So how exactly did that process
6   happen?
7               MR. MITCHELL:  I'm going to object again,
8           attorney-client deliberative process, and instruct
9           the witness not to answer.
10  BY MR. KURSMAN:
11      Q.      Were -- were you instructed at that point
12  to stop looking for pentobarbital if -- if you could
13  find midazolam?
14      A.      No.
15      Q.      So what does it mean, "the word from
16  powers that be is that they first want to try to find
17  midazolam and then go from there?"
18      A.      We couldn't find pentobarbital; and so
19  the decision was made, in looking at another method, to
20  go with midazolam.
21      Q.      But at this point, was the -- the
22  protocol was a pentobarbital protocol; is that right?
23      A.      Yes.
24      Q.      Okay.  And subsequently, after this
25  email, it was changed to a three-drug midazolam

```
 1   protocol.  Right?
 2        A.      Yes.
 3        Q.      Okay.  So can you explain to me why the
 4   pharmacist is still looking for the API pentobarbital?
 5        A.      I would say it was at the direction of
 6   the commissioner that we continued to look for
 7   pentobarbital being used as a one-drug protocol.  He
 8   wanted us to continue to look for it, and if we were
 9   able to find it I would think that that would be what
10   was used.
11        Q.      So if you were able to find
12   pentobarbital, you would -- you would write a new
13   protocol so that pentobarbital was the preferred method
14   of execution?  Is that what you're saying?
15               MR. MITCHELL:  Objection, form.
16               THE WITNESS:  I'm sorry, you broke up
17         there about halfway through the question.
18               MR. KURSMAN:  Well, I'll strike the
19         question.
20               (Exhibit No. 7 marked.)
21   BY MR. KURSMAN:
22        Q.      Let's go to Exhibit 7.  Just let -- let
23   me know when you get there.
24               THE WITNESS:  Can you hear me?  Everybody
25         is frozen.
```

```
 1                    MR. KURSMAN:  I can hear you.  Do you
 2        want to take a break to unfreeze your computer?
 3                    THE WITNESS:  Can you hear me?  Everybody
 4        is frozen.
 5                    MR. KURSMAN:  Let's go off.
 6        Mr. Mitchell, is that okay, so we try to help the
 7        Drug Procurer to update their computer?
 8                    MR. MITCHELL:  I only heard a portion of
 9        what you said.  What was that?
10                    MR. KURSMAN:  That the Drug Procurer
11        keeps saying that everyone is frozen, so maybe we
12        should go off so you can see what's going on in
13        there.
14                    MR. MITCHELL:  Okay, yeah.
15                    THE WITNESS:  You're all back now.
16                    MR. KURSMAN:  Can you hear me then?
17                    THE WITNESS:  Yes.
18                    MR. KURSMAN:  Then I guess we can
19        continue.
20   BY MR. KURSMAN:
21        Q.       Can you pull up Exhibit 7.  And let --
22   let me know when you got there.
23        A.       I'm there.
24        Q.       Okay.  And do you see this?  It's the
25   very bottom of Page 1973.  It says "Thursday, September
```

```
 1   7, 2017, at noon?"  Do you see that?
 2        A.      Yes.
 3        Q.      And did you write this email?  You're
 4   muting.
 5        A.      Sorry.  I was just looking down to see if
 6   I recognize if I wrote it.  Yes.
 7        Q.      Okay.  And is this email to the warden?
 8        A.      Yes.
 9        Q.      And what are the disclaimer requirements?
10        A.      It is a prior -- prior to being able to
11   receive the pento, the pharmacist would have to sign a
12   disclaimer stating that they would not sell or send the
13   pento to a correctional organization.
14        Q.      Okay.  So at this point you were informed
15   that midazolam was readily available; is that right?
16        A.      Yes.
17        Q.      Okay.  And then if we go to 102, which is
18   on the first page of Exhibit 7, do you see they say
19   "They do not.  It's from our primary vendor?"
20        A.      I'm sorry, which page of Exhibit 7 do you
21   want me to look at?
22        Q.      Oh, the first page.  It's -- it's Bates
23   Def. Int. Discl. 1973.  Do you see it's the second
24   email on the first page?
25        A.      Yes.
```

1        Q.      Do you see it says, "They do not.  It's
2    from our primary vendor?"
3        A.      Yes.
4        Q.      Did you end up getting midazolam from the
5    pharmacy's primary vendor?
6        A.      I don't know.  They didn't tell me
7    specifically who it came from, they just obtained it.
8        Q.      Okay.  And at this point, was it
9    compounded or manufactured?
10       A.      Manufactured.
11       Q.      Okay.  Now, if you go up to the first
12   email, which is at 12:08 p.m.
13       A.      Yes.
14       Q.      You see it says information will be
15   passed along to the higher ups.  Do you see that?
16       A.      Yes.
17       Q.      Are the higher ups the same people as the
18   powers that be that you referenced in the prior
19   agreement?
20       A.      Yes.
21       Q.      Okay.  Now, let's go to the second page
22   of Exhibit 7 again.  And would you go to the second
23   email, which is at 12:58 p.m.  Do you see that?
24       A.      Yes.
25       Q.      All right.  And do you see it says -- is

```
 1   this from the pharmacist?
 2        A.      This is from the pharmacy, yes.
 3        Q.      Okay.  And it's in response to the emails
 4   that we just discussed, right?
 5              (Pause.)
 6   BY MR. KURSMAN:
 7        Q.      This is in response to the emails we just
 8   discussed, right?
 9        A.      Yeah.  I'm sorry, I thought I answered
10   "Yes."
11        Q.      Oh, I apologize.  Do you see where it
12   says:
13              "That stuff is readily available with
14               potassium chloride.  I reviewed several
15               protocols from states that currently use
16               that method.  Most have a 3-drug protocol
17               including a paralytic and potassium
18               chloride.  Here is my concern with
19               midazolam.  Being a benzodiazepine, it does
20               not elicit strong analgesic effects.
21               Subjects may be able to feel pain from the
22               second and third drugs, potassium chloride
23               especially.  It may not be a huge concern
24               but can open the door to some scrutiny on
25               your end."
```

1          Do you see that?

2     A.     Yes.

3     Q.     And this was written by the pharmacist?

4     A.     Not by the pharmacist.

5     Q.     Who was it written by?

6     A.     The owner of the pharmacy.

7     Q.     And when -- when you said earlier that

8  the pharmacist is attempting to obtain the API, did you

9  mean the owner of the pharmacy or the pharmacist?

10     A.     No, the pharmacist is the one currently

11  searching for the API pentobarbital.

12     Q.     Okay.  So these emails that we just

13  discussed, is this between -- are these emails between

14  you and the pharmacist or between you and the owner of

15  the pharmacy?

16     A.     These are between myself and the owner of

17  the pharmacy.

18     Q.     Okay.  Now, when -- when the owner of the

19  pharmacy says "that stuff" at the beginning of this,

20  this email, is he referring to midazolam?

21     A.     I can't remember.  I think so.  I haven't

22  seen that email before, but I believe it refers to

23  midazolam.

24     Q.     Now, did you ask him which protocols he

25  reviewed?  When he said he reviewed protocols from

```
 1    several states currently using midazolam, did you ask
 2    him which states he reviewed?
 3            A.       According to this email I believe I did,
 4    and he opines specifically Ohio.
 5            Q.       And are you aware of the botches that
 6    occurred with the three-drug protocol that have
 7    occurred in Ohio?
 8                     MR. MITCHELL:  Object to the form.
 9                     THE WITNESS:  No.
10    BY MR. KURSMAN:
11            Q.       Okay.  Do you know what a paralytic agent
12    is?
13            A.       It would be a drug that renders a
14    person -- that paralyzes him, seizes his muscles.
15            Q.       Do you know why the State of Tennessee is
16    using a paralytic agent in their execution protocol?
17            A.       I don't know that.  I'm not a doctor, so
18    I don't know what the medical -- medical reason is.
19    But it is part of the three-drug protocol that has been
20    constitutionally upheld, so that's what we use.
21            Q.       And how are you aware that it's been
22    constitutionally upheld?
23            A.       I was informed of that.
24            Q.       Okay.  And do you see where the owner of
25    the pharmacy says, "It may not be a huge concern but
```

```
 1    can open the door to some scrutiny on your end?"
 2         A.      Yes.
 3         Q.      Is the pharmacist talking about legal
 4    scrutiny?
 5         A.      I don't know.
 6         Q.      Did you ask the pharmacist what they
 7    meant by "scrutiny on your end?"
 8         A.      No.
 9         Q.      Did you share this email with anybody?
10         A.      Yes.
11         Q.      Who?
12                 MR. MITCHELL:   And I'm going to object
13         pursuant to the protective order.  Again, if you
14         rework your question he can answer that, but go
15         ahead.
16    BY MR. KURSMAN:
17         Q.      Did you share this email with the members
18    of the execution team?
19         A.      No.
20         Q.      Did you share this email with the
21    commission -- commissioner?
22         A.      Yes.
23         Q.      Did you share this email with general
24    counsel?
25         A.      Yes.
```

```
 1        Q.      And did you share this email with the
 2   governor?
 3        A.      I did not.
 4        Q.      Okay.  And what was the response when you
 5   shared this email with those people?
 6        A.      They took it and reviewed it.  I don't
 7   know what if any conversations they may have had.  I
 8   wasn't a party to those.  But then I was then told to
 9   proceed to try and find the midazolam.
10        Q.      You were told to proceed trying to find
11   the midazolam?  Is that what you said?
12        A.      Yes.
13        Q.      Okay.  Are -- are you receiving text
14   messages during this deposition?
15        A.      No.
16        Q.      Okay.  And then the email goes on to say:
17   "Consider the use of an alternative like ketamine or
18   use in conjunction with an opioid."
19                Do you see that?
20        A.      Yes.
21        Q.      Did you share that with the people I just
22   mentioned?
23        A.      Yes.
24        Q.      And what was their response?
25        A.      Ultimately, their response was that we
```

```
 1    would continue and move forward with the midazolam
 2    option.
 3         Q.     Okay.  Did you ever attempt to obtain
 4    ketamine?
 5         A.     No.
 6         Q.     Did you ever attempt to obtain an
 7    alternative like ketamine?
 8         A.     No.
 9         Q.     And did you ever attempt to obtain an
10    opioid?
11         A.     No.
12         Q.     Now, at the beginning of this deposition
13    you said that -- that doctors, pharmacologists, and
14    lawyers were consulted in creating this protocol.
15                Was this email presented to any doctors?
16         A.     I don't know if it was.  I don't know if
17    the commissioner or general counsel did or not.
18         Q.     Was it shared with any pharmacologists?
19         A.     Same answer.
20         Q.     Okay.  And was it shared with any
21    lawyers?
22         A.     The Attorney General's Office.
23         Q.     Why did you not attempt to obtain
24    ketamine?
25         A.     The decision was made to go forward with
```

1  obtaining midazolam.
2      Q.     And why did you not attempt to obtain an
3  opioid?
4      A.     Same answer.
5             Same answer.
6             (Exhibit No. 8 marked.)
7  BY MR. KURSMAN:
8      Q.     Okay.  Now, if we go to Exhibit 8.  Let
9  me know when you get there.
10     A.     Okay.
11     Q.     And do you see this is another email from
12 you?
13     A.     Yes.
14     Q.     Is this between you and the pharmacy
15 owner?
16     A.     One second.  Let me look through it.
17            (Pause.)
18            THE WITNESS:  Yes, it is.
19 BY MR. KURSMAN:
20     Q.     Okay.  And if you look at the second page
21 of this exhibit.
22     A.     Yes.
23     Q.     "The good thing about the multi-drug
24 protocol is that it uses product that is commercially"
25 -- "commercially produced in high quantities that we

```
 1   can get overnight.  The life cycle is around two
 2   years."
 3        A.       Yes, I see that.
 4        Q.       Is that an email from the pharmacy owner
 5   to you?
 6        A.       I'm sorry, could you repeat?
 7        Q.       Yeah.  Is this an email from the pharmacy
 8   owner to you?
 9        A.       Yes.
10        Q.       Okay.  So were you getting commercially
11   manufactured midazolam at first?
12        A.       Yes.
13        Q.       Okay.  And -- and when did you switch
14   from commercially manufactured to compounded?
15        A.       Approximately after May of 2018, I think.
16        Q.       Okay.  Can you go back to the first page
17   in Exhibit 8.  And do you see the email, the very first
18   email at 1:39 p.m. on September 7, 2017?
19        A.       Yes.
20        Q.       And it says:  "Etomidate, limited supply.
21   Ketamine, ample supply.  Sodium thiopental is no longer
22   available."
23        A.       Yes.
24        Q.       And is this from the pharmacy owner to
25   you?
```

Case 3:18-cv-01234    Document 187-3    Filed 03/13/23    Page 177 of 328 PageID #: 6236

```
 1        A.    Yes.
 2        Q.    And do you know what etomidate is?
 3        A.    Sorry, can you repeat?
 4        Q.    Yes.  Do you know what etomidate is?
 5        A.    No, not off the top of my head.
 6        Q.    Do you know what ketamine is?
 7        A.    I think it's a sedative, but I'm not
 8   sure.
 9        Q.    Okay.  Is the pharmacy owner telling you
10   that he has a limited supply of etomidate and that he
11   or she has ample supply of ketamine?
12        A.    No, that's not what he or she can supply;
13   it's what's available, I guess, from vendors.
14        Q.    And are they able to get etomidate or
15   ketamine?
16        A.    I would assume so, but they wouldn't try.
17        Q.    Did -- did you bring this information to
18   the powers that be, or the higher ups, at TDOC?
19        A.    Yes.
20        Q.    And -- and how did they respond?
21        A.    They took the information, considered it.
22   I'm not aware of what conversations they may have had
23   outside of my presence.  And then as a result, I was
24   told to move forward with midazolam.
25        Q.    And did -- did you agree with that
```

1  assessment?

2        A.      Yes.

3        Q.      Why?

4        A.      The decision was made to move forward

5  with a protocol that had been upheld to be

6  constitutional.  And it was a protocol that had been

7  found to be constitutional; so that was the decision to

8  make, to use what had already been determined to be

9  constitutional.

10       Q.      Do you have any email correspondence with

11 other pharmacies?

12       A.      Um, I believe there were some emails when

13 I was trying to find a compounding pharmacy and/or

14 source of pentobarbital.

15       Q.      And when would that have been?

16       A.      I don't have specific dates in front of

17 me.  So it would have been in the '17-'18 timeframe.

18       Q.      And how many pharmacies would you --

19 would you say you had that email correspondence with?

20       A.      Oh, I -- I don't know, off the top of my

21 head.

22              MR. KURSMAN:  Okay.  Mr. Mitchell, we're

23         going to request those emails in discovery, as

24         well.

25              MR. MITCHELL:  Understood.

```
 1   BY MR. KURSMAN:
 2        Q.     Okay.  Now, could we turn to Exhibit 10.
 3        A.     So to be clear, are you skipping over 9?
 4               MR. KURSMAN:  I apologize.  Exhibit 9,
 5        please.
 6               (Exhibit No. 9 marked.)
 7   BY MR. KURSMAN:
 8        Q.     And you see, this is -- if we go to the
 9   very bottom of the page, you see it's an email sent
10   Thursday, September 21st, at 8:44 a.m., 2017.  Do you
11   see?
12        A.     Yes.  Sorry, I have to move my mouse
13   over.
14        Q.     And then you see it says:  "So the word
15   from the powers that be is that we want to move forward
16   with ordering the items for a 3 drug protocol,
17   including midazolam, vecuronium, and potassium
18   chloride."
19               Did -- did you write this email?
20        A.     Parts of it, the parts of the email that
21   contain essentially a response.
22        Q.     So could you explain what you mean?
23        A.     Sure.  So, for instance, I -- I wrote
24   that first part, "So the word from the powers that be."
25   And "The protocol calls for the following."  I wrote
```

1    the -- the "5-gram dose of midazolam."

2              The reply starts with "5 grams seems like

3    a lot, and it's 10 times the amount used by the other

4    states."

5              So the rest of that sentence, the rest of

6    that memo, is my response to the pharmacy owner.

7              Same thing with Nos. 2 and 3.  The same

8    sentences are responses from the pharmacy owner.

9         Q.   And why is -- and the response, is that

10   from the pharmacist or the pharmacy owner?

11        A.   The pharmacy owner.

12        Q.   And how did they write in this written

13   response in an email that you sent to the pharmacy

14   owner?

15        A.   It was in email form; so, I mean, I guess

16   he -- he typed it in, his reply.  He typed it in under

17   those numbers and sent it back to me.

18        Q.   Okay.  So -- so now I think I understand.

19   So this is actually an email from the pharmacy owner to

20   you; is that right?

21        A.   Yes.

22        Q.   Okay.  And you sent the initial and then

23   responded?

24        A.   That's what it says, yes.

25        Q.   Do you know why your initial email was

1  not produced in discovery?

2      A.      I don't know.

3              MR. KURSMAN:  Okay.  I will request your

4      initial email in discovery, as well.

5  BY MR. KURSMAN:

6      Q.      Do -- do you know why the pharmacy owner

7  is reviewing protocols of other states?

8      A.      I would assume so he would understand

9  what the pharmacy could do.

10      Q.      And then under No. 2, he is talking about

11  -- or he or she is talking vecuronium.  And it says:

12  "It would need to be reconstituted and you would need

13  10 vials."

14              Do you see that?

15      A.      Yes.

16      Q.      Why does the vecuronium need to be

17  reconstituted?

18              MR. MITCHELL:  Objection, form.

19              THE WITNESS:  It's in powder form, so it

20      has to be mixed with bacteriostatic water to get

21      it into an injectable form.

22  BY MR. KURSMAN:

23      Q.      And who does that reconstitution?

24      A.      Members of the execution team.

25      Q.      And do you have pharmacy instructions on

1  how to reconstitute the vecuronium bromide?

2       A.    No, they were instructed in the same

3  conversation with the pharmacist via phone.

4       Q.    And do you know what those instructions

5  were?

6       A.    I wasn't part of that phone call.  But

7  the general instructions as explained to me was to take

8  the bacteriostatic water and take 10 milligrams of

9  bacteriostatic water and inject it into the vial with

10 the vecuronium and gently shake it until it's clear.

11      Q.    And is there a protocol that the

12 execution team members must follow when reconstituting

13 the vecuronium bromide?

14      A.    They follow the instructions that were

15 given to them by the pharmacist.

16      Q.    And what happens if they deviate from

17 those instructions?

18            MR. MITCHELL:  Objection, form.

19            THE WITNESS:  If for some reason in the

20       process of reconstituting it would result in an

21       unclear liquid, they would not use it.

22 BY MR. KURSMAN:

23      Q.    Do you know which members of the

24 execution team reconstitute the vecuronium bromide?

25      A.    The executioner.

1    Q.    And does the executioner have any
2    specialized medical experience?
3              MR. MITCHELL:  Objection, pursuant to the
4         protective order.  Don't answer that, Drug
5         Procurer.
6    BY MR. KURSMAN:
7         Q.    Now, let's go down -- stay on Exhibit 9
8    to the -- to the fourth paragraph.  It says:  "We would
9    like to order enough of the above for 20 inmates."
10             Do you see that?
11        A.    Yes.
12        Q.    So you were ordering 5,000 midazolam, 100
13   milligrams of vecuronium, and 100 milliliters of a 2
14   milliequivalent per milliliter concentration dose of
15   potassium chloride for 20 inmates.  Is that right?
16        A.    No, that's not what we ordered.  Based on
17   his -- the explanations of the pharmacy owner in 1, 2,
18   3, they weren't as originally described, 5 grams.  5
19   grams is too much.
20             So what we ended up ordering and using is
21   a 500-milligram protocol for midazolam.  It's 120
22   milliliters to make the concentration for potassium
23   chloride.  And it's 100 milligrams, 100 ml's, of
24   vecuronium.
25        Q.    So just so I'm clear, so you changed the

```
 1   protocol based on the responses of the pharmacy owner?
 2              MR. MITCHELL:  Objection.
 3              THE WITNESS:  Based on the -- the fact
 4        that it was consistent in the other protocols
 5        referenced.
 6   BY MR. KURSMAN:
 7        Q.     Okay.  Is the pharmacy owner a
 8   pharmacist?
 9        A.     Not that I'm aware of.
10        Q.     Is the pharmacy owner a medical doctor?
11              MR. MITCHELL:  Object, based on the
12        protective order.  Please don't answer, Drug
13        Procurer.
14   BY MR. KURSMAN:
15        Q.     Does -- does the pharmacy owner have any
16   specialized expertise in either the medical or legal
17   field?
18              MR. MITCHELL:  Object.  Same objection,
19        pursuant to the protective order.  Please don't
20        answer.
21   BY MR. KURSMAN:
22        Q.     Okay.  So let's go back to Paragraph 4.
23   Again, you ordered enough of the pharmacy owner's
24   suggested protocol for 20 inmates; is that right?
25        A.     We did not get that much.
```

1        Q.      And how much did you get?

2        A.      I'm trying to remember.  I think we got

3    enough to do five or six.

4        Q.      Okay.  Why, at -- at that point were you

5    not using a physician's order?

6        A.      Well, commercially manufactured, you do

7    not have to have a physician's order.

8        Q.      And do you know why for a commercially

9    manufactured drug you don't need a physician's order?

10       A.      That was just what was explained to me by

11   the pharmacy and doctors.

12       Q.      Okay.  After the pharmacy owner replied

13   with these responses in 1, 2, and 3 on Page 2 of

14   Exhibit 9, did you take those responses to the higher

15   ups at TDOC?

16       A.      As I remember, yes.

17       Q.      And what did they do with those

18   responses?

19       A.      Reviewing those and, as I say in looking

20   at the other protocols, said the protocols had been

21   upheld constitutionally.  They looked at it and

22   approved the doses and concentrations.

23       Q.      And at what point did you get back to the

24   pharmacy owner and tell them you were not going with

25   their suggested protocol?

```
 1        A.      I don't remember specifically how long
 2   after this it was that I got back to the pharmacy
 3   owner.
 4        Q.      And is it at this point that they decided
 5   to move forward with the three-drug protocol?  And
 6   they -- "they" being the higher ups at TDOC?
 7        A.      Well, the decision to pursue the three
 8   drugs had already been made.  At this point, we're --
 9   we're I guess finalizing the amounts and the substances
10   that would be used in the protocol.
11        Q.      Do you know why the powers that be
12   continued to go ahead with midazolam, even though the
13   pharmacist explained that it had no analgesic effects?
14        A.      I was not part of this conversation.
15        Q.      Do you see why the Department decided to
16   go ahead with midazolam, even though the pharmacist
17   advised that inmates could feel the effects from the
18   second and third drugs?
19             MR. MITCHELL:  Objection, form.
20             THE WITNESS:  Once again, I wasn't part
21        of that conversation.  But to clarify that
22        statement, it wasn't the pharmacist that said it.
23        It was the pharmacy owner.
24   BY MR. KURSMAN:
25        Q.      Right.  I know that.  I apologize for
```

```
 1   that.
 2              Do -- do you know why the pharmacy owner
 3   was concerned that you might experience some hiccups on
 4   your end if -- if the inmate could experience the second
 5   and third drugs?
 6              MR. MITCHELL:  Objection, form.
 7              THE WITNESS:  Nothing more than what he
 8         wrote in there.
 9   BY MR. KURSMAN:
10         Q.    Okay.  And based on these emails, is it
11   your opinion that the pharmacy owner was trying to make
12   this as smooth of a process for you and for TDOC?
13              MR. MITCHELL:  Objection, form.
14              THE WITNESS:  I don't know -- I don't
15         know if I understand what you mean.  Smooth, in
16         the sense of obtaining whatever drugs we decided
17         to get?
18   BY MR. KURSMAN:
19         Q.    No, I apologize.  I mean smooth, as in so
20   there will be as little scrutiny as possible on your
21   end.
22         A.    I would say he -- the pharmacy owner was
23   interested in us having a -- a successful protocol, for
24   lack of a better term, or a better protocol.
25         Q.    Why?
```

```
 1                    MR. MITCHELL:  Objection.

 2                    THE WITNESS:  I don't know.  I don't know

 3          why he was thinking what he was thinking.

 4   BY MR. KURSMAN:

 5          Q.      All right.  Because in Exhibit 7, he --

 6   he -- he or she says to you:  "It may not be a huge

 7   concern, but that can open the door to some scrutiny on

 8   your end."

 9                    Do you remember discussing that with me

10   just a minute ago?

11          A.      Yes.

12          Q.      Okay.  Did you ask him why he would be at

13   all concerned with scrutiny on your end?

14          A.      No.  No, I didn't specifically ask him.

15          Q.      Is it in his best interests that there is

16   no scrutiny on your end?

17                    MR. MITCHELL:  Objection, form.

18                    THE WITNESS:  Once again, I don't know

19          what the pharmacy owner was thinking.

20   BY MR. KURSMAN:

21          Q.      Okay.  Now let's go back to where we

22   were, which is Exhibit 9.

23          A.      Okay.

24          Q.      You see below, where it says "The

25   protocol calls for the following dosages" on the second
```

1  page of Exhibit 9.  It says:  "For each inmate, we have

2  to have backup dosages of those, so each inmate will

3  require us to have double the above dosages on hand."

4      A.      Yes.

5      Q.      Is that for the lethal injection

6  chemicals?

7      A.      Yes.

8      Q.      And do -- and do you do that now?

9      A.      Yes.

10     Q.      Okay.  Why are backup dosages necessary?

11             MR. MITCHELL:  Objection, form.

12             THE WITNESS:  So if -- for instance, if

13     a -- if the drug was put into a syringe and then

14     at the last minute there was a stay or a reprieve,

15     and then there was another date set or whatever,

16     then we would have enough to be able to proceed

17     accordingly.

18  BY MR. KURSMAN:

19     Q.      Now, let's say the midazolam was

20  injected, the first dose, and the prisoner looked to be

21  still awake.  Would you then inject the second dose

22  into a prisoner?

23             MR. MITCHELL:  Objection.

24             THE WITNESS:  The protocol calls for

25     syringes and the drug to be injected.  Then there

```
1          is a waiting period.  Then there's a consciousness
2          check.
3                  If the inmate is conscious at that time,
4          the execution moves to the second set of drugs.
5          The manner -- I don't remember which one is
6          second.
7    BY MR. KURSMAN:
8          Q.      Okay.  And if the inmate appears to be
9    unconscious and the first set of vecuronium bromide is
10   administered and the inmate doesn't appear to be
11   paralyzed, would the execution team then administer the
12   second dose of potassium chloride?
13                 MR. MITCHELL:  Objection, form.
14   BY MR. KURSMAN:
15         Q.      I apologize, I meant to say vecuronium.
16                 MR. MITCHELL:  Same objection.
17                 THE WITNESS:  So -- your question.  So
18         the vecuronium bromide is administered by syringes
19         in a saline flush.  And at that point, after the
20         saline flush, the potassium chloride is
21         administered after the second flush.
22   BY MR. KURSMAN:
23         Q.      Right, but my question is a bit
24   different.  My question is:  If both of those, which
25   would be one dose; if both of those are administered
```

```
 1   and the inmate looks to be not paralyzed from the
 2   paralytic, would the execution team then use the backup
 3   dosage of the vecuronium bromide?
 4            MR. MITCHELL:  Same objection.
 5            THE WITNESS:  Yes, if they're directed.
 6        If the warden sees that, then he would direct them
 7        to go to the backup set.
 8   BY MR. KURSMAN:
 9        Q.     Okay.  And if the prisoner is given the
10   first dose of potassium chloride, as called for by the
11   protocol, and after they receive that dose they -- at
12   some point their heart doesn't stop, would the
13   execution team then administer the backup dose of
14   potassium chloride?
15            MR. MITCHELL:  Same objection.
16            THE WITNESS:  That would be if -- if --
17        yes, if there was a concern that the first set of
18        drugs are not reaching the inmate, are not in the
19        line, then they couldn't access it.
20            MR. KURSMAN:  Could we take a 10-minute
21        break?
22            MR. MITCHELL:  Sure.
23            THE VIDEOGRAPHER:  We are going off
24        record at 3:56 p.m.
25            (Recess from 3:56 p.m. to 4:11 p.m.)
```

```
1                    THE VIDEOGRAPHER:   We are back on the
2          record at 4:11 p.m.
3    BY MR. KURSMAN:
4          Q.       Drug Procurer, we just came off of a
5    break.   During the break, did you discuss anything with
6    your attorneys?
7          A.       No.
8          Q.       Okay.   And are you still in a room by
9    yourself?
10         A.       Yes.
11         Q.       Okay.   Let's -- let's switch gears now
12   and talk a bit about pentobarbital.   Were you involved
13   in obtaining pentobarbital when the State of Tennessee
14   obtained pentobarbital?
15         A.       No.
16         Q.       And are you currently involved in
17   attempting to obtain pentobarbital?
18         A.       I am not.   I'm searching for it at the
19   pharmacy, yes.
20         Q.       Okay.   And when was the last time that
21   you had a conversation with the pharmacist about
22   attempting to obtain pentobarbital?
23         A.       As previously stated, approximately three
24   weeks ago.
25         Q.       And was this a conversation with the
```

```
 1   pharmacist or the pharmacy owner?
 2        A.       Pharmacist.
 3        Q.       And what did the pharmacist tell you
 4   during that conversation?
 5        A.       That the pentobarbital is not able to be
 6   obtained.
 7        Q.       Did you ask the pharmacist what they
 8   tried to do to obtain -- or what they did to obtain,
 9   try to obtain, the pentobarbital?
10        A.       Yes.  They attempted to order it from a
11   supplier; and the supplier, before it would be shipped,
12   would have required them to sign a disclaimer that it
13   would not be shipped or sold to a corrections
14   organization.
15        Q.       Do you know if this was an API or a
16   manufactured pentobarbital?
17        A.       I think it was manufactured.  I'm not
18   100-percent sure.
19        Q.       And do you know when they attempted to
20   obtain pentobarbital before three weeks ago?
21        A.       As it was explained to me, they
22   periodically look for it from providers or suppliers to
23   see if it's available in either manufactured or API
24   form.  And if they find it, they attempt to order it.
25   They have not been able to order it thus far, but I
```

1    don't know.   I don't have a breakdown of specific dates
2    or how many times they attempted.
3           Q.        Every time they attempt to obtain
4    pentobarbital, do they let you know?
5                   MR. MITCHELL:  Objection, form.
6                   THE WITNESS:  Yes and no.  You know, in a
7           conversation it's always asked by me, "Have you
8           been able to find it?" and I'm told "No."
9    BY MR. KURSMAN:
10          Q.        And do you ask them in those
11   conversations what they have done to attempt to find
12   it?
13          A.        Yes.   And it's as I described; they look
14   at vendors and suppliers to see if they can obtain it,
15   either commercially manufactured or API.
16          Q.        Okay.   And do you know how many vendors
17   or suppliers they have contacted to attempt to obtain
18   pentobarbital?
19          A.        At this time, I don't.
20          Q.        Okay.   And has TDOC tried on their own to
21   attempt to obtain pentobarbital?
22          A.        Yes.
23          Q.        Okay.   When?   When was the last time TDOC
24   did that?
25          A.        As -- as previously stated, 2000 -- 2018.

```
 1   Maybe 2017 and '18.
 2          Q.      And is this pharmacy and pharmacist that
 3   provides you with the lethal injection drugs now, is
 4   this the same pharmacy and pharmacist that said they
 5   would compound pentobarbital for you?
 6          A.      If they could obtain it, yes.
 7                  (Exhibit No. 10 marked.)
 8   BY MR. KURSMAN:
 9          Q.      Okay.  Could I take you to Exhibit 10?
10          A.      Stand by.
11                  (Pause.)
12                  THE WITNESS:  I have it.
13   BY MR. KURSMAN:
14          Q.      And do you see it's an email on April 6,
15   2017.  It says:  "Sir, I'm inquiring as to whether your
16   organization has inventory of pentobarbital.  I
17   appreciate any help you can give."
18                  Do you see that email?
19          A.      Yes.
20          Q.      Is that an email from you?
21          A.      Yes.
22          Q.      And who was it to?
23                  MR. MITCHELL:  Object.  Object on the
24          basis of -- on the basis of the protective order,
25          DE107 and 108, identifying people involved in
```

```
 1          acquiring and supplying drugs.
 2   BY MR. KURSMAN:
 3          Q.      Was it -- was it to the pharmacist or
 4   pharmacy owner that we're discussing?
 5          A.      No.
 6          Q.      It was to a different -- was it to a
 7   pharmacist?
 8          A.      It was to a -- it was to a pharmacy, I
 9   believe.
10                  (Exhibit No. 11 marked.)
11   BY MR. KURSMAN:
12          Q.      Okay.  Now, could you go to Exhibit 11.
13          A.      Stand by.
14                  (Pause.)
15                  THE WITNESS:  Okay.
16   BY MR. KURSMAN:
17          Q.      Do you see the second line down, it says:
18   "Word I am getting from the pharmacist is that we would
19   need 'USP' grade and" -- and then there's a redacted --
20   "asking if the pentobarbital comes in crystalline form
21   for bulk orders to be used to compound?"
22                  Do you see that?
23          A.      Yes.
24          Q.      Does -- did you write this email?
25          A.      Yes.
```

```
 1          Q.      Okay.  Was this for the pharmacist or
 2    pharmacy owner that we were discussing previously?
 3          A.      No.
 4          Q.      When you say "Word I'm getting from
 5    pharmacists," is that pharmacist a pharmacist that we
 6    were discussing previously?
 7          A.      Yes.
 8          Q.      And that's the pharmacist that currently
 9    provides you with the three drugs for your current
10    execution protocol?
11          A.      Yes.
12          Q.      Okay.  Did that pharmacist tell you why
13    you would need USP grade?
14          A.      He just told me that that would be the
15    grade that's required to do compounding.
16          Q.      Did that -- did that pharmacist tell you
17    why it needs to come in crystalline form?
18          A.      No.
19                  (Exhibit No. 12 marked.)
20    BY MR. KURSMAN:
21          Q.      Let's go to Exhibit 12.
22          A.      Stand by.
23                  (Pause.)
24                  THE WITNESS:  Okay.
25    BY MR. KURSMAN:
```

```
 1        Q.        Do you see at the top, it says:    "Hi.   As
 2    discussed over the phone, please see below for the API
 3    numbers and descriptions.  Also copied to this email is
 4    our" -- and it's redacted -- "to assist you with your
 5    questions."  And it lists the pentobarbital.
 6              Do you see that?
 7        A.        I see it.
 8        Q.        Okay.  And who is this email from?
 9              MR. MITCHELL:  Objection, on the basis of
10        the protective order.  Don't answer that, Drug
11        Procurer.
12    BY MR. KURSMAN:
13        Q.        Is it -- is it from the -- a pharmacist
14    that we talked about earlier, the pharmacist that
15    provides the drugs, or a different pharmacist?
16        A.        No.
17        Q.        So a pharmacist did not write this email?
18              MR. MITCHELL:  Object to the form.
19              THE WITNESS:  Sorry, the question broke
20        up on the end.
21    BY MR. KURSMAN:
22        Q.        Did a pharmacist write this?
23        A.        I don't know if the person who authored
24    this is a pharmacist or not.
25        Q.        And then do -- do you see the email below
```

```
 1    it, where it says, "I am looking to purchase
 2    Pentobarbital CAS # 76-74-4.  We would need at least
 3    100 grams to start with?"
 4         A.      Yes.
 5         Q.      Why -- did you write this email?
 6         A.      Yes.
 7         Q.      Why are you asking for at least 100
 8    grams?
 9         A.      That would, by rough calculation, be
10    enough to do 10 executions under our pentobarbital
11    protocol.
12         Q.      And why would you need enough to carry
13    out 10 executions?
14         A.      Because we wanted to make sure that we
15    had an ample supply of pentobarbital to use for ongoing
16    protocol.
17         Q.      And how much did -- did the person who
18    responded say they had available of pentobarbital?
19         A.      It's not in this email chain, I don't
20    think.  Stand by.
21              (Pause.)
22              THE WITNESS:  But if I remember
23         correctly, they -- they didn't actually respond to
24         the specific amount of how much they had.  They
25         did respond that it was in very, very small
```

```
 1          amounts.
 2    BY MR. KURSMAN:
 3          Q.      Do -- do you know how much that amount
 4    was?
 5          A.      I believe it's in another email.  It was
 6    in nanograms and not milligrams.
 7                  MR. KURSMAN:  To the extent there is an
 8          email that mentioned nanograms, we would request
 9          that in discovery, as well.
10    BY MR. KURSMAN:
11          Q.      At the top, in says:  "Hi, As discussed
12    over the phone."  Did you have a phone conversation
13    with this person?
14          A.      Yes.
15          Q.      And what was discussed with them?
16          A.      Whether they had a supply of
17    pentobarbital.
18          Q.      And who was on the phone with you?
19          A.      It was --
20                  MR. MITCHELL:  I'm sorry, was the
21          question "Who was on the phone with you?"
22                  MR. KURSMAN:  Yes.
23                  MR. MITCHELL:  I'm going to object,
24          pursuant to DE107 of the protective order, and
25          instruct the witness not to answer.
```

```
 1    BY MR. KURSMAN:
 2         Q.      Were other members of the execution team
 3    on the phone with you?
 4         A.      No.
 5         Q.      Was the commissioner on the phone with
 6    you?
 7         A.      No.
 8         Q.      Was the warden on the phone with you?
 9         A.      No.
10         Q.      Were other members of this entity that
11    you were discussing pentobarbital on the phone, as
12    well?
13         A.      Not that I know of.
14         Q.      Were other members of TDOC on the phone
15    with this entity?
16         A.      No.
17         Q.      Was the pharmacist who currently supplies
18    you with execution drugs on the phone with this entity?
19         A.      No.
20         Q.      Was the pharmacy owner who currently
21    supplies TDOC execution drugs on the phone with this
22    entity?
23         A.      No.
24         Q.      Okay.  Now, what did you discuss on the
25    phone call?
```

```
 1        A.       Whether or not they had a supply of
 2    pentobarbital.
 3        Q.       And what did they tell you?
 4        A.       Well, in the phone call, the individual
 5    said they would have to discuss it internally and
 6    respond.  And then they responded via email.
 7                 (Exhibit No. 13 marked.)
 8    BY MR. KURSMAN:
 9        Q.       Okay.  Let's go to Exhibit 13.
10        A.       Stand by.
11                 (Pause.)
12                 THE WITNESS:  Okay.
13    BY MR. KURSMAN:
14        Q.       Do you see the email at the top that says
15    "Hello," blank.  Is "blank" you?
16        A.       Sorry.  Yes.
17        Q.       Okay.  And it says:  "Sorry for the
18    dormancy.  We've been busy expanding."
19                 Is this the pharmacy owner that's writing
20    this email?
21        A.       Yes.
22        Q.       Okay.  He says:  "I have some news on the
23    pento.  It's not good.  I had the DEA invite me over to
24    discuss it.  I can call you tomorrow to fill you in on
25    the details tomorrow.  Are you available?"
```

1            Do you see that?

2      A.     Yes.

3      Q.     Did you have a phone discussion with the

4 pharmacy owner to discuss the meeting with the DEA?

5      A.     Yes.

6      Q.     Was the warden on the call?

7      A.     No.

8      Q.     Was the commissioner on the call?

9      A.     No.

10      Q.     Were any of the other execution team

11 members on the call?

12      A.     No.

13      Q.     Was anyone on the call from the pharmacy

14 owner -- from the pharmacy owner's entity?

15      A.     Not that I'm aware of.

16      Q.     Okay.  What did the pharmacy owner tell

17 you about their meeting with the DEA?

18      A.     He informed me that he met with several

19 DEA agents in regard to the possibility of obtaining a

20 license to import pentobarbital and was told that it

21 would not be granted.

22      Q.     Did they say why it would not be?

23           MR. MITCHELL:  Alex, real quick before

24      your next question, if we can just time out for

25      like 90 seconds.  An administrative assistant

```
 1              needs to go into the room where the Drug Procurer
 2              is.  So just if everybody could stay on for 90
 3              seconds.  We are sending an admin in.
 4                      MR. KURSMAN:  Okay.  Sure.
 5                      So can we go off the record for these 90
 6              seconds.
 7                      THE VIDEOGRAPHER:  We're off the record
 8              at 4:25 p.m.
 9                      (Pause.)
10                      THE VIDEOGRAPHER:  We're back on the
11              record at 4:26 p.m.
12      BY MR. KURSMAN:
13              Q.      Before we went off the record, we were
14      talking about the meeting between the pharmacy owner
15      and the DEA.  Who from the DEA met with the pharmacy
16      owner?
17                      MR. MITCHELL:  And I'm going to object
18              again, pursuant to the protective order.  Instruct
19              the witness not to answer.
20                      MR. KURSMAN:  Can you describe for me
21              what would be violated in disclosing who from the
22              Drug Enforcement Administration met with the
23              pharmacy owner to let the pharmacy owner know that
24              they could not import pentobarbital?
25                      MR. MITCHELL:  We're talking about the
```

```
 1              supply and procurement of pentobarbital, which is
 2              one of the lethal injection drugs.  And the
 3              protective order specifically cloaks the
 4              identifying information or cloaks the individuals
 5              who are involved in procuring those drugs.
 6                   We don't know who these DEA people were
 7              yet.  We haven't delved into that.  We also don't
 8              know what their role was.  And so if they were
 9              involved in that, we're going to object to
10              identifying them.
11    BY MR. KURSMAN:
12         Q.       Okay.  Was the DEA involving in procuring
13    lethal injection chemicals for the State of Tennessee?
14                   MR. MITCHELL:  There's no proof to the
15              effect right now.  What I'm --
16                   MR. KURSMAN:  I'm sorry, I'm asking the
17              Drug Procurer that.
18    BY MR. KURSMAN:
19         Q.       You're on mute.
20         A.       I'm sorry.  No.
21         Q.       Okay.  So who from the DEA was at this
22    meeting with the pharmacy owner?
23         A.       All I know is DEA agents.  I don't know
24    any identifiers.
25         Q.       Do -- do you know how many?
```

```
1        A.      No.

2        Q.      Okay.  Do you know what was said?

3        A.      What I described; that they would not be

4   granting an application of the pharmacy to import

5   pentobarbital.

6        Q.      Do you know why?

7        A.      From what I was told, it was because that

8   the DEA indicated that there was supply in the United

9   States.

10       Q.      Have you ever had any conversations with

11  the DEA directly?

12       A.      No.

13       Q.      Has anybody from TDOC, without

14  identifying any of the entities, had any conversations

15  with the DEA about importing pentobarbital?

16       A.      I don't know.

17       Q.      What's that?  I apologize, I didn't hear

18  you.

19       A.      I don't know.

20       Q.      Okay.  Do you know if the pharmacy owner

21  had any conversations with the DEA after the

22  conversation with the DEA in July of 2017?

23       A.      Not that I'm aware of.

24       Q.      Do you know if the pharmacy owner

25  attempted to obtain or import pentobarbital after he or
```

1  she had these conversations with the DEA?

2      A.      Not that I'm aware of.

3      Q.      Did you specifically ask the pharmacy

4  owner whether they attempted to import pentobarbital

5  after these conversations with the DEA?

6      A.      There was one communication, and I cannot

7  remember the date.  And it referenced a company that

8  might have pentobarbital, and I think it may have been

9  overseas.

10             That info was sent to the pharmacy owner,

11  who -- who said I believe something along the lines of,

12  "Hey, it would have to be imported, and you would into

13  the same problems as the DEA said to me to get a

14  license."

15      Q.      Okay.  And were those communications

16  forwarded to you?

17      A.      The one I just referenced was in an

18  email.

19      Q.      An email?  Was -- was that email

20  forwarded to -- to you?

21      A.      Yes, the email, the communication was an

22  email from me to the pharmacy owner and the pharmacy

23  owner back to me.

24             MR. KURSMAN:  Okay.  I would request that

25         the email be provided, to the extent that we don't

```
 1          have that.
 2                    (Exhibit No. 14 marked.)
 3   BY MR. KURSMAN:
 4          Q.      So can I take you to Exhibit 14.
 5          A.      Stand by.
 6          Q.      Let me know when you get there.
 7                    MR. MITCHELL:  Alex, there's an iPhone
 8          connecting, and that is Scott Sutherland's iPhone.
 9                    MR. KURSMAN:  Okay.
10                    MR. MITCHELL:  If you see a participant
11          being added.
12   BY MR. KURSMAN:
13          Q.      Are you there?
14          A.      Yes.
15          Q.      And you see these are handwritten notes?
16          A.      Yes.
17          Q.      Are these your notes?
18          A.      Yes.
19          Q.      Okay.  And did -- did you take these
20   notes?  Do you see below the second full line, it says
21   "7/24/17?"
22          A.      Yes.
23          Q.      Is that when you took these notes?
24          A.      I'm sorry, what did you say?
25          Q.      Is that when you took these notes?
```

```
 1          A.      Yes.

 2          Q.      Okay.  And do you see it says, "Entire"

 3   -- blank -- "meeting at field office."  It says, "No

 4   shortage in U.S., so would not approve import license"

 5   -- or "import LS."  Do you see that?

 6          A.      Yes, I see it.

 7          Q.      And are those your notes relating to the

 8   phone call with the pharmacy owner?

 9          A.      Yes.

10          Q.      And in the first -- the first section of

11   these notes, you have these statutes.  What -- what are

12   they referring to?

13              MR. MITCHELL:  Objection, form.

14              THE WITNESS:  Those reference the

15          requirements for importing of a controlled

16          substance.

17   BY MR. KURSMAN:

18          Q.      And what does "4 to 6 weeks" mean?

19              MR. MITCHELL:  Same objection.

20              THE WITNESS:  You trailed off at the end.

21          Could you repeat?

22   BY MR. KURSMAN:

23          Q.      Oh, I'm sorry.  What does "4 to 6 weeks"

24   mean?

25          A.      Without seeing an index, it's been a long
```

```
 1   time.  I think it's a reference to ordering.  I'm just
 2   looking at this.  I don't remember exactly what that
 3   means.
 4        Q.      Okay.  And then can you see the second
 5   section in your notes?  What is -- what is the statute
 6   cited in the second section referring to, 21 USC
 7   321(p)?
 8              MR. MITCHELL:  Form objection.
 9              THE WITNESS:  That relates -- to the best
10         of my recollection, that also still relates to
11         importation and dealing with whether it's a new
12         drug, defined as a new drug under that statute.
13   BY MR. KURSMAN:
14        Q.      And then you see in your notes, it says
15   "FDA Regs"; and there's an arrow, and it says "Disallow
16   importation of new drugs without prior approved
17   application.  Contents of app are onerous."
18        A.      I see it.
19        Q.      What -- what FDA requirements are you
20   referring to?
21        A.      I think that relates back to that same
22   statute or another one.  Obviously, I didn't write a
23   reference to it; so I don't remember this one, what
24   exactly it's referencing.
25        Q.      Okay.  And what does "contents of app are
```

1    onerous" mean?

2           A.       It referred to the process to get

3    approval for when something is designated as a new

4    drug, I believe, and the -- all the things that had to

5    go into that application or request.

6           Q.       And just -- just so we're clear, because

7    I don't think I said this before.  But these notes are

8    about pentobarbital, right?

9           A.       Yes.

10          Q.       Okay.  Let's -- let's go to the next page

11   of this exhibit.  Do you see at the top it says:

12   "Plenty in Europe and available according," and then

13   redacted, "has it.  No lawyers."

14                   Do you see that?

15          A.       Yes.

16          Q.       Okay.  Why did you -- why did you say "No

17   lawyers?"

18          A.       Really, honestly, I can't -- I think that

19   might still be in reference to the meeting with the

20   DEA, that there were no lawyers present.  I'm not

21   100-percent sure, just looking at this note.

22          Q.       Okay.  And "redacted" -- "has it."  Is

23   that somebody that the pharmacy owner knows, that

24   redacted name?

25          A.       Just looking at this, it would be an

```
 1    entity.
 2         Q.      An entity?  Did the pharmacy owner
 3    contact that entity?
 4              MR. MITCHELL:  Object to the form.
 5              THE WITNESS:  I do not remember.
 6    BY MR. KURSMAN:
 7         Q.      Okay.  Well, how would you know that this
 8    redacted entity has pentobarbital?
 9         A.      Well, I wrote it because it was what was
10    told to me.
11         Q.      Right, but that's what I'm asking about.
12    Did the pharmacy owner tell you that?
13         A.      Yes.
14         Q.      Okay.  And did the pharmacy owner tell
15    you "plenty in Europe and available?"
16         A.      Yes.  Give me one second.
17              So, yeah, these are a continuation of
18    notes, what was being told to me about the DEA meeting.
19    And the reference that references "No lawyers at
20    meeting," "Plenty in Europe," is a statement that the
21    pharmacy owner made.
22         Q.      Okay.  Did you attempt to call anyone in
23    Europe directly?
24         A.      You broke up again.  All I heard was
25    "Europe."
```

```
 1        Q.      I'm sorry.  Did you attempt to obtain the
 2   -- the pentobarbital in Europe directly?
 3        A.      No.
 4        Q.      Okay.  Do you know if the pharmacy owner
 5   attempted to obtain the pentobarbital in Europe ever
 6   directly with the DEA?
 7        A.      Not that I'm aware of.
 8        Q.      Okay.  And in the last section, do you
 9   see it says:  "VA uses midazolam, sodium thiopental,
10   etomidate?"
11        A.      Yes.
12        Q.      And it says:  "In the spring of '17 I was
13   spending approximately 60 to 70 percent of each day on
14   the search."  What does that mean?
15        A.      It was me taking notes.  As requested,
16   the commissioner wanted to know how much time was being
17   spent on the search.
18        Q.      But is that you spending 60 to 70 percent
19   each day on a search, or is that the pharmacy owner
20   spending that much time on the search?
21        A.      That was information requested of me.
22        Q.      Of you?  And during that time, did you
23   attempt to obtain pentobarbital from a source outside
24   the United States?
25        A.      No.
```

```
1          Q.      Okay.  And then is says "Sedatives," with
2    two question marks.  What does that mean?
3          A.      It's probably a note with a question of
4    what other sedatives may be available.  I don't -- I
5    don't know.
6        . Q.      Okay.  And at that time -- I know we
7    already discussed this, but do you recall whether the
8    compounding pharmacy told you that they were able to
9    compound pentobarbital's active pharmaceutical
10   ingredient?
11         A.      They did tell me that they could compound
12   pentobarbital.
13         Q.      And today, they're still willing to
14   compound pentobarbital's active pharmaceutical
15   ingredient, correct?
16         A.      Yes.
17         Q.      Okay.  And as of 8/31/17, Tennessee's
18   lethal injection protocol was still the one-drug
19   pentobarbital protocol, right?
20         A.      I'm sorry, what date did you say?
21         Q.      8/31/17.
22         A.      Yes.  In 2017, yes.
23                 (Exhibit No. 15 marked.)
24         Q.      Okay.  Let's go to Exhibit 15.
25         A.      Stand by.
```

```
 1                      (Pause.)
 2                      THE WITNESS:   Okay.
 3      BY MR. KURSMAN:
 4           Q.      And do you see that the second email is
 5      dated April 4th, 2017?
 6           A.      Yes.
 7           Q.      And is this an email that you wrote?
 8           A.      Sorry, which April 4th email are you
 9      talking about?
10      BY MR. KURSMAN:
11           Q.      Sorry, at 9:41 a.m.
12           A.      I'm sorry, what time?
13           Q.      9:41.
14           A.      Yes.
15           Q.      And here, you're telling another entity
16      that "We have a compounding pharmacy able to compound
17      the solution, they just need the pentobarbital?"
18           A.      Yes.
19           Q.      And that compounding pharmacy, is that
20      the same compounding pharmacy that you're working with
21      today?
22           A.      Yes.
23           Q.      I'm sorry, what was that?
24           A.      Yes.
25                      (Exhibit No. 16 marked.)
```

```
 1   BY MR. KURSMAN:
 2        Q.    Okay.   Now let's go to Exhibit 16, if you
 3   can pull that up.   Take your time.
 4        A.    Got it.
 5        Q.    Do you see this is a PowerPoint?
 6        A.    Yes, it's a PowerPoint.
 7        Q.    Are you familiar with it?
 8        A.    Yes.
 9        Q.    Did you create it?
10        A.    Yes.
11        Q.    Who -- who did you create it for?
12              MR. MITCHELL:   Objection.   I'm going to
13        object, based on the protective order.   I'm going
14        to instruct the witness not to answer.
15   BY MR. KURSMAN:
16        Q.    Did -- did you create it for the
17   commissioner?
18        A.    In part, yes.
19        Q.    Did you create it for the warden?
20        A.    No.
21        Q.    Did you create it for general counsel?
22        A.    In part, yes.
23        Q.    Did you create it for the governor?
24              MR. MITCHELL:   Objection.   Pursuant to
25        the protective order, I'm going to instruct the
```

```
1          witness not to answer.
2    BY MR. KURSMAN:
3          Q.     Did you present this to the commissioner?
4          A.     Sorry.  Yes.
5          Q.     And did you present this to the general
6    counsel?
7          A.     Yes.
8          Q.     And did you present this to the governor?
9                 MR. MITCHELL:  And again, objection.
10         Pursuant to the protective order, I'm going to
11         instruct the witness not to answer.
12   BY MR. KURSMAN:
13         Q.     But why did you create this PowerPoint?
14         A.     I'm sorry, I can't hear you.
15         Q.     I'm sorry.  Why did you create this
16   PowerPoint?
17         A.     The purpose was to demonstrate efforts at
18   finding a source for pentobarbital and explaining that
19   we had not been able to find a source for
20   pentobarbital.
21         Q.     So when you presented this PowerPoint,
22   was it your purpose to push for the State of Tennessee
23   to begin using the three-drug midazolam protocol?
24                MR. MITCHELL:  Object to the form.
25                THE WITNESS:  No.
```

```
 1   BY MR. KURSMAN:
 2        Q.      Have -- has Tennessee's execution
 3   protocol changed since you prepared this PowerPoint?
 4        A.      Yes.
 5        Q.      How quickly after you presented this
 6   PowerPoint did you begin looking for midazolam rather
 7   than pentobarbital?
 8        A.      I believe it was -- this was August.  I
 9   believe it was the next month.
10        Q.      And who told you to start looking for
11   midazolam instead of pentobarbital?
12        A.      The commissioner.
13        Q.      And was it in direct response to this
14   PowerPoint?
15                MR. MITCHELL:  Object to the form.
16                THE WITNESS:  Yes.
17   BY MR. KURSMAN:
18        Q.      And at the -- at the time of the
19   protocol, at the time of that -- I apologize.
20                At the time of that PowerPoint, the
21   protocol was a one-drug pentobarbital protocol, right?
22        A.      Yes.
23        Q.      Let's -- let's look at Page 8 of Exhibit
24   16.  Let me know.
25        A.      Okay.
```

1    Q.    Do you see it says "Reached out to" --
2    and then a name is redacted -- "as it was understood
3    that they had a source for Pentobarbital" -- redacted
4    -- "was unwilling to either share the identity of their
5    source, or provide our contact information to their
6    source."
7          Do you see that?
8    A.    Yes.
9    Q.    Does the redacted portion here refer to a
10   state?
11   A.    Yes.
12   Q.    How many states did you reach out to,
13   without disclosing which states they were?
14   A.    I reached out to one.
15   Q.    Do you see it says -- the next sentence
16   says:  Redacted -- Redacted "was also willing to offer
17   any guidance as to how" -- redacted -- "was able to
18   find its current source?"
19              MR. MITCHELL:  I'm sorry, Alex, if I
20         could just interpose.  I think it was "unwilling,"
21         not "willing."
22              MR. KURSMAN:  Oh, I apologize.  Thank
23         you.
24              THE WITNESS:  Yes, I see that.
25   BY MR. KURSMAN:

```
 1          Q.      Did you reach out -- without identifying
 2   which states, did you reach out to any other states to
 3   see if they'd be willing to offer any guidance as to
 4   how they were able to find their current pentobarbital
 5   sources?
 6          A.      I did not.
 7          Q.      Okay.  So it was just one state?
 8          A.      Yes.
 9                  MR. MITCHELL:  Objection.
10   BY MR. KURSMAN:
11          Q.      Why didn't you reach out to any other
12   states?
13                  MR. MITCHELL:  Same objection.
14                  THE WITNESS:  Sorry.  After this
15          particular communication, I then informed the
16          commissioner of the results of that communication
17          and stated that I was skeptical as to whether,
18          given the nature of difficulty of finding a source
19          that any state would necessarily be cooperative.
20          And even if they were, it's still a matter of
21          finding a source.
22                  So at that point, I made a decision to go
23          directly to the source of the state and directly
24          contact companies.
25   BY MR. KURSMAN:
```

1          Q.          Now, without disclosing any
2    communications or -- any communications with these
3    states, I'm just asking you questions whether you're
4    aware of certain things right now.
5                    So are you aware that the State of Texas
6    uses pentobarbital in their execution protocol?
7          A.          As far as I know, yes.
8          Q.          Are you aware that Missouri uses
9    pentobarbital in their execution protocol?
10         A.          Actually, I wasn't aware they had found
11   any.  But okay.
12         Q.          Okay.  Are you -- what other states do
13   you know that use pentobarbital in their execution
14   protocols?
15         A.          I know Georgia did.
16         Q.          Are you aware of any other states that
17   use pentobarbital in their execution protocols?
18         A.          No, I'm not currently aware of what the
19   other ones are.
20         Q.          Okay.  Were -- were you aware that the
21   federal government used pentobarbital in its most
22   recent execution protocol?
23         A.          Yes, I was aware of that.
24         Q.          Okay.  Since you reached out to this
25   state -- and don't disclose which state that was.

```
 1   Since that time, have you reached out to any other
 2   states about their attempts to obtain pentobarbital?
 3        A.      I have not.
 4        Q.      Okay.  Now, at the top of this
 5   PowerPoint, do you see it says "Search for Source"
 6   in -- it looks like it's been redacted?
 7        A.      This is really a bracket, what I'm
 8   looking at, so I can't see.
 9        Q.      It may just be how your PowerPoint looks.
10   It's okay, you can -- is that top portion of the
11   PowerPoint, do you see that top line going through the
12   entire PowerPoint?
13        A.      Yes.
14        Q.      Okay.  Is that how the PowerPoint looks,
15   or is that a redaction?
16        A.      So on the exhibit that I'm looking at,
17   the entire top of the page is black.  All the -- all
18   the pages are.
19        Q.      Okay.  If -- if there was a redaction, do
20   you know why that would be redacted?
21        A.      If it's -- if it's redacted, I can't see
22   the name or identity or source or potential source that
23   it indicates that someone else consulted out.  But I
24   can't tell.  Everything's black on this one.
25                MR. KURSMAN:  Mr. Mitchell, to the extent
```

```
 1              it's redacted, but we would just request an
 2              unredacted copy of these top portions of it.
 3                     MR. MITCHELL:  If it's helpful, for the
 4              record I think it's just dark navy.  I think I can
 5              dig up a color copy somewhere for you.
 6                     MR. KURSMAN:  I think that's true.  It
 7              just looks like the redactions below in a noncolor
 8              copy.
 9     BY MR. KURSMAN:
10              Q.     Can you turn to Page 9 of Exhibit 16?
11              A.     Okay.
12              Q.     Do you see it says:  "A compounding
13     pharmacy agreed to both compound the LIC and aid in
14     search for a source?"
15              A.     Yes.
16              Q.     And this is the compounding pharmacy that
17     you're still working with today, right?
18              A.     Yes.
19              Q.     And then you -- you also say that you
20     cold called U.S.-based API supply companies.  Right?
21              A.     Yes.
22              Q.     What was the result of those calls?
23              A.     Well, either they did not have a supply
24     of the type of pentobarbital that we would need or they
25     would not -- are not willing to work with a Department
```

```
 1   of Corrections.
 2        Q.    And I think I asked you this before, but
 3   did you contact any non-U.S. API supply companies?
 4        A.    No.
 5        Q.    And when was the last time you made any
 6   attempt to contact an API supply company?
 7        A.    I'd say before 2019.
 8        Q.    Now, let's -- let's go to Page 10.  And
 9   let me know when you got there.
10        A.    Okay.
11        Q.    You see it says:  "Collectively, contact
12   was made with close to 100 potential sources?"
13        A.    Yes.
14        Q.    And all of these, are they all in the
15   United States?
16        A.    I'm sorry, I couldn't hear that.
17        Q.    Are all these sources based in the United
18   States?
19        A.    Yes.
20              MR. MITCHELL:  Object to form.
21   BY MR. KURSMAN:
22        Q.    And collectively, was anybody else making
23   contact with these sources aside from you?
24        A.    The pharmacy.
25        Q.    How many sources did you attempt to
```

1  contact?

2      A.      Off the top of my head, approximately

3  probably 70.

4      Q.      And how many pharmacy contacts?

5      A.      So it's a -- it's all-conclusive.  So

6  it's -- it's, you know, supply companies; but also

7  contacting pharmacies themselves to see if they

8  themselves have a supply in stock.  So it was a

9  combination of the two types of entities that were

10  called.

11      Q.      So I'm not -- I guess I'm a bit confused.

12  So did you contact all 100 of these entities, or did

13  you contact 70 and the pharmacy contacted 30?

14      A.      Once again, these are approximations.

15  But when I'm saying that, I'm approximating that I

16  contacted 70 and that the pharmacy contacted the

17  remainder.  Now, that's not a specific number, that's

18  an approximation.

19      Q.      No, I understand.

20              And you -- in the -- in the PowerPoint,

21  if you look at the third bullet, it says:

22              "Company did not have sufficient quantities

23              of the needed form of pentobarbital and no

24              source to obtain sufficient quantities,

25              approximately 10 percent."

1              Do you see that?

2       A.     Yes.

3       Q.     Does -- does that mean you needed to

4  purchase pentobarbital if they had it in at least a

5  threshold quantity?

6       A.     If I -- as I recall, the conversation

7  never got to the point of "If you had it, would you

8  actually sell it to us?"  It came to that "We don't

9  have it, we can't get it."

10      Q.     Okay.  You have -- the first bullet point

11 says "Company did not have an inventory of

12 pentobarbital."  Right?  Do you see that?

13      A.     Yes.

14      Q.     So that seems to suggest that that would

15 fall into your category of "We don't have it, we can't

16 get it."  Right?

17      A.     Not necessarily, because some of the

18 companies, like you brought up in the email, they had a

19 form of pentobarbital and they had a very, very small

20 amount.  Those would be the ones that can't get

21 sufficient quantities.  The vast majority, they did not

22 have it.

23      Q.     Right.  But what I'm asking about is the

24 10 percent that had some but not sufficient quantities.

25 Were you -- were you willing to work with these

1 companies that couldn't meet your threshold demand?

2       A.     I couldn't hear the rest of that

3 question. It broke up. Am I doing what with these

4 companies?

5       Q.     Sorry. It was worded poorly.

6           Did -- when you called these companies, the

7 10 percent who said "We have some pentobarbital, but we

8 don't have what you're asking for," did you -- did you

9 then say, "Okay, we can't work with you?"

10       A.     No. It's that "We can't" -- "this small

11 amount, we can't get the quantity you need in order to

12 meet your order."

13           I mean, I didn't say to them, "Well, I'm

14 done with you." That was just the end of the

15 conversation.

16       Q.     So your order was for 10 executions,

17 right? That was what you were looking for?

18       A.     Best-case scenario, yes.

19       Q.     Okay. What if a pharmacy said to you,

20 "We have enough for five executions?"

21           MR. MITCHELL: Object to the form.

22           THE WITNESS: In that hypothetical, I

23       would have -- I would have consulted with general

24       counsel and the commissioner, and I would expect

25       we would have ordered.

```
 1  BY MR. KURSMAN:
 2       Q.     Okay.   Did any of these pharmacies
 3  respond, "We have some, we just don't have the amount
 4  that you're asking for?"
 5              MR. MITCHELL:   Object to the form.
 6              THE WITNESS:   Yes, one specifically --
 7         and there's an email -- commented that they had
 8         like nanograms; such a small, small quantity.   And
 9         they couldn't meet -- meet the requirements enough
10         to order.
11  BY MR. KURSMAN:
12       Q.     Okay.   But in this -- in this PowerPoint,
13  you say 10 percent didn't have sufficient quantities.
14  And 10 percent of approximately 100 would be about 10.
15              So how about those other nine pharmacies?
16              MR. MITCHELL:   Object to the form.
17              THE WITNESS:   I was just referencing one
18         that emailed me.   Others on the phone call said
19         that they didn't have it.
20              And I'd also like to reiterate that these
21         are all approximations.
22  BY MR. KURSMAN:
23       Q.     Right.   I understand.   I understand.   And
24  I'm not trying to tie you down to certain numbers, I'm
25  just trying to understand the process.
```

1            So if they said "We have some, we just
2    don't have what you're asking for," then the
3    conversation was over; is that right?
4        A.      Yes.  And it was never a "We don't have
5    enough to do 100, but we can do three or four or five."
6    It was "We don't have anywhere near enough to do,"
7    because it was of nanograms or the wrong kind.  It was
8    a small amount, and it would be for research purposes.
9        Q.      What about with the other pharmacies, or
10   whatever these entities were, from you to say, "Well,
11   if you don't have our amount, how much do you have?"
12   Did you ask that to all 10 percent of the pharmacies
13   that you contacted?
14           MR. MITCHELL:  Object to the form.
15           THE WITNESS:  I -- I don't remember.
16   BY MR. KURSMAN:
17       Q.      Okay.  Let's go to Page 11.  And do you
18   see here on Page 11, you say:  "The search was
19   broadened into the possibility of importing the
20   chemical from overseas?"
21       A.      Yes.
22       Q.      Did anybody at the Tennessee Department
23   of Corrections have a problem with importing
24   pentobarbital from overseas?
25           MR. MITCHELL:  Object to the form.

1          THE WITNESS:  Did anyone at TDOC have,

2      did you say, a problem or --

3  BY MR. KURSMAN:

4      Q.    Yes.

5      A.    With the idea of importing it from

6  overseas?

7      Q.    Yes.

8      A.    No.  They didn't have a problem with the

9  idea, as long as it was done with the proper licenses.

10     Q.    Okay.  How many -- how many suppliers

11 overseas were contacted?  Did you know?

12     A.    I didn't contact any.

13     Q.    And why is this last bullet point

14 redacted?

15          MR. MITCHELL:  And I'm going to object

16     and instruct the witness not to answer that.  That

17     may be more properly a question for counsel

18     offline.

19          MR. KURSMAN:  Okay.

20 BY MR. KURSMAN:

21     Q.    Did you redact the document "Drug

22 Procurement?"

23          MR. MITCHELL:  Again, I'm -- I'm going to

24     object and instruct the witness not to answer.

25     Again, a conversation for us to have offline.

```
 1    BY MR. KURSMAN:
 2        Q.    Let's go to -- could you turn to Page 12.
 3    Do you see the first, where it says:  "The agents
 4    informed" -- redacted -- "that" -- redacted --
 5    "because, according to them, there is a supply" --
 6    "available in the United States?"
 7        A.    Yes, I see that.
 8        Q.    After this PowerPoint presentation, has
 9    anyone attempted to get pentobarbital from overseas in
10    TDOC?
11        A.    Not that I'm aware of.
12        Q.    And has the pharma- -- the -- the owner
13    of the pharmacy attempted to obtain pentobarbital from
14    overseas?
15        A.    Not that I'm aware of.
16        Q.    Okay.  And has the pharmacist attempted
17    to obtain pentobarbital from overseas since then?
18        A.    Not that I'm aware of.
19        Q.    Okay.  And do you see that the next
20    bullet point says:
21                "When told that the companies who do have a
22                supply would not sell their supply for use
23                in lethal injection, the" -- blank --
24                "agents explained that it didn't matter and
25                that it was an issue to take up with the
```

```
 1                    companies themselves."
 2                    Do you see that?
 3          A.        Yes.
 4          Q.        And was that a matter between the DEA and
 5   the -- the pharmacy owner?
 6          A.        Yes.
 7          Q.        Okay.  Let's go to Page 13.  Do you see
 8   that the second paragraph says:
 9                    Blank -- "is now researching FDA
10                    regulations as a result of this case to
11                    determine what if any process can be
12                    undertaken to obtain FDA approval for the
13                    importation of pentobarbital."
14          A.        Yes, I see that.
15          Q.        So at this point, was the Tennessee
16   Department of Correction still wanting to obtain
17   pentobarbital from overseas if -- if it complied with
18   the FDA regulations?
19          A.        Yes.
20          Q.        Okay.  And is that still true today?
21                    MR. MITCHELL:  Object to the form.
22                    THE WITNESS:  Yes.
23   BY MR. KURSMAN:
24          Q.        Okay.  What were the results of this
25   research?
```

```
1                 MR. MITCHELL:  Object to the form.
2                 THE WITNESS:  That the -- um, the FDA
3          would not approve the importing of pentobarbital.
4    BY MR. KURSMAN:
5          Q.      And then do you see in that same
6    paragraph, you say:  "The approval process appears to
7    be very cumbersome?"
8          A.      Yes.
9          Q.      What -- what was cumbersome about the
10   approval process at that time?
11                MR. MITCHELL:  Object to the form.
12                THE WITNESS:  It regarded -- it
13         references those notes we went over earlier on
14         some of those regs of what is required in the
15         application and approval process to be obtained in
16         order to support importing a drug such as
17         pentobarbital for the uses that we would be using
18         it for.
19   BY MR. KURSMAN:
20         Q.      And could you describe what kind of
21   exceptions could be claimed?
22                MR. MITCHELL:  Again, objection to form.
23                THE WITNESS:  I don't remember, off the
24         top of my head, at this point.
25   BY MR. KURSMAN:
```

1    Q.    Did you seek an exception?

2    A.    I did not.  I don't know if the pharmacy

3    did.

4    Q.    And do you remember the last time that

5    anyone at TDOC looked into this issue?

6              MR. MITCHELL:  Object to the form.

7              THE WITNESS:  It would have been -- I

8         can't remember a specific date.  It would have

9         been when there was a -- I believe an agent that

10        came in -- I can't remember from where -- that

11        talked about the FDA and its ability to regulate

12        importation of those drugs, I think.  I don't

13        remember the date.

14   BY MR. KURSMAN:

15        Q.    And -- and that TDOC looked -- looked

16   into that opinion at the time?

17              MR. MITCHELL:  Same objection.

18              THE WITNESS:  That opinion was reviewed,

19        yes.

20   BY MR. KURSMAN:

21        Q.    Okay.  Now, let's go -- let's go to Page

22   16.  Did -- before we get there, did you review that

23   opinion?

24        A.    Yes, sir; I did.  But it's been a while,

25   so I don't remember it specifically.

1      Q.      Okay.  Did the owner of the pharmacy have

2    that opinion?

3      A.      I don't know.

4      Q.      Did anybody from TDOC talk to the owner

5    of the pharmacy about that opinion?

6      A.      I don't remember.

7      Q.      Are you the only person in communication

8    about procuring drugs with the owner of the pharmacy

9    from TDOC?

10     A.      Yes.

11     Q.      Okay.  So if you didn't talk to the

12   pharmacy about that opinion, then nobody from TDOC

13   would have talked to the pharmacy owner about that

14   opinion.  Right?

15     A.      Correct.  But I didn't say I didn't, I

16   just said I don't remember.

17     Q.      Right, right; no, I understand.

18             Could we -- could we turn to Page 16?

19     A.      I'm there.

20     Q.      Okay.  So do you see in the second

21   paragraph, you say:

22             "There are circumstances where the federal

23             government could step in and orchestrate

24             the supply of chemicals in situations where

25             supply is so low and the cost for the

```
 1                    chemical is so high as to make it virtually
 2                    unavailable where there is a significant
 3                    need."
 4                    Do you see that?
 5          A.        Yes.
 6          Q.        What are you talking about in that
 7   paragraph?
 8                    MR. MITCHELL:  Object to form.
 9   BY MR. KURSMAN:
10          Q.        You're on mute, if you're answering.
11          A.        Sorry about that.
12                    I can't remember the specific reg that
13   talks about it, but the federal government has the
14   ability to I guess insert themselves into a situation.
15                    And I can't remember if it references that
16   they can then permit importation or they can dictate that
17   drugs be made available or are given or sold to entities
18   that weren't allowed to have them before.  I can't
19   remember specifically, off the top of my head.
20          Q.        And did you ask the federal government to
21   do that in this case?
22          A.        You broke up there.  Sorry.
23          Q.        I'm sorry.  Did you ask the federal
24   government to do that in this case?
25          A.        I did not.
```

```
 1          Q.        Okay.  Let's go to the next page, which
 2    is Page 17.
 3                     Do you see there's a big question mark?
 4          A.        Yes.
 5          Q.        Is that for people to ask questions who
 6    just viewed your presentation?
 7          A.        Yes.
 8          Q.        Did anybody ask questions?
 9          A.        Not that I remember, but that doesn't
10    mean they didn't.
11          Q.        Did anybody make any statements?
12          A.        Not that I remember.
13          Q.        And we could go back to one of the
14    earlier exhibits, but I believe it's only a week after
15    this presentation that you start searching for
16    midazolam.  Is that your understanding, as well?
17          A.        It was in September, I think.
18          Q.        Right.  If you turn back -- if you turn
19    back to 6.
20          A.        Stand by.
21                    (Pause.)
22                    THE WITNESS:  Okay.
23    BY MR. KURSMAN:
24          Q.        Do you see this email is from September
25    7th, 2017?
```

```
 1          A.      Sorry, you broke up.   Could you repeat,
 2    please?
 3          Q.      Do you see this email is from September
 4    7th, 2017?
 5          A.      Yes.
 6          Q.      And that's a week after the PowerPoint
 7    presentation, right?
 8          A.      Yes.
 9          Q.      And now you're asking for midazolam; is
10    that right?
11          A.      Yes.
12          Q.      Okay.   Did the powers that be tell you to
13    look for the drugs on the day of your presentation?
14          A.      I don't remember if it was that same day
15    or not.
16          Q.      And did you have any conversations with
17    the powers that be about what drugs to look for after
18    September 7th, 2017 -- after -- yeah, after September
19    7th, 2017?
20          A.      Okay.   So, yeah, so here we're looking
21    for midazolam.   And there were the other -- the emails
22    we discussed, which I may have conferred with the
23    powers that be regarding emails from the pharmacy owner
24    about other possible attempts to accommodate.   But even
25    with that information, I was directed to look for
```

```
 1   midazolam.
 2        Q.      But did the powers that be still want you
 3   to look for pentobarbital?
 4        A.      Yes.
 5                (Exhibit No. 17 marked.)
 6   BY MR. KURSMAN:
 7        Q.      Let's go to Exhibit 17 now.
 8        A.      Did you say 17?
 9        Q.      Yeah, 17.
10        A.      Stand by.
11                (Pause.)
12                THE WITNESS:  Okay.
13   BY MR. KURSMAN:
14        Q.      Do you see this is email from October 30,
15   2019?
16        A.      Yes.
17        Q.      And do you see in here, it's -- first of
18   all, who is this email from?  Who wrote this email?
19                MR. MITCHELL:  I'm going to object to
20        that on the basis of the Court's protective order.
21                MR. KURSMAN:  Oh, I apologize.  Let me
22        clarify the information.
23   BY MR. KURSMAN:
24        Q.      Was it the owner of the pharmacy?
25        A.      Yes.
```

```
 1        Q.      Okay.  And he says -- he or she says:
 2                "It's possible we could order it, but
 3                getting it imported would be the issue.
 4                It's a Schedule II drug, and the DEA has
 5                already advised us that they do not allow
 6                the importation of drugs that they consider
 7                readily available in the U.S.  There may be
 8                a loop hole in there given the product is
 9                not readily available."
10                Is the pharmacy owner talking about
11     pentobarbital?
12        A.      Yes.
13        Q.      And did he send this email to you?
14        A.      Yes.
15        Q.      And why -- why are you still looking for
16     pentobarbital at this time?
17        A.      As I stated before, it was directed by
18     the commissioner that I do so.
19                (Exhibit No. 18 marked.)
20     BY MR. KURSMAN:
21        Q.      Okay.  Let's go to Exhibit 18.
22        A.      Okay.
23        Q.      And is this an email on Wednesday, June
24     20th, of 2018, at 10:11 a.m.?  Do you see this?
25        A.      Yes.
```

```
1          Q.      Is this -- did you write this email?
2          A.      Yes.
3          Q.      Okay.  And it says:  "We are still
4    searching for USP-grade pentobarbital."
5                  Do you see that?
6          A.      Yes.
7          Q.      You write this email to the pharmacy
8    owner?
9          A.      No.
10         Q.      Did you write this email to the
11   pharmacist?
12         A.      I'm sorry, to who?
13         Q.      To the pharmacist?
14         A.      No.
15         Q.      Did you get a response from this email?
16         A.      No.
17         Q.      The person never responded, whoever you
18   wrote this email to?
19         A.      No.
20                 (Exhibit No. 19 marked.)
21   BY MR. KURSMAN:
22         Q.      Okay.  Now, let's go to Exhibit 19.
23         A.      Okay.
24         Q.      And you can see this exhibit is titled
25   "Whether the Food and Drug Administration has
```

```
 1   Jurisdiction over Articles Intended for Use in Lawful
 2   Executions?"
 3          A.      Yes.
 4          Q.      Do you see it's dated May 3rd, 2019?
 5          A.      Yes.
 6          Q.      And it says "Memorandum Opinion for the
 7   Attorney General?"
 8          A.      Yes.
 9          Q.      Have you seen this memo before?
10          A.      I believe this was what I was referencing
11   as an Attorney General opinion that I sent to the FDA
12   earlier.
13          Q.      Have you ever read this memo?
14          A.      Yes, I believe I have.
15          Q.      Did you discuss this with anyone at TDOC?
16          A.      With general counsel.
17          Q.      Okay.  Are you aware that this memo
18   instructs the FDA to not exercise jurisdiction over the
19   importation of lethal injection drugs?
20                  MR. MITCHELL:  Objection.
21                  THE WITNESS:  Generally speaking, yes,
22          that's what I remember this opinion said.
23   BY MR. KURSMAN:
24          Q.      And why did you not discuss this memo
25   with the pharmacy owner?
```

```
 1                    MR. MITCHELL:  Object to the form.
 2                    THE WITNESS:  I didn't say I didn't.  I
 3           said I don't remember.
 4    BY MR. KURSMAN:
 5           Q.     Why would the pharmacy owner have not
 6    attempted to obtain pentobarbital from a source outside
 7    of the United States after this memorandum was issued?
 8                    MR. MITCHELL:  Same objection.
 9                    THE WITNESS:  Well, because this
10           memorandum doesn't actually change the law.  And
11           my understanding from general counsel is there's
12           still a D.C. Circuit case that is controlling that
13           this memorandum does not change.  It would still
14           not allow us to do that.
15    BY MR. KURSMAN:
16           Q.     Are you aware that since the issuance of
17    this memo other states have succeeded in obtaining
18    pentobarbital?
19                    MR. MITCHELL:  Object to the form.
20                    THE WITNESS:  If they are the states you
21           referenced earlier, I wasn't specifically aware.
22    BY MR. KURSMAN:
23           Q.     Are you aware that the DEA has not
24    intervened in any importation of execution drugs after
25    the issuance of this memorandum?
```

```
 1                    MR. MITCHELL:  Same objection.
 2                    THE WITNESS:  I don't have that
 3          knowledge.
 4     BY MR. KURSMAN:
 5          Q.       Did you or anyone at TDOC contact the
 6     United States Department of Justice, Office of Legal
 7     Counsel, to get a better understanding of this
 8     memorandum?
 9          A.       I did not.  I can't speak for whether
10     general counsel did or not.
11          Q.       And if you talked to the pharmacy owner
12     about this memorandum, would have that been through
13     email?
14                    MR. MITCHELL:  Object to the form.
15                    THE WITNESS:  More than likely a phone
16          call.
17     BY MR. KURSMAN:
18          Q.       And did you send this memorandum to the
19     pharmacy owner?
20          A.       I don't remember if I did or not.
21          Q.       Did you contact the DEA about this
22     memorandum?
23          A.       No.
24          Q.       Did you contact the FDA about this
25     memorandum?
```

```
 1        A.      No.
 2        Q.      Are you aware whether anyone at TDOC
 3   contacted the DEA about this memorandum?
 4        A.      I'm not aware whether they did or not.
 5        Q.      Are you aware if anyone from TDOC
 6   contacted the FDA about this memorandum?
 7        A.      I'm not aware whether they did or not.
 8                MR. KURSMAN:  I think now is probably a
 9        good time for a 10-minute break.
10                THE VIDEOGRAPHER:  We're off the record
11        at 5:20 p.m.
12                (Recess at 5:20 p.m. to 5:30 p.m.)
13                THE VIDEOGRAPHER:  We are back on the
14        record at 5:30 p.m.
15   BY MR. KURSMAN:
16        Q.      Okay.  So we just got off a break.
17   During the break, did you talk to your attorneys at
18   all?
19        A.      No.
20                (Exhibit No. 21 marked.)
21   BY MR. KURSMAN:
22        Q.      Okay.  Let's go to Exhibit 21.
23        A.      Oh, and I'll tell you I'm still in the
24   room by myself.
25        Q.      Okay.  I appreciate that.
```

```
1          A.      Did you say 21?

2          Q.      Yeah, let's skip 20 and go to 21.

3                  And do you see it's an email dated

4   November 26th, 2019?

5          A.      Yes.

6          Q.      And it says "See attached."

7          A.      Yes.

8          Q.      Is this an email from the pharmacy to

9   you?

10         A.      Yes.

11         Q.      And did it come with an attachment?

12         A.      Yes.

13                 MR. KURSMAN:  Okay.  We will request the

14         attachment in discovery.

15  BY MR. KURSMAN:

16         Q.      And was the attachment lab results?

17         A.      Yes.

18                 (Exhibit No. 22 marked.)

19  BY MR. KURSMAN:

20         Q.      Let's go to Exhibit 22.

21         A.      Okay.

22         Q.      And you see this email is from August

23  9th, 2019?

24         A.      Yes.

25         Q.      It says:  "Attached is our in house
```

```
 1    sterility report."
 2         A.      Yes.
 3         Q.      Is this from the pharmacy, as well?
 4         A.      Yes.
 5         Q.      Can you explain to me why the pharmacy is
 6    conducting an in-house sterility report?
 7              MR. MITCHELL:  Object to the form.
 8              THE WITNESS:  They do that.  My
 9         understanding is they do that anyway with their
10         compounds.  They also test their own sterility.
11    BY MR. KURSMAN:
12         Q.      Did the third party also test sterility
13    for their drugs?
14         A.      Yes.
15         Q.      Okay.  Was there a report attached to
16    this email?
17         A.      Yes.
18              MR. KURSMAN:  Okay.  We will request this
19         report in discovery, as well.
20              (Exhibit No. 23 marked.)
21    BY MR. KURSMAN:
22         Q.      Let's turn to Exhibit 23.  Let me know
23    when you're there.
24         A.      Got it.
25         Q.      Do you see this is an email dated August
```

```
 1   8th, 2019?
 2        A.      Yes.
 3        Q.      Is this an email from the pharmaceutical
 4   company?
 5        A.      Yes.
 6        Q.      And it says:  "Here is the
 7   suitability/methodology test for the KCl that was
 8   falling out of solution."  Do you see that?
 9        A.      Yes.
10        Q.      And "KCl" is potassium chloride, right?
11        A.      Yes.
12        Q.      Where was the potassium chloride falling
13   out of solution?
14                MR. MITCHELL:  Object to the form.
15                THE WITNESS:  It was while at the third
16        party for testing, it was falling out of solution.
17   BY MR. KURSMAN:
18        Q.      And when was that?
19        A.      Could you hear me?
20        Q.      No, I could not hear you.
21        A.      Sorry.  I don't remember a specific date,
22   but it would have been around I think the time of this
23   email.
24        Q.      Okay.  And was that potassium chloride
25   used in an execution?
```

```
1          A.      No.
2                  MR. MITCHELL:  Object to form.
3    BY MR. KURSMAN:
4          Q.      Why would you not use that potassium
5    chloride in an execution?
6                  MR. MITCHELL:  Same objection.
7                  THE WITNESS:  Because it was falling out
8          of solution, then it was -- we wouldn't be able to
9          use it in an execution.
10   BY MR. KURSMAN:
11         Q.      And was a test or results of a test
12   attached to this email?
13         A.      Yes.
14                 MR. KURSMAN:  Okay.  We will request
15         those results, as well, in discovery.
16                 (Exhibit No. 24 marked.)
17   BY MR. KURSMAN:
18         Q.      Could you turn to Exhibit 24.
19         A.      Okay.
20         Q.      This is an email dated August 8th, 2019.
21   Do you see that?
22         A.      Yes.
23         Q.      And it's at the bottom -- I'm sorry, 7:55
24   a.m.  Do you see that?  It says "kcl protocol."  Do you
25   see it?  You're muting.
```

```
 1          A.        Sorry.   Yeah.   I didn't move my mouse
 2     over.
 3          Q.        Okay.   It says:  "I made edits to the
 4     instructions could you have pharmacist review and
 5     confirm these are good."
 6          A.        Yes, I see that.
 7          Q.        Is this an email that you wrote?
 8          A.        Yes.
 9          Q.        Okay.   What -- what edits did you make to
10     what instructions?
11          A.        It was to the calcium chloride
12     preparation protocol.  They were medical edits, as far
13     as I remember.
14          Q.        And why did you have:  "Also I want to
15     confirm that 24 hours in the fridge will be enough time
16     for it to fully thaw given the size of the vials?"
17          A.        Yes, I see that.
18          Q.        Why did you ask that?
19          A.        Since the vials were 60 ml's, they're
20     larger than the vials that had the midazolam.  So I
21     confirmed that as they were larger, 10 milligrams, that
22     24 hours in the refrigerator would be enough time to
23     thaw it.
24          Q.        And the -- the edits you made to the
25     instructions, were they attached to this email?
```

```
 1        A.      Yes.
 2                MR. KURSMAN:   Okay.   We would request
 3        those edits in discovery, as well.
 4   BY MR. KURSMAN:
 5        Q.      Were -- were those edits made at all
 6   because the potassium chloride was falling out of
 7   solution?
 8        A.      If I remember correctly the sequence of
 9   events, it was because it was falling out of solution
10   they had to change the potency at which it was
11   compounded.
12                So our edits were in discussions with
13   them, because it had a different potency, just to make
14   sure that the protocols for preparation of it during an
15   execution were correct -- if I remember correctly.
16        Q.      And did those protocols change at all?
17        A.      Yes.
18                MR. KURSMAN:   Okay.   We would request
19        those, the changes in the protocols, as well.
20   BY MR. KURSMAN:
21        Q.      Do you know why the potassium chloride
22   began to fall out of solution in August of 2019?
23        A.      I don't know the specifics of that.   That
24   would be a pharmacist question.
25        Q.      Did the potassium chloride ever fall out
```

```
 1   of solution at TDOC?
 2              MR. MITCHELL:  Object to the form.
 3              THE WITNESS:  No.
 4   BY MR. KURSMAN:
 5       Q.    Does TDOC ever edit pharmacy instructions
 6   related to any drugs not used in lethal injections?
 7              MR. MITCHELL:  Objection.
 8              THE WITNESS:  Can you rephrase or repeat
 9        your question once again?
10   BY MR. KURSMAN:
11       Q.    Sure.  So here, you as an agent of TDOC
12   edited instructions for the -- the potassium chloride
13   protocol.  My question is:  Does the Department ever
14   edit pharmacy instructions related to any drugs not
15   used in lethal injections?
16              MR. MITCHELL:  Form objection.
17              THE WITNESS:  I don't know.
18   BY MR. KURSMAN:
19       Q.    Okay.  What expertise do you have to edit
20   instructions in a potassium chloride protocol?
21              MR. MITCHELL:  And I'm going to object
22        and instruct the witness not to answer per our
23        conversations this morning about protective order.
24              MR. KURSMAN:  Okay.  I will just continue
25        to request those edits.  And if a redline was sent
```

```
 1              with this email I would request that, as well.
 2                   MR. MITCHELL:  Okay.
 3                   (Exhibit No. 25 marked.)
 4     BY MR. KURSMAN:
 5          Q.     Can we go to Exhibit 25.
 6          A.     Stand by.
 7                 (Pause.)
 8                 THE WITNESS:  Okay.
 9     BY MR. KURSMAN:
10          Q.     Do you see this is an email from July
11     31st, 2019?
12          A.     Yes.
13          Q.     And it says:  "Attached is the complete
14     report for Midazolam.  KCl shows as still pending."
15                 Do you see that?
16          A.     Yes.
17          Q.     Okay.  Was there a report attached for
18     the midazolam?
19          A.     Yes.
20                 MR. KURSMAN:  Okay.  We would request
21          that report in discovery.
22     BY MR. KURSMAN:
23          Q.     "The KCl shows as still pending."  Do you
24     at some point get that report, as well?
25          A.     Yes.
```

```
1                    MR. KURSMAN:  Okay.  I will request that
2         report in discovery, as well.
3    BY MR. KURSMAN:
4         Q.       Let -- let me ask you this:  Do you know,
5    without identifying any information, who the third
6    party is that tests the lethal injection drugs?
7         A.       I know who it is.
8         Q.       You do?  And do you know whether they
9    have a relationship with the pharmacy company?
10        A.       Are you asking do I know if they had a
11   relationship?
12        Q.       Yes.
13        A.       I mean, a business one, I assume.
14        Q.       With the pharmacy company?
15        A.       Right, a business relationship.
16        Q.       And do you know whether the third-party
17   company knows that the drugs they're testing are going
18   to be used in lethal injections?
19        A.       I don't know that they know that.
20                 (Exhibit No. 26 marked.)
21   BY MR. KURSMAN:
22        Q.       Okay.  Let's go to Exhibit 26.
23        A.       Stand by.
24                 (Pause.)
25                 THE WITNESS:  Okay.
```

```
 1    BY MR. KURSMAN:
 2         Q.      You see this is from July 24th, 2019?
 3         A.      Yes.
 4         Q.      And is this also from the pharmacy
 5    company?
 6         A.      No.
 7         Q.      The owner of the pharmacy company?  I
 8    apologize.
 9         A.      Yes.
10         Q.      And it says:  "Attached are the potency
11    reports for Midazolam and KCl.  Another week before the
12    sterility comes back."
13                 Do you see that?
14         A.      Yes.
15         Q.      Were potency reports attached for
16    midazolam and KCl?
17         A.      Yes.
18                 MR. KURSMAN:  Okay.  And we will request
19         both of those reports in discovery.
20    BY MR. KURSMAN:
21         Q.      Did you also receive the sterility
22    reports?
23         A.      Yes.
24                 MR. KURSMAN:  Okay.  We will request the
25         sterility reports for the midazolam and the KCl.
```

1                    (Exhibit No. 27 marked.)

2    BY MR. KURSMAN:

3         Q.       Can we go to Exhibit 27.   And do you see

4    -- let me know when you're there.

5         A.       I'm there.

6         Q.       Okay.   Do you see at the bottom it says:

7    "July 2, 2019," it says "Forward:   KCl protocol?"

8         A.       Yes.

9         Q.       It says:   "Can you review the attached

10   and let me know if this works?"

11        A.       Sorry, can you repeat?

12        Q.       Do you see it says:   "Can you review the

13   attached and let me know if this works?"

14        A.       Yes.

15        Q.       Did you write this email?

16        A.       Yes.

17        Q.       Was this also to the pharmacy?

18        A.       Was it to the pharmacy owner?

19        Q.       Yes.

20        A.       Yes.

21                 MR. KURSMAN:   Okay.   We would request the

22            attachment as referenced in Exhibit 27 as

23            discovery.

24   BY MR. KURSMAN:

25        Q.       And while we're here, do you have or does

```
 1   TDOC have instructions for vecuronium bromide?
 2        A.     No.
 3        Q.     Okay.  And why aren't there instructions
 4   for vecuronium bromide?
 5               MR. MITCHELL:  Objection.
 6               THE WITNESS:  We don't have any written
 7          instructions.  We just rely on the verbal
 8          instructions that were given by the pharmacist to
 9          the executioner.
10   BY MR. KURSMAN:
11        Q.     Okay.  And why did TDOC decide that they
12   didn't need written instructions?
13               MR. MITCHELL:  Same objection.
14               THE WITNESS:  The verbal instructions
15          were sufficient.
16               (Exhibit No. 28 marked.)
17   BY MR. KURSMAN:
18        Q.     Okay.  Let's go to Exhibit 28.
19               And before we get there, are the
20   instructions from the pharmacist mandatory?
21               MR. MITCHELL:  Objection.
22               THE WITNESS:  So when we're talking about
23          the instructions for the preparation of the -- of
24          the -- not drugs; the preparation of the syringes
25          is what you're referring to, yes?
```

```
 1   BY MR. KURSMAN:

 2         Q.     Yes.

 3         A.     Yes, we have to follow those instructions

 4   when preparing.

 5         Q.     And do -- does the execution team have to

 6   follow the pharmacist's instructions for the storing of

 7   the lethal injection chemicals?

 8                MR. MITCHELL:   Same objection.

 9                THE WITNESS:   Yes.

10   BY MR. KURSMAN:

11         Q.     Let's go to Exhibit 28.   Let me know when

12   you're there.

13         A.     I'm there.

14         Q.     Okay.   This is an email dated May 9,

15   2019?

16         A.     Yes.

17         Q.     And it says "Lab report for Midazolam?"

18         A.     Yes.

19         Q.     Okay.   Who wrote this email?

20                MR. MITCHELL:   Can you rephrase that,

21         pursuant to the protective order?

22                MR. KURSMAN:   I apologize.

23   BY MR. KURSMAN:

24         Q.     Did the pharmacy company owner write this

25   email?
```

```
 1          A.      Yes.
 2          Q.      Okay.  And who performed the lab report?
 3  Was it the pharmacy company?
 4          A.      No, the lab report comes from the
 5  third-party tester.
 6          Q.      And was there a report with this email?
 7          A.      Yes.
 8                  MR. KURSMAN:  Okay.  We would request
 9          this lab report as part of discovery, as well.
10                  (Exhibit No. 29 marked.)
11  BY MR. KURSMAN:
12          Q.      Let's go to Exhibit 29.  Let me know when
13  you're there.
14          A.      I'm there.
15          Q.      Okay.  And do you see this is dated April
16  29th, 2019?
17          A.      Yes.
18          Q.      And is this also an email from the
19  pharmacy?
20          A.      From the pharmacy owner, yes.
21          Q.      And was there a potency report attached
22  to this email?
23          A.      Yes.
24                  MR. KURSMAN:  Okay.  We will request that
25          in discovery.
```

```
 1   BY MR. KURSMAN:
 2        Q.      It also says "The sterility is still
 3   pending."  Do you see that?
 4        A.      Yes.
 5        Q.      Okay.  Did you ever receive a sterility
 6   report for the midazolam?
 7        A.      Yes.
 8                MR. KURSMAN:  Okay.  We'll request that,
 9        as well.
10                (Exhibit No. 30 marked.)
11   BY MR. KURSMAN:
12        Q.      Let's turn to Exhibit 30.  And do you see
13   this is from August 6th, 2018?
14        A.      Yes.
15        Q.      And do you see it says "Lab results for
16   sterility testing?"
17        A.      Yes.
18        Q.      Was this also from the pharmacy?
19        A.      From the pharmacy owner, yes.
20        Q.      And was this sterility test done by the
21   third party?
22        A.      Yes.
23        Q.      And there were results attached to this
24   email?
25        A.      Yes.
```

```
 1                    MR. KURSMAN:   Okay.   We will request --
 2         request this as part of discovery, as well.
 3                    (Exhibit No. 31 marked.)
 4    BY MR. KURSMAN:
 5         Q.    Now, let's go to July 12th -- I'm sorry,
 6    to Exhibit 31.
 7         A.    Okay.
 8         Q.    And do you see it says "Attached is the
 9    report from" -- blank -- "on our compounds?"
10         A.    Yes.
11         Q.    Is this also from the pharmacy owner?
12         A.    Yes.
13         Q.    Is this attached on -- or a report on
14    drugs that were compounded?
15         A.    I believe these are testing of the
16    methodology for the compounding, I think.  But there
17    are reports attached.
18         Q.    When you say "the methodology for the
19    compounding," are they actually of the compounded drug?
20         A.    I'm sorry, you broke up there at the end.
21         Q.    So it says "Attached is a report from" --
22    blank -- "on our compounds."  Is the third party
23    testing compounded drugs here?
24                    MR. MITCHELL:   Object to the form.
25                    THE WITNESS:   Yes.
```

```
 1   BY MR. KURSMAN:
 2       Q.    Okay.  Do you know which drugs these
 3   tests were in reference to in terms of which inmate?
 4       A.    Sorry.  This would have been -- like I
 5   said, I don't think this was on a specific compound for
 6   an inmate.  I think this was their testing of their
 7   methodology for making the compound.  So it was a test
 8   to make sure their methodology was sound.
 9       Q.    Okay.  So can you -- can you explain that
10   to me a bit?  Is -- is what you're saying that the
11   pharmacy would compound midazolam to be used in no
12   executions but just to be tested?  Is that what you're
13   saying?
14       A.    They would -- they would compound.  So as
15   I described earlier in the deposition, they have a
16   methodology that's usually from the manufacturer of the
17   API.  They follow that methodology in making the
18   compound.
19             They then send this compound to the
20   third-party testing to make sure that it is -- that it
21   is going to pass potency and sterility and endotoxins.
22   And it's done to make sure on the front end that
23   they're compounding correctly.
24       Q.    So after they do this test compound, do
25   they also send to the third party the drugs that are
```

```
 1   actually compounded to be used in executions?
 2               MR. MITCHELL:  Object to the form.
 3               THE WITNESS:  So -- yes.  So every time
 4         they -- that they compound an LIC for an
 5         execution, it's sent to that third-party testing
 6         lab.
 7   BY MR. KURSMAN:
 8         Q.    So why would they send a pre-execution
 9   compounded drug to the -- to the third party?
10               MR. MITCHELL:  Same objection.
11               THE WITNESS:  This was the first time
12         that they compounded it for us.  If you look at
13         the date, this is before the Irick execution.
14         This was done to make sure the methodology was
15         sound.
16               Once that was determined, now they send
17         the compounds that are made for each inmate and
18         execution and test it.  This was done to make sure
19         the method -- methodology was sound.
20               MR. KURSMAN:  Okay.  Well, I will -- I
21         will request this report on compounds in
22         discovery, as well.
23               And thanks for that explanation.
24               (Exhibit No. 32 marked.)
25   BY MR. KURSMAN:
```

```
 1          Q.      Could we turn to Exhibit 32?  And let me
 2   know when you get there.
 3          A.      I'm there.
 4          Q.      Okay.  Do you see this is an email dated
 5   November 14, 2017?
 6          A.      At 9:59 a.m., right?
 7          Q.      Right.
 8          A.      Yes.
 9          Q.      And do you see it says "Has the exam been
10   set up?"
11          A.      Yes.
12          Q.      Did you write this email?
13          A.      Yes.
14          Q.      What does "Has the exam been set up?"
15   mean?
16          A.      Well, honestly, to tell you what that
17   means could identify who I'm talking about.
18          Q.      Okay.  Well --
19          A.      Is there another way you want to phrase
20   it?
21          Q.      Yes.  Has the -- what does it mean, "Has
22   the exam been set up?"
23                  MR. MITCHELL:  I'm going to lodge an
24          objection pursuant to the protective order and
25          instruct the witness not to answer.
```

```
 1   BY MR. KURSMAN:
 2        Q.     Okay.  Is -- is there a way you can
 3   explain it to me without violating the protective
 4   order?
 5        A.     No.
 6               MR. MITCHELL:  If you want to table this
 7        until the end and then permit me to talk with the
 8        Drug Procurer and take some sort of measure like
 9        that, I'm happy to propose something like that.
10               MR. KURSMAN:  Yeah, let's do that.  I
11        think that's reasonable.
12               (Exhibit No. 33 marked.)
13   BY MR. KURSMAN:
14        Q.     Okay.  Let's move on to Exhibit 34 -- or
15   33, I'm sorry.
16        A.     Stand by.
17        Q.     And let me know when you're there.
18        A.     I'm there.
19        Q.     You see it says:  "Attached is a sample
20   prescription for ordering a compounded preparation?"
21        A.     Yes.
22        Q.     Who wrote this email?  Did the -- I'm
23   sorry, let me ask this.  Did the pharmacy owner write
24   this note?
25        A.     Yes.
```

```
1          Q.      Why?
2                  MR. MITCHELL:  Object to the form.
3                  THE WITNESS:  As a sample of what they
4          accept for an order, a compounded preparation.
5    BY MR. KURSMAN:
6          Q.      And did the pharmacy owner attach a
7    sample prescription?
8          A.      Yes.
9                  MR. KURSMAN:  Okay.  We will request that
10         prescription in discovery.
11   BY MR. KURSMAN:
12         Q.      Is -- is there a reason why the pharmacy
13   owner was so enthusiastic about providing TDOC with
14   execution drugs?
15                 MR. MITCHELL:  Object to the form.
16                 THE WITNESS:  I have no way of knowing
17         his mental state or whether he's enthusiastic or
18         not.
19   BY MR. KURSMAN:
20         Q.      Well, did you -- did you ever talk to him
21   about that?
22         A.      No.
23                 (Exhibit No. 34 marked.)
24   BY MR. KURSMAN:
25         Q.      Okay.  Let's -- let's go to Exhibit 34.
```

```
 1                    Let me know when you're there.
 2        A.     Okay.
 3        Q.     Do you see the second email is December
 4   15th, 2017, at 2:11?
 5        A.     Okay.  The top one is at 2:12.  Let me
 6   scroll down.
 7        Q.     Sure.
 8        A.     Oh, yeah, 2:11.  Okay.
 9        Q.     Did you write this email?
10        A.     Yes.
11        Q.     Was it to the pharmacy owner?
12        A.     Yes.
13        Q.     What Tennessee Supreme Court case were
14   you talking about with the pharmacy owner?
15        A.     If I remember correctly, I'm referencing
16   West Lee Schofield.
17        Q.     I'm sorry?
18        A.     West -- W-E-S-T -- Lee Schofield.  And I
19   cannot remember how to spell his name.
20        Q.     Okay.  That's okay.  And why were you
21   discussing a Tennessee Supreme Court case with the
22   pharmacy owner?
23        A.     The statutes in that case are with regard
24   to the confidentiality protections under Tennessee law.
25        Q.     And when was the last time you discussed
```

```
 1   legal matters with the pharmacy owner?
 2              MR. MITCHELL:  Object to the form.
 3              THE WITNESS:  Um, I don't really recall
 4        discussing legal matters with the pharmacy owner.
 5   BY MR. KURSMAN:
 6        Q.     Okay.  Well, in 2017, you say:  "On the
 7   phone I said subsection (g) of 10-7-504 it is actually
 8   subsection (h)."
 9              That would be a discussion over legal
10   matters you had with the pharmacy owner, right?
11        A.     By that definition, I -- he wanted to
12   know -- the pharmacy owner wanted to know what
13   protections there were for confidentiality and identity
14   of those involved in lethal -- or in executions, and so
15   I sent this information to the pharmacy owner.
16              Other than this, I don't recall any
17   specific instances of having legal conversations with
18   the pharmacy owner.
19        Q.     Okay.  This is the only one you've ever
20   had; is that right?
21        A.     From my recollection, yes.
22              (Exhibit No. 35 marked.)
23   BY MR. KURSMAN:
24        Q.     Okay.  Let's go to Exhibit 35.  And let
25   me know when you're there.
```

```
 1          A.      Okay.
 2          Q.      Okay.  And you see this is an email of
 3   June 26th, 2019?
 4          A.      Yes.
 5          Q.      And it says "Proposed Alternative," as
 6   the subject?
 7          A.      Yes.
 8          Q.      Did you write this email?
 9          A.      Yes.
10          Q.      Okay.  And then it has "Midazolam,
11   Digoxin, Morphine Sulfate, and Propanolol."
12          A.      Yes.
13          Q.      Were you writing this email to the
14   pharmacy owner?
15          A.      Yes.
16          Q.      Why?
17                  MR. MITCHELL:  Object to the form.
18                  THE WITNESS:  It was in relation to a --
19          I want to say it was proposing a list of things as
20          alternatives to the current protocol.
21   BY MR. KURSMAN:
22          Q.      And what were you asking the pharmacy
23   owner to do with this information?
24          A.      To look into availability, but also to
25   look at the drugs themselves and see what the pharmacy
```

```
 1    owner could find out about.
 2         Q.      Did the pharmacy owner look into the
 3    availability of these drugs?
 4              MR. MITCHELL:  Objection.
 5              THE WITNESS:  Yes, I believe so.
 6    BY MR. KURSMAN:
 7         Q.  ·  So the pharmacy owner looked into the
 8    availability of digoxin?
 9              MR. MITCHELL:  Objection.  Same
10         objection.
11              THE WITNESS:  I believe so.
12    BY MR. KURSMAN:
13         Q.      And you believe that the pharmacy owner
14    looked into the availability of morphine sulfate?
15         A.      Yes.
16         Q.      And you believe that the pharmacy owner
17    looked into the availability of propanolol?
18         A.      Yes.
19         Q.      Okay.  And were they told that these
20    drugs were available?
21              MR. MITCHELL:  Objection.
22              THE WITNESS:  Off the top of my head, I
23         can't remember which of these would -- are readily
24         available.
25    BY MR. KURSMAN:
```

```
 1        Q.        Did you say are readily or are not
 2   readily?
 3        A.        I can't remember which of these are or
 4   are not readily available, or were at the time of this
 5   email.
 6        Q.        Okay.  Do you have any records showing
 7   which of these drugs are readily available?
 8                  MR. MITCHELL:  Object to form.
 9                  THE WITNESS:  I don't.  I don't know, for
10        sure.  I -- I may.  There may not be any now.  I
11        don't know.
12                  MR. KURSMAN:  Okay.  And I would request
13        that in discovery.
14   BY MR. KURSMAN:
15        Q.        Do you have any records showing that
16   these drugs that I just discussed are not readily
17   available?
18        A.        Same answer.
19                  MR. KURSMAN:  Okay.  I would request that
20        in discovery.
21   BY MR. KURSMAN:
22        Q.        And what is your definition of "readily
23   available?"
24                  MR. MITCHELL:  Object to form.
25                  THE WITNESS:  Available for purchase and
```

```
 1              allowed to be used or sold to the Department of
 2              Correction and in quantities to do more than -- to
 3              have a ready supply to do more than one execution.
 4       BY MR. KURSMAN:
 5              Q.      So would two executions be enough?
 6                      MR. MITCHELL:   Same objection.
 7                      THE WITNESS:    That -- I would have to
 8              consult with general counsel and the commissioner
 9              on that.
10       BY MR. KURSMAN:
11              Q.      Are you aware that an oral administration
12       of secobarbital could be used as an alternative method
13       of execution?
14                      MR. MITCHELL:   Same objection.
15                      THE WITNESS:    I'm not aware of that.
16       BY MR. KURSMAN:
17              Q.      Did you ever attempt to obtain
18       secobarbital?
19              A.      No.
20              Q.      Did the pharmacy to your knowledge ever
21       obtain secobarbital?
22              A.      Not that I recall.
23                      (Exhibit No. 36 marked.)
24       BY MR. KURSMAN:
25              Q.      Let's go to Exhibit 36.  And let me know
```

```
 1   when you get there.
 2        A.      Okay.
 3        Q.      Are you there?
 4        A.      Yes.
 5        Q.      And you see this is an invoice with an
 6   invoice date of 12/20/19?
 7        A.      Yes.
 8        Q.      And is this an invoice from the pharmacy?
 9        A.      Yes.
10        Q.      And do you see that there is an order of
11   60 -- a quantity of 60 Midazolam Bulk API in grams?
12        A.      Yes.
13        Q.      And does this indicate a purchase of 60
14   grams of midazolam?
15        A.      No, it's -- my understanding is it's 60
16   units, for lack of a better term.  I don't know how
17   many grams are in each unit.
18        Q.      And what does it create?
19        A.      Could you repeat?
20        Q.      What's that?  I'm sorry, I missed that.
21        A.      Could you repeat?
22        Q.      Yes.  What does it create?
23                MR. MITCHELL:  Object to the form.
24                THE WITNESS:  I'm sorry, you keep
25        breaking up.  It was "something create."
```

```
 1   BY MR. KURSMAN:
 2         Q.      Yes.   What does 60 units create?
 3                 MR. MITCHELL:  Same objection.
 4                 THE WITNESS:  60 units is -- like I said
 5         earlier, I haven't seen API.  My understanding is
 6         that there's a number of grams in each unit.  I
 7         don't know how many grams are in each unit.
 8   BY MR. KURSMAN:
 9         Q.      So let me get this straight.  The
10   Department is paying $40,000 for 60 units of API, but
11   you don't know how many grams are in each unit?
12                 MR. MITCHELL:  Same objection.
13                 THE WITNESS:  Not at this time, I don't.
14   BY MR. KURSMAN:
15         Q.      Okay.  Do you know how many executions 60
16   units could be used for?
17                 MR. MITCHELL:  Same objection.
18                 THE WITNESS:  At this -- right now, I
19         don't remember.
20                 (Exhibit No. 37 marked.)
21   BY MR. KURSMAN:
22         Q.      Okay.  Let's go to Exhibit 37, and let me
23   know when you get there.
24         A.      Okay.
25         Q.      Okay.  Do you see this invoice from
```

```
 1   October 26th, 2017?

 2        A.     Yes.

 3        Q.     And is this also from the pharmacy?

 4        A.     Yes.

 5        Q.     And it says "A quantity of 50 potassium

 6   chloride at 2 milliequivalents per milliliter at 20

 7   milliliters."  Do you see that?

 8        A.     Yes.

 9        Q.     So are you aware of how much potassium

10   chloride that is?

11        A.     In that instance, I think it refers to 50

12   vials.

13        Q.     Okay.  So if you took 50 vials of 2

14   milliequivalent per milliliter, 20 milliliters, that

15   would be 40 milliequivalents per vial.  Right?

16                 MR. MITCHELL:  Object to form.

17                 THE WITNESS:  Sorry, you have to go slow

18        with me on that.

19   BY MR. KURSMAN:

20        Q.     Okay.  I'm sorry.

21               So you have these vials that are 2 milli-

22   -- 2 milliequivalent per milliliters at 20 milliliters.

23   Do you see that in the description?

24        A.     Yes.

25        Q.     Okay.  So that would be a vial that
```

1  contained 40 milliequivalents of potassium chloride,

2  correct?

3       A.      It has 20 milliliters of potassium 2 mEq

4  concentration of potasium chloride.

5       Q.      Okay.  So my question is:  That would be

6  40 milliequivalents of potassium chloride per vial --

7  per vial, right?

8                   MR. MITCHELL:  Object to the form.

9                   THE WITNESS:  No, it's 20 milliliters.

10 BY MR. KURSMAN:

11      Q.      Okay.  Let's -- let me -- let me try this

12 again.  So there's in this vial, every milliliter,

13 there's 2 milliequivalents of potassium chloride,

14 right?

15      A.      Correct.

16      Q.      And there's 20 milliliters in this vial,

17 right?

18      A.      Correct.

19      Q.      So there would be 40 milliequivalents of

20 potassium chloride in each vial, right?

21      A.      I'm not understanding the math.  So it

22 doesn't -- 20 times 2 doesn't change the potency or the

23 mEq.  It's 2 mEq, 20 milliliters of that concentration.

24      Q.      So your understanding is that you have --

25 each vial is 2 milliequivalents in the 20-milliliter

Case 3:18-cv-01234   Document 184-3   Filed 03/13/23   Page 277 of 328 PageID #: 6336

```
 1   vial?
 2               MR. MITCHELL:  Again, I'm going to object
 3          to form.
 4               THE WITNESS:   The concentration of 2
 5          mEq's per milliliter, and there are 20 milliliters
 6          of it.
 7   BY MR. KURSMAN:
 8          Q.      Right.  So my question is:  Because it's
 9   a 20-milliliter vial, doesn't that mean each vial has
10   40 milliequivalents of potassium chloride?
11               MR. MITCHELL:  Same objection.
12               THE WITNESS:   No.
13   BY MR. KURSMAN:
14          Q.      What does it mean?
15          A.      As I've already stated, it means the
16   entire solution has a concentration of 2 mEq's per ml.
17          Q.      And how much is the entire solution?
18          A.      There are 20 milliliters in each vial.
19          Q.      Okay.  So if the vial has 20 milliliters
20   at a solution of 20 milliequivalents per milliliter,
21   what is your understanding of how many milliequivalents
22   of potassium chloride are in each vial?
23               MR. MITCHELL:  Object to the form.
24               THE WITNESS:   As I stated, 2 mEq's per ml
25          is the concentration of the entire vial.
```

```
 1   BY MR. KURSMAN:
 2        Q.      Right.   I understand that.   What I'm
 3   not -- I'm not asking per the ml.   I'm asking what's
 4   your understanding of how many milliequivalents are
 5   there of potassium chloride in each vial.
 6             MR. MITCHELL:   And, Alex, I'm going to
 7        lodge the same objection.   This has been asked and
 8        answered.   I'm going to let the Drug Procurer
 9        answer it, but it may be better for another
10        deposition.
11             THE WITNESS:   There's 20 ml's in a 2 mEq
12        concentration, so there are 20 ml's of that
13        concentration.
14   BY MR. KURSMAN:
15        Q.      Right.   So what does that equal?   How
16   many milliequivalents of potassium chloride are there
17   per vial?
18        A.      As I've already stated probably eight
19   times, there's 20 milliliters -- 20 milliliters of 2
20   mEq concentration.   20 milliliters of 2 mEq
21   concentration.
22        Q.      Right.   So I'm asking -- because this is
23   an important thing of the protocol for the execution
24   team to know.   So what I'm asking is:   How many
25   milliequivalents of potassium chloride do you believe
```

```
 1  are in each vial?
 2              MR. MITCHELL:  Alex, this has been asked
 3        and answered several times, and I just don't think
 4        you like the answer.
 5  BY MR. KURSMAN:
 6        Q.    But you -- but you can answer the
 7  question.
 8        A.    There are in a 20-milliliter vial, the
 9  entire solution, the entire 20 milliliters is a
10  concentration of 2 mEq.  So multiple vials are drawn up
11  to meet the 120-milliliter requirement for the
12  execution.
13        Q.    And how many of them are drawn up?
14        A.    Doing the math, it'd be -- to meet 20
15  milliliters would be 10 vials.
16        Q.    10 vials?  Okay.
17              (Exhibit No. 38 marked.)
18  BY MR. KURSMAN:
19        Q.    Let's go to Exhibit 38.  Let me know when
20  you get there.
21        A.    Okay.
22        Q.    Okay.  And you see that's an invoice
23  dated August 16, 2018?
24        A.    Yes.
25        Q.    Okay.  And it's an invoice from the
```

```
 1    pharmacy company?
 2         A.      Yes.
 3         Q.      And do you see it says:  "24 doses of
 4    midazolam at 50 milligrams per milliliter at 5
 5    milliliters compounded for injection?"
 6         A.      Yes.
 7         Q.      Okay.  Do you know how many milligrams of
 8    midazolam are in each vial?
 9         A.      Sorry, each vial?  Each vial is 5
10    milliliters.
11         Q.      Okay.  But how many milligrams of
12    midazolam are in each vial?
13         A.      The potency is 50 milligrams per ml.
14         Q.      Right.  In each -- in each vial, how many
15    milligrams of midazolam in each vial?
16              MR. MITCHELL:  Object to the form.
17              THE WITNESS:  We're going with this math
18         again, so let's see if I can talk my way through
19         it to answer the question.
20              Okay.  So you're asking it's 5
21         milliliters, there's 50 grams per milliliter.  So
22         that is -- the potency of the entire 5 milliliters
23         then has to be diluted when pulled into the
24         syringe.
25    BY MR. KURSMAN:
```

```
1          Q.      So how many vials would be used in each
2    execution?
3                  MR. MITCHELL:  And again, objection to
4         form.
5                  THE WITNESS:  It's -- sorry, I'm doing
6         math in my head.
7                  It's four.
8    BY MR. KURSMAN:
9          Q.      Did you say four?
10         A.      Yeah.
11         Q.      Okay.  So for each execution, of the
12   potassium chloride are you ordering 10 vials or 20
13   vials?
14         A.      For an execution, it's a total of 8
15   vials.
16         Q.      8 vials?  Is that right?
17         A.      8 vials per execution.
18         Q.      Okay.  And if we go back to Exhibit 37
19   that we just talked about a second ago.
20         A.      Stand by.
21         Q.      Sure.
22                 (Pause.)
23                 THE WITNESS:  What did you say it was?
24   BY MR. KURSMAN:
25         Q.      Pardon?
```

```
 1          A.      Exhibit?

 2          Q.      37.

 3                  (Pause.)

 4                  THE WITNESS:   Okay.

 5   BY MR. KURSMAN:

 6          Q.      Okay.  So for each execution, am I right

 7   that you're ordering 20 vials of potassium chloride for

 8   each execution?

 9          A.      Of the commercially manufactured, it

10   would be 20.

11          Q.      20?  Okay.

12                  So for each execution, you ordered 20 vials

13   of potassium chloride and 8 vials of midazolam; is that

14   right.

15          A.      If it's commercially manufactured, we

16   would need 20 vials of potassium chloride.  And

17   midazolam, a commercial manufacturer, I think it was --

18   I think it was the same number, but I can't remember

19   off the top of my head.  The numbers of vials are

20   different when it's compounded.

21          Q.      Okay.  And how different are they?

22                  MR. MITCHELL:  Object to form.

23                  THE WITNESS:  The compounded vials have a

24          higher potency, so we don't need as many.  So we

25          have to order 8 vials of midazolam and we order --
```

```
 1              to include that, we order the same quantity of
 2              potassium chloride.
 3      BY MR. KURSMAN:
 4          Q.      So for compounded you order 8 vials of
 5      midazolam, you said?
 6          A.      Yes.
 7          Q.      And 20 -- still 20 of potassium chloride?
 8          A.      No, 8.
 9          Q.      8 of both?
10          A.      Yes.
11                  (Exhibit No. 39 marked.)
12          Q.      Okay.  Now, let's go to Exhibit 40, I
13      believe.
14                  You know what?  I apologize.  Let's go to
15      Exhibit 39.
16                  And let me know when you're there.
17          A.      I'm there.
18          Q.      Okay.  And this is an invoice from
19      December 28th, 2017?
20          A.      Yes.
21          Q.      And this is from the pharmacy company?
22          A.      Yes.
23          Q.      And do you see here you have two charges
24      for sterile water for injection?
25          A.      Yes.
```

```
 1        Q.       Why in 37 and 38 were there no charges
 2   for sterile water injection?
 3              MR. MITCHELL:  Object to the form.
 4              THE WITNESS:  Could you repeat?
 5   BY MR. KURSMAN:
 6        Q.       Sure.  So in Exhibit 39, there are
 7   charges for sterile water for injection, but in
 8   Exhibits 38 and 37 there are no charges for sterile
 9   water for injection.  Why is that?
10              MR. MITCHELL:  Same objection.
11              THE WITNESS:  We didn't need any more
12         sterile water.
13   BY MR. KURSMAN:
14        Q.       Did you have sterile water on hand?
15        A.       Are you asking do we currently have it on
16   hand?
17        Q.       No, at the time of these invoices.
18        A.       Right.  We -- we received it from them,
19   and then we didn't need -- when the next invoice rolled
20   around, we still had -- still had sterile water
21   supplies.
22        Q.       Does sterile water for injection have a
23   beyond use date?
24              MR. MITCHELL:  Objection to the form.
25              THE WITNESS:  It does have.  It does have
```

```
 1          an expiration date on the package.
 2   BY MR. KURSMAN:
 3        Q.      Okay.  And do you put that on the vials,
 4   as well?
 5        A.      Yes.
 6                (Exhibit No. 40 marked.)
 7   BY MR. KURSMAN:
 8        Q.      Let's go to Exhibit 40.  And you see this
 9   is October 31st, 2019.
10        A.      Okay.
11        Q.      Do you see that?
12        A.      Yes.
13        Q.      And here you ordered a quantity of 24
14   midazolam, 50 milligrams per milliliter, at 5
15   milliliters for a compounded injection.
16                Do you see that?
17        A.      Yes.
18        Q.      And this is for compounding?
19        A.      Yes.
20        Q.      Okay.  So this is a compounded drug that
21   you're ordering here?
22        A.      Yes.
23        Q.      Okay.  How many executions is this for?
24        A.      This is -- this would be for one
25   execution.
```

```
1         Q.      Okay.  A quantity of 24 is for one
2   execution?
3         A.      Not all 24 are used for the execution.
4   Only 8 are used and sent to us for the execution.
5         Q.      Okay.  And are all 8 used in the
6   execution?
7                 MR. MITCHELL:  Object to the form.
8                 THE WITNESS:  No.
9   BY MR. KURSMAN:
10        Q.      What's that?
11        A.      No.
12        Q.      How many of the 8 are used in the
13  execution, if all goes well?
14                MR. MITCHELL:  Same objection.
15                THE WITNESS:  4.
16  BY MR. KURSMAN:
17        Q.      4?  Okay.
18                Now -- and is this the first time that you
19  purchased compounded midazolam?
20        A.      Sorry.  No.
21        Q.      Okay.  When was the first time you
22  purchased compounded midazolam?
23        A.      Before the Irick execution.
24        Q.      Okay.  And is -- it looks like compounded
25  midazolam is a bit cheaper than manufactured midazolam;
```

```
 1   is that right?
 2          A.     I'd have to go back and compare them.
 3          Q.     Okay.  Well, if you go back to Exhibit
 4   40, just let me know if my math is correct.
 5                 Or Exhibit 39, I apologize.
 6                 (Pause.)
 7                 THE WITNESS:  All right.  I'm just going
 8          to go off here and try to do this right.
 9                 So going back to Exhibit 39, which was
10          commercially manufactured.  It was 8 boxes of
11          midazolam.  Each box had 10 vials, 750 a box, at
12          $6,000.
13                 So let's see, let me go back to the other
14          one.
15                 No, I would say that compounding is more
16          expensive.
17                 (Exhibit No. 41 marked.)
18   BY MR. KURSMAN:
19          Q.     Okay.  I guess I was confused.  Let's go
20   to Exhibit 41.
21          A.     Okay.
22          Q.     And you see at the top it says
23   September 7, 2018?
24          A.     Yes.
25          Q.     Are these -- is this your handwriting?
```

```
 1        A.      No.
 2        Q.      Okay.  Is this the lot that we were
 3   discussing?
 4        A.      Yes.
 5        Q.      Okay.  Is this the handwriting?
 6        A.      Yes.
 7        Q.      Okay.  Do you see, if you go to midazolam
 8   at the very bottom, two up from the top, do you see it
 9   says "4 vials?"
10        A.      Midazolam.  Oh, okay.  I'm sorry.  I'm on
11   the page, yes.
12        Q.      You see it says "Expired 7/26/2018?"  Do
13   you see that?
14        A.      Yes, I see it.
15        Q.      And do you also see it says "40 days"
16   right above it?
17        A.      Yes.
18        Q.      Okay.  Why do you have midazolam expired
19   on 7/26/2018?
20                MR. MITCHELL:  Object to the form.
21                THE WITNESS:  It was -- it's written in
22        here.  It was written because it was on the label.
23   BY MR. KURSMAN:
24        Q.      So it was -- at the time of September 7,
25   2018, was this midazolam still in the possession of
```

```
 1   TDOC?

 2        A.      Sorry, you broke up there.  Could you

 3   please repeat?

 4        Q.      Yeah, sure.  At the time of September

 5   7th, 2018, the date of this log, was the midazolam, the

 6   4 vials purchased on 7/26/2018, was that in TDOC's

 7   possession?

 8        A.      Based on this, based on this page, the

 9   page indicates that it was in inventory at the -- at

10   Riverbend.

11        Q.      Why wasn't it removed if it was expired?

12                MR. MITCHELL:  Same objection.

13                THE WITNESS:  I don't know.

14   BY MR. KURSMAN:

15        Q.      Okay.  And what does "40 days" mean?

16        A.      That would probably -- that's a reference

17   to the USP BUD.

18        Q.      The USP what?

19        A.      BUD.

20        Q.      And what do you mean by that?

21        A.      It would seem to be a reference to -- at

22   the time this was in here to say that by the USP BUD

23   you actually have 40 days to go.

24        Q.      On September 7th, 2018?

25                MR. MITCHELL:  Object to the form.
```

```
 1   BY MR. KURSMAN:
 2        Q.     I'm just -- I'm trying to understand the
 3   log.  So the way you read the log on September 7, 2018,
 4   there's a notation made "midazolam, 4 vials in 2018, 40
 5   days."  It's your understanding that "40 days" means
 6   that midazolam is good for another 40 days?
 7        A.     I'm just saying that's a possibility.  I
 8   don't know what it means.
 9        Q.     Okay.  Now, if you go up one, two, three
10   four lines, do you see there's another entry for
11   midazolam?  Do you see that?
12        A.     Yes.
13        Q.     And it says "280 vials?"
14        A.     Yes.
15        Q.     And then it says "Expires 6/1 of 2018?"
16        A.     Yes.
17        Q.     Do you know why you still have got
18   midazolam on your hands on September 7th of 2018?
19        A.     No.
20        Q.     Do you know why you have 280 vials of
21   midazolam?
22        A.     Because it was what we ordered from the
23   pharmacy.
24        Q.     And were those orders in conjunction with
25   a physician's order?
```

```
 1          A.       They were in -- they were not in a
 2    specific order for a specific execution, because they
 3    were commercially manufactured.
 4          Q.       And if you go up to potassium chloride,
 5    you see it says "88 vials?"
 6          A.       Yes.
 7          Q.       And it says 50 vials expire June 1st,
 8    2018.  Do you see that?
 9          A.       Yes.
10          Q.       Why did you still have those in TDOC's
11    possession after they expired?
12          A.       I don't know.
13          Q.       Okay.  And isn't keeping these vials in
14    TDOC's possession contrary to the protocol?
15                   MR. MITCHELL:  Object to the form.
16                   THE WITNESS:  Sorry.  Having -- yes, the
17          protocol does call for them to be discarded
18          after -- once they expire.
19    BY MR. KURSMAN:
20          Q.       And do you know why they weren't
21    discarded?
22          A.       No.
23          Q.       And who decides whether it will be
24    discarded?  Is that the warden or is that you?
25          A.       I'm sorry, you broke up at the end.
```

```
 1          Q.      Sorry.   Who decides when the drugs will
 2    be discarded?  Is that the warden or is that you?
 3          A.      It's -- it's a combination of both.
 4          Q.      Now, let's go to -- back to potassium
 5    chloride where it says "88 vials."  And it says 38
 6    vials expires July of 2019.  Do you see that?
 7          A.      Yes.
 8          Q.      Is that compounded or manufactured
 9    potassium chloride?
10          A.      Manufactured.
11          Q.      Are all these drugs that we're looking at
12    right here manufactured?
13          A.      Sorry, one second.  Let me look through
14    it.
15          Q.      Sure.
16                  (Pause.)
17                  THE WITNESS:  I believe so, yes.
18                  (Exhibit No. 42 marked.)
19    BY MR. KURSMAN:
20          Q.      Okay.  Let's go to Exhibit 42 now.
21                  MR. MITCHELL:  Can we go off record real
22          quick?
23                  MR. KURSMAN:  Sure.
24                  THE VIDEOGRAPHER:  We're going off the
25          record at 6:30 p.m.
```

```
 1                      (Discussion off the record.)

 2                      (Recess at 6:30 p.m. to 6:34 p.m.)

 3                      THE VIDEOGRAPHER:  We're back on record

 4        at 6:34 p.m.

 5   BY MR. KURSMAN:

 6        Q.       We just took a brief break.  Did you

 7   consult with your attorneys during the break?

 8        A.       No, I did not.  And I'm still in the room

 9   by myself.

10        Q.       Okay.  Can we go to Exhibit 42 now?  Let

11   me know when you get there.

12        A.       Okay.

13        Q.       And do you see that this is a log dated

14   December 30th, 2018?

15        A.       Yes.

16        Q.       Is this your handwriting?

17        A.       No.

18        Q.       Is it the warden's?

19        A.       Yes.

20        Q.       Okay.  Now, is all of the drugs that are

21   in this lab, are these all compounded drugs or are they

22   manufactured drugs?

23        A.       One second.  Let me look through it.

24                      MR. MITCHELL:  I'm going to object.

25                      (Pause.)
```

```
 1                    THE WITNESS:  Sorry.  Just to clarify,
 2          which page?  Are you just asking about the first
 3          page?
 4    BY MR. KURSMAN:
 5          Q.       Yes, let's start with the first page.
 6          A.       All right.  So on the first page, these
 7    are all commercially manufactured.
 8          Q.       Okay.  And what about the second page?
 9          A.       One second.  I'm reviewing it.
10                   (Pause.)
11                   THE WITNESS:  The midazolam at the top of
12          the page is -- at the top of the page is
13          compounded.
14    BY MR. KURSMAN:
15          Q.       And why doesn't it -- oh, it does.  Okay.
16                   (Exhibit No. 43 marked.)
17    BY MR. KURSMAN:
18          Q.       Let's look at Exhibit 43.
19          A.       Okay.
20          Q.       Do you see it says February 11th, 2020?
21          A.       Correct.
22          Q.       And are all the drugs here compounded
23    drugs?
24          A.       So the drugs referenced under the
25    February 11, 2020, date are compounded drugs.  The
```

1  drugs referenced under August 4, 2020, are

2  manufactured.

3         Q.      Okay.  Now can you see in the -- in the

4  first section there it says:  "Potassium Chloride, 15

5  solution"; the second one has potassium chloride.

6                And then it says:  "Freezer temp,

7  negative 5, two refrigerator, 47 degrees?"

8         A.      Yes, I see that.

9         Q.      What's that?

10        A.      Yes, I see that.

11        Q.      Okay.  Who determined that refrigerator

12  to be at 47 degrees?

13        A.      The -- when it was moved out of the

14  freezer to the refrigerator, they read the thermometer

15  in the refrigerator.

16        Q.      And the thermometer in the refrigerator

17  read 47 degrees?

18        A.      The thermometer in the refrigerator read

19  47 degrees.

20        Q.      Are you aware that USP 659 sets the

21  temperature for which compounded drugs should be stored

22  in the refrigerator?

23                MR. MITCHELL:  Object to the form.

24                THE WITNESS:  I'm sorry, did you say the

25    actual temperature, or did you ask if I'm aware

```
1          that they set a temperature?
2    BY MR. KURSMAN:
3          Q.     Are you aware of a temperature?
4          A.     I'm not aware.
5          Q.     And are you aware that the temperature
6    that is set in USP 659 is between 36 degrees and 46
7    degrees?
8                 MR. MITCHELL:  Same objection.
9                 THE WITNESS:  I'm not aware of that.
10   BY MR. KURSMAN:
11         Q.     And when it says "freezer temp," is that
12   negative 5 degrees or is that 5 degrees?
13         A.     I didn't write this, but to me it would
14   appear that that's a dash, not a negative.
15         Q.     And how about above, where it says
16   "Potassium Chloride, freezer temp, 7?"  Is that a
17   negative 7 degrees or a 7 degrees?
18                MR. MITCHELL:  Same objection.
19                THE WITNESS:  That appears to be a dash,
20        as well.
21   BY MR. KURSMAN:
22         Q.     Okay.  Did you and the warden discuss the
23   actual freezer temp of the potassium chloride as a
24   negative 5 or a negative 7 or a 5 and 7?
25         A.     Actually, I can speak to the 7-degree one
```

1  because that is my handwriting. So that is a dash,

2  it's not a negative.

3       Q.      Okay. And then do you see the potassium

4  chloride at -- at the bottom, it says "Expires

5  2/23/2020." Do you see that?

6       A.      Yes.

7       Q.      Okay. And this is written on February

8  11th?

9               Is that right?

10      A.      That's right. Yes, expiration,

11  2/23/2020.

12      Q.      Okay. And it stays in the refrigerator

13  at 47 degrees, right?

14      A.      Not on that date.

15      Q.      Okay. On what date was it moved to the

16  refrigerator at 47 degrees?

17      A.      I didn't move it. It was done by a

18  member of the execution team prior to the February

19  execution.

20      Q.      Okay. And do you know what date it was

21  moved to the refrigerator?

22      A.      I don't remember the specific date of

23  that execution, off the top of my head, so it would

24  have been the day before the day of the execution.

25      Q.      Okay. Do you think they should have put

```
 1   the date that the potassium chloride was moved from the
 2   freezer to the refrigerator?
 3                   MR. MITCHELL:  Object to the form.
 4                   THE WITNESS:  That would help clarify,
 5        yes.
 6   BY MR. KURSMAN:
 7        Q.      Okay.  And if the execution was called
 8   off but the potassium chloride was still in the
 9   refrigerator, per the execution protocol could it still
10   be used?
11                   Drug Procurer, you're muted.
12        A.      Sorry.  If it's -- if it's, to use your
13   term, called off, if it's reset to a date beyond the
14   new date or the compound being sent to the
15   refrigerator, then it would not be used.
16        Q.      So here we have the date it was moved to
17   the refrigerator.  So if an execution was stayed, let's
18   say for two days, could it still be used?
19                   MR. MITCHELL:  Object to the form.
20                   THE WITNESS:  If it's two days, so it
21        does not go down to BUD three days, technically,
22        yes, it could be used.  That would be a scenario.
23        That's why we order a backup set.  We would just
24        use the backup set.
25   BY MR. KURSMAN:
```

```
 1         Q.       But -- but you, as the Drug Procurer
 2   who's responsible for the storage of the lethal
 3   injection chemicals, don't actually know what day the
 4   potassium chloride was moved to the refrigerator,
 5   right?
 6         A.       As I stated, it was the day before the
 7   execution.  I just don't remember the date, off the top
 8   of my head.
 9         Q.       Well, how do you know that, if it wasn't
10   in the log?
11         A.       Because I know when the members of the
12   execution team went to do it.
13         Q.       And let me ask you this about the
14   refrigerator temperature.  Did you talk to the
15   pharmacist or the pharmacy owner about what temperature
16   you should keep the refrigerator at?
17         A.       I don't remember if I did or not.  I
18   don't recall a specific conversation today.
19         Q.       And did you talk to the pharmacy or
20   pharmacy owner about what temperature you should keep
21   the freezer at?
22         A.       We did talk about that, and it was -- I
23   was told to keep it a little freezing, I recall, in the
24   edit.
25         Q.       And while the drugs are in either the
```

1  refrigerator or the freezer, you cannot tell what the
2  temperature is unless you open the refrigerator or the
3  freezer, correct?
4      A.      That's correct.
5      Q.      Okay.  And the refrigerator and freezer
6  are sealed until they're either moved from the freezer
7  to the refrigerator, they're moved from the
8  refrigerator to the execution chamber, or during your
9  periodic reviews.  Right?
10     A.      That's correct.
11     Q.      So at all other times, no one in TDOC can
12 determine the temperature of the refrigerator or the
13 freezer, right?
14             MR. MITCHELL:  Object to the form.
15             THE WITNESS:  The warden would be able to
16         go in at any time, unlock it, and check the
17         temperature of the freezer.  Outside the warden,
18         no.
19 BY MR. KURSMAN:
20     Q.      But for him to do that, he would have to
21 break the seal.  Right?
22     A.      That's correct.
23     Q.      And if he broke the seal, that would be
24 recorded in your logs.  Right?
25     A.      That's correct.

1       Q.      Okay.  And do you see that the 2/11/2020

2  ledger indicates that the midazolam is in 10-milliliter

3  vials?

4              MR. MITCHELL:  Object to the form.

5              THE WITNESS:  Yes.

6  BY MR. KURSMAN:

7       Q.      Okay.  Now, if you go back to Exhibit 2.

8  Let me know when you get there.

9       A.      I'm sorry, did you say "2?"

10      Q.      Yes, Exhibit 2.

11      A.      Stand by.

12            (Pause.)

13              THE WITNESS:  Okay.

14  BY MR. KURSMAN:

15      Q.      Do you see under there you will need, 1,

16  4, 5 milliliters midazolam, 50-milligrams per

17  milliliter vials?

18      A.      Yes.

19      Q.      So why aren't you following the storage

20  and preparation instructions for the storage of the

21  midazolam on February 11th of 2020?

22              MR. MITCHELL:  Object to the form.

23              THE WITNESS:  It would -- without looking

24     at it, it would appear that the indication of 10

25     milliliters in the log was not accurate.  It

```
 1          should have been 5 milliliters.  But once again,
 2          without looking at it, I can't confirm it.
 3   BY MR. KURSMAN:
 4          Q.      When you say "without looking at it,"
 5   what are you talking about looking at?
 6          A.      The vials.
 7          Q.      Okay.  And this is your handwriting right
 8   here under "February?"
 9          A.      Which exhibit is that?  I have to pull it
10   back up.
11          Q.      Exhibit 43.
12          A.      Stand by.
13                  (Pause.)
14                  THE WITNESS:  Yes.
15   BY MR. KURSMAN:
16          Q.      So do you think someone made a mistake
17   and it should have said 5-milliliter vials?
18          A.      Yes.
19          Q.      Did the warden double -- does the warden
20   double-check when you make entries into the journal,
21   into the log?
22          A.      Yes, usually.
23          Q.      And the warden didn't double-check in
24   this instance?
25          A.      I don't specifically remember if he did
```

1   or he didn't.

2        Q.      Okay. And who is tasked with adjusting

3   the preparation to ensure that the proper concentration

4   in the vials are achieved?

5        A.      Who would -- I want to make sure I'm

6   understanding you correct -- I'm sorry, the question.

7              You're asking who would -- if the

8   concentration was different, who would instruct on how

9   to prepare it?

10       Q.      Yes.

11       A.      The pharmacist.

12       Q.      Okay. And then who prepares the syringes

13   once an execution date is set on the date of the

14   execution?

15       A.      Members of the execution team prepare the

16   syringes.

17       Q.      Okay. And who are the members, without

18   identifying them, by their roles?

19       A.      The executioner prepares the syringes.

20       Q.      And do you, as the Drug Procurer, take

21   steps to ensure that the drugs are acquired in the

22   concentration and volume contemplated by the

23   pharmacist's instructions?

24       A.      Yes.

25       Q.      Okay. And how do you do that?

```
 1        A.      We order them in the concentration
 2   suggested by the pharmacist.  They compound it to that
 3   specification.  Then it is sent to us.  And then during
 4   inventory usually we indicate the correct concentration
 5   of the vials when we log it in.
 6                    (Exhibit No. 44 marked.)
 7   BY MR. KURSMAN:
 8        Q.      Let me take you to Exhibit 44.  Let me
 9   know when you get there.
10        A.      I'm there.
11        Q.      Okay.  And do you see the "Chemical
12   Preparation Time Sheet?"
13        A.      Yes.
14        Q.      And the date is 5/16/19?
15        A.      Yes.
16        Q.      And do you see the potassium chloride was
17   prepared at 7:29?
18        A.      Yes.
19        Q.      Do you see the vecuronium bromide was
20   prepared at 7:24?
21        A.      Yes.
22        Q.      And do you see that the midazolam was
23   prepared at 9:20?
24        A.      Yes.
25        Q.      Do you know why the midazolam is prepared
```

1　two hours before the other two drugs?

2　　　　A.　　No, I don't, because I'm not involved in

3　the preparation of this.

4　　　　Q.　　And who on the execution team, without

5　identifying any names, prepares the midazolam?

6　　　　A.　　The executioner.　The -- I don't know

7　what acronym, without identifying the individual for

8　the second person to witness.

9　　　　Q.　　Do you know how the drugs are mixed on

10　the day of execution?

11　　　　A.　　I'm sorry, did you say do I know how they

12　are mixed?

13　　　　Q.　　Yes.

14　　　　A.　　Okay.　The midazolam is pulled from the

15　vial into the syringe; then, per the directions, saline

16　is pulled into the syringe to dilute it to the right

17　concentration.

18　　　　　　　The vecuronium bromide, as described

19　earlier, the bacteriostatic water is injected into each

20　of the vials used and lightly shaken until it dissolves

21　completely and is clear.

22　　　　　　　Then the liquid injection is pulled into

23　the syringe and potassium chloride is pulled directly

24　from the vials at the quantity directed in the

25　directions.

```
 1        Q.      And what do the drugs look like when you
 2   receive them?
 3        A.      I'm sorry, could you repeat?
 4        Q.      Sure.  What do the drugs look like when
 5   you receive them?
 6        A.      They are in brownish-colored vials,
 7   light-colored vials, small.  The 5-milliliter ones are
 8   small.  The potassium chloride vials are bigger.  And
 9   they have a label on it.
10        Q.      And how are they transported from the
11   pharmacy to TDOC?
12        A.      They are shipped, stored in dry ice and
13   shipped.
14        Q.      And is there a temperature gauge in those
15   shipments?
16        A.      As stated earlier, no, there's not a
17   temperature gauge in them.
18        Q.      Okay.  So you don't know how cold
19   those -- those drugs are during shipment?
20        A.      I do not know the specific temperature,
21   no.
22        Q.      Is there a reason for a temperature gauge
23   while they're being shipped?
24                MR. MITCHELL:  Objection, form.
25                THE WITNESS:  I don't know.  That would
```

```
 1              be a question for the pharmacists.  They're the
 2              ones that are tasked with shipping it in
 3              accordance with guidelines.
 4       BY MR. KURSMAN:
 5              Q.      And how long does it take to ship from
 6       the pharmacy to the prison?
 7                      MR. MITCHELL:  I'm going to object on the
 8              basis of the protective order.  That's a question,
 9              the answer of which could be identifying
10              information that could lead or be calculated to
11              lead to the location or identity of the pharmacy
12              or pharmacist.
13                      So don't answer, Drug Procurer.
14       BY MR. KURSMAN:
15              Q.      Let me see if I could -- does it take
16       over 24 hours?
17                      MR. MITCHELL:  Same objection.  Don't
18              answer.
19       BY MR. KURSMAN:
20              Q.      What is the protocol for determining
21       whether or not any of the lethal injection chemicals
22       have fallen out of solution?
23                      MR. MITCHELL:  Object to the form.
24                      THE WITNESS:  Sorry.  When they're --
25              when they're pulled into the syringes, they're
```

```
 1              checked to make sure they're clear and they don't
 2              have any particulates or bodies.
 3      BY MR. KURSMAN:
 4              Q.      And when you get the drugs from the
 5      pharmacy, is it done via overnight shipping?
 6                      MR. MITCHELL:  Again, I'm going to object
 7              to that specific question and direct the Drug
 8              Procurer not to answer -- again, pursuant to the
 9              protective order.
10      BY MR. KURSMAN:
11              Q.      Are the compounded drugs tested for
12      stability?
13              A.      Did you say sterility?
14              Q.      Yes, sterility.
15              A.      Yes.
16              Q.      Okay.  Is the pH level tested for each of
17      the drugs?
18                      MR. MITCHELL:  Objection.
19                      THE WITNESS:  I'm sorry, I didn't
20              understand you.  You broke up.
21      BY MR. KURSMAN:
22              Q.      I'm sorry.  Is the pH level tested for
23      each of the drugs?
24                      MR. MITCHELL:  Same objection.
25                      THE WITNESS:  That is I believe part of
```

1    the testing, as well.  It was part of the testing

2    when -- as discussed earlier, when they did the

3    feasibility of the methodology testing.

4  BY MR. KURSMAN:

5        Q.    But do you know what it is for the

6  individual execution?

7        A.    I think so, but that's a question for the

8  pharmacist.

9        Q.    What sort of due diligence do you conduct

10 on the pharmacist?

11             MR. MITCHELL:  Object to the form.

12             THE WITNESS:  I don't understand what you

13       mean by "due diligence."

14 BY MR. KURSMAN:

15       Q.    Did you check to see if the pharmacy had

16 a current license?

17       A.    They provided me with a license.  I

18 haven't checked.  Since they provided me that license I

19 haven't check it, no.

20       Q.    Did you ever check to see if that license

21 was valid?

22       A.    I haven't checked recently.

23       Q.    Have you ever checked to see if that

24 license was valid?

25       A.    I checked when they provided it to me.

```
 1          Q.      Okay.  Have you ever checked to see if
 2    the pharmacy was the subject of any lawsuits?
 3          A.      No.
 4          Q.      Okay.  Did you ever check to see if the
 5    pharmacy was the subject of any criminal actions?
 6          A.      No.
 7          Q.      Did you ever check to see if the pharmacy
 8    was ever sanctioned for any violations?
 9          A.      I did.  I did see information related to
10    that at one time.
11          Q.      That they were sanctioned for violations?
12                  MR. MITCHELL:  And I'm -- I'm going to
13          object to this and instruct the witness not to
14          answer this with respect to the protective order.
15                  MR. KURSMAN:  You're -- so, Mr. Mitchell,
16          you're objecting to the Drug Procurer's answer
17          that they found out the pharmacy committed at
18          least one violation?
19                  MR. MITCHELL:  I don't think that was the
20          answer.  The answer was that the drug -- I think
21          the answer was that the pharmacy -- that the Drug
22          Procurer checked to see if the pharmacy had been
23          sanctioned.
24                  The answer was yes, the Drug Procurer had
25          checked.  And then I objected to anything further.
```

```
 1                    MR. KURSMAN:   Court reporter, could you
 2         read back the question and answer.
 3                    (Record read.)
 4    BY MR. KURSMAN:
 5         Q.      When you saw information related to that
 6    at one time, did you follow up with the pharmacy?
 7         A.      Yes.
 8         Q.      And what did the pharmacy tell you?
 9                    MR. MITCHELL:   Objection.   Again,
10         pursuant to the protective order, I'm going to
11         instruct the witness not to answer.
12    BY MR. KURSMAN:
13         Q.      How did you and the pharmacy resolve
14    whatever you found?
15                    MR. MITCHELL:   Again, that could also
16         lead to information identifying the pharmacy.   I'm
17         going to again instruct the Drug Procurer not to
18         answer.
19    BY MR. KURSMAN:
20         Q.      Did you do any research after finding
21    whatever you found related to the pharmacy?
22         A.      No.
23         Q.      Why not?
24         A.      Because the information did not indicate
25    an issue with the pharmacy owner or the pharmacist.
```

```
1                    MR. KURSMAN:  We'll request that,
2          whatever information you found, in discovery as
3          well.
4                    (Exhibit No. 45 marked.)
5     BY MR. KURSMAN:
6          Q.    If you could turn to Exhibit 45.
7          A.    Okay.
8          Q.    And do you see this is an email dated
9     August 13th, 2020?
10         A.    Yes.
11         Q.    Did you write this email?
12         A.    One second.  Let me read it.
13         Q.    Sure.
14               (Pause.)
15               THE WITNESS:  No.
16    BY MR. KURSMAN:
17         Q.    Did the pharmacy owner write it?
18         A.    No.
19         Q.    Did the pharmacist write it?
20         A.    Yes.
21         Q.    Okay.  Was -- was this email written to
22    you?
23         A.    Was the email what?  I'm sorry.
24         Q.    Was the email written to you?
25         A.    Yes.
```

```
 1          Q.      Okay.  Why was the pharmacist looking up
 2   information related to sterile compounding?
 3                  MR. MITCHELL:  Object to form.
 4                  THE WITNESS:  It was -- it was
 5          information obtained at the request of counsel.
 6   BY MR. KURSMAN:
 7          Q.      Okay.  And why did the pharmacist look up
 8   that information at this point?
 9                  MR. MITCHELL:  Same objection.
10                  THE WITNESS:  Because it was information
11          they requested related to a lawsuit.
12   BY MR. KURSMAN:
13          Q.      Was it related to this lawsuit?
14          A.      I honestly don't remember if this related
15   to this one or another one.
16          Q.      And did counsel contact the pharmacist to
17   get -- to get requirements for sterile compounding?
18                  MR. MITCHELL:  I'm sorry, could you
19          repeat the question?  Drug Procurer, could you
20          mute real quick?  Thank you.
21   BY MR. KURSMAN:
22          Q.      Sure.  Did counsel ask the pharmacist to
23   look up the training requirements for sterile
24   compounding?
25          A.      There was a question regarding what
```

1  training is received for sterile compounding, both in
2  background and ongoing.
3      Q.      And why was that question posed to the
4  pharmacist on August 13th, 2020?
5      A.      I don't remember exactly, because it was
6  directly related to responding to interrogatories.
7      Q.      And -- and did the pharmacist have the
8  training requirements required for sterile compounding
9  at that time?
10         MR. MITCHELL:  Object to the form.
11         THE WITNESS:  Per indication, yes.
12  BY MR. KURSMAN:
13      Q.      And when the pharmacist here talks about
14  drugs expiring, are they talking about the API?
15         MR. MITCHELL:  Same objection.
16         THE WITNESS:  Yes.
17         (Exhibit No. 46 marked.)
18  BY MR. KURSMAN:
19      Q.      Okay.  Let's go to Exhibit 46.
20      A.      Okay.
21      Q.      Is this the Pharmacy Services Agreement
22  you have with the current pharmacy from which you
23  procure compounding drugs?
24      A.      Yes, sir.
25      Q.      What's that?  I'm sorry.

```
 1          A.      Yes.
 2          Q.      Okay.   And you're not working with any
 3   other pharmacies, correct?
 4          A.      Correct.
 5          Q.      Okay.   Let's go to -- and this is dated,
 6   just let me see.   This is dated 12/4/17.   Do you see
 7   that on Page 5?
 8          A.      Let me scroll down to it.   Yes.
 9                  (Exhibit No. 47 marked.)
10   BY MR. KURSMAN:
11          Q.      Okay.   Let's go to Exhibit 47.
12          A.      Okay.
13          Q.      Do you see this email chain on October
14   18th, 2017?
15          A.      Yes.
16          Q.      Is this between you and the pharmacy that
17   we've been discussing?
18          A.      It's between myself and the pharmacy
19   owner.
20          Q.      Okay.   And were you ordering drugs from
21   that pharmacy?
22          A.      Yes.
23          Q.      Why were there orders before the Pharmacy
24   Services Agreement?
25          A.      Because they agreed to obtain the
```

1  chemicals for us prior to the agreement.

2      Q.     So why at some point did you sign a

3  Pharmacy Services Agreement with the pharmacy?

4      A.     Sorry, I was on mute.

5             The Pharmacy Services Agreement was a part

6  of or an attachment to the protocol previously that we

7  wanted to have permanently attached to this protocol.

8      Q.     Okay.  Let me -- let me ask you this.

9  Are you aware that some states perform executions by

10 firing squad?

11     A.     I'm not sure that any currently do as the

12 primary method.  It may be a backup method.

13     Q.     Have you ever attempted to obtain any --

14 any instruments that could be used for execution in a

15 firing squad?

16             MR. MITCHELL:  Object to the form.

17             THE WITNESS:  No.

18 BY MR. KURSMAN:

19     Q.     Do you think you could obtain such

20 instruments if a firing squad was the method of

21 execution?

22             MR. MITCHELL:  Same objection.

23             THE WITNESS:  Yes.

24 BY MR. KURSMAN:

25     Q.     Okay.  And do you carry a firearm?

```
1          A.      Sorry, could you repeat?

2          Q.      Do you carry a firearm?

3          A.      No.

4          Q.      Do you have any firearms training?

5                  MR. MITCHELL:  Objection, pursuant to the

6          protective order.  Don't answer.

7   BY MR. KURSMAN:

8          Q.      Do you know of anyone at TDOC that is

9   qualified to use a firearm?

10         A.      Yes.

11         Q.      And does TDOC provide firearms training?

12         A.      You trailed off, but I think are you

13  asking does TDOC provide firearms training?

14         Q.      Yes.

15         A.      Yes.

16         Q.      And does TDOC have a firearms shooting

17  range?

18         A.      Yes.

19         Q.      And does TDOC own firearms?

20                 MR. MITCHELL:  Object to the form.

21                 THE WITNESS:  Yes.

22  BY MR. KURSMAN:

23         Q.      And does TDOC own ammunition?

24         A.      Yes.

25         Q.      And do you know if TDOC has facilities
```

```
 1   where a firing squad execution could take place?
 2                MR. MITCHELL:  Object to the form.
 3                THE WITNESS:  I'm not sure where that
 4        would take place.  So to answer your question, at
 5        this time I don't know.
 6   BY MR. KURSMAN:
 7        Q.     Okay.  Do you know whether TDOC could
 8   execute someone by firing squad if it was the protocol?
 9                MR. MITCHELL:  Object to the form.
10                THE WITNESS:  Yes.  If it was the
11        protocol, yes, TDOC could do it.
12   BY MR. KURSMAN:
13        Q.     Okay.  And do you think TDOC could
14   execute by a single bullet to the back of the head if
15   that was the protocol?
16                MR. MITCHELL:  Same objection.
17                THE WITNESS:  Logistically speaking, yes.
18        Identifying someone to do it could be problematic.
19   BY MR. KURSMAN:
20        Q.     Okay.  And have you attempted to identify
21   somebody to do that?
22                MR. MITCHELL:  Objection.
23                THE WITNESS:  No.
24   BY MR. KURSMAN:
25        Q.     Have you ever asked the pharmacy that
```

```
 1   you've been communicating with whether they could
 2   provide you with a wedge-shaped cushion for an
 3   execution?
 4        A.      No, I haven't.
 5        Q.      Are you aware that using a wedge-shaped
 6   cushion could reduce the risk of pain during an
 7   execution?
 8              MR. MITCHELL:  Object to the form.
 9              THE WITNESS:  I'm not aware of that.
10   BY MR. KURSMAN:
11        Q.      Do you think you could obtain a
12   wedge-shaped cushion?
13              MR. MITCHELL:  Object to the form.
14              THE WITNESS:  If needed, yes.
15   BY MR. KURSMAN:
16        Q.      Do you think you could obtain equipment
17   to administer drugs orally?
18              MR. MITCHELL:  Object to the form.
19              THE WITNESS:  I'm not sure what equipment
20        you're referring to.  Could you be more specific?
21   BY MR. KURSMAN:
22        Q.      Just any -- any equipment that would be
23   required to administer drugs orally, if needed.
24              MR. MITCHELL:  Same objection.
25              THE WITNESS:  Do you mean like a cup for
```

```
 1          a liquid?  Sure.  Beyond that, I don't really know
 2          what equipment you're referring to.
 3   BY MR. KURSMAN:
 4          Q.      And have you ever attempted to obtain
 5   drugs for an execution by an oral dose of a
 6   barbiturate?
 7                  MR. MITCHELL:  Same objection.
 8                  THE WITNESS:  No.
 9   BY MR. KURSMAN:
10          Q.      Okay.  And were you present for the
11   execution of Billy Ray Irick?
12          A.      No, I wasn't present in the room for the
13   execution.
14          Q.      Did you talk to anybody about that
15   execution after it occurred?
16          A.      Yes.
17          Q.      Who did you talk to, without disclosing
18   the identity of the people involved?
19          A.      I spoke to the warden and commissioner.
20          Q.      And what did the warden and commissioner
21   say to you about the execution of Billy Ray Irick?
22                  MR. MITCHELL:  Object to the hearsay.
23                  THE WITNESS:  I can't remember specific
24          things said.  Mainly that it went smoothly, with
25          no issues.
```

1    BY MR. KURSMAN:

2         Q.      Do you know how long the execution of

3    Billy Ray Irick took?

4         A.      No, I don't, not off the top of my head.

5         Q.      Okay.  Do you know if a second dose of

6    midazolam was prepared for the execution of Billy Ray

7    Irick?

8         A.      By "a second dose," are you referring to

9    the preparation of two sets of needles or are you

10   referring to the backup set?

11        Q.      The backup set.

12        A.      It was not prepared.

13        Q.      Do you know why it wasn't?

14        A.      As I remember, it's because we -- we used

15   the first set.

16        Q.      Isn't that a deviation from the protocol?

17               MR. MITCHELL:  Object to the form.

18               THE WITNESS:  No.  The protocol requires

19          preparing two sets of syringes, and that's what

20          they did.

21   BY MR. KURSMAN:

22        Q.      And were you involved with the practice

23   sessions for the execution of Billy Ray Irick?

24        A.      I'm sorry, what kind of discussion?

25        Q.      I'm sorry.  Were you involved in any of

```
 1    the practice sessions for the execution of Billy Ray
 2    Irick?
 3         A.      I attended some of the practice sessions.
 4         Q.      And why would you attend a practice
 5    session?
 6         A.      Just to --
 7              MR. MITCHELL:  Object to the form and
 8         instruct the Drug Procurer not to answer pursuant
 9         to the protective order.
10              MR. KURSMAN:  For the record,
11         Mr. Mitchell, I obviously don't know who the Drug
12         Procurer is.  So if the Drug Procurer is part of
13         the execution team that would in no way expose
14         that person's identity, because all I know of the
15         Drug Procurer is that he or she is a Drug
16         Procurer.
17              MR. MITCHELL:  The fact that the Drug
18         Procurer attended can come in.  Why the Drug
19         Procurer attended cannot.
20              MR. KURSMAN:  Okay.  And why are you
21         objecting to that?  I'm just curious.
22              MR. MITCHELL:  Because I presume the
23         protective order could lead to the identification
24         of the Drug Procurer.
25    BY MR. KURSMAN:
```

```
 1        Q.      Okay.  How many practice sessions did you
 2   attend?
 3        A.      I don't know exactly.
 4        Q.      Did you observe what the injection rate
 5   was during the practice sessions?
 6        A.      No.
 7                MR. KURSMAN:  Okay.  Could we take a
 8        two-minute break?
 9                THE VIDEOGRAPHER:  We're off the record
10        at 7:14 p.m.
11                (Recess at 7:14 p.m. to 7:16 p.m.)
12                THE VIDEOGRAPHER:  We are on the record
13        at 7:16 p.m.
14                MR. KURSMAN:  Okay.  And I am going to
15        ask at this point to keep the deposition open to
16        resolve any of these outstanding objections for
17        privilege or deliberative process, based on the
18        statute.
19                There was one thing, Mr. Mitchell, that
20        you said we'd come back to, and that was Exhibit
21        33.
22                MR. MITCHELL:  Yes.  If you'll permit me
23        to speak with -- stipulate that I can speak with
24        the Drug Procurer and that anything we discuss,
25        you know, remains privileged.  But try to find a
```

```
 1          way to describe, I think that's the one about how
 2          the exam was set up.  See if we can confer with
 3          the Drug Procurer and see if we can -- there's a
 4          way to provide you that description.
 5                    MR. KURSMAN:  And it was actually Exhibit
 6          32.
 7                    MR. MITCHELL:  32.  Okay.
 8                    MR. KURSMAN:  Okay.  Thanks.  So could we
 9          go off the record for a few minutes.
10                    THE VIDEOGRAPHER:  We are off the record
11          at 7:17 p.m.
12                    (Recess at 7:17 p.m. to 7:25 p.m.)
13                    THE VIDEOGRAPHER:  We are on the record
14          at 7:25 p.m.
15                    MR. MITCHELL:  Alex, pursuant to the
16          stipulation I conferred with the Drug Procurer.
17          And there's no way to provide or clarify what that
18          language means in Exhibit 32 without leading to
19          some identifying information of the pharmacy.
20                    And so we're going to stand by our
21          objection on that.
22                    MR. KURSMAN:  Okay.  So what we will do
23          at this point is just keep the deposition open.
24                    Go ahead, Mr. Mitchell.
25                    MR. MITCHELL:  We can do that if you are
```

```
 1          doing it to challenge some of the objections we
 2          made, provided you likewise stipulate that we can
 3          communicate with the deponent about -- about, you
 4          know, matters related to the State, this case,
 5          production of some of the attachments, you know,
 6          and other matters with this.
 7                    I mean, as long as you're doing it to
 8          challenge, that's okay, but otherwise --
 9                    MR. KURSMAN:  We're doing it to
10          challenge.
11                    MR. MITCHELL:  Okay.
12                    MR. KURSMAN:  That is all we're doing it
13          for at this point.
14                    MR. MITCHELL:  You're okay with us
15          communicating with your client, then, about the
16          case?
17                    MR. KURSMAN:  Well, I think you can, yes.
18          Yes, that's fair.
19                    MR. MITCHELL:  You agree to that?  Okay.
20          Then we have no problem with you leaving -- no
21          objection to leaving the deposition open.
22                    MR. KURSMAN:  Okay.  I think we can go
23          off the record.
24                    THE VIDEOGRAPHER:  We're off the record
25          at 7:26 p.m.
```

```
1                    (Proceedings adjourned sine die at
2          7:26 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3      STATE OF TENNESSEE

 4      COUNTY OF KNOX

 5              I, Rhonda S. Sansom, RPR, CRR, CRC, LCR #685,

 6      licensed court reporter in and for the State of

 7      Tennessee, do hereby certify that Volume 1 of the above

 8      videotaped videoconference deposition of DRUG PROCURER

 9      was reported by me and that the foregoing 324 pages of

10      the transcript is a true and accurate record to the

11      best of my knowledge, skills, and ability.

12              I further certify that I am not related

13      to nor an employee of counsel or any of the parties to

14      the action, nor am I in any way financially interested

15      in the outcome of this action.

16              I further certify that I am duly licensed

17      by the Tennessee Board of Court Reporting as a Licensed

18      Court Reporter as evidenced by the LCR number and

19      expiration date following my name below.

20

21              Rhonda S. Sansom

22              _____

23   RhondaSansom@gibsonreporters.   Rhonda S. Sansom, RPR, CRR, CRC
         2021.07.27 13:31:24         Tennessee LCR# 0685
24   Signer:                         Expiration Date:  6/30/22
     CN=RhondaSansom@gibsonreporters.com

25
```

Gibson Court Reporting